1          IN THE UNITED STATES DISTRICT COURT

2

3   MOHAMAD E. TAHA, (Deceased),     )

4   and SANAA M. YASSIN, his wife,   )

5        Plaintiffs,                 ) Case No. 17-1174C

6             vs.                    )

7   UNITED STATES OF AMERICA,        )

8        Defendant.                  )

9

10

11                  Courtroom 1201

12          Timberlake Federal Annex Building

13               501 East Polk Street

14                  Tampa, Florida

15             Monday, December 9, 2019

16                    9:29 a.m.

17                 Trial - Volume 1

18

19

20        BEFORE THE HONORABLE CHARLES F. LETTOW

21

22

23

24

25   Reported by: Lori L. Bundy, RMR, CRR, FPR

Trial
Mohamad E. Taha, et al. v. USA                               12/9/2019

```
 1   APPEARANCES:

 2

 3   ON BEHALF OF THE PLAINTIFFS:

 4           ALI M. TAHA, Pro Se

 5           247 Dove Trail

 6           Bradenton, FL  34212

 7           (941) 896-3571

 8

 9   ON BEHALF OF THE DEFENDANT:

10           ELIZABETH A. KANYER, ESQ.

11           DAVID PINCUS, ESQ.

12           U.S. Department of Justice, Tax Division

13           Ben Franklin Station

14           Post Office Box 26

15           Washington, D.C. 20044

16           (202) 514-9440

17           elizabeth.a.kanyer@usdoj.gov

18

19

20

21

22

23

24

25
```

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

```
 1                            INDEX
 2     WITNESS:                                      PAGE:
 3   ALI TAHA
 4     OPENING STATEMENT AND                          15
 5     DIRECT EXAMINATION
 6     CROSS-EXAMINATION                             101
 7     BY MS. KANYER:
 8   DIEDRICH WOLFF
 9     DIRECT EXAMINATION                            175
10     BY MS. KANYER:
11     CROSS-EXAMINATION                             209
12     BY MR. TAHA:
13
14                          *****
15
16                   ADMITTED EXHIBITS
17                                                  PAGE:
18     Plaintiffs' Exhibit Number A1                 46
19     Plaintiffs' Exhibit Number A2                 51
20     Plaintiffs' Exhibit Number A3                 54
21     Plaintiffs' Exhibit Number B1                 58
22     Plaintiffs' Exhibit Number B2                 60
23     Plaintiffs' Exhibit Number B3                 62
24     Plaintiffs' Exhibit Number C1                 64
25     Plaintiffs' Exhibit Number C2                 64
```

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

```
 1                      INDEX (Continued)

 2

 3                      ADMITTED EXHIBITS

 4                                                    PAGE:
```

```
 5      Plaintiffs' Exhibit Number C3                 68

 6      Plaintiffs' Exhibit Numbers D1 through D4     73

 7      Plaintiffs' Exhibit Numbers E1 and E2         75

 8      Plaintiffs' Exhibit Number F                  77

 9      Plaintiffs' Exhibit Numbers G1, G2, and G3    83

10      Plaintiffs' Exhibit Number H1                 89

11      Plaintiffs' Exhibit Number H2                 89

12      Plaintiffs' Exhibit Number I1                 99

13      Plaintiffs' Exhibit Number I2                 99

14      Defendant's Exhibit Number 26                163

15      Defendant's Exhibit Number 1                 174

16      Defendant's Exhibit Number 2                 174

17      Defendant's Exhibit Number 3                 175

18      Defendant's Exhibit Number 7                 186

19      Defendant's Exhibit Number 8                 190

20      Defendant's Exhibit Number 4                 194

21      Defendant's Exhibit Number 6                 197

22      Defendant's Exhibit Number 9                 201

23      Defendant's Exhibit Number 10                203

24      Defendant's Exhibit Number 11                205

25      Defendant's Exhibit Number 12                207
```

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

```
 1                    P R O C E E D I N G S
 2                    -    -    -    -    -
 3          (Proceedings called to order at 9:29 a.m.)
 4          THE COURT:  Good morning.
 5          MR. TAHA:  Good morning.
 6          MS. KANYER:  Good morning, Your Honor.
 7          THE COURT:  We're in an unusual setting for
 8  the trial of Mohamad Taha and his wife versus United
 9  States, Number 17-1174.
10          Mr. Taha, would you please announce yourself
11  for the record as the representative of the plaintiffs.
12          MR. TAHA:  Yes, Your Honor.  My name is
13  Ali Taha.  I'm representing plaintiffs Mohamad Taha and
14  his wife, Sanaa Yassin.
15          THE COURT:  Welcome.
16          MR. TAHA:  Thank you.
17          THE COURT:  Ms. Kanyer, will you introduce
18  yourself and your colleague, please.
19          MS. KANYER:  Yes, Your Honor.
20  Elizabeth Kanyer for the United States, and with me is
21  David Pincus, also with the Department of Justice for
22  the United States.
23          THE COURT:  Thank you and welcome.
24          Our court reporter today and tomorrow is
25  Lori Bundy.  And if people have questions for
```

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    Ms. Bundy, don't hesitate to ask them.  And she will

2    help us make sure we take breaks at appropriate times

3    and otherwise address these matters in a relatively

4    quite organized fashion.

5         We have a limited mandate from the court of

6    appeals, and it's a very explicit mandate.  On the

7    remand we're to decide whether the taxpayers had filed

8    an income tax refund claim, and that is so for 2003,

9    whether that claim was timely.

10        And that has to do, in part, with the

11   applicable statute of limitations, or limitations

12   period; it's not a statute of limitations, and whether

13   the claim had actually been disallowed by the Internal

14   Revenue Service.  There is a possibility that we might

15   have answers to all three questions as a result of the

16   trial today and tomorrow.

17        Now, Mr. Taha, you are representing the

18   plaintiffs, neither of the plaintiffs is here, and one

19   of the plaintiffs is actually deceased.  We understand

20   that you are in a position to testify as to certain

21   matters, and we'll definitely call for that.  The

22   witness box is right there (indicated), and we'll ask

23   you to take the witness stand in a moment or so.

24        Where do we stand insofar as the trial

25   exhibits?  Ms. Kanyer, you have provided some.  Have

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    you provided them to Mr. Taha as well?

2              MS. KANYER:  Yes, Your Honor, we've provided

3    defendant's Exhibit lists.  We also have sets for the

4    Court of plaintiffs exhibit lists and defendant's

5    exhibit lists.

6              THE COURT:  And I understand from the

7    reporter that she has the set that is to be used by the

8    witness; is that correct?

9              MS. KANYER:  The court reporter has

10   defendant's exhibit list.  I wasn't sure if you wanted

11   those up at the actual witness stand.

12             THE COURT:  Do you have copies for the Court

13   and the clerk?

14             MS. KANYER:  We do.  May I approach, Your

15   Honor?

16             THE COURT:  Yes, certainly.

17             MS. KANYER:  Your Honor, should we place a

18   set in the witness box?

19             THE COURT:  Yes, you might as well.  If we're

20   all using the same binder, then we'll be in better

21   shape.  You managed to fit all these things in two

22   binders?

23             MS. KANYER:  Yes.  Your Honor, we also have

24   an extra set for plaintiff if plaintiff would like one.

25             THE COURT:  Why don't we make sure that Mr.

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    Taha has a set.

2            Mr. Taha, we'll give you a moment to look at

3    them to make sure you know what's there.

4            MS. KANYER:  In addition, Your Honor, we also

5    have the parties' exhibit lists, as far as exhibit

6    number, witnesses and disposition as provided by the

7    Court's order.

8            THE COURT:  Thank you.  And if you will hand

9    those up, please, that will help us.

10           MS. KANYER:  Your Honor, we also have an

11   extra set for plaintiff, if he would like one.

12           THE COURT:  Yes.  I hope we can take a

13   15-minute recess midmorning.  I hope we can break for

14   our lunch at either 12:00 or 12:30.  Do the parties

15   have a preference which one?

16           MS. KANYER:  No, Your Honor.

17           THE COURT:  Mr. Taha?

18           MR. TAHA:  That's fine.

19           THE COURT:  I'm sorry?

20           MR. TAHA:  I'm in agreement.

21           THE COURT:  Okay.  Thank you.

22           And we had called for 15-minute opening

23   statements with a minute or so overlay.  And, Mr. Taha,

24   in a moment I'm going to ask if you're ready to

25   proceed, but I'll give you a moment to make sure that

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1   you're settled in the courtroom.  And you may speak
2   from that podium.  You don't have to get there now, but
3   you can, if you want.
4              MR. TAHA:  Your Honor, I have a couple of
5   questions.
6              THE COURT:  I'm sorry.  You're going to have
7   to speak up.
8              MR. TAHA:  This parties' exhibit list looks
9   vague to me.  I cannot recognize a single exhibit.
10  There is no title for the exhibit and the
11  identification is kind of confusing to me.
12             THE COURT:  We'll find out.  We'll give time
13  to make sure that everyone understands what it is.
14             MR. TAHA:  Okay.
15             THE COURT:  Those are just the numbers.  And
16  they probably are the numbers that were assigned by
17  Ms. Kanyer; is that correct?
18             MS. KANYER:  Yes, Your Honor.  The way we did
19  it is, plaintiffs listed their exhibits and attached
20  their pretrial brief as A, B, and C, but within each
21  there are documents, and they didn't correspond exactly
22  page numbers.  So we just assigned PDF numbers for
23  everyone's reference when referring to these for
24  efficiency purposes.
25             THE COURT:  That's why the Court wanted to

Trial
Mohamad E. Taha, et al. v. USA                              12/9/2019

1    take a moment for Mr. Taha to take a look at the actual

2    exhibit binder, because I think you probably have them

3    identified specifically there.

4              Mr. Taha, just take a look at the binder, the

5    plaintiffs' binder, I think it's a separate binder.

6    It's the smaller volume, Mr. Taha.

7              MR. TAHA:  This one here (indicated)?

8              THE COURT:  I think it's the smaller volume.

9              MS. KANYER:  That's correct.

10             MR. TAHA:  This is my exhibit?

11             THE COURT:  It should be.

12             MR. TAHA:  Generally, it looks fine.  And the

13   other exhibit list is -- I'm aware of because I'm the

14   one who provided all these documents.

15             THE COURT:  Yes, that's fine.  I wanted to

16   make sure that you knew that they were there, or if

17   they weren't, we can deal with that.  But also they're

18   numbered, and so that will help you identify them as we

19   go through.

20             MR. TAHA:  That's fine, Your Honor.

21             THE COURT:  Lettered and numbered, I take it.

22             All right.  Are there any other preliminary

23   matters we have to address before we actually begin

24   with the opening statements?  Ms. Kanyer?

25             MS. KANYER:  No, Your Honor.

Trial

Mohamad E. Taha, et al. v. USA                    12/9/2019

1          THE COURT:  Mr. Taha, can you think of
2    anything we have to address?
3          MR. TAHA:  Only one statement I'd like to
4    make is personal conditions of mine.  I'm wearing two
5    hearing aids.
6          THE COURT:  Yes.
7          MR. TAHA:  So I may speak louder than
8    necessary or I may not be able to hear the question or
9    anybody's statement, therefore, I may request a repeat.
10          THE COURT:  Yes.  And, in fact, I'm used to
11    the witness actually being on the left side and I might
12    have trouble hearing on my right side.
13          Stephanie, do you want to switch sides?
14          CLERK:  I don't mind.
15          THE COURT:  And then we'll use the left
16    side -- my left, your right -- as the witness stand.
17    And we'll probably have an easier time all the way
18    around hearing.
19          MS. KANYER:  Your Honor, may I switch the
20    exhibits?
21          CLERK:  Do you want me to leave them?
22          MS. KANYER:  Yes.
23          CLERK:  Then they're over there.
24          THE COURT:  Now, if the reporter has any
25    difficulty hearing, all she has to do is signal to us

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1   and we can address it.

2           COURT REPORTER:  Yes, Your Honor.  Thank you.

3           THE COURT:  Are we ready then to begin?

4   Mr. Taha?

5           MR. TAHA:  Your Honor, may I make a

6   statement, another statement, in regards to the timing

7   of presenting the opening statement?

8           THE COURT:  Yes.  Why don't you take the

9   podium.  There is a microphone at the podium, and it

10  will help.

11          MR. TAHA:  I'm representing plaintiffs here

12  for the facts that, number one, we are facing the IRS,

13  the Government, two sectors, and three courts that what

14  we have experienced so far.

15          And, therefore, my opening statement may take

16  longer than 15 minutes.  I indicated this to you, Your

17  Honor, on December 2nd.  And my understanding, that it

18  shouldn't be a problem if I go 20 minutes.

19          THE COURT:  Several minutes.  We just try to

20  be very precise and organized, Mr. Taha.  But I do

21  understand.

22          Let me ask an initial question.  I take it

23  that Mr. Mohamad Taha is a brother of yours; is that

24  correct?

25          MR. TAHA:  He is my brother, Your Honor.

Trial

1              THE COURT:  Yes.  He is your what?

2              MR. TAHA:  My brother.

3              THE COURT:  Yes.  So you're a family member

4     of the plaintiffs, which is an appropriate -- and

5     you're, thus, under the Court's rules, an appropriate

6     representative.

7              MR. TAHA:  That's correct, Your Honor.

8              THE COURT:  Yes.  You may proceed.

9              MR. TAHA:  Good morning, Your Honor, and good

10    morning, Counsel.  My name is Ali Taha.  I'm 79 years

11    old.  I'm representing plaintiffs Mohamad E. Taha,

12    deceased, and Sanaa Yassin, his wife, as pro se

13    plaintiffs versus United States as defendant, Case

14    Number 17-1174C.  Unfortunately neither plaintiff can

15    be present.

16             Before I start I would like to make a

17    personal note.  English is my second language with

18    possible occurrence of unintended or inadvertent

19    grammatical experiences or pronunciations.

20             THE COURT:  Mr. Taha, may I just note that

21    your locution and your use of the English language is

22    very adept.  It's very satisfactory.

23             MR. TAHA:  Thank you, Your Honor.

24             I apologize if that occurs.

25             Moreover, it has been everything wrecking for

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

 1    this action in facing the IRS, two government sectors,

 2    and three courts in order to achieve plaintiffs' rights

 3    that have been denied for 12 years.  The legal entities

 4    are facing only one, that is plaintiff.

 5              This action is the subject of recovering

 6    plaintiffs' claim for tax refund in the amount of

 7    $14,177 paid for years 2002 and 2003.

 8              As owner and chairholder of a private

 9    family-owned company by the name of Atek Construction,

10    Inc., S Corporation in California, I contributed

11    10 percent of my own shares to brother, Mohamad Taha,

12    in year 2002.

13              This contribution was to help him and his

14    family of five to have a starting opportunity to earn

15    money to live on while they became residents of the

16    United States.  Financially, they were my

17    responsibility such that they would not become a

18    financial burden on the United States Government.

19              THE COURT:  Mr. Taha, just a moment.

20              Ms. Kanyer, somewhat unusually, I think

21    Mr. Taha is testifying as to facts.  I would actually

22    like to swear Mr. Taha as a witness as he's giving his

23    opening statement.  May I do that?

24              MS. KANYER:  No objection, Your Honor.

25              THE COURT:  No objection.

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

```
 1          Mr. Taha, may I swear you as a witness?  Just
 2   because some of the recitations you're making are
 3   factual ones, and they're not necessarily in the
 4   record, and I'd like them to be in the record as
 5   evidence.  Do you mind?
 6          MR. TAHA:  I do not mind.
 7          THE COURT:  Just raise your right hand to be
 8   sworn then.
 9          Mr. Taha, do you swear or affirm that the
10   testimony you're about to give in this case shall be
11   the truth, the whole truth, and nothing but the truth
12   so help you God?
13          MR. TAHA:  I do.
14          THE COURT:  Thank you.  You may proceed.
15   THEREUPON,
16                      ALI TAHA,
17   a witness, having been first duly sworn, upon his oath,
18   testified as follows:
19          MR. TAHA:  I'll go back to my statement that
20   I could not finish.
21          Financially, they were my responsibility such
22   that they would not become a financial burden on the
23   United States Government as mandated in my sponsorship
24   to their immigration.
25          Neither Mohamad or his wife were proficient
```

Trial

1    in communication.  They only had minimal education.

2    Mohamad Taha, as a shareholder of Atek, earned ordinary

3    income in the amounts of $85,010 for year 2002, and

4    $77,813 for year 2003 at a total of $162,823.  He was

5    paid $20,000 by Atek to pay their taxes for both years,

6    leaving a balance of $142,823 owed by Atek.

7            Atek executed two promissory notes to its

8    shareholders for both years, as procedurally adopted

9    since Atek's inception in 1996.

10           Taxpayers Mohamad Taha and his wife,

11   Sanaa Yassin, filed jointly their income tax returns

12   and paid income taxes of $8,573 for 2002 and $5,604 for

13   2003 for a total of $14,177.

14           They also paid state taxes to the California

15   Franchise Tax Board in the amount of $4,626 for both

16   years.

17           In year 2004, Atek experienced financial

18   difficulties because of delays of project owners in

19   paying its receivables.  Atek's creditors and other

20   complained and requested the bonding companies who

21   bonded Atek's projects to be paid.

22           The bonding companies immediately took over

23   Atek's operation, ordered project owners to withhold

24   receivable payments due to Atek, filed suits against

25   Atek and its primary shareholders, and hired other

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    contractors to finish the projects.

2           That put Atek out of business, and,

3    therefore, forced it into dissolution.  The bonding

4    companies essentially forced Atek -- repeat, the

5    bonding companies essentially froze Atek's multimillion

6    dollars in receivables and other assets and possessed

7    all shareholders' monies of $1,871,000 owed by Atek.

8           As such, all shareholders of Atek lost their

9    distributed income, including taxpayers' earned income

10   of $142,823 that was lost and became business bad debt.

11   That is worthless.

12          Taxpayers filed simultaneously their amended

13   income tax returns, Forms 1040-X with the IRS in

14   Fresno, California, for both years, 2002 and 2003.

15   Their claim was filed within the IRS seven-year statute

16   on the basis of the loss of their income as business

17   bad debt.

18          THE COURT:  If that claim was actually filed,

19   Mr. Taha, in 2009, if the Court recalls correctly, when

20   in 2009?

21          MR. TAHA:  They were filed in 2007,

22   Your Honor.

23          THE COURT:  '7.  Thank you for clarifying.

24          MR. TAHA:  Their claim was filed within the

25   IRS seven-year statute on the basis of the loss of

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    their income as business bad debt supported with

2    documented evidence.  The IRS center in California,

3    this allowed the taxpayers' claim for 2002 on

4    December 20, 2007.  That answers your question,

5    Your Honor.

6              THE COURT:  Yes, thank you.

7              MR. TAHA:  The IRS alleged that it received

8    the claim late; that is, three years from the return

9    due date, which was not applicable to the claim for bad

10   debt.

11             Taxpayers notified the IRS of the 2003 claim

12   in multiple letters to no avail.  They were ignored;

13   that is, plaintiff or taxpayers.  Although the 2002 and

14   2003 claim were filed correctly, taxpayers reconsidered

15   and re-amended their tax refund claim under year 2004

16   on November 1, 2009, as legally advised.

17             Year 2004 was considered to be fixed and

18   determinable within which the income was lost and

19   became bad debt due to Atek's dissolution.  That also

20   qualified the claim for tax refund under the IRS

21   seven-year statute for business bad debt,

22   Code 6511(d)-1.

23             The claim was supported with preponderance of

24   evidence for the bad debt.  Five years -- sorry.  Five

25   other IRS centers in Pennsylvania, Tennessee,

Trial

1    Pennsylvania again, Florida, and Texas shuffled

2    taxpayers' claim from one state to another for ten

3    years.  They disallowed the claim.

4         Before and after taxpayers' several appeals,

5    these centered alleged that they received the claim

6    late; that is, three years from the return due date or

7    other meritless reasons, which was not true or

8    applicable for the business bad debt.

9         After 3,575 days of messy and disoriented

10   standard written disallowances and meaningless letters

11   by six IRS centers in six states, 33 agents,

12   12 departments, and 33 letters that were responded with

13   30 letters of appeals by taxpayers, the IRS finally

14   recognized and determined on March 22, 2016, that,

15   quote, dot, dot, dot, which is a continuation sentence,

16   "The bad debt statute of seven years is correct and the

17   claim would be worthy of reconsideration if there had

18   been actual bad debt," closed quote.

19         It became obvious that the IRS intentionally

20   ignored the preponderance of evidence for the bad debt

21   that was previously provided on January 21, 2008, and

22   provided again on February 24, 2015, at the request of

23   the IRS.

24         Taxpayers exhausted every administrative

25   remedy available and demonstrated a good faith effort

Trial

1  to resolve all issues with the IRS before filing this

2  action.  They were left with no further options but to

3  file suit.

4          They filed their complaint for tax refund in

5  this action on May 10, 2017, with the District Court of

6  Florida.  Plaintiffs could not afford an attorney.

7  They filed their complaint as pro se with my

8  representation.

9          Plaintiffs' complaint complied with

10  Rules 7422, 3402, 6532, and 6511.  The district court

11  ordered the transfer of the complaint to court of

12  federal claims due to plaintiffs' residency issues with

13  emphasis of concurrent jurisdiction with this Court.

14          Plaintiffs transferred their complaint to the

15  district court -- sorry.  Plaintiffs transferred their

16  complaint to the court of federal claims on

17  September 15, 2017.  In response to plaintiffs'

18  complaint, defendant filed its motion to dismiss

19  plaintiffs complaint on January 30, 2018.

20          Defendant followed with a motion for

21  clarification after their motion to dismiss was

22  granted.  Defendant alleged that the Court has no

23  subject matter jurisdiction.

24          No fact or proof or substance were presented

25  by defendant for its allegations.  Due to the absence

Trial

Mohamad E. Taha, et al. v. USA                              12/9/2019

1    of tangible facts, defendant only resorted to cite

2    hundreds of referenced cases that were presumably

3    inapplicable, some of which were proven as such.

4              I prove some of those cases, or those cases

5    on Your Honor that they were not applicable, and we can

6    talk about them a little later after this.

7              Respectfully, defendant ignored and/or failed

8    to acknowledge the preponderance of evidence that

9    plaintiffs presented for the business bad debt.

10             Following defendant's motion to dismiss, the

11   Court issued its opinion and order on April 10, 2018,

12   regard granting defendant's motion to dismiss followed

13   by its order granting the defendant's motion for

14   clarification.  The Court also alleged that it lacked

15   subject matter jurisdiction.

16             It is presumed that the Court relied heavily

17   on defendant's allegations and reference to case laws.

18   The Court also relied on referencing its allegations to

19   several cases that were presumably inapplicable.

20             In fact, some of these cases were proven

21   inapplicable.  Respectfully, the Court also ignored

22   acknowledging plaintiffs preponderance of evidence for

23   its jurisdiction.

24             Plaintiffs requested the Court to reconsider

25   its ruling by filing their objection to Court's orders

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    to dismiss on January 8, 2018, that included the

2    preponderance of evidence for the bad debt.

3            Plaintiff respectfully alleged that the

4    Court's factual findings were clearly erroneous.  The

5    Court's selection of law and its application of law to

6    such findings regarding plaintiffs' claim for tax

7    refund was contrary to law.

8            In response to plaintiffs' objection to the

9    Court's order granting defendant's motion to dismiss,

10   the Court issued its order on May 1, 2018, by stating,

11   quote, the clerk is directed to file the submission.

12   That is my -- that is my objection.

13           But the Court has no power to consider it.

14   Jurisdiction has passed to the court of appeals for the

15   federal circuit now that plaintiff has taken an appeal.

16           Plaintiff has taken appeal reluctantly,

17   reluctantly as the only option to pursue their claim as

18   directed by the Court's front office because the

19   Court's order was asserted as final and not subject to

20   objection.

21           In response to plaintiffs' appeal in the

22   federal circuit, the federal circuit issued its opinion

23   and order on December 14, 2018, affirming in part,

24   vacating in part, and remanding plaintiffs' claim for

25   tax refund for this Court to resolve.

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1          Plaintiffs' impetus (phonetically) filed
2    their petition for rehearing on January 3, 2019, for
3    the federal circuit to reconsider its omission of their
4    issues of facts, but denied with no reason.
5          As of today, 923 days were consumed in
6    courts, compounded by heavy volumes of motions and more
7    motions by defendant on orders and more orders by the
8    Courts.  They were responded with heavier volumes, with
9    counter motions and objections to no avail.
10         It became clear that the business bad debt
11   became the major issue of this action, plus other
12   issues alleged by defendant and the Courts.  As the
13   honorable judge affirmed during the telephonic
14   conference on April 5, 2019, this action is now a de
15   novo in this trial.  He affirmed the same again in
16   subsequent telephonic conferences.
17         I intend to dispute defendant's allegations
18   and requesting the Court to dismiss plaintiffs' claim
19   for tax refund on the alleged grounds that the Court
20   has no jurisdiction.  I will dispute that.  Defendant
21   provided no proof for its allegations, and, therefore,
22   were of no merit.
23         I will dispute the Court's order granting
24   defendant's motion to dismiss on the alleged grounds
25   that it has no jurisdiction.  The Court did have

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    jurisdiction based on all the evidence that plaintiffs

2    provided in regards to their compliance with the rules.

3    The district court affirmed its concurrent jurisdiction

4    with this Court as well.

5           I will present the evidence to prove that

6    plaintiffs' claim for tax refund was justified as

7    claimed within the seven-year statute for business bad

8    debt and compliance with the rules.  I will provide

9    hard evidence to that effect, including the IRS

10   admission of the seven-year statute as correct.

11          I will rebut defendant and/or the Court's

12   allegations that were presented without proof.  I will

13   rebut some of the hundreds of cited cases as

14   inapplicable to plaintiffs' case.  My search of

15   comparable cases did not produce any in existence.

16          Lastly, plaintiffs emphasize that their claim

17   for tax refund is sound and clear.  They were refunded

18   their California state taxes in the amount of $8,364.86

19   for 2002 and 2003 on the basis of bad debt.

20          THE COURT:  When did that occur, Mr. Taha?

21          MR. TAHA:  A few years ago.

22          THE COURT:  Two years ago?

23          MR. TAHA:  Few.  A few years ago.

24          THE COURT:  All right.  Thank you.

25          MR. TAHA:  And I may have evidence of the

Trial
Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    refund in checks that I can present.

2              THE COURT:  Well, if you recall, if you know

3    personally, then you can testify to that effect.

4              MR. TAHA:  Yes, Your Honor.

5              Mr. Eyad Khalil has filed and was refunded

6    his taxes of refund 2,200 -- let me repeat again.

7              Mr. Eyad Khalil, who was another major

8    shareholder of Atek, has filed and was refunded his

9    taxes of around $200,000 for 2002 and 2003 on the basis

10   of bad debt as he declared in his subpoena to produce

11   documents in this action.  His declaration is

12   considered authentic.  He confirmed the same to

13   Ali Taha by e-mail; that's me.

14             Plaintiffs' refund claim of $14,177 for 2002

15   and 2003 on the basis of bad debt was respectfully

16   disallowed unjustly by the IRS, the Government, and the

17   Courts.

18             This Honorable Court should not allow the

19   double standards adopted by the IRS in refunding one

20   taxpayer, Mr. Kahlil, and didn't allow another, that's

21   plaintiffs, on the same basis of the business bad debt

22   for the same years from the same debtor; that's Atek.

23             In conclusion, plaintiffs are represented

24   here in this court in front of the honorable judge and

25   defendant's counsel to fight for their rights in

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    claiming their tax refund.

2              They pray for a fair, just, and

3    jurisdictional ruling in their favor.  They pray not to

4    be defeated based on obtuse technicality or mere

5    allegations without facts or evidence.  They pray for a

6    non-bias conclusion by the Honorable Court as a

7    government entity.

8              Plaintiffs' claim for tax refund filed within

9    the seven-year statute for business bad debt was

10   supported with evidence.  In fact, the IRS concurred

11   and determined that plaintiffs' claim filed within the

12   seven-year statute was correct.

13             That also affirmed that plaintiffs' claim was

14   filed for 2002 and 2003 individually, or 2004 inclusive

15   of 2002 and 2003 was correct.  Plaintiffs complied with

16   the rules and bore the burden of proof for

17   jurisdiction.  Thank you.

18             THE COURT:  Thank you, Mr. Taha.

19             Ms. Kanyer?

20             MS. KANYER:  May it please the Court, Your

21   Honor, Elizabeth Kanyer for the United States.

22             This case is about two things, whether a

23   claim for refund was filed for tax year 2003, and if

24   that claim for refund was filed, whether it was timely

25   in taking into account bad debt; that is, business bad

Trial
Mohamad E. Taha, et al. v. USA                    12/9/2019

1   debt.

2          THE COURT:  Well, the question is in

3   addition, whether it was ever disallowed by the IRS, if

4   it was filed?

5          MS. KANYER:  That is correct, Your Honor.

6   That was one of the issues that the federal circuit

7   asked us to address.  The Government isn't contending

8   that there's any disallowances that we can point to.

9          So related to the first issue, the filing,

10  the evidence will show that the Internal Revenue

11  Service did not receive a claim for refund for tax year

12  2003; that is, a Form 1040-X Amended U.S. Individual

13  Tax Return for 2003.

14         The United States will present evidence of a

15  Form 4340, a Certificate of Assessment, Payment, and

16  Other Specified Matters, which do not list any refund

17  for tax year 2003.  These Forms 4340s are presumed

18  true, accurate, and correct.

19         In addition, we will also be calling a

20  witness, an IRS revenue agent, Mr. Wolff, who has over

21  25 years of experience with the IRS.  He will be

22  authenticating the IRS documents and explaining how

23  Forms 1040-X are received and accounted for by the IRS.

24         In previewing plaintiffs' case, plaintiffs'

25  representative indicated that he will be presenting

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    evidence of mailing through the Form 1040-X for 2003,

2    along with evidence of mailing of Form 1040-X for

3    2002 and various --

4              THE COURT:  It appears that they were both

5    filed in November of 2007, now that we have that

6    particular answer, and they appear to have been filed

7    at the same time.

8              MS. KANYER:  That is plaintiffs' testimony,

9    Your Honor, but the evidence will show that plaintiff

10   does not -- or excuse me, plaintiffs' representative

11   does not specifically recall how it was mailed or who

12   it was mailed or show any evidence of certified mailing

13   or registered receipt.

14             In addition, relating to the second issue,

15   Your Honor, the timeliness or the bad debt; that is,

16   business bad debt, the evidence will show that

17   plaintiff Taha worked his entire career in the United

18   Arab Emirates.  In 2002, Ali Taha gave his brother

19   10 percent of the shares in exchange for nothing.  He

20   did not pay any money in exchange for the shares of

21   Atek Construction.

22             Atek Construction was a construction

23   business.  It would bid on projects, it would obtain

24   bonding, hire employees, hire subcontractors, purchase

25   material and supplies, and actually construct

Trial

1    businesses -- or construct projects, excuse me.

2              But the evidence will show that plaintiff

3    Taha did not have any role in Atek, he had no titles

4    with Atek, he was not responsible for any of those

5    activities, so he wasn't responsible for the bidding or

6    obtaining bonding or hiring or purchasing materials or

7    constructing any of the materials -- constructing any

8    of the projects.

9              He also didn't review any financial

10   statements or any return filing.  Quite simply, he was

11   merely a shareholder.

12             Through Atek's activities, though, it did

13   receive income in 2003.  Plaintiff Taha, as a

14   shareholder, paid tax on that pro rata share of Atek's

15   income.  And Atek, instead of distributing those

16   proceeds to plaintiff Taha, reinvested those proceeds

17   in the company to keep it operational.

18             This is because Atek always paid its

19   creditors before making any distributions to its

20   shareholders.  This meant that Atek would pay its

21   employees, its subcontractors, its material and

22   suppliers before making any distributions to the

23   shareholders.

24             Now, at some point in 2004, plaintiffs'

25   representative has presented testimony, and will likely

Trial
Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    present more testimony, that Atek stopped making

2    payments to some of its creditors and eventually those

3    creditors sought payments from the bonding companies.

4            Plaintiffs are seeking to present evidence of

5    a bonding takeover that prevented Atek from being able

6    to pay its creditors.  But the evidence will show,

7    Your Honor, that the plaintiffs in this case had no

8    knowledge of any of the bonding company's letters,

9    demand letters, or complaints, or any of the final

10   actions that occurred with respect to the bonding

11   companies.

12           Now, plaintiffs in this case are seeking to

13   convert what was undistributed shareholder income into

14   debt.  And to do so, they are presenting evidence of a

15   promissory note.  This promissory note was generated by

16   Ali Taha.  It was the -- the purported debt is that

17   undistributed shareholder income.

18           And the evidence will show that plaintiff did

19   not -- plaintiff Mohamad Taha did not provide any money

20   in exchange for this promissory note.  He also was not

21   involved in negotiating any of the terms of the

22   promissory note, meaning, you will see, a provision for

23   interest, he did not negotiate any of the provisions

24   for interest, he did not negotiate any of the payment

25   terms.

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1              In addition, there will also be evidence that
2       plaintiff Taha did not demand or even calculate any
3       interest on this note.  It did not demand any security
4       in exchange for this loan, and it did not actually
5       require any fixed payments or a maturity date for this
6       note.  And the evidence --
7              THE COURT:  Will the promissory notes be put
8       into evidence?
9              MS. KANYER:  Your Honor, we have some issues
10      with the timing of this document, and so we're
11      objecting on those grounds.  We think that we can -- I
12      think I can deal with that during the cross.
13             THE COURT:  Would you, please.
14             MS. KANYER:  In addition, Your Honor, Atek,
15      as the corporation, did not treat this as a loan.  It
16      reported to the IRS that it did not have any loans
17      outstanding, any loans from shareholders by the end of
18      tax year 2003.  And also, its financial statements do
19      not report any outstanding loans.
20             Now, plaintiffs, after not having received
21      any payments, they did not actually seek any legal
22      proceedings or anything to collect this purported debt.
23      Instead, they held off at the request of their brother,
24      Ali Taha.
25             And in 2006, they filed a proof of claim in

Trial
Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    another shareholders' bankruptcy proceeding hoping to
2    get paid.  And it wasn't until after that bankruptcy
3    proceeding in 2007 that plaintiffs are even purporting
4    that they filed a refund claim.
5              So, Your Honor, at the end of this trial --
6              THE COURT:  The bankruptcy involved which
7    entities?
8              MS. KANYER:  It involved Eyad Khalil, one of
9    the shareholders.
10             THE COURT:  But not Atek itself?
11             MS. KANYER:  Correct.
12             THE COURT:  That was the Court's
13   understanding.
14             MS. KANYER:  That is our understanding as
15   well, Your Honor.
16             So, Your Honor, at the end of this trial,
17   we'll be asking you to find that the Court lacks
18   jurisdiction over this complaint as to 2003 because the
19   evidence will show that plaintiffs did not file a
20   refund claim, and because plaintiffs did not incur a
21   bad debt, that is business debt.
22             THE COURT:  Let me ask a question.  Mr. Taha
23   has indicated that the State of California provided a
24   tax refund to the plaintiff Tahas.  Is that correct?
25             MS. KANYER:  That is his testimony.  We

Trial

Mohamad E. Taha, et al. v. USA                           12/9/2019

1    haven't received any documents.  He hasn't produced any

2    of those documents during discovery.  We haven't seen

3    the claim for refund, we haven't seen a check actually

4    providing the refund.  So our understanding is, that's

5    his testimony.

6          THE COURT:  All right.  That will be a

7    subject of Mr. Taha's testimony and your

8    cross-examination, one would assume?

9          MS. KANYER:  That is correct.

10         Your Honor, we also wanted to address briefly

11   the issue of the proper party.  We'll address it during

12   the opening.

13         So, Your Honor, the issue of whether

14   Mohamad Taha should be dismissed because he is

15   deceased, plaintiff Taha passed away before this suit

16   was initiated, and it is well established that the

17   answer to the question of whether an action can be

18   initiated in the name of a deceased person is, in a

19   quote, plainly no.

20         A deceased person does not have legal

21   existence, which is a prerequisite to have the capacity

22   to sue or be sued.  A person who dies before filing

23   suit does not -- is not a legal entity, which renders

24   the suit a nullity or otherwise extinguishes the claim

25   unless it's inherited by some other party.

Trial

Mohamad E. Taha, et al. v. USA                                12/9/2019

1           Case law's also clear that you can't
2    substitute a party because Rule 25 contemplates that a
3    person actually had a legal existence at the beginning
4    of an action.  Courts have indicated that you could
5    amend a complaint in order to add the proper party, but
6    then as we were -- as it was discussed earlier today,
7    it becomes whether or not the representation of pro se
8    person is proper.
9           Because at this point, Mohamad Taha would be
10   proceeding as his estate and case law is clear that an
11   estate like a corporation needs to have an actual
12   lawyer represent the party.  And so that would be an
13   independent reason why this case --
14          THE COURT:  Well, it depends.  If there's an
15   executor of the estate and the executor of the estate
16   is a family member, that is a possible route for
17   representation.
18          MS. KANYER:  Correct, but in -- in those
19   cases, that was the only beneficiary, was the personal
20   representative.  In this case we have evidence that
21   there is also Ms. Yassin and her children that might
22   have an interest in this claim, and in those cases
23   Courts analogize them.
24          THE COURT:  Well, the Court doesn't know
25   that.  We'll have to establish that as a factual matter

1    during the trial.

2            MS. KANYER:  Understood.  And the other issue

3    that we also raised in the pretrial hearing was the

4    issue of Ms. Yassin's interest in the overpayment.

5            Ms. Yassin was a homemaker, she did not earn

6    any income during the years at issue, and so she did

7    not herself contribute to the overpayment.

8            THE COURT:  Why would that make a difference?

9            MS. KANYER:  So in order to be entitled to

10   the refund, you have to actually be the one who makes

11   the overpayment.

12           THE COURT:  But if the man and wife filed a

13   joint return and held the asset jointly, why would not

14   that suffice for the purpose?

15           MS. KANYER:  So that is a matter of state

16   law.  The case law is pretty clear that the issue of

17   who is entitled to the overpayment looks at the person

18   who contributes it.

19           THE COURT:  Well, we'll find out.  It's not

20   readily apparent at that point -- well, the point being

21   when they were shareholders, where they resided.  And

22   Mr. Taha can apparently testify to that effect.  If it

23   was California, that's one thing.

24           MS. KANYER:  Right.  And so --

25           THE COURT:  California is a community

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    property state.

2              MS. KANYER:  And our understanding of the

3    case law is that even in community property states,

4    that would be an issue that would occur after the

5    refund would actually be -- if there was an entitlement

6    to a refund, those actions would take place after the

7    refund was provided.

8              THE COURT:  This is just such a fascinating

9    case.  I've never seen a case like this that is so

10   complicated in all its legal aspects that is yet

11   something that should be quite simple.

12             You have to know a lot about Subchapter S,

13   you have to know a lot about equity, and contributions

14   to capital, you have to know a lot about survivorship

15   or not, you have to know a little about community

16   property.  It's just fascinating.  It's like a puzzle.

17             MS. KANYER:  I agree, Your Honor.

18             THE COURT:  You're so lucky.

19             MS. KANYER:  Your Honor, we would propose

20   that this would be something that we would be able to

21   address on any post trial briefing and proceed forward

22   with today.

23             THE COURT:  All right.

24             MS. KANYER:  Thank you, Your Honor.

25             THE COURT:  Thank you.  Would you like to

Trial

Mohamad E. Taha, et al. v. USA                            12/9/2019

```
 1   take a recess at this point for about five or
 2   ten minutes?
 3            MS. KANYER:  Yes, Your Honor.
 4            MR. TAHA:  As you wish, Your Honor.
 5            THE COURT:  What?
 6            MR. TAHA:  As you wish.
 7            THE COURT:  Well, we shall.  We'll take a
 8   recess for ten minutes.
 9            (A break was taken.)
10            THE COURT:  Mr. Taha, why don't you take the
11   witness stand.  And you're already sworn as a witness,
12   so why don't you just sit right over there and the
13   reporter and I will -- and take your exhibit binder
14   with you, please, and your notes.  You can leave -- the
15   witness binders, Mr. Taha, are already in place.  You
16   can just go ahead and take your notes and sit.
17            Mr. Taha, before you begin, where do you
18   actually reside at this point?
19            MR. TAHA:  I reside in Bradenton, Manatee
20   County, in Florida, of course.
21            THE COURT:  Thank you.  And, Mr. Taha, you
22   may go ahead and testify from the documents and cover
23   each of the documents in your plaintiffs' binder, if
24   you could, please.
25            And, Ms. Kanyer, if you would, at any given
```

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    point, help us out, that would be appreciated.

2              MR. TAHA:  May I ask for some clarification

3    of how to start?  Do I understand that -- start with

4    presenting all the documents as evidence?

5              THE COURT:  Yes, you are.

6              MR. TAHA:  Yes.

7              THE COURT:  You might start -- just look

8    through the plaintiffs' exhibit list.  Ms. Kanyer was

9    kindly disposed and hopefully put all these in the same

10   order that you had presented them, so they ought to be

11   familiar to you.

12             MR. TAHA:  First, I would like to talk about

13   taxpayer Mohamad Taha's earned income as ordinary

14   income from Atek Construction.

15             THE COURT:  Could you cover one thing before

16   you begin, what was your role in the Atek corporation?

17             MR. TAHA:  I was part owner at 50 percent

18   shareholdership.  My title was president and secretary.

19   I basically was a cofounder of Atek Construction with

20   my nephew who was spelled out in this action.  His name

21   is Eyad Khalil.

22             THE COURT:  What was your management role at

23   Atek corporation?

24             MR. TAHA:  It's essentially an administrative

25   role; that is, helping in negotiating contracts to do

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1   the work on behalf of Atek, Atek's accounting system,

2   comprehensively.

3          Essentially, the other thing I would like to

4   say, I do have an accounting degree.  And as counsel

5   mentioned at one time or another, that I never

6   practiced accounting.  But I did practice accounting

7   with Atek.  I prepared my own income tax returns since

8   1973.  I did that myself.  I never been audited.  For

9   over 50 years, never been audited.

10         Atek was audited.  And with my role in Atek,

11   I was ready to prepare all the documentations for the

12   federal government that was represented by an auditor

13   to audit Atek for two years consecutively, two years.

14   I had boxes prepared with all the evidence that I was

15   expecting to be questioned about.

16         Atek was granted relief.  There was nothing

17   to find, there was nothing against the law that was

18   documented; nothing.

19         THE COURT:  Did you have a role, for example,

20   in preparing the returns that are listed as Exhibit A

21   in your binder?

22         MR. TAHA:  I prepared the necessary

23   documentation for the CPA to prepare this documentation

24   in Exhibit A.

25         And what I prepared, based on a list that the

Trial
Mohamad E. Taha, et al. v. USA                                    12/9/2019

1     CPA asked you for -- or asked me for, for example,
2     balance sheet, profit and loss, expense accounts,
3     receivables.  Whatever is in the accounting system that
4     came out of this Exhibit A, I have to prepare that to
5     the CPA for him to prepare it.
6               THE COURT:  In the first page of the actual
7     return, 1120-S for 2002, there's a signature.  Whose
8     signature is that?
9               THE WITNESS:  There are two signatures,
10    Your Honor.
11              THE COURT:  Yes.
12              THE WITNESS:  The bottom signature is the
13    CPA's signature, and the top signature is mine.
14              THE COURT:  And it shows -- lists the date of
15    March 15, 2003, and you as president.  Was that your
16    status at that time?
17              THE WITNESS:  That's correct.
18              THE COURT:  All right.  I'm going to try to
19    stop asking questions.  What I'm trying to do is get
20    you to introduce these subjects, and you can walk or
21    weigh through them, if you would, please.
22              THE WITNESS:  I'm sorry, Your Honor.
23              THE COURT:  All right.  No, go ahead.  Walk
24    us through these.
25              THE WITNESS:  This income tax return, 1120-S,

Trial
Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    is entitled "United States Income Tax Return for an
2    S Corporation."  This form shows as a caution under
3    Item Number G, if you look at where G is, there is a
4    caution.  It says, "Include only trade or business
5    income and expenses on lines A-1 through -21."
6            What this means, if you look at line 1-A is
7    the gross receipts from the contracts that Atek
8    received.
9            Do I need to say the number, Your Honor?
10           THE COURT:  No.
11           MR. TAHA:  Okay.  And then line 2, it shows
12   the gross cost of goods.
13           THE COURT:  I don't think you need to cover
14   what's actually on the form; just the fact that you
15   probably apparently signed this at the stated date,
16   as -- in your role as president of Atek; is that
17   correct?
18           MR. TAHA:  That's correct.
19           THE COURT:  All right.
20           MR. TAHA:  So, however, I would like to refer
21   you very important points that were either ignored or
22   denied by defendant.
23           If you look at Schedule K on the second page,
24   in regards to shareholders' share of income for these
25   deductions, et cetera, prorated share of items,

Trial
Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    initially, I believe, I recall it was denied as the
2    income was pro rata share.
3          So I want to clarify this and emphasize it,
4    that the income was pro rata share based on every
5    shareholders' percentage of share.  That schedule, what
6    is called Schedule K, is a comprehensive schedule for
7    all shareholders' income.
8          Now, on the other following pages that I will
9    show -- I will show you, that Schedule K is divided
10   into Schedule K-1 for all the shareholders.  Each
11   shareholder would receive Schedule K-1 showing their
12   pro rata share of income as ordinary income, probably
13   four or five pages after.
14         After Schedule K, Your Honor --
15         THE COURT:  Mr. Mohamad Taha is
16   Shareholder 4; is that correct?
17         MR. TAHA:  Mohamad Taha is what?
18         THE COURT:  I'm sorry?
19         MR. TAHA:  I'm sorry, I didn't get your
20   answer.
21         THE COURT:  Mr. Mohamad Taha is Shareholder
22   4; is that correct?
23         MR. TAHA:  Yes, Mohamad Taha is a share --
24   shareholder of Atek at 10 percent, as I emphasized
25   earlier.

Trial

Mohamad E. Taha, et al. v. USA                              12/9/2019

1          And you can see, Your Honor, his ordinary

2     income of 83,168, and there's interest that Atek made,

3     those two numbers added up to 85,000, I believe, and 10

4     dollars.  That was for year 2002 that showed on

5     Mohamad's income tax return 1040.  And I will come to

6     that.

7          Another thing I would like to point on this

8     form, Your Honor, on this exhibit, if you look at

9     Schedule M, that's page 4, page 4 of Form 1120-S,

10    page 4 is indicated at the right-hand side, top corner,

11    page 4.

12          THE COURT:  Yes.

13          MR. TAHA:  Your Honor, if you look at line 2,

14    you can see healthy receivables of 1,248,452.  Atek was

15    not in trouble in the year 2002 financially because it

16    had that receivable and it had cash of $1,800,000.  So

17    Atek was not in distress in 2002.

18          The other line I would like to refer to

19    Your Honor is line 24.  The accounting system provides

20    that the income made from the project is reported as

21    returned earnings, and that returned earning is 124.

22    So for year 2002, there's a 1,723,347, line 24.

23          I'm sorry, am I losing, Your Honor?

24          THE COURT:  No, I'm following you.

25          MR. TAHA:  Page 4.

Trial

1          THE COURT:  Yes.

2          MR. TAHA:  Okay.  So line 24, it shows the

3     returned earnings.  Returned earnings is practically

4     the shareholders' earned income as ordinary income.

5          I'll take you one page back -- or two pages

6     back, back to Schedule K.  This is very, very important

7     for the Court to recognize that there is no capital

8     gain whatsoever, none.  If you look at -- there's a

9     line B, line B on Schedule K in the middle of the

10    Schedule K, ordinary dividends, none.  This was

11    emphasized by defendant that plaintiffs' income was

12    dividend, and it was not.

13         One more statement to this, the IRS

14    specifically define S Corporation Schedule K-1 as

15    non-dividend income.  Royalty income is none.  Line D,

16    short-term capital gain, none.  They are blank.

17         So the only income is ordinary income and the

18    interest, no capital gain.  I like to emphasize this as

19    many times as I can because it's been a huge issue

20    presented by defendant.

21         Do I need to go through 1120-S for 2003?

22         THE COURT:  Yes.  You need to identify it for

23    the record.  And the Court will admit what is

24    Exhibit A1, which I take it is the 2002 tax return.

25         MS. KANYER:  All right.  Your Honor, while we

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    don't object that this is plaintiffs' retained copy, we
2    would object that this is not the filed copy.  We have
3    the filed copy listed in our exhibits, the copy
4    received by the IRS as Exhibit 9.
5              THE COURT:  Why do we need the as-filed copy?
6    Is it different in any way?
7              MS. KANYER:  It's different in the sense that
8    it was the filed copy.  And as this case is about,
9    whether or not a claim for refund was filed, we would
10   request these --
11             THE COURT:  But this is the return of the
12   base company.
13             MS. KANYER:  Correct.  We would just like to
14   use the filed copy since this case is about filing.
15             THE COURT:  And this is essentially DX-9,
16   you're saying?
17             MS. KANYER:  Correct, Your Honor.
18             MR. TAHA:  May I respond to this, Your Honor?
19             THE COURT:  I'm sorry?
20             MR. TAHA:  May I respond?
21             THE COURT:  Yes.
22             MR. TAHA:  This is supposed to be, according
23   to you, authenticated.
24             THE COURT:  Yes, and you've just done that.
25   And I'm admitting it.

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

```
 1              MR. TAHA:  So referring as to either
 2    documents, wherever they are, is not practical.
 3              THE COURT:  Well, we'll have
 4    cross-references.  We have it in the record.
 5              (Plaintiffs' Exhibit Number A1 was admitted
 6         into evidence.)
 7              MR. TAHA:  Are we ready for 1120-S for year
 8    2003?
 9              THE COURT:  Yes.
10              MR. TAHA:  Second page, Schedule K --
11              THE COURT:  Well, again, could you just
12    authenticate this for the record, please, the
13    signatures and the date and so on?
14              MR. TAHA:  I'm sorry, Your Honor.
15              THE COURT:  No, nothing to be sorry about.
16              MR. TAHA:  On top, signature of officer, I
17    was considered an officer, that's my signature, signed
18    on March 13, 2004.  And under that signature is the CPA
19    signature signed on March 12, 2004.
20              THE COURT:  Thank you.
21              MR. TAHA:  Page 2, Your Honor --
22              THE COURT:  Ms. Kanyer, is this PX-A2?
23              MS. KANYER:  PX-A2, yes, Your Honor.
24              THE COURT:  All right.  Thank you.
25              MS. KANYER:  Your Honor, can I make a
```

Trial
Mohamad E. Taha, et al. v. USA                    12/9/2019

1   reference point?  So the PDFs correspond through

2   this -- it's one document, so the PDFs will go

3   consistently throughout.  And so it might be helpful to

4   look at the PDF numbers to direct attention.  It might

5   just be easier for Mr. Taha.

6            MR. TAHA:  Your Honor, I believe I forgot --

7            THE COURT:  I'm not sure I understand what

8   you're driving at.

9            MS. KANYER:  This document was filed attached

10  to plaintiffs' pretrial memo as one document, so this

11  actually goes from one -- PDF page 1 to 106, and so the

12  PDF numbers correspond to the number in plaintiffs'

13  trial binder.  So if you look in the upper right-hand

14  corner, 1120-S is PDF page 16 of 106.

15           THE COURT:  I see that.  Do we need to know

16  that?

17           MS. KANYER:  No, no, no, I was just hoping it

18  would be helpful for everyone.

19           THE COURT:  We can find it that way.

20           MS. KANYER:  Yes, exactly.

21           THE COURT:  There's no doubt about that.

22  Thank you.

23           MR. TAHA:  Your Honor, I don't have that

24  list.  I think I left it on the other desk.

25           THE COURT:  I'm sorry?

Trial

1           MR. TAHA:  I don't have that list because I
2   believe I left it on the other desk.
3           THE COURT:  Do you have an extra?
4           MS. KANYER:  I have an extra.
5           THE COURT:  That's helpful.  Thank you.
6           MR. TAHA:  As I mentioned earlier, I don't
7   know what these numbers mean.
8           THE COURT:  No, that's fine.  Ms. Kanyer is
9   about to hand it to you.
10          MR. TAHA:  So, Your Honor, what was 1120-S,
11  2002, what was that identified as?
12          THE COURT:  PX-A1.
13          MR. TAHA:  PX-A1, is that the first one?
14          THE COURT:  I'm sorry?  Yes.  So we've
15  already done that one, and --
16          MR. TAHA:  And PX-A2 is 1120-S 2003?
17          THE COURT:  Well, it's just that Ms. Kanyer
18  has helped us out a little bit by referring to these
19  PDF numbers.  The first one was 4 of 106, so she has
20  PDF 4 as the introduction to it.  And we're now working
21  on 2003, so that's PDF 16, that's what she means.  It's
22  the 16th page.
23          That's my understanding of what you said.
24          MS. KANYER:  That's correct, Your Honor.
25          THE COURT:  Okay.  It'll just help us find

Trial

1    it; that's all.  And you've already authenticated it,

2    Mr. Taha.  You signed it; right?

3              MR. TAHA:  Can I proceed, Your Honor?

4              THE COURT:  Yes.  I'm sorry to interrupt.

5              MR. TAHA:  Schedule K, Your Honor, on page 2

6    of 1120-S for 2003, it, again, shows the ordinary

7    income and the interest income, no other income, no

8    dividends, no royalty income, no short-term capital

9    gain, no short-term capital gain or loss, no other

10   ordinary or portfolio income, no net action 1231

11   (phonetic); none.

12             Go forward to page 4 shown on the top

13   right-hand corner.  As for the shareholders' ordinary

14   income, again, it showed under returned earnings.  This

15   is an accounting procedure, Your Honor.  That's where

16   the money goes that is being owed.

17             At that time it becomes up to me to break up

18   that returned earnings and show it as loans to

19   shareholders.  But for these years, 2002, I may have

20   shown it, I broke it up.  But for 2003, it stayed

21   there, as well as returned earnings.  So I did not get

22   the chance to break it up between the shareholders.

23             Regardless, Your Honor, it is shareholders'

24   money.  And the accounting system says returned

25   earnings is a sub-account of the major account called

Trial
Mohamad E. Taha, et al. v. USA                              12/9/2019

1    shareholders' entity -- I'm sorry, shareholders'

2    equity.

3              Similarly, the page after, it shows

4    Mohamad Taha's Schedule K-1 showing his ordinary income

5    and the interest and no capital gain.  Several items

6    here pertaining to capital gain or capital loss or

7    dividend, so on and so forth, none.  The only income is

8    ordinary income and ordinary interest.

9              If you add those numbers, Your Honor, it's

10   what was reported on taxpayers' 1040 for 2003.

11             THE COURT:  May I just say to both parties,

12   the Court is generally quite familiar with Subchapter S

13   returns.  It's a good thing, is all I can say, so we'll

14   go from there.

15             Go ahead.

16             MR. TAHA:  No accounting, Your Honor?

17             THE COURT:  I'm not an accountant, no.

18   Practical experience.  Anyway, we'll go forward.

19             MR. TAHA:  You can see, Your Honor, in

20   addition to Mohamad's Schedule K-1, there are also

21   Schedule K-1 for the other shareholders that followed

22   his Schedule K-1 page.

23             THE COURT:  May the Court admit PX-A2?

24             MS. KANYER:  Your Honor, we would have the

25   same note that DX-10 is -- Defendant's Exhibit 10 is

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    the filed copy of the Form 1120-S for 2003.

2              THE COURT:  All right.  We'll take that into

3    account.  Thank you, Ms. Kanyer.

4              So we're going to 28; is that correct?

5              (Plaintiffs' Exhibit Number A2 was admitted

6         into evidence.)

7              MR. TAHA:  Your Honor, may I suggest

8    something?

9              THE COURT:  Yes.

10             MR. TAHA:  I think this part, this exhibit

11   list, it has become or it's becoming confusing, so why

12   don't we rely on what is in the exhibit list binder?

13             THE COURT:  Why do you think it's becoming

14   confusing?

15             MR. TAHA:  Because of the PX and the A2 and

16   the --

17             THE COURT:  It's just that we have the

18   explanation of the numbers just appearing on the top

19   right of the page, it just helps us find them in the

20   pile; that's all, I think.  I don't think it's

21   confusing.

22             MR. TAHA:  Okay, Your Honor.  I appreciate

23   that.

24             THE COURT:  So the return for 2003 is

25   admitted of Atek corporation.

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1              Now, we're going to the return for 2004?

2              MR. TAHA:  Yes, Your Honor.

3              THE COURT:  Let's do that.

4              MR. TAHA:  1120-S, "U.S. Income Tax Return

5    for an S Corporation for Year 2004," similarly,

6    presents the same pieces of information like the

7    previous 2002 and 2003.

8              My signature is on the top filed on

9    November 15, 2012, as an amended return.

10             Second page, Your Honor, Schedule K, it shows

11   the ordinary income as a loss of 3,873,786; that was a

12   loss.  That was because Atek was dissolved in October,

13   2004 on the grounds that it was forced into dissolution

14   by the bonding companies.  So, therefore, it incurred

15   these losses.

16             It's a fact that Atek did experience

17   financial difficulties around September/October, 2004.

18   In the beginning of the year, Atek was healthy,

19   financially.  It's all because -- I mentioned in my

20   opening statement because the project owners delayed

21   for whatever reason $5 million of Atek's receivables.

22   Atek could not operate by delaying its receivables, so

23   it exhausted whatever it had in reserve.

24             So, again, Your Honor, Schedule K does not

25   show annual losses in capital dividends, long-term or

Trial

Mohamad E. Taha, et al. v. USA                              12/9/2019

 1    short-term capital, et cetera; none.  Only two line
 2    items of income and/or loss.
 3               Going forward --
 4               THE COURT:  Well, may I ask a quick question.
 5    Why was it filed, this return filed as an amended
 6    return in 2012?
 7               MR. TAHA:  Because of, I believe I would say,
 8    two reasons, if not more.  One, Atek did not intend to
 9    file an income tax return when it knew that it was
10    taken over by the bonding companies.  That probably was
11    not the right thing to go forward with because Atek
12    would have or is obligated to file income taxes,
13    whether it's a gain or a loss.
14               So when it was filed, it was filed late, I
15    believe, in 2012 by Eyad Khalil.  I was not in
16    California at the time, I was living in Florida.  So
17    Eyad took the responsibility and had it filed in the
18    year 2012.
19               Somehow it came to my attention when it was
20    filed, I noticed Eyad claimed the sole shareholder of
21    Atek.  Really?  So he made a mistake, or maybe his CPA
22    made a mistake.  It's the same CPA who prepared all
23    these 1120-S, so I cannot tell, Your Honor.
24               All I can tell you is he made a mistake that
25    made me realize there was a mistake and filed this

Trial

Mohamad E. Taha, et al. v. USA                    12/9/2019

1    amendment.  I was the president and officer of Atek.

2    Does that answer your question?

3              THE COURT:  Yes.

4              May I admit the return for 2004?

5              MS. KANYER:  Your Honor, we would have the

6    same objection.  We don't mind that it's the retained

7    copy, but we would object that it's not the filed copy.

8              THE COURT:  Admitted.  We'll probably end up

9    admitting the other version with a cross-reference.

10             (Plaintiffs' Exhibit Number A3 was admitted

11          into evidence.)

12             MR. TAHA:  Going forward, Your Honor, for

13   Schedule K-1 for Mohamad Taha, it shows ordinary income

14   loss of negative, which is a loss, $387,379; that is on

15   line 1 of Schedule K-1.  So he lost money, or actually

16   all shareholders lost money because Atek lost the money

17   in the takeover by the bonding companies.

18             Following that page, Your Honor, you can see

19   Schedule K-1 for the remaining shareholders, three of

20   them, with the loss based on their pro rata share of

21   Atek Construction shares.

22             THE COURT:  You may continue.

23             MR. TAHA:  Do you want me to identify this on

24   the exhibit list?

25             THE COURT:  Yes.

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

```
 1                    MR. TAHA:  Is that Number 28?
 2                    THE COURT:  Well, I think we finished the A
 3          series.  We're about to go to the B series, I hope.
 4                    MR. TAHA:  So it's Number 28, PDF 28?
 5                    MS. KANYER:  Are you looking at Exhibit --
 6                    MR. TAHA:  2004, 1120-S.
 7                    THE COURT:  I thought we finished with 2004.
 8                    MS. KANYER:  I thought we did as well.
 9                    THE COURT:  In the A series.
10                    MR. TAHA:  So it is identified on PX-A3,
11          PDF 28?
12                    THE COURT:  Yes, you had testified about it,
13          I had admitted it.  I had admitted it subject to the
14          caveat that Ms. Kanyer says they have the as-filed
15          version from the IRS, but that's -- we'll take that up
16          later.
17                    MS. KANYER:  Your Honor, we do want to
18          clarify our objection specifically related to the
19          amended return for 2004, the 1120-S.
20                    If you look at defendant's Exhibit 13, you do
21          see a different signature date than the date on the one
22          that plaintiff just offered to admit.
23                    THE COURT:  I think that's one of the reasons
24          the Court asked Mr. Taha the question the Court did;
25          right?  You understand?
```

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1              MS. KANYER:  Yes, Your Honor.

2              THE COURT:  All right.

3              MR. TAHA:  Your Honor?

4              THE COURT:  Yes.

5              MR. TAHA:  I believe every document in this

6    part of the exhibit should not be questionable.  It

7    could be questionable, but if I respond to that

8    question -- because my confusion, Your Honor, is, we

9    compare this with what the IRS has or not have, I

10   cannot -- I cannot comprehend it.

11             THE COURT:  Well, we'll have to take it up in

12   order.  If we take these documents in order, then

13   Ms. Kanyer will have another set, and hopefully by that

14   time we'll have an explanation.

15             I think you gave us the explanation for the

16   2004 return that you signed in 2012 and why that might

17   have been different from that return which was filed

18   earlier.  We have that on the record.

19             MR. TAHA:  Yes, Your Honor.  Thank you.

20             Moving to Exhibit B, Your Honor.

21             THE COURT:  Yes.

22             MR. TAHA:  That is Form 1040, U.S. Individual

23   Income Tax Return For Year 2002.

24             On the first page, Your Honor, it shows

25   wages, none, because neither plaintiff had wages.

57

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1              Line 8-A, it shows the interest that

2      taxpayers earned from Atek.

3              On line 17, Your Honor, is the S corporation

4      Schedule K-1 that they received, that number, 83,968,

5      is as shown on 1120-S, Schedule K-1, for year 2002.

6      Compare those numbers, they are exact.

7              The total gross income is $85,010, and this

8      is the basis for the income that plaintiff received for

9      2002 and reported on 1040-X, and it was lost as bad

10     debt, this $85,010.

11             THE COURT:  Do you recognize the signatures

12     that are on the second page of this return?

13             MR. TAHA:  The second page is Mohamad Taha,

14     he is a plaintiff, he signed it on 4/3/03.

15             THE COURT:  Do you recognize that signature?

16             MR. TAHA:  That's my brother, Mohamad Taha's

17     signature.

18             THE COURT:  All right.

19             MR. TAHA:  I helped him prepare this income

20     tax return.

21             THE COURT:  I'm sure that was what Ms. Kanyer

22     was going to ask you, and I was thinking about asking

23     you but decided not to.

24             MR. TAHA:  He was living in the

25     United States, he was living with me during that year.

Trial

Mohamad E. Taha, et al. v. USA                    12/9/2019

1            THE COURT:  Because he's listed as a

2    California address; is that correct?  Mission Viejo?

3            MR. TAHA:  Oh, yes, Your Honor.  That's where

4    I lived at the time, and he lived with me.

5            Again, on this first page, Your Honor, no

6    income amounts identified as ordinary dividend or

7    capital gains or losses, none or no gain; none.

8            THE COURT:  May the Court admit the document

9    identified as PX-B1?

10           MS. KANYER:  We would have the same

11   objection, Your Honor.

12           THE COURT:  Same objection?  Do you have the

13   return as filed?

14           MS. KANYER:  We do have the return as filed.

15           THE COURT:  Admitted with that caveat.

16           (Plaintiffs' Exhibit Number B1 was admitted

17       into evidence.)

18           THE COURT:  So now we go to 43; is that

19   correct?

20           MR. TAHA:  Form 1040, "U.S. Individual Tax

21   Income Form for the Year 2003" was filed on

22   April 14, 2004, signed by Mohamad Taha, who was a

23   brother, and his wife, Sanaa Yassin, both were signed

24   on April 14, 2004.

25           I asked them to sign them because they were

Trial

Mohamad E. Taha, et al. v. USA                    12/9/2019

1    there, they were present in the United States.  Again,

2    page 1 shows only two income items, one is interest and

3    one is S corporation, which is Atek's distributed

4    income of 74,566.

5              The total income, gross income, was $77,813,

6    and that was the basis for plaintiffs' business bad

7    income because this number was lost due to Atek's

8    dissolution and takeover by the bonding companies.  So

9    that was a lost income.  It became worthless.

10             THE COURT:  May the Court admit PX-B2?

11             MS. KANYER:  Your Honor, we would have the

12   same objection.  We do not have the filed copy.

13             THE COURT:  You do have the filed?

14             MS. KANYER:  We do not have the filed copy.

15             THE COURT:  You do not have the filed copy?

16             MS. KANYER:  No.  We wanted the record

17   reflect that -- I think previously we said we had the

18   copy, we do not have the filed copy for 2003.

19             THE COURT:  Now, I take it you will ask on

20   cross-examination Mr. Taha's knowledge of his brother's

21   and his brother's wife's filing of this return?  This

22   is the base return; it's not the amended return?

23             MS. KANYER:  Correct, Your Honor.  So at this

24   point I did not have questions related to that, but I

25   certainly can.

Trial

Mohamad E. Taha, et al. v. USA                           12/9/2019

1            THE COURT:  All right.  PX-B2 is admitted.

2            (Plaintiffs' Exhibit Number B2 was admitted

3       into evidence.)

4            MR. TAHA:  Again, Your Honor, Schedule K-1

5    from Mohamad Taha shows only two income items or

6    dividend income and interest, no capital gain of any

7    sort, whether short or long, no dividend, et cetera;

8    none.

9            I'm emphasizing these line items that do not

10   exist because they were brought up by the Court and by

11   defendant in their motions and orders, Your Honor.

12           THE COURT:  So now we go to PDF 54; is that

13   correct?

14           MS. KANYER:  Yes, Your Honor.

15           MR. TAHA:  Are you ready for me, Your Honor?

16           THE COURT:  Yes.

17           MR. TAHA:  Thank you.

18           Exhibit C is Atek's promissory notes and

19   transaction --

20           THE COURT:  I'm sorry.  I thought we were

21   going to PX-B3, PDF 54.  We might as well go through

22   this, but if you want to switch to Exhibit E.  -- all

23   right.  Let's -- you go ahead.  You're talking about

24   Exhibit E; is that correct?

25           MR. TAHA:  Your Honor, I thought PDF --

Trial

 1    PX-B3, PDF 54 is year 2004.

 2             THE COURT:  Yes.

 3             MR. TAHA:  And now we go to PX-C1, PDF 58 --

 4             THE COURT:  Well, let's talk about PX-B3,

 5    PDF 54, because this is a different address for your

 6    brother and his wife.  Of course your brother was

 7    deceased at this point, and your brother's wife had

 8    signed it, it looks like, on October 21, 2011.

 9             And you might testify of your own personal

10    knowledge why this was submitted, if it was submitted,

11    and why it was submitted at the time it was submitted?

12             MR. TAHA:  Do you want me to testify now?

13             THE COURT:  Yes.

14             MR. TAHA:  Year 2004 -- in year 2004, Atek

15    incurred losses.  Mohamad Taha, as a taxpayer, received

16    Schedule K-1 shows the loss -- the income as a negative

17    number, which was a loss.

18             So at the time when that occurred, when year

19    2004 1120-S came to my knowledge, when it was filed

20    originally and then re-amended, I presumed at the time

21    because of the loss for year 2004, Mohamad Taha did not

22    need to file an income tax return.  It would have been

23    useless.  It's still useless.

24             However, Your Honor, after I filed the 1040-X

25    under year 2004, the IRS requested me -- or requested

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

```
 1   the taxpayers to file 1040, which is this (indicated),
 2   in order to consider the 1040-X.
 3             THE COURT:  Did you have a role in the
 4   preparation of this return?
 5             MR. TAHA:  Yes, Your Honor, I have -- yes,
 6   Your Honor, I do.
 7             THE COURT:  All right.  May the Court admit
 8   PX-B3, Ms. Kanyer?
 9             MS. KANYER:  Same objection.  We object that
10   this is the retained copy and not the filed copy, which
11   we do have.
12             THE COURT:  All right.  Thank you.  It's
13   admitted subject to that caveat.
14             (Plaintiffs' Exhibit Number B3 was admitted
15       into evidence.)
16             MR. TAHA:  I would like to make a statement
17   in regard to preparation of these income tax returns.
18             First, Mohamad or his wife had no knowledge
19   of any of -- of any of filing income taxes.  They had
20   no knowledge.  The only thing Your Honor said -- this
21   is a question they asked me, "Why do we have to pay
22   taxes?  We never paid taxes back where we lived at the
23   United Arab Emirates."
24             I said, "This is the law.  We all pay taxes.
25   Whether we like it or not, we have to pay taxes."
```

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1              So, Your Honor, not knowing what to do or

2      what to report, I had to help him with this.  I knew

3      the laws, so I helped them.  So I prepared it for them

4      and, where necessary, I asked them to sign.

5              After some time in the year 2004 -- never

6      mind, Your Honor.

7              Moving forward, Your Honor, to Schedule C.

8              Schedule C, Your Honor, is a promissory note

9      for -- there are two promissory notes, one for year

10     2002 income that Atek Construction owed to the

11     shareholders, and the other promissory note is the

12     income that Atek Construction owed for year 2003.

13             This promissory note from what I have seen so

14     far, Your Honor, have become a big issue or a hurdle,

15     which I do not understand.  I formulated these

16     promissory notes as a president and secretary of Atek

17     Construction.  I had the right, I had the experience

18     how to formulate these promissory notes, and there's

19     nothing that I can see is wrong with them.

20             Contrary to what defendant has been claiming

21     all along, they are not good, Mr. Taha wrote those

22     promissory note, so on and so forth.  A promissory note

23     is simple.  It can be worded any way, as long as it's

24     clear and satisfies the intent of promissory note

25     content.

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1          So here in this promissory note for year

2     2002, Atek promised Mohamad Taha and others, but

3     specifically promised Mohamad Taha to pay him $84,935

4     that Atek owed and lost because of the bonding

5     companies' takeover, and, therefore, Atek was

6     dissolved.

7          Similarly, for year 2003, Your Honor, second

8     page, Atek promised to pay shareholders, including

9     Mr. Mohamad Taha, $77,708.  That income was lost again

10    in a takeover -- in the takeover by the bonding

11    companies when Atek, therefore, dissolved.

12         THE COURT:  Ms. Kanyer, may the Court admit

13    PX-C1 and PX-C2?

14         MS. KANYER:  No objection, Your Honor.

15         THE COURT:  Admitted.

16         (Plaintiffs' Exhibit Number C1 was admitted

17       into evidence.)

18         (Plaintiffs' Exhibit Number C2 was admitted

19       into evidence.)

20         MR. TAHA:  Going forward to a document by

21    Atek Construction called Transactions By Account.  This

22    transaction, Your Honor, essentially shows the

23    profit -- we called it profit distribution or earned

24    income, but it's all the same terminology.

25         The third item, Your Honor, it shows

Trial
Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    Mohamad Taha's profit distribution for year 2002,
2    $84,935.  This is the number, whether it's exact or
3    maybe a few dollars of difference, was reported on
4    Mohamad Taha's and his wife's joint income tax return
5    for 2002, was reported as $85,010, it shows here
6    84,935.  It's practically the same number.
7            Out of that profit distribution, Your Honor,
8    Mohamad was paid $12,000.  It's the second number with
9    a check mark on the right-hand side, Your Honor.  Under
10   that item, Your Honor, Mohamad was paid for 2002,
11   another $3,000.
12           These payments were credited to the year 2002
13   profit distribution, which was $85,000 or 84,935, as
14   stated above.  That's where that distribution come
15   from.
16           So the third item of income that he received
17   was $5,000, again, identified with a check mark on the
18   right-hand side.  Those three items of income
19   distributed to Mohamad Taha was for him to be able to
20   pay his taxes plus.
21           The second item from the bottom, how do I
22   call it, the item before last at the bottom, it shows
23   Mohamad Taha's profit distribution for 2003, $77,708.
24   That also was reported on his Form 1040 for year 2003.
25           The next page, Your Honor --

Trial

Mohamad E. Taha, et al. v. USA                              12/9/2019

 1              THE COURT:  Well, may I admit -- this is
 2   identified as PX-C3?
 3              MS. KANYER:  No objection, Your Honor.  C3
 4   also goes to the next page as well.  So no objection to
 5   that page.
 6              MR. TAHA:  I'm sorry, Your Honor, what do I
 7   understand about objection again?
 8              THE COURT:  No, it's not a problem.  It's
 9   just we haven't covered what is marked as page 61 in
10   the upper right.
11              MS. KANYER:  Correct.
12              THE COURT:  If you could cover what page 61
13   on the upper right is, that would satisfy the concern
14   at the time.
15              MR. TAHA:  I see, Your Honor, you're
16   referring to these page numbers on -- on identification
17   of each document?
18              THE COURT:  Yes.
19              MR. TAHA:  So you would like for me --
20   instead of saying --
21              THE COURT:  This is a document headed Tahas'
22   Financials, Income, and Expenses January 1, 2002
23   through September 6, 2006.  You were about to talk
24   about that in any event.
25              MR. TAHA:  Yes, Your Honor.

Trial

Mohamad E. Taha, et al. v. USA                    12/9/2019

1          THE COURT:  Why don't you go forward and do

2     that.

3          MR. TAHA:  This document is called "Tahas'

4     Financials, Income and Expenses, January 1, 2002

5     through September 6, 2006."  This is a comprehensive

6     that I prepared, comprehensive to all the Tahas'

7     receipt of money from Atek and other expenditures that

8     are not shown here because they are not relevant to

9     this first page or relevant to this case.

10         If you look at line 14, Your Honor, it says,

11    "For profit Mohamad Taha," parentheses, "for profits

12    earned and taxed, $162,543."  This number, Your Honor,

13    I stated this number in my opening statement which --

14    which comprises of two incomes for 2002 and 2003.

15         If you add the $85,010 and 77,000 plus, if

16    you add those two numbers, they equate to $162,543.

17    This is a -- it's a comprehensive numbers that are

18    added for year 2002 and 2003.

19         So he was paid $20,000, as you see on

20    line 17; that's what he was paid.  And we already

21    talked about that in Atek's transaction previous

22    document.

23         THE COURT:  Who prepared this sheet?

24         MR. TAHA:  I did.

25         THE COURT:  Okay.

Trial
Mohamad E. Taha, et al. v. USA                                    12/9/2019

1          MR. TAHA:  And this is a legal document,
2    Your Honor, legal in this court and legal in previous
3    courts.
4          THE COURT:  All right.  Ms. Kanyer?
5          MS. KANYER:  No objection to this document.
6    I have no knowledge of the legality of it.
7          THE COURT:  PX-C3 is admitted.
8          (Plaintiffs' Exhibit Number C3 was admitted
9       into evidence.)
10         MR. TAHA:  On line 16, Your Honor, comparing
11   to line 16, there is an item -- there is a number of
12   142,543.  This is the net or the balance that Atek owed
13   plaintiffs; 142,543, and this document, again, and
14   everywhere in motions and objections, so on and so
15   forth.  That is the number, what I called -- again,
16   this is my terminology, Your Honor, that number, I
17   called it seized by petitioners at that time.  And
18   those petitioners were the bonding companies.
19         Go forward, Your Honor?
20         THE COURT:  Yes, please.
21         MR. TAHA:  Exhibit D.  I love this exhibit,
22   Your Honor.  This is the heart of this action, plus
23   others.  Is that okay, Your Honor?  I'm trying to get a
24   relief, Your Honor, if that's okay with you?
25         THE COURT:  You want to take a break?

Trial

Mohamad E. Taha, et al. v. USA                    12/9/2019

1           MR. TAHA:  I'm trying to get a relief, if
2    that's okay with you?
3           THE COURT:  What kind of relief?
4           MR. TAHA:  By saying I like to see Ms. Kanyer
5    smiling.
6           THE COURT:  Well, we all like to see people
7    smiling, even Mr. Pincus, but he does so rarely, but it
8    helps.
9           MR. PINCUS:  If I might, I think that the
10   relief could be left to the Court perhaps rather than
11   the witness.
12          THE COURT:  We're not talking about legal
13   forms of relief, I don't think.
14          MR. TAHA:  Right.
15          THE COURT:  Okay.  We're on Exhibit D and how
16   did you come to become familiar with this document,
17   Mr. Taha?
18          MR. TAHA:  I was still living in California,
19   and I was still president in Atek Construction's
20   offices, or office.  I was still president.  And Atek
21   was copied with these letters.  They were addressed to
22   the project owners, but they were copied or they were
23   filed.  I do not recall if they were filed with the
24   complaints, but I was aware of it in the year 2004
25   around October -- in October, 2004.

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

```
 1            So the first letter, Your Honor, from one
 2   bonding company by the name of Hartford Insurance,
 3   Hartford Fire Insurance Company, or the Hartford.  It's
 4   addressed to a project owner by the name of Huntington
 5   Beach Union High School District.  And the project that
 6   Atek was working on for this school district was called
 7   "Huntington Beach High School fire alarm system
 8   upgrades."  Atek was working on that contract.
 9            What Hartford did in the middle of the third
10   line, third paragraph, what it says "At this time,
11   however, Hartford demands that you" -- referring this
12   demand to Huntington Beach Union High School District,
13   "you release no further funds under the
14   above-referenced contract without the advanced written
15   consent and direction of Hartford."
16            This is one document that brought Atek down,
17   and, therefore, dissolved.
18            The second letter, Your Honor, again, it is a
19   demand by Hartford Fire Insurance Company addressed to
20   Huntington Beach Union High School District, which is
21   the same project owner as the previous document.  And,
22   again, Your Honor, this project is identified as
23   "Huntington Beach High School modernization."
24            And Hartford Fire Insurance Company demanded,
25   quote, "At this time, however, Hartford demands that
```

Trial

Mohamad E. Taha, et al. v. USA                    12/9/2019

1    you release no further funds under the above-referenced

2    contract without the advanced written consent and

3    direction of Hartford."  This also compounded the

4    dissolution of Atek.

5         The third document, Your Honor, is another

6    letter by Hartford Fire Insurance Company addressed to

7    another owner by the name of Anaheim Union High School

8    District.  And the project name was "Lexington Junior

9    High School modernization," Bid Number -- so and so,

10   Bid Number 20054-31.

11        Again, Your Honor, third paragraph, that

12   Hartford Fire Insurance Company demanded by stating at

13   this time, "However, Hartford demands that you release

14   no further funds under the above-referenced contract

15   without the advanced written notice and direction of

16   Hartford."  That also compounded the reason for Atek's

17   dissolution because of the bonding companies' takeover

18   of Atek.

19        The next letter, Your Honor, is by The Insco

20   Dico Group.  I didn't know that name at the time when

21   we had bonding from what they call Developers Surety

22   and Indemnity Company.  So we knew Developers Surety

23   and Indemnity Company, and I addressed this name as

24   such in this action.

25        Similarly, Your Honor, they addressed the

Trial
Mohamad E. Taha, et al. v. USA                                    12/9/2019

1   letter by the name to Fontana Unified School District.
2   And the project name is "A.B. Miller High School wing
3   addition."
4            And the second paragraph, Your Honor,
5   "Developers demanded "Fontana Unified School District,
6   please consider this letter as notice to Fontana
7   Unified School District that no progress payments of
8   contract funds are to be made to Atek on this project
9   without the expressed written consent of Developers
10  Surety and Indemnity Company.  Please acknowledge
11  receipt of directive in writing."
12           That also compounded the reason for Atek's
13  dissolution.  At this time, Your Honor, Atek did not
14  receive any money for its receivables.  And as I
15  mentioned in my opening statement, there was
16  multimillion dollars in receivables that project owners
17  delayed and paid Atek, therefore, Atek was dissolved in
18  the takeover by the bonding companies because the
19  bonding companies by this time, Your Honor, right after
20  these letters took over Atek.
21           Now, the bonding companies' contractual
22  agreement is that they would be responsible to complete
23  the project if the contractor defaulted.  And, of
24  course, the contractor in this case did not default.
25  They were forced into dissolution.

Trial

Mohamad E. Taha, et al. v. USA                                12/9/2019

1          So at that time, Your Honor, the creditors
2    and others, like material suppliers, contractors,
3    subcontractors, et cetera, who were owed money by Atek
4    complained to the bonding company.  Now, the bonding
5    companies have to comply and pay these creditors.  It's
6    an obligation contractually.
7          So, therefore, the bonding companies took
8    over Atek such that they would pay these creditors.  I
9    do not know what they paid or when they paid; it was
10   the bonding companies' property or became the property
11   of the bonding companies at that time.
12          THE COURT:  Ms. Kanyer, may the Court admit
13   Documents D1, D2, D3, and D4?
14          MS. KANYER:  No objection.
15          THE COURT:  Thank you.  Admitted.
16          (Plaintiffs' Exhibit Numbers D1 through D4
17       were admitted into evidence.)
18          MR. TAHA:  The next document, Your Honor,
19   I'll follow your directions by saying page 71 of 106,
20   this page, Your Honor, is a summons page.  And it was
21   stamped by the Court and initiated by Hartford Fire
22   Insurance Company.
23          Attached to the summons, there's a complaint
24   that was filed in the United States District Court
25   Central District of California, a complaint for breach

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1     of indemnity agreement, specific performance of

2     indemnity agreement, statutory reimbursement money

3     paid, so on and so forth, Your Honor.

4            So these documents are the basis and

5     selection of volumetric document that Hartford Fire

6     Insurance Company filed with the Court.  Because it was

7     volumetric, I opted to attach these as exhibits page

8     for the summons and the complaint.

9            If necessary, Your Honor, I would provide the

10    full volume of the complaint.  But I believe because,

11    Your Honor, the bonding company, from what I have seen

12    in their response to counsel's request to produce

13    documents, they did not produce this document.

14           THE COURT:  Ms. Kanyer?

15           MS. KANYER:  Your Honor, we do not object to

16    these documents.  We do note, as you have as well, that

17    they're not the complete document.  But we do not

18    object to these documents.

19           THE COURT:  All right.  The first one appears

20    to be the Hartford summons and the first page of the

21    complaint.  And the second is the Developers Surety and

22    Indemnity Company's complaint.  The summons is the

23    first page, and the first page of the complaint is the

24    second.

25           These are the documents that Atek received,

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    Mr. Taha?

2              MR. TAHA:  Yes, Your Honor, because Atek was

3    sued, so, yes.

4              THE COURT:  May the Court admit Exhibits E1

5    and E2, Ms. Kanyer?

6              MS. KANYER:  No objection, Your Honor.

7              THE COURT:  Admitted.

8              (Plaintiffs' Exhibit Numbers E1 and E2 were

9         admitted into evidence.)

10             MR. TAHA:  Similarly, Your Honor, and

11   Counsel, page 73 of 106 is a summons filed by

12   Developers Insurance Company.  And attached to that

13   summons was page 74 of 106, which is Developers'

14   complaint in the Superior Court of the state of

15   California for the County of Orange.

16             Again, this document is also, which is a

17   complaint of a lawsuit filed by Developers against Atek

18   and its primary shareholders.  And the primary

19   shareholders, Your Honor, is me, Ali Taha, and

20   Eyad Khalil.

21             THE COURT:  All right.  That document has

22   been admitted.  I was curious why in the world Hartford

23   filed in the federal district court and Developers

24   filed in superior court, but that is a question for

25   another day and is irrelevant to the proceedings today.

Trial
Mohamad E. Taha, et al. v. USA                           12/9/2019

1              MR. TAHA:  I can give you an unreliable
2    reason.
3              THE COURT:  All right.
4              MR. TAHA:  And that is, one bonding company
5    exists in such and such location near the court, and
6    the other bonding company resides in a different
7    location that is closer to a different court.
8              THE COURT:  Well --
9              MR. TAHA:  Yes, Your Honor.
10             THE COURT:  Let's move on to Exhibit F.
11             MR. TAHA:  Exhibit F, page 76 of 106, it is
12   titled "Final Judgment on Plaintiffs' First Cause of
13   Action for Breach of Indemnity Agreement."
14             The reference to "Plaintiffs" is Hartford
15   Fire Insurance Company.  And this final judgment was
16   issued to Hartford Fire Insurance Company on
17   January 24, 2006, as stamped on top of the page by the
18   Court.
19             This document also compounded to the loss of
20   Atek business.
21             THE COURT:  Ms. Kanyer, may the Court admit
22   Exhibit F?
23             MS. KANYER:  Your Honor, we do have the
24   two-page document, Defendant's Exhibit 26, so we
25   would -- it is the same document, but we have the

Trial

Mohamad E. Taha, et al. v. USA                                  12/9/2019

1    completed version at 26.

2              THE COURT:  All right.  We'll admit on a

3    provisional basis Exhibit F.  We'll wait for the

4    complete document as part of the Government's case.

5              (Plaintiffs' Exhibit Number F was admitted

6         into evidence.)

7              THE COURT:  Let's move to Exhibit G.

8              MR. TAHA:  Exhibit G comprises of three years

9    of unlimited income tax returns.  Page 78 of 106,

10   Form 1040-X, which is an "Amended U.S. Individual

11   Income Tax Return for Year 2002."

12             It is signed by Mohamad Taha's wife,

13   Sanaa Yassin, because Mohamad was deceased at that

14   time.  She filed it on November 9, 2007, and he died in

15   August, 2007.

16             This amended income tax return, Your Honor,

17   it shows on column 1 the original amount of the

18   original return, which is Form 1040.  It shows the net

19   change, which the net change is the loss that

20   Mohamad Taha incurred because of Atek dissolution.  And

21   out of that, column C, is $20,000.  He was paid that

22   $20,000 as a correct amount.

23             Let me flag this number, Your Honor.

24   Defendant claimed that this $20,000 was not paid tax

25   on.  It is reported in here and the net taxable income

1    shows zero.  So, therefore, that $20,000 became

2    nontaxable because there is no income or gross income

3    on line 10.

4              This is mathematics, Your Honor.  You report

5    the original numbers, line 10 as an example, column A,

6    it shows what the taxpayers paid, 8,573, and the net

7    change is negative $8,573 because plaintiffs are

8    requesting this refund.  So the tax -- total tax is

9    zero.

10             Line 5 above, Your Honor, you can look at the

11   taxable income is zero, even though $20,000 is included

12   above in those numbers, those four numbers, but the net

13   taxable income is zero.  So, therefore, $20,000 did not

14   need to be taxable because of the losses that Mohamad

15   and his wife incurred.

16             Line 23 is the amount considered to be owed,

17   and requested for refund is 8,573.

18             THE COURT:  Did Ms. Sanaa Yassin have

19   assistance in preparing this net of return?

20             MR. TAHA:  Yes, Your Honor, I did assist in

21   every document they filed.  Because, as I mentioned

22   earlier, they did not have the education, they did not

23   have the language proficiency; therefore, I -- and

24   being my responsibility, Your Honor, as I indicated

25   earlier, I had to help them.  They didn't have money to

Trial
Mohamad E. Taha, et al. v. USA                              12/9/2019

 1   go to an outside help.
 2              THE COURT:  All right.  That covers 2002's
 3   amended return.
 4              2003 is on page 80; is that correct?
 5              MR. TAHA:  Yes, Your Honor.
 6              THE COURT:  That appears to be dated the same
 7   date as the amended return for 2002; is that correct?
 8              MR. TAHA:  That's correct, because, Your
 9   Honor, both 2002 and 2003 were filed simultaneously.  I
10   know that for sure, they were filed simultaneously, and
11   taken to the post office either by myself or my --
12   whoever at the time, most likely myself, because
13   plaintiffs didn't have transportation, they didn't know
14   where the post office is.  I have to help them with
15   that.
16              So I know for sure 2002 and 2003 were filed
17   simultaneously.  And I will prove later that the IRS
18   seemed to have insisted on ignoring my reminder letters
19   of the 2003.  They would not give me a reason why the
20   2003 was ignored.
21              THE COURT:  To the best of your personal
22   knowledge, were they filed in the same envelopes or
23   different envelopes?
24              MR. TAHA:  I would assert, based on my
25   experience, they were filed separately.  Now,

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    regardless of -- in my opinion, Your Honor, they were

2    filed simultaneously on the same day.

3              Going forward, Your Honor, Document 80 of

4    106, it's 1040-X for Amended U.S. Individual Income Tax

5    Return for 2003.  I thought we talked about this.

6              THE COURT:  We did.

7              MR. TAHA:  Am I going back to it?

8              THE COURT:  Yes.

9              MR. TAHA:  My apologies.

10             The next document is Form 1040-X Amended U.S.

11   Individual Income Tax Return identified as page 82 of

12   106.  And this is for year 2004.

13             THE COURT:  And this has a different date; is

14   that correct?

15             MR. TAHA:  This was filed on

16   November 1, 2009.

17             THE COURT:  And how did you become familiar

18   with this document?

19             MR. TAHA:  The 1040-X?

20             THE COURT:  Yes.

21             MR. TAHA:  I became familiar with it when I

22   received Form 1120-S for year 2004 that incurred losses

23   or reported losses, so I had to report it under year

24   2004 as or in lieu of 2002 and 2003.

25             There is a reason, Your Honor.  2002 and --

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    2002 was denied or disallowed.  2003 was ignored.  On

2    that basis, I decided I want to file their income tax

3    refund under year 2004 for the single reason, which is

4    the year within which the income became bad debt.

5            The IRS Code 6511(d)-1 asserts this fact that

6    tax refund -- tax refund within -- filed within the

7    seven-year statue should be filed within the year the

8    debt became worthless.  And this is the year, because

9    Atek was dissolved in 2004.

10           One more thing, Your Honor.  Defendant

11   asserted in its contentions and its memorandum of

12   contentions of fact on law, they allege that a refund

13   claim should be filed within the year the overpayment

14   occurred, and that means 2002 and 2003.  You cannot

15   have it both ways, Your Honor.  I mean not you

16   directly, sorry.

17           So if that is the case, then the 2002 and

18   2003 as filed, they were correct, for the -- based on

19   the allegation defendant made.  I think the 2004

20   complies with the seven-year statute and year 2004 is

21   the year within which the debt became worthless.

22           2004, Your Honor, this amended income tax

23   return, it shows basically there is no income in

24   column 1, which is the original amount, which is 1040,

25   Form 1040 did not have any income, therefore, this

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    column is blank.  And the net change is what the
2    taxpayers lost, which is 142,823; that is the net
3    change.  And the correct amount, Your Honor, is the
4    same, it's a loss of $142,823.
5            If you go all the way down, Your Honor, it's
6    on all these numbers reported, line 23, it shows amount
7    applied to your estimate -- no, I'm sorry, line 23,
8    Your Honor, it shows amount of tax refunded to you --
9    oh, my apologies, Your Honor.  It says amount of
10   line 22 you want refunded to you, 14,177.  And this is
11   the same number that was reported by plaintiffs for tax
12   refund.
13           If you go forward, Your Honor, to page 84 of
14   106, I prefer this to supplement the 1040-X, to
15   supple- -- to identify what changes have been made on
16   the front page of 1040-X.  And this page is here, as
17   called it, explanation of changes to income,
18   deductions, and credits.
19           And I explained the item that we showed on
20   the front of 1040-X form.  It explains what changes
21   were made.  And you come up with Bullet Number 3 in the
22   middle of the page, Bullet Number 3 at the top, which
23   says "Deduct total loss as bad debt from lines above,
24   4,289 plus 138,536 equals 142,853 (sic).  And this is
25   the subject amount that plaintiffs lost and never

Trial
Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    received.  And this is the number that plaintiffs paid,

2    14,177, in taxes on it.

3                THE COURT:  All right.  Because you prepared

4    this, may I ask, Ms. Kanyer, if you would agree to the

5    admission of the three exhibits he documents?

6                MS. KANYER:  We would have the same objection

7    that these are the retained copies and not the filed

8    copies.

9                THE COURT:  That's true.  Do you have the

10   filed copies?

11               MS. KANYER:  We have the filed copy for the

12   2002 and 2004, but we, of course, do not have the filed

13   copy for 2003.

14               THE COURT:  So we're at the same position we

15   were before.  All right.  Thank you.

16               The three documents, PX-G1, -G2, and -G3, are

17   admitted.

18               (Plaintiffs' Exhibit Numbers G1, G2, and G3

19        were admitted into evidence.)

20               THE COURT:  Shall we go for another few

21   minutes, or do you want to take a break now, Mr. Taha?

22               MR. TAHA:  I can go on, Your Honor.

23               THE COURT:  You can?  Are you sure?

24               MR. TAHA:  Yes, Your Honor.

25               THE COURT:  All right.  We shall.  We'll

Trial
Mohamad E. Taha, et al. v. USA                          12/9/2019

1     cover Exhibits H and I then.

2             MR. TAHA:  Do you want to go through until

3     5:30, Your Honor?

4             THE COURT:  What?

5             MR. TAHA:  I'm ready to go through until

6     5:30.

7             THE COURT:  Well, let's not do that.  We're

8     going to take a luncheon break, but your stamina is

9     impressive, Mr. Taha.

10            MR. TAHA:  Page 85 of 106, Your Honor, on

11    that same Exhibit Tab G, again --

12            THE COURT:  I thought we had finished --

13            MR. TAHA:  It's Schedule K-1.  And it shows

14    the ordinary -- ordinary loss that Mohamad incurred of

15    negative 387,379.  This supplements the 1040-X as a

16    proof of what Mohamad received in income or loss.

17            Exhibit H, this is page 87 of 106.  This is a

18    letter from the IRS to taxpayers Mohamad Taha and

19    Sanaa Yassin dated December 20, 2007.  And the title of

20    this letter is for tax year December 31, 2002.

21            And the letter says, "We could not allow your

22    claim."  And they explained why they did not allow the

23    claim.

24            At the bottom, Your Honor, the first dashed

25    item or bullet item, the reason for disallowing the

Trial

Mohamad E. Taha, et al. v. USA                    12/9/2019

1    claim is the allegation that the IRS received the claim

2    late.  That means they received it later than the three

3    years from the return due date of a family filed

4    unextended return.

5           This three years is not applicable for

6    business bad debt, the seven years is.  And plaintiffs

7    insisted on -- I insisted on their behalf, as well

8    documented, that this period is not applicable; the

9    seven years is, if it is.

10          Similarly, Your Honor, which I missed, if it

11   is not three years from the return due date as being

12   filed late, it is two years after you pay the tax.

13   Actually, one or the other reason, it's the same.

14          The next document, Your Honor, is page 92 of

15   106.  This letter, I wrote this letter, Your Honor.

16   Ms. Sanaa Yassin would never be able to write a letter

17   like this because of the reason I expressed earlier.

18   This letter, Your Honor, is dated January 21, 2008.

19   It's addressed to the Internal Revenue Service in

20   Fresno, California.  The subject of the letter,

21   Your Honor, is "Mohamad Taha and Sanaa Yassin" with tax

22   identification number, and the reference to the IRS

23   letter of this allowance, which we talked about

24   earlier, and that letter number is identified as

25   "LTR105CE0," this reference number on the disallowance

Trial
Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    letter by the IRS.

2              And, again, in the subject title, it says,

3    "Tax Period December 31, 2002, 2003."  I'm telling the

4    IRS, Your Honor, you'll ignore 2003 here and I'm

5    reminding you of it.  It's a reminder.  No response

6    whatsoever from the IRS in regards to 2003.  They

7    ignored it.

8              Just to supplement this letter, Your Honor, I

9    believe this was like an appeal letter by taxpayers.

10   It was followed by a letter from the IRS appeals office

11   that I did not include in here.

12             It was followed -- the first disallowance by

13   the IRS was followed by another disallowance.  I don't

14   recall if I attached it to previous motions, but that

15   letter that I received from the appeals office was in a

16   similar content that they disallowed the claim for tax

17   refund on the basis of receiving the claim three years

18   from the return due date, and they ignored the 2003

19   income tax return that I filed simultaneously with

20   2002.

21             Attached to this letter, Your Honor, I

22   received a notice of possible dividend, an order fixing

23   time to file claims from the United States Bankruptcy

24   Court, Central District of California in regards to

25   debtor Eyad Khalil.

1          Eyad Khalil at the time filed bankruptcy, and

2     the United States Bankruptcy Court issued this notice

3     of possible dividend to all creditors of Eyad Khalil or

4     creditors of Atek Construction.

5          Now, at this time, Your Honor -- and I will

6     express it simply, that taxpayers Mohamad Taha and his

7     wife, Sanaa Yassin, were hopeful that they would get

8     something out of this.  There was nothing in the

9     bankruptcy, not a dollar or a penny.

10         So this document was filed in compliance with

11    the notice by the United States Bankruptcy Court, and

12    the taxpayers filed what you call here is a claim or a

13    proof of claim that's page 94 of 106.  That's what the

14    taxpayers filed with the notice of possible dividends

15    in Eyad Khalil's bankruptcy.

16         They claim, in the middle of the page on the

17    right-hand side corner, $142,643.  In fact, in this

18    action, plaintiffs claim $142,823, a few dollars

19    difference.

20         Second page, Your Honor, page 95 of 106, it

21    lists a summary of basis for the claim.  And the claim

22    is, like I said, the previous page, which is called

23    proof of claim.  So this page, Your Honor, 95 of 106,

24    is a summary of the claim of $142,643.

25         The first line item, it shows year, 2002,

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    share of income performed, K-1, dated 12/31/2002.

2    Attached -- Schedule K-1 was attached for year 2002.

3    It shows the income of $84,935.

4           The next line item, Your Honor, it shows year

5    2003, share of income per Form K-1 dated 12/31/2003

6    attached, it's also attached.  And it shows share of

7    income of $77,708.

8           The third item, Your Honor, and Counsel, it

9    shows taxpayers received partial payment on share of

10   income, Check Number 17358, dated 4/4/03, attached.

11          I'm sorry, I missed one line item above.

12   That line item above is taxpayers received $12,000, and

13   that is the same number that we have reviewed earlier

14   in Atek's transaction account.

15          The last item, Your Honor, received partial

16   payment on share of income, Check Number 18215, dated

17   October 15, 2003, attached, $5,000.  The net amount due

18   taxpayers is 142,643.  And that is the same number

19   shown on the proof of claim, first page.

20          THE COURT:  So no bankruptcy petition was

21   filed respecting Atek; is that correct?

22          MR. TAHA:  That is correct.  There is an

23   argument, Your Honor.  Atek could not defend itself,

24   could not file bankruptcy.  Nevertheless, Atek was

25   dissolved.  There is no money to file for bankruptcy;

Trial

Mohamad E. Taha, et al. v. USA                              12/9/2019

1    none.  This is the primary reason, two primary reasons

2    why Atek did not file bankruptcy.  It would have been

3    useless and would have been nonsense.

4              THE COURT:  Ms. Kanyer, may the Court admit

5    the three documents that are identified as Exhibit H,

6    H1, H2, and H3?

7              MS. KANYER:  I only have H1 and H2.  The

8    United States does not object to --

9              THE COURT:  I'm sorry, you're right.  You're

10   exactly right.  I was translating I1 and I2.

11             All right.  We're talking just about H1 and

12   H2.  The Court asked you about that, those two

13   documents?

14             MS. KANYER:  As far as H1, we would object on

15   the grounds of relevancy.  It relates to 2002 and not

16   2003, and 2002 is not at issue in this case.  So we

17   would object to H1.  We do not object to H2.

18             THE COURT:  The Court, nonetheless, will

19   admit H1 and H2.

20             (Plaintiffs' Exhibit Number H1 was admitted

21        into evidence.)

22             (Plaintiffs' Exhibit Number H2 was admitted

23        into evidence.)

24             THE COURT:  Now we can go to Exhibit I,

25   Mr. Taha.

Trial

Mohamad E. Taha, et al. v. USA                    12/9/2019

1          MR. TAHA:  Your Honor, let me make a
2     statement again in regard to the proof of claim.
3          THE COURT:  Yes.
4          MR. TAHA:  As I mentioned earlier, plaintiffs
5     or taxpayers were hopeful that they would get something
6     out of it.  In my honest opinion, I knew at the time
7     that there was nothing in the bankruptcy to claim, but
8     in a formality fashion, I decided to make this claim on
9     their behalf.
10          I didn't know how much Eyad Khalil has in his
11     bankruptcy, but I knew at the time, at least, it was
12     something that we can hope may happen, and it did not
13     happen.
14          This does not mean, Your Honor, a downer for
15     their actual claim for tax refund in this action.  I
16     filed this at the very first evidence of document for
17     the business bad debt within the seven-year statute of
18     the IRS.  That is the very first document that we
19     provided for the business bad debt.  We made a claim to
20     prove that the debt was bad debt, therefore, being
21     claimed in this document.
22          Again, Your Honor, the next document is
23     Schedule K-1, page 96 of 106 and page 97 of 106 for
24     2003.  The first was for 2002.  Those two are
25     Schedule K-1 to support the proof of claim.

1          What I mean, Your Honor, this Schedule K-1
2   supports the proof of claim by showing the income that
3   taxpayers receive from Atek or it -- it's not really
4   income per se, it was a distributed income that they
5   never received just to attach it as a proof and support
6   of the proof of claim.
7          The next page also is a support for the proof
8   of claim, and it's identified as page 98 of 106.  And
9   it shows three check stubs for a total of $20,000 that
10  Mohamad Taha received from Atek Construction to be able
11  to pay for his taxes that he owed for 2002 and 2003.
12         Moving forward, Your Honor, page 99 of 106,
13  moving forward, Your Honor, and Counsel, to page 99 of
14  106, this is another letter dated September 24, 2009,
15  that I helped taxpayers to respond to the IRS, this
16  letter is addressed to the IRS.  And the subject of the
17  letter, Your Honor, is Mohamad and Sanaa Yassin, tax
18  identification number, letter reference number
19  APCOFRCAGL.
20         This letter is in response to that reference
21  letter.  And the form is Form 1040; amount of claim,
22  $14,177, and the tax period is December 31, 2002, and
23  2003.  This letter is another reminder to the IRS that
24  plaintiffs or taxpayers are claiming their tax refund
25  for both years, 2002 and 2003.

Trial

Mohamad E. Taha, et al. v. USA                    12/9/2019

1              It's a short paragraph, Your Honor, let me
2       read it.
3              THE COURT:  We can see it.
4              MR. TAHA:  I'm sorry?
5              THE COURT:  We can see it.
6              MR. TAHA:  You can see it.  Okay.
7              Specifically, Your Honor, in the middle of
8       the paragraph, I say, "We disagree with your assertion
9       of denial and emphasize that our amended return was
10      filed timely within the seven-year statute of
11      limitation for business bad debt, and, therefore, your
12      assertion of the three years is not applicable."
13             Next page, 100 of 106, this is a similar
14      letter, Your Honor, dated November 12, 2009, addressed
15      to the Internal Revenue Service.  And, again, it
16      identifies the subject letter, the subject for tax
17      period December 31, 2002, and 2003.
18             There are these two letters, the one that I
19      identified earlier and this letter here, both of them
20      were addressed to the IRS within two months.  First
21      letter was addressed on September 24, 2009, and the
22      second one, which is this one, November 12, 2009.  It
23      addressed the same subject to the IRS.
24             All these letters, Your Honor, they are solid
25      proof of reminding the IRS that the 2002 and 2003 were

Trial

Mohamad E. Taha, et al. v. USA                              12/9/2019

```
 1    filed.  Did I get -- or did taxpayers get any response
 2    in regards to years 2003?  No, none.  If -- in my
 3    opinion, Your Honor, if the IRS -- can I say it,
 4    Your Honor, the way I want to?
 5              THE COURT:  Yes.
 6              MR. TAHA:  My language is fairly good.
 7              If the IRS had the integrity to address these
 8    letters, to respond to these letters, they would have,
 9    but they opted to ignore them, Your Honor.
10              I cannot be any clearer on behalf of the
11    taxpayers than what I have identified here.  You,
12    Your Honor -- I'll retract that.
13              At this point, Your Honor, let me make a very
14    brief statement to all these documents.
15              They were not acknowledged once.  They were
16    ignored in total by two sectors of -- of defendant and
17    three courts.  Respectfully, Your Honor, they were not
18    acknowledged, but ignored.
19              THE COURT:  This is why --
20              MR. TAHA:  I will call it allegation by these
21    governmental entities that respectfully did not
22    acknowledge -- this what I call a preponderance of
23    evidence for the business bad debt.
24              THE COURT:  Let's cover Exhibit I, if we can,
25    before we forget.
```

Trial

Mohamad E. Taha, et al. v. USA                              12/9/2019

1          MR. TAHA:  Proceed, Your Honor?

2          THE COURT:  Yes.

3          MR. TAHA:  Exhibit I, page 102 of 106, this

4   letter is from the IRS to taxpayers Mohamad Taha and

5   Sanaa Yassin, dated October 15, 2019.  My apologies,

6   Your Honor, this is the filing date.

7          This letter was addressed to the taxpayers on

8   March 22, 2016.  And there's a reference to it such

9   that we indicate that reference in my responding

10  correspondence to the IRS.  This letter, Your Honor,

11  came from Joseph Dianto, he's an agent of the IRS.  And

12  he -- according to his letter, he is a field director,

13  accounts management department.

14          This letter is very, very important,

15  Your Honor, and Counsel.  For the same reasons of not

16  acknowledging or ignoring taxpayers' preponderance of

17  evidence they provided, here's what they said, "We

18  are" -- I'm quoting, Your Honor, what the IRS is

19  responding with to the taxpayers.

20          "Dear Taxpayer, we are unable to process your

21  claim for the tax period shown above."

22          And that tax year shown above, Your Honor,

23  and Counsel, is tax period December 31, 2004.

24          "The issue is unallowable because the

25  deductions are based on monies not paid to you that you

Trial

1   maintain you were owed.  There is no basis in the law

2   for taking a loss for income that was never paid in the

3   first place."

4           And my response to that, really?

5           And they continued, "The bad debts statute of

6   seven years is correct, and the claim would be worthy

7   of reconsideration if there had been actual bad debt."

8           There was actual bad debt, but ignored by the

9   IRS.  Another thing, Your Honor, in this regard, the

10  IRS cannot have it both ways.  The taxpayers' claim,

11  Your Honor, was filed on the basis of seven years for

12  business bad debt.  Both reasons are attached or in

13  conformance with each other.  Seven years for business

14  bad debt, you cannot split it here.

15          If you acknowledge the seven-year statute for

16  business bad debt and the business bad debt is part of

17  the seven years, then it's one and the same.  So once

18  you acknowledge it for seven years, they should legally

19  acknowledge it for the bad debt.  Nevertheless,

20  Your Honor, the bad debt was provided, but ignored.

21          This exhibit, Your Honor, was provided to the

22  IRS.  It's a volume.  Your Honor, I'll go back to the

23  subject title.  They alleged that the date of claim

24  received, April 1, 2011.  As you can see, I put a

25  question mark on it because it didn't ring a bell at

1   that time, but later on maybe I recognized it.  You

2   received it on April 1, 2011, and you acknowledged it

3   on March 22, 2016, five years after, Your Honor, and

4   Counsel.

5            Remember, Your Honor, and Counsel, what I

6   said in my opening statement about the six IRS centers,

7   the six states, the 33 agents, 12 departments, and

8   33 letters, I would like to re-emphasize that as the

9   disorganized responses and understanding by the IRS of

10  the claim.  They were totally distorted and I said that

11  in my opening statement.

12           There was a distortion between the IRS state

13  centers, agents and departments, and the 33 letters.

14  None of the 33 letters addressed directly to the

15  subject matter; none.  They were all pulled out of the

16  archives of the IRS, and here it is.

17           Thirteen letters, Your Honor, and Counsel

18  requested 45 days extension.  And those 45 days

19  extension never been actual 45 days.  Maybe 60 days

20  extension, maybe 90 days extension, whenever they felt

21  like it, they would respond.  They never responded

22  within that 45 days as they stated they would respond.

23           Every time, every letter I sent, give us

24  45 days extension so we can complete our research.  Ten

25  years, Your Honor, to complete their research.

Trial

1            THE COURT:  Ms. Kanyer?

2            MS. KANYER:  Your Honor, we object.  This is

3     not relevant and doesn't go to the issues that the

4     remand --

5            THE COURT:  Well, we still have to cover

6     page 102 and following of 106.  Let's do that.

7            MS. KANYER:  Thank you, Your Honor.

8            MR. TAHA:  Incidentally, Your Honor,

9     Mr. Dianto was subpoenaed by me to appear in this

10    trial.  And you indicated in your agreement with

11    counsel that it would not be necessary or for whatever

12    other reason that you specified at the time of

13    December 2nd.

14            THE COURT:  Yes.

15            MR. TAHA:  During the telephonic conference

16    because I believe you indicated if this letter is here,

17    that will suffice.

18            THE COURT:  That's right.  And we actually

19    have, I think, as well, it looks like your response on

20    page 104; is that correct?

21            MR. TAHA:  That is correct, Your Honor.

22            THE COURT:  Did you ever get an answer to

23    this letter?

24            MR. TAHA:  No, Your Honor.  However,

25    Your Honor, I received letters after this from the IRS

Trial

1    center in Texas, Austin, Texas, claiming that we

2    received your request for audit.  I don't know if I

3    included that letter, Your Honor, but I'll be glad to

4    present it.

5             THE COURT:  No, you don't have to do that.

6             MR. TAHA:  We received your letter for

7    consideration for audit.  And they said in the top of

8    the page, amount due, zero.

9             Then I responded to that letter by saying, we

10   never -- taxpayers never requested an audit.  But the

11   fact of the matter, Your Honor, here is, what I have

12   indicated earlier how the IRS operates from one state

13   to another.

14            THE COURT:  It's a big organization,

15   Mr. Taha.

16            MR. TAHA:  I agree with you, Your Honor, but

17   for ten years?  Not realistic.

18            THE COURT:  May the Court admit PX-I1 and

19   -I2?

20            MS. KANYER:  Your Honor, we would have the

21   same objection that the PX-I, PDF 102 is not relevant.

22   It's a de novo proceeding and this relates to a tax

23   year that's already been dismissed.  And related to the

24   other document, we would have the same objection.

25            THE COURT:  The Court will nonetheless admit

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    them for the context.  I grant you that, if these
2    relate to 2004, we're not necessarily viewing the 2004.
3    We are dealing with 2003, though.  So PX-I1 and PX-I2
4    are admitted.
5              (Plaintiffs' Exhibit Number I1 was admitted
6         into evidence.)
7              (Plaintiffs' Exhibit Number I2 was admitted
8         into evidence.)
9              THE COURT:  We have gone through all of
10   plaintiffs' exhibits.  May we take a luncheon break?
11             MR. TAHA:  Your Honor, let me make a
12   statement --
13             THE COURT:  Yes.
14             MR. TAHA:  -- in this regard.
15             The claim is for 2002 and 2003.  I asserted
16   this to you during more than one telephonic conference.
17             THE COURT:  That's true.
18             MR. TAHA:  This trial, Your Honor, is a claim
19   for both years, for 2002 and 2003, whether they are
20   filed individually or they are filed under 2004, which
21   was inclusive of both 2002 and 2003.
22             I indicated this in the telephonic conference
23   to you and to counsel, and you indicated that you will
24   consider in this trial the claim in total.
25             THE COURT:  Yes.

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1              MR. TAHA:  Thank you, Your Honor.

2              THE COURT:  You're welcome.  May we take a

3    break?  Given the hour, the court reporter has been

4    very patient, I must say, because we're really running

5    over time.  But we did do a fair amount of the work

6    that's required in this trial.  Let us take a break

7    until 2:00.  Is that satisfactory?

8              MS. KANYER:  Yes, Your Honor.

9              THE COURT:  Mr. Taha, is that satisfactory?

10             MR. TAHA:  That's satisfactory, Your Honor.

11   I would like for you to clarify one thing for me.

12             THE COURT:  Yes, please.

13             MR. TAHA:  Is this what you -- I'm not aware

14   or familiar with the procedure, so I'm going to clarify

15   this.

16             This presentation is Item Number 3 on your

17   final pretrial order, which says, "Plaintiff and

18   defendant shall each be allowed six hours for the

19   presentation of evidence" --

20             THE COURT:  Yes.

21             MR. TAHA:  -- is that what you call it?

22             THE COURT:  Yes.

23             MR. TAHA:  Thank you, Your Honor.

24             THE COURT:  That's it.  All right.  We're in

25   recess until 2:00.

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1              (A break was taken.)

2              THE COURT:  Ms. Kanyer, I do believe we're

3    ready for cross-examination of Mr. Taha.  You may

4    proceed.

5              MS. KANYER:  Your Honor, we call Mr. Taha.

6              THE COURT:  Mr. Taha, if you would return to

7    the witness stand.

8                      CROSS-EXAMINATION

9    BY MS. KANYER:

10   Q.  Good afternoon, Mr. Taha.

11   A.  Good afternoon, Ms. Kanyer.

12   Q.  Mr. Taha, could I please have you turn to

13   Plaintiffs' Exhibit G2, which is at PDF 80.

14   A.  Counsel, I'm having a little difficulty hearing

15   you.

16   Q.  Is this better?

17   A.  No, your voice is too soft.

18   Q.  I will speak up.  Thank you for letting me know.

19              Mr. Taha, can I please have you turn to

20   Plaintiffs' Exhibit G2, which is at PDF 80.

21   A.  Is that my exhibit book?

22   Q.  Yes, Mr. Taha.

23   A.  Exhibit G, on what page?

24   Q.  80, 8-0.  It is a Form 1040-X for tax year 2003.

25   A.  Thank you.  I see it.

Trial
Mohamad E. Taha, et al. v. USA                              12/9/2019

```
 1    Q.   You see it?  Okay.
 2              Mr. Taha, you testified you are Plaintiff
 3    Taha's brother; correct?
 4    A.   Yes.
 5    Q.   And you assisted plaintiffs in preparing this
 6    document; correct?
 7    A.   Correct.
 8    Q.   And you testified that you were the one who
 9    actually prepared this Form 1040-X for tax year 2003;
10    correct?
11    A.   Correct.
12    Q.   Can I please direct your attention to the
13    signature on the bottom of the line above that reads
14    "Filing as surviving spouse."
15    A.   It's Sanaa M. Yassin, as filing as surviving
16    spouse, on 11/9/07.
17    Q.   It's your testimony that that's Ms. Yassin's
18    signature?
19    A.   Yes.
20    Q.   Ms. Yassin wasn't living with you in 2007; is that
21    correct?
22    A.   Yes.
23    Q.   She was living in the United Arab Emirates?
24    A.   Yes.
25    Q.   But you obtained her signature at some point
```

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1   before file -- before purportedly filing this document;
2   correct?
3      A.   She was living at the United States at the time
4   she signed this document.
5      Q.   I thought you just testified that she was living
6   in the United Arab Emirates as of November of 2007; is
7   that not correct?
8      A.   In November, 2007, she was living in the United
9   States.
10     Q.   So she was not living in the United Arab Emirates
11  in 2007?
12     A.   Correct.  She did not.
13     Q.   She did not.  Okay.
14          Mr. Taha, you took a deposition in this case;
15  correct?
16     A.   I'm sorry?
17     Q.   You took a deposition in this case; is that
18  correct?
19     A.   I'm sorry, I don't --
20     Q.   Do you recall taking a deposition in this case?
21     A.   Me as -- as deposed?
22     Q.   Correct.
23     A.   You deposed me, yes.
24     Q.   You recall that; right?
25     A.   Yes, ma'am.

Trial

```
 1    Q.  We were in Bradenton, Florida; is that correct?
 2    A.  That's correct.  I'm sorry.
 3    Q.  You were under oath at that deposition; right?
 4    A.  Correct.
 5    Q.  Okay.  And you were under that same oath that
 6    you're here today; correct?
 7    A.  Correct.
 8    Q.  Okay.  And you swore to tell the truth; is that
 9    correct?
10    A.  Correct.
11    Q.  And you did tell the truth; correct?
12    A.  Correct.
13    Q.  Okay.  And after you finished testifying, you were
14    given a copy of the transcript; is that correct?
15    A.  That's not correct.
16    Q.  You did not receive an e-mail copy of the
17    transcript?
18    A.  I did receive an e-mail.  I did not read it
19    because it was tedious for my eyes.  It was about
20    150 pages.  I could not review it on the computer.  So
21    I responded to the senator of that transcript, I
22    believe her name is Ms. Granier (phonetic), I requested
23    a hard copy to be mailed to me.  She never did.
24    Q.  And you said her name was -- what was her name?
25    A.  I believe G-R-A-N-I-E-R.
```

Trial

1    Q.   Okay.  I just wanted to make sure.  It sounded

2    like my name.

3             But you did receive that e-mail attaching the

4    transcript; is that right?

5    A.   That is correct, but I did not review it.

6             MS. KANYER:  Your Honor, may I approach?

7             THE COURT:  With what?

8             MS. KANYER:  A transcript.

9             THE COURT:  Yes, you realize the Court is --

10   I was about to use the word "persnickety" on the use of

11   prior deposition testimony.

12            MS. KANYER:  I did not know that.

13            THE COURT:  I try to follow the rules of

14   evidence very precisely.

15            MS. KANYER:  Okay.  I hope that I am doing it

16   correctly.

17            THE WITNESS:  Let me make another statement,

18   if you don't mind, Your Honor, and counsel.

19            THE COURT:  Yes.

20            THE WITNESS:  About the transcript that I

21   received by e-mail.  I wear two implants in my eyes.

22            THE COURT:  Mr. Taha, the Court doesn't read

23   e-mails that long either.

24            THE WITNESS:  Okay.

25            THE COURT:  So I understand completely.

Trial
Mohamad E. Taha, et al. v. USA                          12/9/2019

1              THE WITNESS:  Thank you, Your Honor.
2              THE COURT:  May I have a copy, please.
3              MS. KANYER:  Of course.
4    BY MS. KANYER:
5     Q.  Mr. Taha, I'm going to read from a page of your
6    deposition.
7              THE COURT:  No, you're not.
8              MS. KANYER:  Am I not doing it correctly?
9              THE COURT:  I'm sorry?
10             MS. KANYER:  I'm not doing it correctly then.
11             THE COURT:  That's not allowed.
12             MS. KANYER:  Okay.  Do you mind if I have a
13   moment to confer with my co-counsel.
14             THE COURT:  Yes, you have to establish that
15   there's some sort of inconsistent statement first
16   before you do that.
17             MS. KANYER:  Okay.
18             THE COURT:  Mr. Pincus would tell you the
19   same thing.
20             MS. KANYER:  Thank you.
21   BY MS. KANYER:
22    Q.  Mr. Taha, do you recall me asking you -- or,
23   Mr. Taha, I asked you in your deposition about
24   Ms. Yassin; that's correct?
25    A.  I do not recall, but I'm not going to question it.

Trial
Mohamad E. Taha, et al. v. USA                              12/9/2019

1     Q.  And so you don't recall testifying that Ms. Yassin
2     resided in --
3                  THE COURT:  In where?
4                  MS. KANYER:  The United Arab Emirates.
5                  THE COURT:  What was the precise question you
6     asked Mr. Taha in his deposition?  Why don't you ask
7     that question again.
8                  MS. KANYER:  Your Honor, it's just an
9     inconsistent statement.  I previously heard Mr. Taha
10    testify that she lived --
11                 THE COURT:  Yes, but let's have the question
12    from the deposition transcript.  What was the question
13    to which you say Mr. Taha gave an inconsistent
14    response?
15                 MS. KANYER:  So the full question is -- I
16    apologize, it's not the best worded question -- "Okay.
17    So in December of 2007" --
18                 THE COURT:  It's where in the transcript?
19                 MS. KANYER:  Sorry.  It is page 129 of the
20    transcript.
21                 THE COURT:  Just a moment.
22                 MS. KANYER:  Line 2.
23                 THE WITNESS:  Sorry?  Which page again?
24    BY MS. KANYER:
25    Q.  Page 129, line 2.

Trial
Mohamad E. Taha, et al. v. USA                              12/9/2019

1           THE COURT:  Mr. Taha, why don't you just find
2   it.  Let's not read anything or say anything; just tell
3   us when you found the question.
4           THE WITNESS:  Your Honor, there are several
5   questions and answers.
6           THE COURT:  This is a mini script.  Do you
7   have page 129, Mr. Taha?
8           THE WITNESS:  Yes, Your Honor.
9           THE COURT:  All right.  Good.  Let's go from
10  there.
11  BY MS. KANYER:
12    Q.  I'm looking at line 2, the question that starts
13  with "Okay."
14          THE COURT:  Why don't you read the question.
15  BY MR. TAHA:
16    Q.  "So in December of 2007, was mail going to you
17  instead of Mohamad?  Was that how that worked?  I guess
18  can you explain to me how their mail situation worked?
19          THE COURT:  If you talk about a compound
20  question; that's it.  Let's take it a step at a time.
21  BY MS. KANYER:
22    Q.  Okay.  And your answer said --
23          THE COURT:  No.  No answer.  I haven't seen
24  anything that amounts to a question that you've asked
25  Mr. Taha today where he provided an inconsistent

Trial
Mohamad E. Taha, et al. v. USA                                    12/9/2019

```
 1   response.
 2              MS. KANYER:  Okay.  I will move on then.
 3   BY MS. KANYER:
 4     Q.  Mr. Taha, can I direct your attention to the
 5   bottom portion of this document, the handwriting?
 6     A.  Page 129?
 7     Q.  Oh, excuse me.  Page 80 in plaintiffs' exhibits.
 8   Page 80 in plaintiffs' exhibits, GX2.  It's the 1040-X
 9   we were just looking at.
10     A.  Okay.  I'm here.
11     Q.  That's your handwriting; correct?
12     A.  That is correct.
13     Q.  And that's your internal file name for this
14   document; is that correct?
15     A.  That is what?
16     Q.  Your file name for this document?
17     A.  That is correct.
18     Q.  And it's your testimony that this document, GX2,
19   page 80, PDF page 80, this is plaintiffs' filed 1040-X?
20     A.  That's correct, it's 1040-X.
21     Q.  Okay.  But, Mr. Taha, you don't specifically
22   recall mailing the Form 1040-X for 2003; correct?
23     A.  Correct.
24     Q.  And you don't specifically recall how this 1040-X
25   was mailed; correct?
```

Trial

1    A.   Correct -- or it was mailed; correct.

2    Q.   And, Mr. Taha, can I please have you turn to the

3    very beginning of plaintiffs' exhibits to PDF page 2,

4    "Plaintiffs' Exhibit List."

5    A.   I'm sorry, what exhibit number?

6    Q.   It's PDF page 2, so it's the very front of

7    plaintiffs' exhibits.

8    A.   I don't know what PDF numbers mean to me.

9    Q.   So in the upper right-hand corner looking at the

10   second page of this document entitled "Plaintiffs'

11   Exhibit List," so it's right before A.

12   A.   I'm sorry, Counsel, I do not follow.  Is that

13   Exhibit G?

14   Q.   No, it is the page before Exhibit A.  Do you see

15   "Plaintiffs' Exhibit List"?

16   A.   Are you talking about "Plaintiffs' Memorandum of

17   Contentions Exhibit List"?

18   Q.   Can you please turn to the next page in this set

19   of documents?

20   A.   Okay.

21   Q.   Does that say "Plaintiffs' Exhibit List"?

22   A.   That's the exhibit I prepared, yes.

23   Q.   Okay.  And these are listing all of plaintiffs'

24   exhibits that you are using for this trial; correct?

25   A.   That's correct.  And these are the same documents

Trial
Mohamad E. Taha, et al. v. USA                                12/9/2019

1    that I already presented earlier.

2    Q.  And in this you have not listed a certified mail

3    card in this exhibit list, correct, for tax year 2003;

4    correct?

5    A.  I can answer with an explanation.  The answer is

6    correct.  And the explanation is, you are asking me

7    what happened 15 years ago, 13, 14 years ago.  I do not

8    recall how it was mailed.  But the fact remains,

9    Counsel, it was mailed simultaneously with 2002.

10   Q.  We'll get to that in a second.  Plaintiffs also

11   haven't listed a registered mailing card as well;

12   correct?

13   A.  Correct.  Are you still talking about certified

14   mail?

15   Q.  I'm talking about registered mailing of the refund

16   claim for 2003.

17   A.  That's the same thing as certified, isn't it?

18   Q.  No, it is not.

19   A.  It's not?  Okay.

20   Q.  Did you have any registered mailing receipts

21   listed in Plaintiffs' Exhibits List?

22   A.  It would be the same answer as for the certified

23   mail.

24   Q.  And regarding that 2002 federal refund claim, you

25   don't specifically recall mailing the 2002 federal

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    income -- excuse me, 2002 refund claim; correct?

2    A.   It was mailed along with 2003; that's correct.

3    Q.   But you don't specifically recall mailing the 2002

4    refund claim; correct?

5    A.   That's correct.   It's because of the period that

6    passed.   But the fact remains and the IRS acknowledged

7    receiving 2002 claim, so I do not understand -- my

8    apologies, I do not understand what you are leading to

9    except the fact that the IRS acknowledged 2002.

10           However it was mailed, I do not recall how it

11   was mailed.   Most likely it was mailed by either

12   certified mail or regular mail or registered mail.   I

13   have no recollection to that.

14   Q.   And is it your -- you said it was mailed

15   potentially -- let me start my question over.

16           Was it mailed with one envelope or two

17   envelopes?

18   A.   That I do not recall, but if I want to guess --

19   and I hate to guess, Your Honor -- it would have been

20   mailed in separate envelopes, but I cannot swear on

21   that.

22   Q.   And, Mr. Taha, you also referenced a State of

23   California refund claim; correct?

24   A.   That's correct.

25   Q.   And that was for 2002 and 2003; correct?

Trial
Mohamad E. Taha, et al. v. USA                              12/9/2019

1    A.   That's correct.

2    Q.   And is it your testimony that those were filed at

3    the same time?

4    A.   That's correct.

5    Q.   Okay.  And were those in separate envelopes?

6    A.   No, they were filed together.  When I say

7    "together," the State of California's income tax return

8    540 X was attached to the federal Form 1040-X for the

9    same year, both have to go together.

10        It's a must that the State would receive both

11   forms together, because for the following reason,

12   number one, it is standard or it is a requirement by

13   the State of California -- talking about the State of

14   California only -- that you attach the federal income

15   tax return along with the state income tax return.

16        For whatever reason, it's up to the State

17   whatever reason it is, maybe they want to verify what

18   the federal income tax return calls for, whatever

19   number it has, matches whatever is on the state income

20   tax return; that's my intuition.

21   Q.   So I want to make sure I'm understanding.  Are you

22   saying that these returns, the federal return and the

23   state return, were mailed only to the State of

24   California?

25   A.   No, that's not what I said.

Trial

1  Q.  I wanted to make sure I understand you correctly.

2  A.  What I said is, when I filed the State of

3  California income tax refund claim 540 X, it was

4  attached to the 1040 federal income tax return 1040-X.

5  Those two went to the State of California.  That is

6  completely separate from what was mailed to the IRS.

7  Q.  Okay.  And thank you.  Were those two State of

8  California returns, the 2002 return and the 2003 state

9  returns, refund claims, were they filed in one envelope

10 or two envelopes?

11 A.  I apologize for not being specific, but most

12 likely they were filed separately because of the weight

13 of the document.  Because at the time I knew what it

14 would cost to mail a standard weight envelope versus

15 overweight envelope.  So I put stamps -- most likely I

16 put stamps on that envelope, which is a standard rate

17 stamp, and mailed them.

18 Q.  And, Mr. Taha, did you also file your own refund

19 claims for 2002 and 2003 at the same time as these

20 refund claims were filed?

21 A.  This is irrelevant, I'm sorry.  It's irrelevant to

22 this case.

23     MS. KANYER:  Your Honor, I would say this is

24 not irrelevant.  We are going to how these returns were

25 filed based on what his actions were.

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1          THE COURT:  Mr. Taha, it probably is relevant
2    insofar as how the returns were filed.  It's not
3    irrelevant to the claim itself -- I mean it's not
4    relevant to the claim itself, I apologize for
5    misspeaking.
6          THE WITNESS:  Okay.  Your Honor, I did file
7    and I got refunded, similar to Mr. (Inaudible).  No
8    questions asked, I was refunded my claim for tax
9    refund.
10          Because you asked me to -- you responded that
11    it is relevant, therefore, I have to respond that, yes,
12    I did file and I was refunded.
13          THE COURT:  And you were what?
14          THE WITNESS:  Refunded my income tax.
15          THE COURT:  You were?
16          THE WITNESS:  Yes, sir.
17    BY MS. KANYER:
18    Q.  Mr. Taha, my question was very specifically did
19    you file your own refund claims for tax year 2002 and
20    2003 at the same time you filed these refund claims for
21    plaintiffs Taha for 2002 and 2003?
22    A.  That I do not recall because they were separate.
23    I do not recall when I filed it.
24    Q.  Okay.  So we're looking at -- just so I'm clear,
25    we're looking at potentially four different envelopes,

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    one for the federal for 2002 refund claim, one for the
2    federal 2003 refund claim, and then one for the State
3    of California for 2002 attaching a federal refund claim
4    for 2002 and a separate envelope with the 2003 State of
5    California refund claim attaching the Form 1040 for
6    2003.
7         THE COURT:  Ms. Kanyer, this is a complicated
8    question.  Are you asking about the 1040-Xs that
9    were -- and the state equivalent refund request that
10   were filed on behalf of the plaintiffs in this case, or
11   Mr. Taha himself?
12        MS. KANYER:  I'm talking about the
13   plaintiffs, and I'm just asking the number of
14   envelopes.
15        THE COURT:  Well, that assumes they were all
16   filed at the same time.
17        MS. KANYER:  Correct.
18        THE COURT:  Which might not be accurate.
19   We'll find out.
20        THE WITNESS:  Let me respond to this answer,
21   Your Honor, and counsel.
22        Twelve years passed.  I apologize for not
23   having that memory to remember how they were filed and
24   when they filed, but the fact remains they were filed.
25   BY MS. KANYER:

Trial

Mohamad E. Taha, et al. v. USA                              12/9/2019

1    Q.  Mr. Taha, you don't remember how you addressed

2    these envelopes, do you?

3    A.  I addressed them according to the instructions

4    that came up in the software, the software, which is

5    very famous software in the United States that a lot of

6    people use it, and it tells you where to file it.

7            As far as the very original filing for

8    taxpayers Mohamad Taha and Sanaa Yassin, it went back

9    to the same source or same destination where the

10   original 1040 was mailed to in Fresno, California.  And

11   that's where the 1040-X went, Fresno center in

12   California.  Fresno is the name of a city.

13   Q.  So, Mr. Taha, were you the one who specifically

14   addressed the envelopes?

15   A.  I myself addressed the envelope.  No one else did,

16   no.

17   Q.  You specifically recall doing that?

18   A.  Of course, yes.

19   Q.  Sitting here today, you specifically recall doing

20   that?

21   A.  I addressed it, and I mailed it.

22   Q.  So your testimony is now that you were the one who

23   mailed it?

24   A.  In my testimony I gave, I still confirm that I

25   mailed it because of the inability of -- I mailed it,

Trial

1   yes.

2     Q.  So your testimony is now you specifically recall

3   mailing the refund claim for tax year 2003?

4     A.  Specifically, I did answer that question.  I

5   mailed them as required to the exact same address.

6           And to prove that statement, I repeat, the --

7   the IRS center in Fresno, California acknowledged

8   receiving 2002, but did not acknowledge 2003 for

9   whatever reason, I do not -- I'm not qualified to make

10  a reason why they did not acknowledge 2003.

11    Q.  Mr. Taha, can I have you turn to Exhibit H, and in

12  Exhibit H looking at page 92.

13    A.  Exhibit H.  Document number?

14    Q.  It's a letter dated January 21, 2008.

15    A.  That's page 92 of 106?

16    Q.  That's correct.

17    A.  Thank you.

18    Q.  You wrote this letter; correct?

19    A.  Yes.

20    Q.  But it's your testimony that that's Ms. Yassin's

21  signature; is that correct?

22    A.  That's correct.

23    Q.  And if I could have you turn to page 99, also in

24  Exhibit H.

25    A.  99 of 106, yes.

Trial

Mohamad E. Taha, et al. v. USA                    12/9/2019

```
 1    Q.   And you also wrote this document; right?

 2    A.   That's correct.

 3    Q.   And then turning to the next page, the

 4   November 12, 2009, letter, you wrote that one as well?

 5    A.   That's correct.

 6    Q.   And if I could have you turn back to Plaintiffs'

 7   Exhibit List, which is page 2, so the page right before

 8   Exhibit A.

 9    A.   Exhibit H?

10    Q.   Yes -- no, sorry, page 2, so it's the exhibit

11   before -- the page before Exhibit A, the very front of

12   the document.

13            Actually, just to make it easier, could I

14   actually have you turn, sorry, to Exhibit G, page 80,

15   it's the 1040-X for 2003?

16    A.   Back to Exhibit G?

17    Q.   Exhibit G, page 80.

18    A.   Yes.

19    Q.   Okay.  And it's your testimony that this

20   document -- this is the filed document from November of

21   2007; is that your testimony?

22    A.   That's correct.

23    Q.   Okay.  And so this came before -- it's your

24   testimony that this came before those letters that we

25   just looked at?
```

Trial

1    A.   That's correct.  Not all -- not all the letters, I

2    believe.  Was one letter 2015?  And that's not

3    before -- I would say yes, this was filed before those

4    letters were sent to the IRS; that's correct.

5    Q.   And this is the only 1040-X for 2003 that

6    plaintiffs included in their exhibits; correct?

7    A.   That's correct, this is the only one.

8    Q.   All right.  Mr. Taha, I want to talk to you about

9    Atek Construction.  Okay?

10   A.   Correct.

11   Q.   You testified that Atek Construction was an

12   S corporation; correct?

13   A.   Correct.

14   Q.   And it was formed in 1996; is that right?

15   A.   It was formed in 1996; that's correct.

16   Q.   And it was formed as an S corporation?  It was

17   formed as an S corporation?

18   A.   That's correct.

19   Q.   And you left your 20 plus career as an engineer to

20   start Atek; is that right?

21   A.   Before starting Atek?  That's correct.

22   Q.   So you're not a lawyer; correct?

23   A.   I'm not what?

24   Q.   Not a lawyer?

25   A.   Not a where?

Trial

Mohamad E. Taha, et al. v. USA                              12/9/2019

```
 1    Q.  A lawyer?
 2    A.  No, I'm not a lawyer, I'm sorry.  God forbid, I'm
 3  not.
 4    Q.  You're not a lawyer?
 5    A.  I'm not a lawyer.
 6    Q.  And Atek was originally owned by you and your
 7  nephew, Eyad Khalil; is that correct?
 8    A.  That is correct.
 9    Q.  And originally you and Mr. Khalil were equal
10  owners; correct?
11    A.  Correct.
12    Q.  And you would agree with me, right, that Atek was
13  formed as an S corporation because the shareholders
14  decided they wanted to pay taxes themselves and not the
15  corporation; correct?
16    A.  Correct.
17    Q.  And then in 2002, your percentage ownership
18  changed from 50 percent; correct?
19    A.  Let me go back to the previous question, if you
20  don't mind.
21    Q.  Go ahead.
22    A.  Why the reason it was decided to form the
23  S corporation, to pass through the income to the
24  shareholders, that was not the reason because there is
25  a rule behind this formation of S corporation.
```

Trial

Mohamad E. Taha, et al. v. USA                              12/9/2019

1          In order to form the S corporation, you have
2     to abide by Rule 1362, Section 1362.  And it happens
3     that Rule 1362 talks about passing through the income
4     to the shareholders.
5          I did not decide it.  The Rule 1362 decided
6     it, because Rule 1362 says if you want to form an
7     S corporation, then that's what happens to the income,
8     it automatically goes to the shareholders to pay taxes
9     on the income.  Do you follow what I mean?  I don't
10    know if I'm explaining myself right or not.
11    Q.   My question is, why did you and Mr. Khalil choose
12    to form Atek as an S corporation?
13    A.   It's because Atek was -- first and foremost it was
14    a newly formed company, therefore, the "S" means small
15    corporation, so that's why we decided on selecting Atek
16    to be established as a small company.  And then it came
17    about Rule Section 1362, that's what you need to do for
18    a small company to incorporate it as S corporation
19    because it was a small company.
20    Q.   So in 2002 your percentage ownership changed from
21    50 percent; correct?
22    A.   It was changed to what?
23    Q.   Your ownership changed from 50 percent in 2002;
24    correct?
25    A.   That's correct, it was changed.

Trial

1    Q.   You gave Plaintiff Taha 10 percent of your shares;
2    correct?
3    A.   That's correct.
4    Q.   He didn't give you any money in exchange for those
5    shares; correct?
6    A.   I take that back.  I did not -- sometimes I feel
7    confused with the terminology of whether of I gave or I
8    contributed.  So I would like to emphasize that I
9    contributed 10 percent of my shares to Mohamed Taha as
10   my brother when he came to the United States as
11   immigrant.
12          So I did not -- so basically I'm trying to
13   correct the word "gave" versus "contributed."  Because
14   this was an issue in the stipulation, Counsel, you
15   first stated in the stipulation that Mohamad Taha was
16   gifted 10 percent of Atek's shares, and this was
17   troublesome to me.
18          Because the fact is, Mohamad Taha was
19   contributed 10 percent of Ali Taha's shares.  It was a
20   contribution so he can live on that earned money such
21   that he would not cause any financial burden on the
22   United States Government when he came to the United
23   States.  It's a law.  It's a sponsorship law that the
24   sponsor, and that was me in this case, to be
25   responsible for the immigrant financially and not cause

Trial

Mohamad E. Taha, et al. v. USA                    12/9/2019

1   any financial burden.

2            Because what that means, let's say

3   Mohamad Taha, of course he didn't have money, I didn't

4   help him, then he can go and request some kind of

5   financial help from the United States Government.

6   That's not going to be allowed because I'm responsible

7   for him at that time.

8            MS. KANYER:  Your Honor, I would object.

9   This is going beyond the scope of my question of if it

10  was the 10 percent really given to --

11           THE COURT:  That objection is overruled.

12  BY MS. KANYER:

13  Q.  Mr. Taha didn't give you any money in exchange for

14  those shares; correct?

15  A.  He did--

16  Q.  Did Mohamad Taha give you any money in exchange

17  for those shares?

18  A.  No.

19  Q.  Was he required to perform any services in

20  exchange for those shares?

21  A.  No, for the reason he was trying to get treatment

22  for his cancer illness and other reasons.  That's

23  exactly what happened.

24  Q.  And your brother, another brother, also received

25  5 percent of the shares of Atek; is that correct?

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

```
 1     A.  No, he was contributed 5 percent of my shares, my
 2   shares.  That's what he was contributed, true.
 3     Q.  So he also had 5 percent of the shares in 2002;
 4   correct?
 5     A.  Correct.
 6     Q.  So by the end of 2002, I want to make sure I have
 7   my shareholders correct, Atek was owned by four
 8   individuals; correct?
 9     A.  That's correct.
10     Q.  Mr. Khalil owned 50 percent; correct?
11     A.  That's correct.
12     Q.  And you owned 35 percent; correct?
13     A.  That's correct.
14     Q.  And one of your other brothers owned 5 percent;
15   correct?
16     A.  Correct.
17     Q.  And Plaintiff Taha owned 10 percent; correct?
18     A.  Correct.
19     Q.  And this was a family-owned company; correct?
20     A.  Correct.
21     Q.  And Atek operated as a construction company;
22   correct?
23     A.  Correct.
24     Q.  And it worked on some public projects; correct?
25     A.  Correct.
```

Trial

Mohamad E. Taha, et al. v. USA                    12/9/2019

1   Q.  And you testified that you were the president and

2   secretary; right?

3   A.  Correct.

4   Q.  And your nephew, he was a vice president; correct?

5   A.  Correct.

6   Q.  And as part of the operations, Atek would review

7   bids; correct?

8   A.  Correct.

9   Q.  And Atek would generate an offer; correct?

10  A.  Correct.

11  Q.  And Atek would submit bids; correct?

12  A.  Correct.

13  Q.  And it would obtain bonds from surety companies

14  for the projects; correct?

15  A.  Correct.

16  Q.  And Atek would hire labor employees; correct?

17  A.  They would hire?

18  Q.  They would hire labor employees; correct?

19  A.  That's correct.

20  Q.  And it would also obtain subcontractors for

21  specialty work?

22  A.  Correct.

23  Q.  And it would purchase material and supplies?

24  A.  Correct.

25  Q.  And it would actually build the structure;

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    correct?

2    A.  Correct.

3    Q.  Atek also had a line of credit; correct?

4    A.  Correct.

5    Q.  And Plaintiff Taha didn't guarantee that line of

6    credit; correct?

7    A.  Who?

8    Q.  Plaintiff Taha did not guarantee that line of

9    credit; correct?

10   A.  He did not; that's correct.

11   Q.  And Atek also had assets; correct?

12   A.  Correct.

13   Q.  It had automobiles?

14   A.  Correct.

15   Q.  Tools?

16   A.  Correct.

17   Q.  Equipment?

18   A.  Correct.

19   Q.  And money in bank accounts?

20   A.  Correct.

21   Q.  And you would agree with me that Atek actually

22   made money from its construction projects in 2002 and

23   2003; correct?

24   A.  Correct.

25   Q.  If I could have you turn to Plaintiffs'

Trial

Mohamad E. Taha, et al. v. USA                        12/9/2019

```
 1    Exhibit 1A -- Plaintiffs' Exhibit A1, excuse me.  This
 2    is the 1120-S for 2002, it's PDF page 4.
 3    A.   What page?
 4    Q.   It's A1 is the exhibit, and it's page 4, so it's
 5    the first page or the second page after the A tab.
 6    A.   Schedule K-1 for year 2002, there's no page on
 7    it -- oh, page 1?
 8    Q.   In the upper right-hand corner, do you see page 4
 9    of 106?
10    A.   Could you refer me to the page number of 106,
11    which number is that?
12    Q.   Page 4 of 106.
13    A.   Page 4.  I'm sorry, I'm a little slow.  Yes.
14    Q.   Okay.  You assisted in preparing this return;
15    correct?
16    A.   I assisted; that's correct.
17    Q.   And you testified that that was your signature at
18    the bottom of the document?
19    A.   That's correct.
20    Q.   And so for 2002 Atek received ordinary income of
21    837,668, looking at line 21?
22    A.   839,682 (sic)?  That's correct.
23    Q.   If I could have you turn to Exhibit A2, which is
24    page 16.
25    A.   Page 2?
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

```
 1    Q.   Page 16 of 106, it is the 1120-S for 2003.
 2    A.   You said page 5 of 106?
 3    Q.   Page 16 of 106.
 4    A.   Oh, 16.  I'm sorry, I apologize for not being able
 5    to hear you clearly.  1120-S for 2003.
 6    Q.   Okay.  You also assisted in preparing this 1120-S;
 7    correct?
 8    A.   Correct.
 9    Q.   And that's your signature at the bottom of the
10    page?
11    A.   That's correct, it is.
12    Q.   And Atek reported that it received $745,962?
13    A.   That's correct.
14    Q.   Atek would periodically make cash distributions to
15    its shareholders; correct?
16    A.   Correct.
17    Q.   But you would agree with me that Atek retained
18    some of its profits in order to keep it in operation;
19    correct?
20    A.   That's correct.
21    Q.   And so Atek would pay -- and you would agree with
22    me that Atek would pay its creditors before Atek paid
23    its shareholders; correct?
24    A.   That's correct.
25    Q.   So this means that the employees were paid before
```

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    the shareholders?

2    A.   The employees would --

3    Q.   Were paid before the shareholders received a

4    distribution?

5    A.   That's correct.

6    Q.   And that's to stay with the subcontractors?

7    A.   That's correct.

8    Q.   And labor and material?

9    A.   That's correct.

10   Q.   And you would agree with me that Atek didn't

11   specifically set aside or earmark money in bank

12   accounts for the shareholders' pro rata shares; right?

13   A.   Bank accounts?

14   Q.   Would Atek set aside money in the bank accounts

15   for the shareholders' pro rata shares?

16   A.   Not specifically, no.  The bank accounts is a

17   comprehensive of all the money that Atek is depositing

18   regardless where that money goes.

19        What I'm saying, there's no specific number

20   that is assigned to Ali Taha or Mohamad Taha, or

21   Eyad Khalil, there's no such specific numbers in the

22   bank account.

23   Q.   And what you just described, did that occur from

24   1996 to 2004?

25   A.   Correct.

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    Q.   So in 2002 when plaintiff received the shares or

2    became a shareholder, he was living with you; correct?

3    A.   That's correct.

4    Q.   And did Plaintiff Taha and his family live with

5    you between 2002 and 2004?

6    A.   They were what?

7    Q.   Did Plaintiff Taha and his family live with you

8    between 2002 and 2004?

9    A.   They did live with me, yes.

10   Q.   So you observed his activities during that period;

11   correct?

12   A.   Yes.

13   Q.   Plaintiff Taha did not have a job in the United

14   States between 2002 and 2004; correct?

15   A.   Correct.

16   Q.   And I believe he previously worked in the United

17   Arab Emirates before coming to the United States;

18   correct?

19   A.   Correct.

20   Q.   But you don't recall specifically what he did in

21   the United Arab Emirates; correct?

22   A.   I do not recall.

23   Q.   And so Plaintiff Taha was unemployed between 2002

24   and 2004?

25   A.   Who was?

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1     Q.   Plaintiff Taha, Mohamad Taha, was unemployed
2  between 2002 and 2004?
3     A.   That's correct.
4     Q.   And you testified that Plaintiff Taha left the
5  United States -- excuse me, Plaintiff Taha left the
6  United States around 2004 for treatment in United Arab
7  Emirates; correct?
8     A.   That's correct.
9     Q.   Did he return to the United States after 2004?
10    A.   He may have come back for a visit, but I do not
11  recall.  But he occasionally, during the year, he would
12  come back with his family to live with me and stay for
13  certain periods of time and then go back.
14         But specifically he left in 2004 to get
15  medical treatment that was not available for him due to
16  financial situation wherein the United Arab Emirates he
17  would get free treatment.
18    Q.   So Plaintiff Taha was not involved in the running
19  of Atek; correct?
20    A.   That's correct.
21    Q.   And he did not have any titles at Atek as far as
22  being a president or a vice president; correct?
23    A.   That's correct.
24    Q.   And he was not an employee of Atek; correct?
25    A.   That's correct.

Trial

Mohamad E. Taha, et al. v. USA                          12/9/2019

1    Q.   And he did not receive a salary from Atek;
2    correct?
3    A.   Correct.
4    Q.   And Plaintiff Taha was not responsible for any of
5    Atek's projects; correct?
6    A.   Correct.
7    Q.   So you would agree with me that Plaintiff Taha was
8    not responsible for reviewing any of the bids; correct?
9    A.   That is correct.  I did not review bids either.
10   Q.   And so he was not responsible for generating any
11   offers; correct?
12   A.   That's correct.
13   Q.   And he never submitted any bids; correct?
14   A.   That's correct.
15   Q.   And he did not obtain any bondings from surety
16   companies; correct?
17   A.   Correct.
18   Q.   And he never hired any labor employees; correct?
19   A.   Correct.
20   Q.   And he never obtained any subcontractors for
21   specialty work; correct?
22   A.   Correct.
23   Q.   And you never purchased any material or supplies;
24   correct?
25   A.   Correct.

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    Q.   And he never actually physically built those

2    structures; correct?

3    A.   Correct.

4    Q.   And Plaintiff Taha was not responsible for

5    preparing any of the Forms 1120-S; right?

6    A.   Correct.

7    Q.   And he was not responsible for reviewing any of

8    the financial statements; is that correct?

9    A.   Correct.

10   Q.   Plaintiff Taha had not provided any other loans

11   other than the purported loans we're talking about at

12   issue today; is that correct?

13   A.   Mr. Taha did not provide any loan to anybody.

14   Q.   And with respect --

15   A.   The loan was owed by Atek to him.  He did not

16   provide it.

17   Q.   He did not contribute or did not exchange any

18   money in exchange for the note?

19   A.   Correct, no.

20   Q.   And with respect to Ms. Yassin, she worked as a

21   homemaker; correct?

22   A.   Correct.

23   Q.   And she did not earn any money herself; is that

24   correct?

25   A.   Correct.

Trial

Mohamad E. Taha, et al. v. USA                          12/9/2019

1    Q.   So just so I'm clear, the purported debt that
2    we're talking about today and the debt that you were
3    describing this morning, that's Plaintiff Taha's pro
4    rata share of Atek's income that was taxed but not
5    distributed; correct?
6    A.   Correct.
7    Q.   And to be clear, Atek owed this debt to Plaintiff
8    Taha; is that your testimony?
9    A.   Correct.
10   Q.   Okay.  But it's not your testimony that Plaintiff
11   Taha made a loan?
12   A.   He did not make a loan; correct.
13   Q.   And it wasn't just Plaintiff Taha that was owed
14   this debt, it was also the other shareholders as well;
15   correct?
16   A.   That's correct.
17   Q.   And it was each shareholders' pro rata share that
18   they had not received; correct?
19   A.   Correct.
20   Q.   And so the debt that you're describing, it
21   occurred in 2004?
22   A.   Correct.
23   Q.   So before 2004, these debts, as you described
24   them, they were not considered debts?
25   A.   Correct.

Trial
Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    Q.   What were they considered?

2    A.   My apologies, I was confused.  They were still

3    considered debt.  As long as the shareholders did not

4    receive their earned income and was kept by Atek, it is

5    owed by Atek to the shareholders, including Mr. Taha.

6    So it was a net -- I'm trying to differentiate because

7    I'm getting this confused, trying to compare anything

8    before 2002, that when Atek was dissolved, versus what

9    happened before.

10            Every year Atek owed money because Atek

11   maintained that income to keep it in operation, so

12   that's still a debt.  And there are promissory notes

13   for every year where Atek promises to pay the

14   shareholders that money owed every year.  And in this

15   case for Mohamad Taha, it's for year 2002 and 2003.  So

16   I hope I clarified your question.

17   Q.   Well, I'm actually trying to pin down the date

18   that this debt occurred.  Is it your testimony that the

19   debt occurred after March 15th of the year that Atek

20   reported the income to the IRS?

21   A.   The word "correct" I do not agree with, because

22   every year there is an occurrence of debt to Mr. Taha

23   and other shareholders, every year.  But when it

24   occurred -- I would say why it occurred, it's because

25   of Atek's dissolution.  So I'm a little bit confused

Trial

Mohamad E. Taha, et al. v. USA                              12/9/2019

```
 1    trying to answer your question by saying occurred.
 2    Every year there is an occurrence of debt.
 3      Q.  So it occurred -- is it your testimony that it
 4    occurred when the bonding company takeovers that you
 5    were describing happened, that's when the debt arose?
 6      A.  I would not call it that.  I would call it lost
 7    once the bonding companies took over.
 8      Q.  So when did it arise?
 9      A.  As soon as the bonding companies filed these
10    letters with the project owners demanding no more
11    receivables should be paid to Atek.  That exactly --
12    when it happened, on October 13th for Hartford.  And
13    probably two days after the letter came from developers
14    to withhold the receivables from paying Atek.  That's
15    exactly when that debt became business bad debt.
16      Q.  So my question is, when did it arise?
17      A.  When did it what?
18      Q.  When was the debt established?
19      A.  It was established when Atek was dissolved and
20    there was no more assets in Atek.
21      Q.  So what was it considered before Atek was
22    dissolved, as you're describing it?
23      A.  Atek was healthy, it had the money, the money was
24    not lost, the money is still being owed, some of the
25    money was still being owed by Atek to the shareholders,
```

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

```
 1   and, therefore, they were not bad debt.
 2            There's a difference between debt and bad
 3   debt.  In 2004, the debt became bad debt, which means
 4   Atek cannot pay.  And according to the IRS rules, it's
 5   a bad debt, it happened in year 2004 for filing the
 6   income tax refund.
 7   Q.  So I think I understand your testimony as to when
 8   it became bad debt, but you also said that it was debt
 9   before it became bad debt; correct?
10   A.  No, I did not say that.
11   Q.  Okay.  So it did not --
12   A.  I said the only debt that became bad debt is when
13   Atek was dissolved in 2004.  So if there was money for
14   prior years that Atek owed, it became bad debt along
15   with any money owed for 2004, inclusive of the previous
16   year, that occurred in October of 2004, that's when it
17   became bad debt.
18   Q.  So it was considered -- the undistributed
19   shareholder income, what was that considered before the
20   bonding takeover occurred?
21   A.  It was a loan or whatever -- it's a loan, which
22   means money maintained by Atek to keep it in operation,
23   so it was a loan.
24   Q.  And you testified that Atek created promissory
25   notes; correct?
```

Trial

Mohamad E. Taha, et al. v. USA                              12/9/2019

1    A.  That's correct.

2    Q.  If I could have you turn to Plaintiffs' Exhibit C,

3    and we're looking at Exhibit C1 and C2, which are at

4    PDF 58 and 59.

5    A.  Exhibit C?

6    Q.  Exhibit C; correct.

7    A.  58 of 106?

8    Q.  58 of 106 and 59 of 106.

9    A.  Okay.  Thank you.

10   Q.  These are the promissory notes you're referring

11   to; correct?

12   A.  That's correct.

13   Q.  And you're familiar with these promissory notes;

14   correct?

15   A.  I wrote them, yes.

16   Q.  You said you wrote them?

17   A.  Yes.

18   Q.  You wrote both the promissory note for 2002 and

19   the promissory note for 2003?

20   A.  Yes.

21   Q.  And you didn't have any lawyers assist you in

22   drafting these promissory notes?

23   A.  I did not because I didn't need to.

24   Q.  And you signed these promissory notes for 2002 and

25   2003; correct?

Trial

Mohamad E. Taha, et al. v. USA                    12/9/2019

1    A.  That's correct.

2    Q.  And Plaintiff Taha, he didn't have any role in

3    drafting these promissory notes; correct?

4    A.  Correct.

5    Q.  So you would agree with me that Plaintiff Taha did

6    not negotiate any of the terms of this promissory note

7    for 2002 or 2003; correct?

8    A.  That's correct.

9    Q.  So then you would agree with me that Plaintiff

10   Taha did not negotiate the amount of interest provision

11   on these notes; correct?

12   A.  That's correct.

13   Q.  And he didn't negotiate any time specificities for

14   repayment; correct?

15   A.  I'm sorry?

16   Q.  Any specific time for repayment; correct?

17   A.  The specific time is an appropriate time whenever

18   Atek had the working capital, so that is correct.

19   Q.  So just to be clear, Plaintiff Taha did not

20   negotiate the appropriate request date of --

21   A.  That's correct.

22   Q.  Thank you.  Okay.  If we could just look at the

23   promissory note for 2002, so Exhibit C1, page 58 of

24   106, this promissory note is dated December 31, 2003;

25   correct?

Trial

1    A.   That's correct.

2    Q.   And this is the date you signed the promissory

3    note?

4    A.   Huh?

5    Q.   This is the date you signed this promissory note?

6    A.   That's correct.

7    Q.   So is it your testimony that as of

8    December 31, 2003, Mohamad Taha -- excuse me, Atek

9    agreed to pay Mohamad Taha $84,935?

10   A.   That's correct.

11   Q.   I believe you testified previously that Atek had

12   distributed 20,000 to Plaintiff Taha for tax year 2002;

13   correct?

14   A.   Correct.

15   Q.   And those payments were to cover taxes; correct?

16   A.   Correct.

17   Q.   If I could have you turn to Plaintiffs'

18   Exhibit H2, and we're looking at PDF page 98 of 106.

19   A.   98 of 106?  Thank you.

20   Q.   Do you recognize this document?

21   A.   Yes.

22   Q.   What is this document?

23   A.   These are some checks for the money that

24   Mohamad Taha received from Atek.

25   Q.   And these checks were dated -- the first check was

Trial

Mohamad E. Taha, et al. v. USA                              12/9/2019

1    dated March 31, 2003; correct?

2    A.   That's correct, March 31, 2003.   Thank you.

3    Q.   And it was noted that it was for a profit

4    distribution; is that correct?

5    A.   Correct.

6    Q.   And then the second check was issued on

7    March 4, 2003; correct?

8    A.   That's correct.

9    Q.   And it was for a 2002 profit draw; is that

10   correct?

11   A.   Correct.

12   Q.   And then the third check was October 16, 2003;

13   correct?

14   A.   Correct.

15   Q.   And that was for a profit distribution; correct?

16   A.   Correct.

17   Q.   And so these are the $20,000 that we were

18   previously discussing; correct?

19   A.   Correct.

20   Q.   And so as of October 16, 2003, Plaintiff Taha had

21   received $20,000; correct?

22   A.   That's correct.

23   Q.   If I could have you return to Exhibit C1, page 58

24   of 106.

25   A.   Yes.

Trial

Mohamad E. Taha, et al. v. USA                              12/9/2019

1    Q.  You just previously testified that as of

2    December 31, 2003, Atek had agreed to pay $84,935;

3    correct?

4    A.  I'm sorry, I must be on the wrong page.  I thought

5    you said 63 of 106.

6    Q.  58 of 106.  58.  Sorry about that.

7    A.  Back to the promissory note, yes.

8    Q.  Correct.  Looking at that $84,935; do you see

9    that?

10   A.  Yes.

11   Q.  As of December 31, 2003, hadn't $20,000 already

12   been distributed to Plaintiff Taha?

13   A.  That's correct.

14   Q.  So this promissory note as to Mr. Taha is not

15   correct -- promissory amount as to Mr. Taha is not

16   correct?

17   A.  It should have been reduced by $20,000, and

18   there's records of it.  So this promissory note was not

19   revised.  I did not revise it.  It was my

20   responsibility, but I know that Mohamad Taha was owed

21   $20,000 less from 84,935.

22   Q.  And was that $20,000 considered a loan repayment?

23   A.  It's considered payment of the loan, yes.

24   Q.  But as of December 31, 2003, is it your testimony

25   that it wasn't a bad debt at that time?

Trial

Mohamad E. Taha, et al. v. USA                           12/9/2019

1    A.  I didn't say that.

2    Q.  What is your testimony?

3    A.  I said this 84,000 is a bad debt.

4    Q.  As of December 31, 2003?

5    A.  But before it became bad debt, he was paid

6    $20,000.

7    Q.  And is it your testimony that that was a loan --

8    was that a loan payment or a distribution?

9    A.  What's the difference?

10   Q.  Is it your testimony that that was a loan payment?

11   A.  This 84,000 for 2002 was documented as a loan.

12   Okay?  This promissory note is a loan for $84,000.  So

13   when he was paid $20,000, this loan was not revised.

14   So this loan became bad debt in October, 2004 when Atek

15   was dissolved by the bonding companies.

16   Q.  Mr. Taha, can I have you please turn just two

17   pages over to page 60 of 106.

18   A.  Yes.

19   Q.  Do you recognize this document?

20   A.  Yes.

21   Q.  And this is detailing Plaintiff Taha's '02 -- or

22   this includes Plaintiff Taha's '02 profit distributions

23   in the amount of $20,000?

24   A.  Yes.

25   Q.  And it was called an '02 profit distribution for

Trial

1    each of those payments?

2    A.  Correct.

3    Q.  It was not listed as a loan repayment; correct?

4    I'm sorry, I didn't hear an answer.

5    A.  The $20,000 paid was paid from the loan that Atek

6    owed him before the bonding companies took over Atek

7    and seized its operation, so it was a loan when the

8    $20,000 paid.

9         After the bonding companies filed their suit

10   and letters, that loan became bad debt, no longer -- it

11   was still a loan on record, but it became a bad debt.

12   I don't know how else I can explain it or if I actually

13   understand your question.

14   Q.  Let me ask my question again.

15   A.  Thank you.

16   Q.  So you agree with me that the $20,000 payments --

17   so we're looking at page 60 of 106, the Atek

18   Construction transaction by accounts, we're looking at

19   those three payments; do you see them?

20   A.  Yes.

21   Q.  Okay.  And it's -- you would agree with me that

22   it's an '02 profit distribution for each one of those

23   three payments; correct?

24   A.  What this means, they are distribution from what

25   he earned for 2002.  It's not a -- okay.  Okay.  Let me

Trial

Mohamad E. Taha, et al. v. USA                              12/9/2019

1   make it simple.  If you look at the third line item, he
2   was distributed $84,000.
3     Q.  And that's retained earnings; correct?
4     A.  That's correct.
5     Q.  And that retained earnings doesn't mean
6   retained --
7     A.  The $84,000 now was reduced, but he was
8   distributed what he was given in total of $20,000.  So
9   at that time, that $84,000, if you take the $20,000,
10  then the net money left for 2002 profit distribution
11  became $64,000.
12    Q.  Thank you.
13    A.  Accounting is complicated sometimes, but that's
14  how it is.
15    Q.  Can I have you return to the promissory note for
16  2002, so page 58 of 106.
17    A.  58 of 106, yes.
18    Q.  You're there?  Okay.  The term "loaned profit
19  distribution," that means each shareholders' pro rata
20  share of Atek income that had not been distributed;
21  correct?
22    A.  That's correct.
23    Q.  In looking at an appropriate request date, that
24  term means when Atek would be financially capable of
25  making the payment; correct?

Trial
Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    A.   That's correct.

2    Q.   And Atek would retain that money in order to help

3    it keep making bids; correct?

4    A.   Correct.

5    Q.   So Atek would not make distributions to

6    shareholders if credits were -- if creditors were

7    outstanding; correct?

8    A.   Creditors come first; correct.

9    Q.   And so what that means is, that if Atek would miss

10   a payment to one of its creditors, then it wouldn't

11   make a payment to the shareholder; right?

12   A.   No, Atek would prioritize payments to the

13   creditors.

14   Q.   And so that meant that employees would always come

15   first; correct?

16   A.   Correct.

17   Q.   And subcontractors would always come first?

18   A.   Yes.

19   Q.   And payments to materials and suppliers, that

20   would also come first?

21   A.   Correct.

22   Q.   If I could direct your attention to the interest

23   rate of 10 percent provision.  So this promissory note

24   doesn't include a date that interest payments are to

25   begin -- begin to be calculated; correct?

Trial

1     A.   Begin when?

2     Q.   Begin to be calculated.

3     A.   The interest was not calculated because there's no

4     money to calculate interest for.  There was no money.

5     So calculating interest is -- would not have any

6     meaning because there is no money to calculate the

7     interest on.  That is gone, that is debt, became

8     worthless.

9               So there was no sense in calculating what the

10    interest rate or what the interest amount is because

11    there is no money to calculate interest on.

12    Q.   So what about between December 31, 2003, and

13    October when you described the takeover, there was no

14    interest calculated during that period?

15    A.   That's correct, no interest calculated, because

16    the money was still in place in the bank.

17    Q.   So interest is only getting calculated if a

18    payment is going to be made?

19    A.   That is correct.  Let's say as an example, this

20    $84,935 was ready to be paid to Mohamad Taha right

21    then, then the interest would have been calculated.

22    Q.   But no interest was calculated?

23    A.   That's correct.

24    Q.   For 2002 --

25    A.   Because the money was not made to him or any other

Trial

Mohamad E. Taha, et al. v. USA                          12/9/2019

1    shareholder.  You cannot -- let me put it like this,

2    you cannot calculate an interest on money that you are

3    not getting.

4       Q.  You would agree with me, right, that Mohamad Taha

5    did not require Atek to pledge any of its assets in

6    exchange for the notes; correct?

7       A.  Did not require what?

8       Q.  Did Atek ever pledge any of its assets that we

9    previously discussed, like bank accounts, cars, or

10   equipment, to secure any of these notes?

11      A.  No, the only thing that Atek pledged is this

12   amount on the promissory note.

13      Q.  Can I please have you turn the page to Exhibit C2,

14   which is at PDF 59 of 106?  So you're looking at a

15   promissory note for 2003?

16      A.  Yes.

17      Q.  You would agree with me that the language in the

18   promissory note for 2003 uses the same type of language

19   for the promissory note in 2002?

20      A.  Yes.

21      Q.  And so this means that the loan profit

22   distribution language in the 2003 note has the same

23   meaning; correct?

24      A.  Yes.

25      Q.  And that means it's each shareholders' pro rata

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    share of Atek's income that had not been distributed;
2    correct?
3    A.  Correct.
4    Q.  And as related to Plaintiff Taha, that was that
5    77,708?
6    A.  Yes.
7    Q.  And, again, Plaintiff Taha didn't give Atek any
8    money in exchange for this note; correct?
9    A.  For this year, he did not.
10   Q.  And the purpose of this note was so that Atek
11   would be able to continue bidding on its projects;
12   correct?
13   A.  Yes, correct.
14   Q.  And the at appropriate request date has the same
15   meaning as the 2002 promissory note?
16   A.  Yes.
17   Q.  And that means at a time that Atek would be
18   financially capable of making the payment; is that
19   correct?
20   A.  Correct.
21   Q.  And so it had the same meaning, that creditors
22   always come first?
23   A.  Yes.
24   Q.  And as far as this 10 percent listed in the 2003
25   promissory note, that was never calculated as well;

Trial

1    correct?

2    A.   That's correct.

3    Q.   And it was never paid; correct, just to be clear?

4    A.   Correct.

5    Q.   And interest would only get calculated if money

6    became available to distribute to the shareholders?

7    A.   That's correct.

8    Q.   And, likewise, Atek didn't pledge any of its

9    assets that we previously discussed, like bank

10   accounts, or the cars, or the equipment, to secure any

11   of these notes; correct?

12   A.   Correct.

13   Q.   And so looking at this promissory note for 2003,

14   it's signed March 15, 2004; correct?

15   A.   That's correct.

16   Q.   And as of March 15, 2004, Atek would not have been

17   able to obtain a loan for this amount or the amount for

18   the 2002 year; correct?

19   A.   That's not correct.

20   Q.   Can you please explain what's incorrect?

21   A.   There was money available in different accounts.

22   The major one was receivables that Atek was supposed to

23   have been paid for, and there was money in returned

24   earnings.  But Atek at that date decided it did not

25   want to spend the money that is in returned earnings

Trial

Mohamad E. Taha, et al. v. USA                          12/9/2019

1    because that money in returned earnings was already

2    spent.

3            So, therefore, by March, by middle of 2004,

4    October, 2004, Atek exhausted all the money it had,

5    including the money Atek owed to the shareholders.

6    That money became bad debt.

7    Q.   Did Atek ever try to get a loan to pay the amounts

8    listed on these promissory notes for 2002 or 2003?

9    A.   The answer is yes in one way and no in another.

10   The first, Atek requested assistance from the bonding

11   companies, which is a standard request to ask the

12   bonding companies to help the contractor financially.

13   That did not happen.

14           The other one is, Atek had enough receivables

15   and they had line of credit with a bank that extended

16   or exhausted, and, therefore, there was no interest in

17   seeking other financial or credits from other sources.

18   Q.   So I'm not sure I understand your answer.  Is your

19   answer that Atek did try to get a loan to pay these

20   amounts for 2002 and 2003?

21   A.   Atek has a line of credit, and that line of credit

22   was spent.

23   Q.   As of when?

24   A.   2004.

25   Q.   So not as of --

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

```
 1    A.   As of October, 2004, it was spent.  It was not
 2    spent in total; it was spent gradually.  Whenever the
 3    money needed to pay for creditors or material
 4    suppliers, Atek would use that money periodically, not
 5    as a total, per se.  So that's how Atek spent that line
 6    of credit.
 7              Now, as far as going back to your question,
 8    Atek did not feel requesting any further credits
 9    because of what Atek had in receivables that Atek was
10    expecting to be received or to be paid by the project
11    owners.  So the answer is no, it did not seek another
12    financial assistance or credit from anywhere.
13              That's probably as brief as I should have
14    answered your question, but I wanted you to understand
15    the background behind asking or requesting financial
16    assistance from other creditors.
17    Q.   So is it your testimony that Atek would have been
18    able to get a loan for either the amounts on the
19    promissory note for 2002 or 2003?
20    A.   Atek was not able to pay them or -- I don't know
21    if I understood your question.  Was Atek able to pay
22    them?
23    Q.   Let me try to break it up.  Is your testimony that
24    Atek would have been able to get a loan for the total
25    amount of the promissory note for 2002 as of
```

Trial

Mohamad E. Taha, et al. v. USA                    12/9/2019

1    December 31, 2003?

2     A.   Atek did not seek that.

3     Q.   Was Atek able to get a loan as of

4    December 31, 2003, for close to $65,000?

5     A.   This is a hypothetical question.  All I can tell

6    you, Atek did not seek for financial help from any

7    source to pay these loans.  It did not.  Again, Atek

8    had enough receivables, I said that in my opening

9    statement, multimillion dollars, and there's proof to

10   show it, accurate as on the 1120-S that we reviewed

11   already.

12            There was plenty of money, but that money was

13   being delayed by the project owners.  So every month we

14   would -- Atek would seek that money to come in, and it

15   would not come in.  So it was exhausting its reserve.

16    Q.   Mr. Taha, you testified that Atek previously had

17   other notes before 2002; correct?

18    A.   Yes.

19    Q.   Plaintiffs haven't produced any other promissory

20   notes beyond the ones for 2002 and 2003 in this

21   litigation; correct?

22    A.   That's correct, there was no other promissory

23   notes.

24    Q.   So your testimony is there were no other

25   promissory notes other than the two at issue in this

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    case?

2      A.  Other than these two; correct.

3            MS. KANYER:  Your Honor, would it be an okay

4    time to take a break?

5            THE COURT:  We can.  In fact, I was thinking

6    about that myself.  I think we can take a 20-minute

7    break.  Should we do that?

8            MS. KANYER:  That would be great.

9            THE COURT:  We're in recess for 20 minutes.

10            (A break was taken.)

11            THE COURT:  Ms. Kanyer, where do we go from

12   here?

13            MS. KANYER:  Your Honor, we still have some

14   questions for Mr. Taha.

15            THE COURT:  Mr. Taha, if you'll please return

16   to the witness stand, that would be helpful.

17   BY MS. KANYER:

18     Q.  Mr. Taha, can I please have you return to

19   Plaintiffs' Exhibit 1A, which is PDF 4 of 106.  It is

20   the 1120-S for 2002.

21     A.  1120-S for 2002?

22     Q.  Yes.  If I could have you turn to PDF page 7, the

23   "Balance Sheets Per Books."  And this is an 1120-S for

24   2002; correct?

25     A.  Correct.  Page 7 of 106, I'm here.

Trial
Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    Q.   Okay.  Looking at "Liabilities and Shareholders'
2    Equity under Schedule A, Balance Sheets Per Books," do
3    you see where it says "Loans from shareholders"?
4    A.   Yes.
5    Q.   And at the beginning of the year, it's showing
6    592,823 outstanding loans from shareholders; correct?
7    A.   That's correct.
8    Q.   And then at the end of the year it's showing
9    $58,524 of loans outstanding; correct?
10   A.   Correct.
11   Q.   Can I please have you turn to Plaintiffs'
12   Exhibit A2, which is on PDF page 16 of 106.  This is
13   the 1120-S for 2003; correct?
14   A.   Correct.
15   Q.   If I could have you turn to PDF page 19 of 106.
16   A.   Yes.
17   Q.   Once again, we're looking at the "Balance Sheet
18   Per Books, Schedule L."  Do you see that?
19   A.   Yes.
20   Q.   And then looking at "Liabilities and shareholders'
21   equity," do you see 19 loans from shareholders?
22   A.   Yes.
23   Q.   And then do you see at the beginning of the year
24   it's showing $58,524; do you see that?
25   A.   That's correct.

Trial

1     Q.   And then at the end of the year, it's not showing
2   any amounts --
3     A.   Correct.
4     Q.   -- outstanding as loans from shareholders?
5     A.   Any what?
6     Q.   Any amounts outstanding as loans from
7   shareholders; correct?
8     A.   It's under line 24.
9     Q.   My question is a little bit more simple.  You
10  don't see any amounts listed as loans from shareholders
11  at the end of the year?
12    A.   No, there isn't.
13    Q.   What?
14    A.   No, there is not, no amount for 2004.
15    Q.   If I could have you turn to Plaintiffs'
16  Exhibit A3, which is at PDF 28.
17    A.   Page 83?
18    Q.   Page 28.
19    A.   28, sorry.
20    Q.   Sorry, it is Plaintiffs' Exhibit A3.  So we're
21  looking at the 1120-S for 2004, the amended 1120-S.
22    A.   Yes.
23    Q.   You amended this to add a shareholder; correct, or
24  to add shareholders?
25    A.   Correct.

Trial
Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    Q.   You didn't make any other changes?

2    A.   No.

3    Q.   You retired in 2004; correct, from Atek?

4    A.   Yes.

5    Q.   When in 2004 did you retire?

6    A.   What?

7    Q.   When in 2004 did you retire?

8    A.   I do not recall the exact day, but I would say

9    around the time when Atek was taken over by the bonding

10   companies.

11   Q.   And so you didn't prepare the original 1120-S for

12   2004; right?  So you're looking at the amended 1120-S

13   for 2004.

14   A.   Yes.

15   Q.   You did not prepare the original 1120-S for 2004;

16   correct?

17   A.   That's correct.

18   Q.   If I could have you turn to PDF page 31 of 106.

19   Do you see "Schedule L, Balance Sheets Per Books?

20   A.   Yes.

21   Q.   And do you see line 19, "Loans From Shareholders"?

22   A.   Yes.

23   Q.   And do you see that it does not list any amounts

24   for the beginning of the year or the end of the year;

25   correct?

159

Trial

Mohamad E. Taha, et al. v. USA                                12/9/2019

1    A.  Correct.

2    Q.  If I could have you turn back to the beginning of

3    the 1120-S, page 28 of 106.

4    A.  Page 28 of 106, yes.

5    Q.  So it's your testimony that the debt became bad as

6    of 2004; correct?

7    A.  Correct.

8    Q.  And so why didn't Atek report any cancellation of

9    indebtedness income?

10   A.  Did not report any income?

11   Q.  Did not report any income from cancellation of

12   indebtedness?

13   A.  There is no income for 2004.

14   Q.  There's no income from cancellation of

15   indebtedness income from the shareholders?

16   A.  2004 incurred a loss, so there was no income to be

17   distributed.  It was a loss.  As you can see, there's a

18   loss of $3,873,000.

19   Q.  So you did not amend the 2004 1120-S to report any

20   cancellation of indebtedness income on account of this

21   bad business debt; correct?

22   A.  Not on the other 1120-S 2004, this is the only

23   amended 2004 1120-S.

24   Q.  And no cancellation of indebtedness income was

25   reported on account of this bad business debt; correct,

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    by Atek?

2    A.   That's what I was trying to explain to you because

3    sometimes the question does not have a clear answer yes

4    or no.  So I'm trying to clarify whatever loans Atek

5    owed, it is under retained earnings; that's where it

6    is.  At that time I did not go back and break it up

7    between the shareholders.  There's a million $871,000

8    end of 2003, and it shows here at the beginning of

9    2004, a million 871, that's page 31 of 106.  That's

10   where all the shareholders' money is sitting, right

11   under retained earnings.

12              Retained earnings means it's a sub-account

13   under the major account of stockholders or

14   shareholders' equity.  This money was not

15   distributed -- it is there, we know what it is for

16   every shareholder, but it was not showing as loans on

17   the line Number 19 as a loan.  It's still sitting here.

18   We didn't have the chance, I guess, at the time to

19   break it up.

20   Q.   As an equity account; is that what you're saying?

21   A.   Huh?

22   Q.   As an equity account; is that what you're saying?

23   A.   This retained earning is a sub-account of

24   shareholders' equity account.

25   Q.   Okay.  So you testified there was a takeover in

Trial

1    2002 by the bonding companies; right?

2    A.  Yes.

3    Q.  And you testified that the bonding companies came

4    in and took over everything; correct?

5    A.  Correct.

6    Q.  And that included documents; correct?

7    A.  Correct.

8    Q.  And they actually completed the projects for Atek;

9    correct?

10   A.  That I do not know.

11   Q.  You do not know.  Did you testify that they came

12   in and they paid the creditors of Atek?

13   A.  I do not recall that statement.  All I know is,

14   the bonding companies was liable based on the

15   contractual clauses that they would be liable to pay

16   all creditors and employees of Atek if Atek defaults or

17   Atek, in this case, was dissolved.  I did not -- I do

18   not recall saying the bonding companies paid this and

19   paid that, I do not -- I do not recall that.

20   Q.  Okay.  But they were, under some contract,

21   required to pay the creditors?

22   A.  Right, because -- that's correct.  Because this is

23   a liability of the bonding company.  That's why they

24   are bonding the projects.

25   Q.  And did the bonding companies pay any of the

Trial

1    shareholders on the promissory notes?

2    A.   Not a penny.

3    Q.   Okay.  And you previously walked us through the

4    letters, the demand letters from the bonding companies.

5    Do you recall that?

6    A.   Yes.

7    Q.   Plaintiffs were not aware of any of these demand

8    letters; correct?

9    A.   Any what?

10   Q.   Plaintiffs were not aware of any of these letters;

11   is that correct?

12   A.   That's correct.

13   Q.   And that's the same with the complaints, the

14   plaintiffs weren't aware of those summonses and those

15   complaints; correct?

16   A.   That's correct.

17   Q.   And that's the same with the judgments, plaintiffs

18   weren't aware of the judgments; correct?

19   A.   That's correct.

20   Q.   If I could have you turn to Defendant's

21   Exhibit 26, so it's in the defendant's binder.

22   A.   26 of 106?

23   Q.   This is a document that has been Bates labeled,

24   it's premarked Defendant's Exhibit 26.  It's hard to

25   see, but it's Bates labeled HAR0001 to 000 --

Trial

Mohamad E. Taha, et al. v. USA                              12/9/2019

1    A.  I'm sorry, I lost you.  Page number?

2    Q.  So I'm looking at Defendant's Exhibit 26.

3    A.  Exhibit 26?

4    Q.  So do you have Defendant's exhibits open, the

5    bigger of the two binders?

6    A.  Oh, I'm sorry.

7    Q.  If you could look at Tab 26.

8    A.  "Final Judgment"?

9    Q.  Yes, that's correct.

10   A.  Yes.

11   Q.  Do you recognize this document?  You can flip

12   through.

13   A.  Yes, I do.

14   Q.  You recognize it?

15   A.  Yes.

16          MS. KANYER:  Your Honor, we would offer

17   Exhibit 26 as the completed final judgment from

18   plaintiffs for cause of action for breach of indemnity

19   agreement.

20          THE COURT:  Admitted.

21          (Defendant's Exhibit Number 26 was admitted

22      into evidence.)

23   BY MS. KANYER:

24   Q.  And regarding this promissory note, Plaintiff Taha

25   didn't file any legal action trying to get paid, any

Trial
Mohamad E. Taha, et al. v. USA                          12/9/2019

1    legal action against Atek; correct?

2    A.   Correct.

3    Q.   Can I have you please turn to Plaintiffs'

4    Exhibit H2, which is PDF page 94?

5    A.   Page 94 of 106?

6    Q.   That's correct.

7    A.   Thank you.

8    Q.   And this is the proof of claim that plaintiffs

9    filed in Mr. Khalil's bankruptcy proceeding?

10   A.   Correct.

11   Q.   And just to be clear, it says the dates were

12   incurred March 15th -- excuse me, the date the debt was

13   incurred was March 15, 2002, and March 15, 2003?

14   A.   The total claim is comprising 2002 and 2003

15   claims.

16   Q.   So I'm looking at line 2, so in the middle of the

17   document, do you see where it says, "Date the debt was

18   incurred"?

19   A.   Yes.

20   Q.   And it says, "March 15, 2002," and

21   "March 15, 2003"?

22   A.   Yes.

23   Q.   So those dates are not correct; right?  Those are

24   not the correct dates the debt was incurred?

25   A.   Well, the understanding here, those are the

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    dates -- if you notice, it's the filing date of 3/15/02

2    and 3/15/03, so this debt pertains to those years.

3       Q.  It pertains to --

4       A.  It does not imply or indicate that when the debt

5    was incurred.  Just like I said, it translated $142,000

6    debt for both years 2002 and 2003; that's what it is.

7       Q.  So this is not intending to say the debt was

8    incurred on March 15, 2002, and March 15, 2003?

9       A.  It depends on how I'm trying to understand your

10   question.  If you're talking about the bad debt, these

11   are not the dates when the bad debt occurred.

12      Q.  So are these the dates --

13      A.  If you look, again, as I explained it, that's

14   how -- how it is.  These dates are the years for the

15   debt that Atek owed to the shareholder.

16      Q.  Well, that's actually what I'm trying to drive at.

17      A.  I do not understand either.

18      Q.  So March 15, 2002, wouldn't that relate to tax

19   year 2001?

20      A.  These are the years they were filed and they

21   are -- as I explained, these are the years that

22   Mohamad Taha earned his ordinary income of $142,000.

23      Q.  So Mohamad Taha earned ordinary income on

24   March 15, 2002?

25      A.  Correct.

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    Q.   Wasn't the tax return filed, the 1120-S for 2002
2    filed March 15, 2003?
3    A.   No, that's when he filed his own 1040 income tax
4    return for 2002 and 2003.  He filed both years on these
5    dates.
6    Q.   Can you say that again?
7    A.   Mohamad Taha filed his income tax return for
8    2002 -- I take it back.
9            I cannot recall how these dates came about,
10   but if you look at the attached page, it explains
11   exactly how that $142,000 came in place.  It itemizes
12   the first line, 2002; share of income, 84,000; year
13   2003, 77,000.  He got paid 12,000, 3,000, and $5,000,
14   and the balance was $142,000 that Atek owed
15   Mohamad Taha.
16   Q.   So you don't have an understanding of why --
17   A.   So I recall -- first, I don't understand your
18   question.  Number two, I do not recall how these dates
19   were incurred.
20   Q.   And looking at the name --
21   A.   It's been 16, 17 years old, I'm sorry, I cannot
22   recall that.  But it was signed -- as you can see at
23   the bottom, it was signed on January 3, 2006.
24   Q.   And that's --
25   A.   It was signed by an attorney.

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    Q.   It was signed by an attorney?

2    A.   Right.

3    Q.   It was not signed by Mohamad Taha?

4    A.   Correct, because the attorney submitted it to the

5    bankruptcy court.

6    Q.   Okay.  In looking at the name and address of where

7    this should be sent, it says it should be sent to

8    Mohamad M. Taha; is that correct?

9    A.   Yes.

10   Q.   How do you spell Mohamad's name?  Is it with one

11   "M" or two "Ms"?

12   A.   M-O-H-M-A-D.

13   Q.   Okay.

14   A.   M-O-H-A-M-A-D.

15   Q.   I want to go back to Plaintiffs' Exhibit A3,

16   that's the 1120-S for 2004, so it should be PDF 28.

17   A.   1120-S for 2004?

18   Q.   Yes, the amended 1120-S for 2004.  Are you there?

19   A.   Okay.

20   Q.   And is it your testimony that this document is the

21   filed amended 1120-S for 2004?

22   A.   Correct.

23   Q.   Okay.  And that's your signature at the bottom;

24   correct?

25   A.   Correct.

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

```
 1    Q.   And it was signed 11/15/2012?

 2    A.   Correct.

 3    Q.   And it's your testimony that it was filed

 4    11/15/2012?

 5    A.   Correct.

 6    Q.   If I can have you turn to Defendant's Exhibit 12,

 7    so it's in the other binder.  Are you at Defendant's

 8    Exhibit 12?

 9    A.   1120-S, yes.

10    Q.   Do you recognize this document?

11    A.   Yes.

12    Q.   In looking at the bottom, is that your signature?

13    A.   Yes.

14    Q.   And what is that date of that signature?

15    A.   That signature is 11/15/13.

16    Q.   So is it still your testimony that the previous

17    document was filed on 11/15/2012?

18    A.   It's the same month and the same day, but for some

19    reason I had to maybe sign it twice.  I may have wrote

20    the year wrong, I cannot recall.  But I have another --

21    along with this 1120-S that I sent to the IRS, I sent a

22    letter along with this and I explained why I was

23    amending this return.

24    Q.   So is your testimony --

25    A.   And this is not --
```

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    Q.  -- still that the 1120-S for 2004, which is
2    Plaintiffs' Exhibit A3 at PDF page 28 of 26, is the
3    filed 1120-S for 2004?
4    A.  All I can say, I do not know -- I don't know -- I
5    don't have a record of your Exhibit 12.  I have a
6    record of my Exhibit A.  So, again, the year looks
7    different.  I have to go back to my letter that I
8    addressed to the IRS attaching 1120-S for 2004, then I
9    can verify which was the accurate year.  As far as the
10   way I see it, 11/12 (phonetic) is the year.
11   Q.  So sitting here today, you do not know if the
12   1120-S for 2004 in plaintiffs' exhibits is the filed
13   copy for 2004?
14   A.  That's correct, I do not recall how that happened.
15   Q.  Mr. Taha, you've previously testified about a
16   State of California refund claim in this case; correct?
17   A.  Yes.
18   Q.  You haven't produced any documents for the State
19   of California refund claim; correct, they're not
20   included in Plaintiffs' Exhibit List?
21   A.  Provided the exhibit list to the State of
22   California?
23   Q.  Let me start my question again.  You have not
24   included in your exhibits any State of California
25   refund claim; correct?

Trial
Mohamad E. Taha, et al. v. USA                    12/9/2019

1    A.   That's correct, it's 540X, and I didn't think it
2    was necessary because Plaintiff Taha or taxpayer Taha
3    was refunded his tax, so I didn't think it was a
4    necessity to include it here.
5    Q.   And that's the same with your refund claim, your
6    federal refund claim for the same years, you haven't
7    included any federal -- your federal refund claims in
8    plaintiffs' exhibits; correct?
9    A.   Whose?
10   Q.   Yours.
11   A.   That's correct.
12   Q.   And that's the same with Mr. Khalil's refund
13   claims, his refund claims are not included in
14   plaintiffs' exhibits; correct?
15   A.   That's correct.
16   Q.   And that's the same with a refund check from the
17   State of California to plaintiffs, that's not included
18   in plaintiffs' exhibits; correct?
19   A.   Correct.
20   Q.   And that's the same with a refund check to you for
21   tax years 2002 and 2003, those refund checks are not
22   included in plaintiffs' exhibits; correct?
23   A.   Correct.
24   Q.   And that's the same with Mr. Khalil's refund
25   checks, those checks are not included in plaintiffs'

Trial

Mohamad E. Taha, et al. v. USA                        12/9/2019

1    exhibits; correct?

2    A.   Correct.

3              MS. KANYER:  Your Honor, may I take just one

4    moment?

5              THE COURT:  May you what?

6              MS. KANYER:  Take just one moment.

7              THE COURT:  Yes, certainly.

8              MS. KANYER:  Chat with co-counsel.

9              No further questions, Your Honor.

10             THE COURT:  Okay.  Thank you.  Mr. Taha, do

11   you have anything you would care to add to your

12   testimony?

13             MR. TAHA:  I do not recall if I said it

14   earlier.  Clearly I explained the occurrence of the

15   debt.  It seemed like counsel may have confused and I

16   may have confused her, because the way I tried to

17   explain when the debt occurred.

18             So my testimony was the debt normally occurs

19   yearly for that specific year if it was not paid to the

20   shareholder.  If it was not paid, it will continue

21   being owed by the shareholder for the year after and it

22   accumulates.

23             So if I misunderstood counsel's question when

24   the debt occurred, if that was the word, and I said the

25   debt occurred, I explained it in multiple of

Trial

Mohamad E. Taha, et al. v. USA                          12/9/2019

1   statements, depending on when, for what year it was

2   occurred, and if it became bad debt, then it occurred

3   in October, 2004.

4           So I hope this would clarify how that debt

5   became a debt versus it became bad debt.  Bad debt

6   means it was lost.  Debt, it means it's still being

7   owed to the shareholder.  I hope that clarifies that

8   question.  I know I may have confused you, but that's

9   my clarification.

10          THE COURT:  Thank you very much.

11          MR. TAHA:  I'm sorry?

12          THE COURT:  Thank you very much.

13          MR. TAHA:  Thank you, Your Honor.

14          And I do not recognize this 1120-S 2004 that

15  you questioned me about.  But if you have no objection,

16  I'm trying to rethink about it, try to see where my

17  letter that I sent to the IRS with attached 1120-S, and

18  that will be primarily the date it was sent to the IRS.

19          The difference between 2012 and 2003, I

20  agree, I'm confused of it because I cannot recollect

21  how it happened, whether it was sent again, even it was

22  sent again.

23          Because you asked me, Counsel, the question

24  if I ever filed another 2004 1120-S, and my answer was,

25  no.  But if this happened, it's the same 1120-S for

Trial

Mohamad E. Taha, et al. v. USA                    12/9/2019

1    2004.  There's no change to a single number.  They're

2    all the same numbers.  It's a matter of whether this

3    was filed again as a confirmation or it was filed in

4    the year 2012.

5              So I just want to clarify that.  And as I

6    said, I would review the letter that I sent to the IRS,

7    that would be the standing date.

8              THE COURT:  Thank you.

9              MR. TAHA:  Thank you, Your Honor.  And thank

10   you, Counsel.

11             THE COURT:  All right.  You may return to

12   your chair by the table.

13             Ms. Kanyer, where do we go from here?

14             MS. KANYER:  Your Honor, at this time we

15   would like to move in Defendant's Exhibits 1, 2, and 3,

16   which are Forms 4340 because they are

17   self-authenticating and not hearsay.

18             So I have the -- the 4340s come with a

19   certificate of record which actually has the seal.  The

20   one that's in the binders are the ones that we scanned

21   into our system and then used a Bates label so we could

22   produce them to plaintiff.

23             But if Your Honor would like, I can approach

24   and show the certified copies.

25             And so Exhibit 1 is a Form 4340, "Certificate

Trial
Mohamad E. Taha, et al. v. USA                              12/9/2019

1   of Assessment, Payments and Other Specified Matters for
2   Tax Year 2002."
3              Defendant's Exhibit 2 is for tax year 2003.
4              And Defendant's Exhibit 3 is for tax year
5   2004.
6              THE COURT:  May I have a simpleminded
7   question?
8              MS. KANYER:  Yes.
9              THE COURT:  It has to do with defendant's
10  Exhibit 1.  There appear to be two dates that are out
11  of order from the date standpoint; that is, the claim
12  disallowed occurs before the amended return file?
13             MS. KANYER:  I couldn't describe to you
14  exactly why that happens, but I do know that these
15  dates are used to accurately reflect the dates in the
16  IRS records.  I don't think the order in which they
17  appear on the transcript changes it.
18             THE COURT:  But these are the certified
19  records, notwithstanding that?
20             MS. KANYER:  Yes, Your Honor.
21             THE COURT:  All right.  DX-1, -2, and -3 are
22  admitted.
23             (Defendant's Exhibit Number 1 was admitted
24       into evidence.)
25             (Defendant's Exhibit Number 2 was admitted

Trial

Mohamad E. Taha, et al. v. USA                          12/9/2019

```
 1        into evidence.)
 2            (Defendant's Exhibit Number 3 was admitted
 3        into evidence.)
 4            MS. KANYER:  Your Honor, at this time we
 5   would like to call Revenue Agent Wolff to the stand.
 6            THE COURT:  Thank you.
 7            If you'll stop about right there and raise
 8   your right hand to be sworn.
 9            Do you swear or affirm that the testimony
10   you're about to give at this trial shall be the truth,
11   the whole truth, and nothing but the truth so help you
12   God?
13            THE WITNESS:  I do.
14            THE COURT:  Thank you.  And when you get to
15   the witness stand, if you would please hesitate for a
16   moment, make yourself comfortable, and then state your
17   full name for the record, that would be helpful.
18   THEREUPON,
19                    DIEDRICH WOLFF,
20   a witness, having been first duly sworn, upon his oath,
21   testified as follows:
22            THE WITNESS:  My full name is Diedrich,
23   D-I-E-D-R-I-C-H, last name Wolff, W-O-L-F-F.
24            THE COURT:  Thank you.  You may proceed.
25                    DIRECT EXAMINATION
```

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

```
 1   BY MS. KANYER:

 2     Q.  Good afternoon, Mr. Wolff.

 3     A.  Good afternoon.

 4     Q.  You just stated your name, so can I please have

 5   your address for the record, your business address?

 6     A.  Business address is 850 Trafalgar Court.  That's

 7   in Maitland, Florida, 32751.

 8     Q.  Can you spell Trafalgar?

 9     A.  Yes, lots of As.  T-R-A-F-A-G-A-R -- well, there's

10   an "L" in there somewhere, but everything's an A.

11            THE COURT:  Same name as the British military

12   event?

13            THE WITNESS:  I think so.

14            THE COURT:  All right.  And that helps.

15   Thank you.

16   BY MS. KANYER:

17     Q.  Mr. Wolff, where are you currently employed?

18     A.  I'm currently employed with the Internal Revenue

19   Service.

20     Q.  And what is your current job title?

21     A.  It's internal revenue agent.

22     Q.  And revenue agent Wolff, where are you currently

23   located?

24     A.  At the Maitland, Florida, what we call POD, post

25   of duty.
```

Trial
Mohamad E. Taha, et al. v. USA                                        12/9/2019

1    Q.  And how long have you been with the IRS?

2    A.  A little more than 25 years.

3    Q.  Now, before we get into your work experience,

4    revenue agent Wolff, what schools have you attended?

5    A.  How far back do we need to go?

6    Q.  Let's start with just college.

7    A.  College, I graduated from high school, of course,

8    and went to the George Washington University in

9    Washington, D.C.  I completed the bachelor's in

10   accounting degree.

11   Q.  And what year did you graduate?

12   A.  Forgive me, but that was 1984 or '85.

13   Q.  Do you have any other education?

14   A.  Later on I wanted to move into tax, so I secured a

15   degree from the American University for a master's

16   degree in taxation.

17   Q.  And what year was that?

18   A.  I think I finished it in 1998 or 1999.

19   Q.  And revenue agent Wolff, are you a CPA?

20   A.  Yes, I am.

21   Q.  And what is a CPA?

22   A.  Certified public accountant.

23   Q.  And where are you a CPA?

24   A.  I passed the exam in the state of Maryland.

25   Q.  And what year was that?

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

```
 1   A.   1986.
 2   Q.   And revenue agent Wolff, how long have you been
 3   with the IRS in Maitland, Florida?
 4   A.   Since 2009 or 2010.  It's about nine years, I
 5   believe.
 6   Q.   Can you please describe your current job
 7   responsibilities?
 8   A.   Currently I conduct examinations of Forms 1040,
 9   1040-Xs, 1120s, 1120-Ss, and 1065s, 1065s being
10   partnership returns.
11   Q.   And I believe we haven't yet during this trial
12   said what an 1120 is.  I'm assuming you're talking
13   about forms; correct?
14   A.   Correct.  An 1120 is a corporate tax return.  It
15   is not an S corp return; it's different.  It is a
16   taxpaying entity.
17   Q.   And what does it mean to examine a return?
18   A.   It's to look at a particular item on a return that
19   has been selected for you or suggested for you, that,
20   along with certain mandatory audit techniques that are
21   used in every audit.  Sometimes that expands into other
22   areas, and sometimes that expands into other years.
23   Q.   Okay.  Have you ever examined a refund claim?
24   A.   Many.
25   Q.   And what is your process for examining refund
```

Trial

Mohamad E. Taha, et al. v. USA                          12/9/2019

1    claims?

2    A.   Generally, it's the claim itself, to start with.

3    There is some change requested on the original 1040, we

4    start with the claim, the adjustment that the taxpayer

5    want to make, and we figure out whether it's

6    appropriate under the statutes; and if so, we allow it.

7         There are many outcomes that can happen.  We

8    can allow it totally, partially, we can disallow it

9    fully, and we can disallow it fully and make additional

10   assessments on the original return, if the statute is

11   still open on the original return.

12   Q.   Thank you.  Where else have you been located since

13   you've been with the IRS other than Maitland, Florida?

14   A.   I started in Washington, D.C. at 500 North Capital

15   Street.  That was in 1994.  We did a lot of training.

16   All IRS hires go through many series of trainings.

17        I stayed at 500 North Capital for about a

18   year, and then moved to the Wheaton, Maryland post of

19   duty where I remained there until approximately the

20   year 2000.

21   Q.   So when you were at the IRS on North Capital

22   Street, what was your title?

23   A.   Internal revenue agent.  I was hired as an

24   internal revenue agent.

25   Q.   And then when you were in the Wheaton location,

Trial
Mohamad E. Taha, et al. v. USA                    12/9/2019

1    what was your title?

2    A.   The same, internal revenue agent.

3    Q.   And what were your job responsibilities as an

4    internal revenue agent when you were in the D.C. and

5    Wheaton offices?

6    A.   Well, in the D.C., it was just new agent training,

7    which is generally just very limited to -- for example,

8    it might look at Schedule A 1040s only as a trainee.

9    Your competency is not up to speed yet.  But when I

10   moved to Wheaton, my variety of work expanded.

11   Q.   I'm sorry, you mentioned a Schedule A?

12   A.   Schedule A 1040s.  It's like contributions, real

13   estate taxes, medical expenses, a typical Schedule A as

14   part of the 1040.

15   Q.   Okay.  And when you were in the Wheaton, Maryland

16   office, what were your job responsibilities?

17   A.   They had expanded to 1120s and then later into

18   flow-through entities, which are 1120-S and 1065.

19   Q.   I believe you also mentioned training.  Can you

20   describe the training that you went through at the IRS?

21   A.   IRS currently has four phases of training, the

22   first phase, Phase 1, is general; it just relates to

23   1040s.  Phase 2 then is more involved, more involved

24   1040, more in-depth, including rental activities and

25   more technical stuff, including the inaltman (phonetic)

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    taxes and the various credits.

2           So it's -- when you finish Phase 1 and 2,

3    you've essentially finished all the training you're

4    going to get for the 1040.

5    Q.   And is all that training on campus, or do you do

6    actual work with real taxpayers?

7    A.   Well, it's both, you go for several weeks of

8    training.  Phase 1 can last three or four weeks.

9    Phase 2 can also last three weeks.  But it's usually in

10   a site together and just training, is all you're doing

11   is training.

12   Q.   And then were there any other phases beyond

13   Phase 1 and Phase 2?

14   A.   Phase 3 is corporate training, 1120, and would

15   usually last -- a little shorter, maybe two weeks.

16   Q.   And was there just those three trainings, or were

17   there additional trainings?

18   A.   One more, it's called flow-through training, which

19   includes 1120-S and 1065.

20   Q.   And what were your job responsibilities after you

21   finished your training?

22   A.   I was a fully trained revenue agent, so I would be

23   assigned tax returns by my group manager.  And I

24   conduct those examinations and close the case with

25   either additional tax assessed or sometimes there's a

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1     no change, whatever the case may be.

2        Q.   And after 2000 -- after year 2000, where were you

3     working?

4        A.   I went to 1111 Constitution Avenue into the IRS

5     headquarters.   I changed my job description from

6     revenue agent to tax law specialist.

7        Q.   And what were you doing as a tax law specialist?

8        A.   I was working in the forms and publications

9     division of IRS.

10       Q.   And what were your job responsibilities in the

11    forms and publications division?

12       A.   To update forms and publications according to

13    whatever congress decided to change on a year-to-year

14    basis.

15       Q.   Do you recall any specific forms that you worked

16    on sitting here today?

17       A.   Initially there was individuals were working

18    exclusively in publications, and other individuals were

19    working exclusively in forms.   But gradually over a few

20    years, they started to mix the forms and publications

21    together, and it made logical sense.

22             For example, I was responsible for

23    Publication 463, which is travel, entertainment, gift,

24    and car expenses.   It's a rather -- it's a large

25    publication.   It's referred to a lot by 1040 users.

Trial

Mohamad E. Taha, et al. v. USA                          12/9/2019

1      And Form 2106, which is attached to the 1040, is an
2      integral part of that publication, so logically that
3      particular form would be assigned to me.  So I had a
4      mix of publications and other forms to work on.
5      Q.  And so were you at the 1111 Constitution Avenue
6      headquarters until you went to Maitland?
7      A.  Before that we moved to the -- I'm not sure you
8      call it the headquarters overflow, but it's in
9      New Carrolton, there was three large buildings which
10     was also IRS headquarters; just an extension of 1111.
11     Q.  And did you go from forms and publications to the
12     Maitland office?
13     A.  Correct, I wanted to reside in Florida, and the
14     option was to go back to being a revenue agent.  So
15     that's what I decided to do.
16     Q.  Okay.  Revenue agent Wolff, can I please have you
17     turn to Defendant's Exhibit 7.  Defendant's Exhibit 7
18     is in the binder that's labeled "Defendant's Exhibits."
19     If you can turn to Tab 7.  Defendant's Exhibit 7 is
20     titled "Form 1040-X, Amended U.S. Individual Income Tax
21     Return for Tax Year 2002," and it begins Bates
22     USPROD15.  And "U.S. Prod" means that we produced them
23     from our file.
24          Revenue agent Wolff, do you recognize
25     Defendant's Exhibit 7?

Trial

Mohamad E. Taha, et al. v. USA                              12/9/2019

1    A.  Yes, I do.

2    Q.  What is this?

3    A.  It's a 1040-X, which is an amended U.S.

4    individual income tax return.

5    Q.  Is it also considered a claim for refund?

6    A.  Generally, yes, it can be classified as an

7    abatement if the tax was unpaid when the claim is

8    filed.

9    Q.  And is it also been considered a claim for

10   refund --

11   A.  Yes.

12   Q.  -- if there is no abatement?

13   A.  Same form.

14   Q.  Have you seen documents like this in the normal

15   course of your job responsibilities?

16   A.  Yes.

17   Q.  How often would you say you work with amended

18   individual tax returns?

19   A.  Currently, weekly.

20   Q.  Looking at this document, whose amended return is

21   this?

22   A.  This is for Mohamad Taha and Sanaa Yassin.

23   Q.  And if I can direct your attention to the stamp in

24   the lower left-hand corner, do you see that stamp?

25   A.  Yes, I do.

Trial

Mohamad E. Taha, et al. v. USA                          12/9/2019

1    Q.   What is that stamp?

2    A.   This is the first stamp applied to the paper

3    return, and it's a received stamp.

4    Q.   And what date does it say that it is received?

5    A.   It's difficult to read, but I believe it's

6    November 29, 2007.

7    Q.   Is that a stamp in IRS marking?

8    A.   Yes, it's for the Fresno, California service

9    center.

10   Q.   Okay.  What is your understanding of how this

11   stamp comes to get placed on a 1040-X such as this?

12   A.   My understanding is that when a 1040-X comes in,

13   it is always stamped, and this is the date when it's

14   received, the actual date when IRS secures or takes

15   possession of the paper document.

16   Q.   Do you know why the IRS places a stamp on 1040-Xs?

17   A.   Statute dates are important, and that is part of

18   their general procedures in submission processing, to

19   always stamp the 1040-X.

20   Q.   So was this stamp made in the ordinary course of

21   the IRS's activities?

22   A.   Yes.

23   Q.   And is it also your understanding that this return

24   was kept in the IRS's normal business activities?

25   A.   Normal business?

Trial

1   Q.  Business activities?

2   A.  Yes.

3            MS. KANYER:  Your Honor, at this time the

4   United States offers Defendant Exhibit 7 as the

5   IRS-filed copy of Form 1040-X for 2002.

6            THE COURT:  Mr. Taha, do you have a view?

7            MR. TAHA:  I'm fine with it.

8            THE COURT:  What?

9            MR. TAHA:  I'm fine with it.

10           THE COURT:  All right.  Admitted.

11           (Defendant's Exhibit Number 7 was admitted

12       into evidence.)

13  BY MS. KANYER:

14   Q.  Revenue agent Wolff, can you tell me what your

15   understanding is of what happens to an envelope that is

16   received at the IRS service center?

17   A.  The envelope is opened.  And there's a unique way

18   the envelope is opened for each submission.  The

19   envelope is cut on three sides and opened completely so

20   nothing can be missed in the interior of the envelope.

21   Q.  Do you know where the IRS actually receives paper

22   returns?

23   A.  Well, they call it their mailroom, so it's a

24   rather large one.

25   Q.  And after a document is stamped such as Exhibit 7,

Trial

Mohamad E. Taha, et al. v. USA                    12/9/2019

1    do you know how the IRS tracks those returns?

2      A.   It is moved through a pipeline.  I don't know

3    their precise procedures, but I notice there are

4    several indices on the return indicating different

5    locations within the pipeline.

6      Q.   And what do you mean by there's certain indices on

7    this return about the pipeline?

8      A.   Well, in the bottom of the return there is a stamp

9    that says "December 4, 2007," and a series of numbers.

10   That would appear to be the next location where an

11   individual actually stamped it.  And I believe the

12   series of numbers identifies what is known as a 1040-X

13   unit that actually had possession of this document and

14   stamped it.

15     Q.   And what is your understanding of the accounts

16   management stamp that's also on this 1040-X, Exhibit 7?

17     A.   I believe that after December 4th, and possibly

18   because there is no date of another indicator here, it

19   made its way to accounts management.  And they --

20   accounts management stamped this on December 5, 2007.

21     Q.   Do you know whether this document was ever scanned

22   into any sort of system?

23     A.   I believe that's -- that's -- when you look at the

24   accounts management stamp, at the bottom it says

25   "Fresno ICT," which means image control team, I believe

Trial

Mohamad E. Taha, et al. v. USA                              12/9/2019

1    at that point this document was converted into an

2    image.  I'm not sure if it's PDF or whatever image, it

3    is a computer image after that date.

4      Q.  Do you know what happens when two tax returns are

5    filed in the same envelope?

6      A.  They are separated.  The individual that puts them

7    in the image control process separates returns, I

8    believe it's by a blue sheet of paper.

9      Q.  When two returns come in one envelope, what is

10   your understanding of how or if any received stamps are

11   put on those returns?

12     A.  Well, done correctly, they both get a received

13   stamp based on the individual's review of the paperwork

14   identifying a second return.

15          THE COURT:  Ms. Kanyer, may I ask Mr. Wolff a

16   quick question?

17          MS. KANYER:  Of course.

18          THE COURT:  What happens to the paper copy

19   after the scan occurs?

20          THE WITNESS:  I believe it is destroyed

21   fairly quickly.  I believe the image becomes then the

22   original return, so documents are not filed for 20 or

23   30 years anymore.

24   BY MS. KANYER:

25     Q.  But if two returns were included or scanned into a

Trial

1   system, would the system have an ability to account for

2   various documents being scanned at once?

3     A.   Right.  If it was accidentally scanned together,

4   the image control would identify an anomaly being

5   another return and indicate that.

6     Q.   Revenue agent Wolff, can I please have you return

7   to Defendant's Exhibit 8, which is behind the 8 tab in

8   defendant's binder.  Defendant's Exhibit 8 is a

9   premarked exhibit.  It's entitled "Form 1040-X, Amended

10  U.S. Individual Income Tax Return for Tax Year 2004,"

11  and it begins Bates USPROD00017.

12           Revenue agent Wolff, do you recognize

13  Defendant's Exhibit 8?

14    A.   Yes.

15    Q.   What is this?

16    A.   It's a 1040-X, Amended U.S. Individual Income Tax

17  Return.  And in this case for tax year 2004.

18    Q.   Whose amended return is this?

19    A.   Mohamad Taha and Sanaa Yassin.

20    Q.   And revenue agent Wolff, I'd like to direct your

21  attention to the stamp in the lower left-hand corner,

22  it's sideways.  Do you see that stamp?

23    A.   Yes, I do.

24    Q.   What is that stamp?

25    A.   That is the received stamp.

Trial

Mohamad E. Taha, et al. v. USA                          12/9/2019

1    Q.   And what is that received date?

2    A.   It appears to be April 1, 2011.

3    Q.   And is that an IRS marking?

4    A.   Yes.

5    Q.   And is that stamp made in the ordinary course of

6    the IRS business activities?

7    A.   Yes.

8    Q.   And what does that stamp mean?

9    A.   It means that the IRS took possession of this

10   document on April 1st in the Fresno, California service

11   center.

12   Q.   And is it your understanding that this document

13   was kept in the IRS's -- in the normal course of the

14   IRS's regular conducted activities?

15   A.   Yes.

16        MS. KANYER:  Your Honor, at this time we

17   would like to move to admit Defendant's Exhibit 8 as

18   the IRS's filed copy of Form 1040-X for 2004.

19        THE COURT:  Mr. Taha?

20        MR. TAHA:  No objection, Your Honor.

21        THE COURT:  All right.  Admitted.

22        (Defendant's Exhibit Number 8 was admitted

23      into evidence.)

24   BY MS. KANYER:

25   Q.   And looking at that accounts management stamp,

1    what is your understanding of what that accounts

2    management stamp means?

3        A.   Similar to the previous document, accounts

4    management was the final recipient of the paper copy,

5    and it was scanned into the system on April 22, 2011.

6        Q.   And revenue agent Wolff, can I have you please

7    turn back in the binder to Defendant's Exhibit 4.

8    Defendant's Exhibit 4 is a premarked exhibit titled

9    "Form 1040, U.S. Individual Income Tax Return for Tax

10   Year 2002."  It has Bates labeled beginning

11   USPROD00010.

12            Revenue agent Wolff, do you recognize

13   Defendant's Exhibit 4?

14       A.   Yes, I do.

15       Q.   What is it?

16       A.   It's a Form 1040, U.S. Individual Income Tax

17   Return for Tax Year 2002.

18       Q.   How often do you work with Forms 1040, U.S.

19   individual income tax returns, in your job

20   responsibilities?

21       A.   On a daily basis.

22       Q.   Looking at this exhibit, whose Form 1040 is this?

23       A.   It's Mohamad Taha and Sanaa Yassin.

24       Q.   So there are no stamps on this document; correct?

25       A.   Correct.

Trial

1    Q.   I should say no received stamp on this document;
2    correct?
3    A.   Correct.
4    Q.   Do you know why that is?
5    A.   This return would have been received on a timely
6    basis on or before April 15, 2013, and because of that
7    would not receive a received stamp.
8    Q.   And that's the IRS's normal practice?
9    A.   Yes.
10   Q.   I'd like to direct your attention to the numbers
11   in the upper right-hand corner.
12   A.   Yes.
13   Q.   There's a big group of numbers.  Do you know what
14   that is?
15   A.   That's called a document locator number, DLN for
16   short.
17   Q.   And what is a DLN number?
18   A.   I believe it started as a physical location for
19   the document itself.
20   Q.   Do you know what it is now?
21   A.   If it's an image -- I can't be 100 percent
22   certain, but everything still gets a document locator
23   number.  If it's an image, it's obviously located in
24   some database somewhere, but everything still has a DLN
25   number.

Trial

Mohamad E. Taha, et al. v. USA                              12/9/2019

1    Q.  And do you know --

2              THE COURT:  Ms. Kanyer, may I interrupt for

3    just a moment?

4              MS. KANYER:  Sure.

5              THE COURT:  Mr. Wolff, you identified the

6    document as having been timely filed in 2013.  I think

7    you probably meant 2003; is that correct?

8              THE WITNESS:  Did I say '13?

9              THE COURT:  Yes.

10             THE WITNESS:  Yes, it's 2003, April 15, on or

11   before.

12             MS. KANYER:  Thank you, Your Honor, I

13   appreciate that.

14   BY MS. KANYER:

15   Q.  And that DLN number, is that an IRS marking?

16   A.  Yes, it is.

17   Q.  And is it made in the ordinary course of the IRS's

18   business activities?

19   A.  Yes, it is.

20             MS. KANYER:  Your Honor, defendant offers

21   into evidence Defendant's Exhibit 4 as the IRS's filed

22   copy of Form 1040 for 2000.

23             THE COURT:  Before I ask Mr. Taha what he

24   thinks of your request, may I ask Mr. Wolff a question?

25             MS. KANYER:  Sure.

Trial

Mohamad E. Taha, et al. v. USA                          12/9/2019

```
 1              THE COURT:  Mr. Wolff, based on your
 2    testimony, it appears that the IRS changed its handling
 3    of paper receipted documents sometime between 2003 and
 4    2007 or '9; is that correct?
 5              THE WITNESS:  That's possible.  There was a
 6    great push for electronically filed returns and an
 7    attempt to reduce all the paperwork, and at some point
 8    scanning became the important way to maintain the file
 9    in perpetuity, apparently.
10              THE COURT:  You don't exactly know when that
11    occurred?
12              THE WITNESS:  I do not, sir.
13              THE COURT:  Okay.  Thank you.
14              Mr. Taha?
15              MR. TAHA:  No objection, Your Honor.
16              THE COURT:  Admitted.
17              (Defendant's Exhibit Number 4 was admitted
18         into evidence.)
19    BY MS. KANYER:
20     Q.  Revenue agent Wolff, can I have you please turn to
21    Defendant's Exhibit 6?
22              Defendant's Exhibit 6 is a premarked exhibit
23    titled "Form 1040-A U.S. Individual Income Tax Return
24    for Tax Year 2004."  DX-6 is beginning Bates
25    USPROD00024.
```

Trial

Mohamad E. Taha, et al. v. USA                          12/9/2019

1           Revenue agent Wolff, do you recognize
2    Defendant's Exhibit 6?
3    A.  Yes.
4    Q.  What is it?
5    A.  It's a Form 1040-A, U.S. Individual Income Tax
6    Return for Tax Year 2004.
7    Q.  Do you know whose 1040-A this is?
8    A.  It's for Mohamad Taha and Sanaa Yassin.
9    Q.  Have you seen documents like this in the normal
10   course of your job responsibilities?
11   A.  Yes, but not very often, quite frankly, because it
12   is a simpler tax return.
13   Q.  So what's the difference between a Form 1040 and a
14   Form 1040-A?
15   A.  Well, there is no business schedule, which would
16   be a Schedule C that you can attach to this return.
17   There are no rental activities or flow-through
18   activities on this form.  I'm scanning quickly just to
19   make sure I'm not making any mistakes, but the Schedule
20   E is also not included.  So several things are left out
21   of this return for simplicity.
22   Q.  And revenue agent Wolff, I would like to direct
23   your attention to the stamp in the lower right-hand
24   corner of this document.  Do you see that stamp?
25   A.  Yes.

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    Q.  What is that stamp?

2    A.  It's a received stamp.

3    Q.  And what is the date of that received stamp?

4    A.  October 25, 2011.

5    Q.  And is this an IRS marking?

6    A.  Yes, it is.

7    Q.  And is it made in the normal course of the IRS's

8    business activities?

9    A.  Yes.

10   Q.  What is your understanding of what this stamp

11   means?

12   A.  It's stamped received by apparently the

13   Philadelphia service center on October 25, 2011.

14   Q.  And what is your understanding of why the IRS

15   placed a stamp on this return and not Defendant's

16   Exhibit 4 that we just looked at?

17   A.  My understanding is because it is a delinquent

18   return.

19   Q.  So if I could direct your attention to the group

20   of numbers in the upper right-hand corner.  Do you see

21   those numbers?

22   A.  Yes.

23   Q.  What are those numbers?

24   A.  I believe the "919" corresponds to an individual

25   that has reviewed the return.

Trial

Mohamad E. Taha, et al. v. USA                            12/9/2019

1    Q.  Sorry, I think I directed you to the wrong side.
2  Can I direct you to the right-hand side group of
3  numbers?
4    A.  Oh, okay.  That's the document locator number.
5    Q.  And is that an IRS marking?
6    A.  Yes, it is.
7    Q.  Is it made in the normal course of the IRS
8  business activities?
9    A.  It is.
10   Q.  Okay.
11         MS. KANYER:  Your Honor, defendant offers
12  into evidence Defendant's Exhibit 6 as the IRS's filed
13  copy of the Form 1040-A.
14         THE COURT:  Mr. Taha?
15         MR. TAHA:  No objection, Your Honor.
16         THE COURT:  Thank you.  Admitted.
17         (Defendant's Exhibit Number 6 was admitted
18     into evidence.)
19  BY MS. KANYER:
20   Q.  Revenue agent Wolff, can I please have you turn to
21  Defendant's Exhibit 9?
22         Defendant's Exhibit 9 is a premarked exhibit.
23  It's titled "Form 1120-S, U.S. Income Tax Return For an
24  S Corporation for Tax Year 2002."  It begins Bates
25  USPROD00026.

Trial

Mohamad E. Taha, et al. v. USA                    12/9/2019

1              Revenue agent Wolff, do you recognize
2    Exhibit 9?
3    A.  Yes, I do.
4    Q.  What is it?
5    A.  It's a Form 1120-S, U.S. Income Tax Return for an
6    S Corporation for Tax Year 2002.
7    Q.  Have you seen documents like this in the normal
8    course of your job responsibilities?
9    A.  Yes.
10   Q.  How often do you work with 1120-Ss?
11   A.  Depending if it's in my inventory, which I have
12   currently, it could be on a weekly basis, depending.
13   Q.  Looking at this Form 1120-S, who is the taxpayer?
14   A.  A-T-E-K, Atek Construction, Inc.
15   Q.  I would like to direct your attention to the stamp
16   on the left side of this document.  What is that stamp?
17   A.  This is a received stamp.
18   Q.  Okay.  And is that an IRS marking?
19   A.  Yes.
20   Q.  And is it made in the normal course of the IRS's
21   business activities?
22   A.  Yes, it is.
23   Q.  That stamp is crossed out; correct?
24   A.  Yes.
25   Q.  So what does that stamp indicate?

Trial

1    A.  The stamp indicates that it was received in the

2   Ogden, Utah service center on March -- I believe that

3   is 23, 2003.  And specifically it's marked out and a

4   handwritten received date to the right of it is changed

5   to March 15, 2003.

6    Q.  I'd like to direct your attention to the group of

7   numbers in the upper right-hand corner.  Do you see

8   those numbers?

9    A.  Yes, I do.

10   Q.  What are they?

11   A.  That's a document locator number.

12   Q.  And is that an IRS marking?

13   A.  Yes.

14   Q.  Is it made in the normal course of the IRS's

15  business activities?

16   A.  Yes.

17       MS. KANYER:  Your Honor, defendant offers

18  into evidence Defendant's Exhibit 9 as the IRS's filed

19  copy of Form 1120-S for 2002.

20       THE COURT:  Mr. Taha, I have a question for

21  Mr. Wolff again.  May I ask it?

22       MR. TAHA:  Yes, Your Honor.  I could probably

23  ask him a couple of simple questions.

24       THE COURT:  I'm sorry, what?

25       MR. TAHA:  I have a couple of questions to

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    ask.

2              THE COURT:  You may ask -- when your time

3    comes for cross-examination, you may ask them.  I just

4    have a technical question for Mr. Wolff at the moment.

5              MR. TAHA:  Okay.

6              THE COURT:  Mr. Wolff, what are the

7    circumstances in which one receives stamp could be

8    crossed out and a handwritten notation added?

9              THE WITNESS:  My understanding is that there

10   is potentially a grace period available for certain

11   returns, and that may have been the case here so that

12   the return would not be identified as a delinquent

13   return.

14             THE COURT:  I suppose I have to ask the

15   follow-up question, I apologize to all.

16             The due date for a Subchapter S corporation

17   is March 15th; is that correct?

18             THE WITNESS:  That's correct, sir.

19             THE COURT:  All right.  Thank you.

20             MS. KANYER:  May I ask a follow-up question,

21   Your Honor?

22             THE COURT:  Certainly.

23   BY MS. KANYER:

24   Q.  Are there other options available such as a timely

25   postmark that could also warrant a crossing out of a

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    received date?

2    A.   That's correct.  So technically it's received when

3    the postmark is postmarked on the envelope.  So that's

4    more likely an explanation in this case, and thank you

5    for helping me with that.

6            MS. KANYER:  Your Honor, we offer into

7    evidence Defendant's Exhibit 9 as the IRS's filed copy

8    of the 1120-S.

9            THE COURT:  Mr. Taha?

10           MR. TAHA:  No objection, Your Honor.

11           THE COURT:  Admitted.

12           (Defendant's Exhibit Number 9 was admitted

13       into evidence.)

14   BY MS. KANYER:

15   Q.   Revenue agent Wolff, may I please have you turn to

16   Defendant's Exhibit 10?

17           Defendant's Exhibit 10 is a premarked

18   exhibit.  It's titled "Form 1120-S for U.S. Income Tax

19   Returns for an S Corporation for Tax Year 2003."  DX-10

20   begins Bates label USPROD00044.

21           Revenue agent Wolff, do you recognize this

22   document?

23   A.   Yes, I do.

24   Q.   What is it?

25   A.   It's a Form 1120-S, U.S. Income Tax Return for an

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial
Mohamad E. Taha, et al. v. USA                          12/9/2019

1    S Corporation for Tax Year 2003.

2    Q.   Looking at this Form 1120-S, who is the taxpayer?

3    A.   Atek Construction, Inc.

4    Q.   What year is this return for?

5    A.   2003.

6    Q.   I'd like to direct your attention to the stamp

7    that's in the middle of this document.  Do you see that

8    stamp?

9    A.   Yes.

10   Q.   What is that stamp?

11   A.   The received stamp.

12   Q.   And what date is on the received stamp?

13   A.   March 18, 2004.

14   Q.   And is that an IRS marking?

15   A.   Yes, it is.

16   Q.   And is it an IRS marking made in the normal course

17   of the IRS's business activities?

18   A.   Yes.

19   Q.   And what is your understanding of what this stamp

20   means?

21   A.   It means that the paper copy was received in the

22   IRS mailroom in Ogden, Utah on March 18, 2004.

23   Q.   I would like to direct your attention to the group

24   of numbers in the upper right-hand corner.  Do you see

25   those numbers?

Trial

Mohamad E. Taha, et al. v. USA                    12/9/2019

```
 1    A.   Yes, I do.

 2    Q.   What are they?

 3    A.   That's a document locator number.

 4    Q.   And that's an IRS marking?

 5    A.   Yes, it is.

 6              MS. KANYER:  Your Honor, defendant offers

 7    into evidence Defendant's Exhibit 10 as the IRS's filed

 8    copy of Form 1120-S for 2003.

 9              THE COURT:  Mr. Taha?

10              MR. TAHA:  I don't have any objection,

11    Your Honor.

12              THE COURT:  Okay.  Admitted.  Thank you.

13              (Defendant's Exhibit Number 10 was admitted

14        into evidence.)

15    BY MS. KANYER:

16    Q.   Revenue agent Wolff, can I please have you turn to

17    Defendant's Exhibit 11?

18              Defendant's Exhibit 11 is a premarked exhibit

19    titled "Form 1120-S, U.S. Income Tax Return for an

20    S Corporation for Tax Year 2004."  DX-11 begins Bates

21    label USPROD00065.

22              Revenue agent Wolff, do you recognize this

23    document?

24    A.   Yes.

25    Q.   What is it?
```

Trial

Mohamad E. Taha, et al. v. USA                           12/9/2019

1    A.   It's a Form 1120-S, U.S. Tax Return for an

2    S Corporation for Tax Year 2004.

3    Q.   And looking at this Form 1120-S, who is the

4    taxpayer?

5    A.   Atek Construction, Inc.

6    Q.   I'd like to direct your attention to the stamp in

7    the lower left-hand corner, or left side of this

8    document.  Do you have see that stamp?

9    A.   Yes.

10   Q.   What is that stamp?

11   A.   It's a received stamp.

12   Q.   What is the date of that received stamp?

13   A.   November 13, 2007.

14   Q.   And is that an IRS marking?

15   A.   Yes.

16   Q.   And is it an IRS marking made in the normal course

17   of the IRS's business practice?

18   A.   Yes.

19   Q.   What is your understanding of what that stamp

20   means?

21   A.   My understanding is that it's received in the

22   Ogden, Utah service center on November 13, 2007.

23   Q.   And I would like to direct your attention to the

24   numbers in the upper right-hand corner.  Do you see

25   those numbers?

Trial

Mohamad E. Taha, et al. v. USA                          12/9/2019

1     A.   Yes.

2     Q.   What are they?

3     A.   That's the document locator number.

4     Q.   And is this an IRS marking made in the normal

5     course of the IRS's business practices?

6     A.   Yes.

7          MS. KANYER:  Your Honor, defendant offers

8     into evidence Defendant's Exhibit 11 as the IRS's filed

9     copy of Form 1120-S for 2004.

10         THE COURT:  Mr. Taha?

11         MR. TAHA:  No objection, Your Honor.

12         THE COURT:  Admitted.

13         (Defendant's Exhibit Number 11 was admitted

14     into evidence.)

15    BY MS. KANYER:

16    Q.   Revenue agent Wolff, may I have you please turn to

17    Defendant's Exhibit 12.  Defendant's Exhibit 12 is a

18    premarked exhibit titled "Form 1120-S, Amended U.S.

19    Income Tax Return for an S Corporation for Tax Year

20    2004," and it begins Bates label USPROD000077.

21         THE COURT:  Before we do that, may I actually

22    look at the various pages of DX-11?

23         MS. KANYER:  Sure.

24         THE COURT:  Thank you.

25    BY MS. KANYER:

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1   Q.   Revenue agent Wolff, do you recognize Defendant's
2   Exhibit 12?
3   A.   Yes.
4   Q.   What is it?
5   A.   It's a Form 1120-S, U.S. Income Tax Return for an
6   S Corporation.
7   Q.   And is this 1120-S an amended 1120-S?
8   A.   Looking at the box on line -- just above line 1,
9   "amended return" is checked.
10  Q.   Looking at this Form 1120-S, who is the taxpayer?
11  A.   Atek Construction, Inc.
12  Q.   Have you seen documents like this Amended Form
13  1120-S in the normal course of your job
14  responsibilities?
15  A.   Yes.
16  Q.   How often would you say you've worked with Amended
17  Form 1120-Ss?
18  A.   Occasionally.
19  Q.   Like yearly?
20  A.   Possibly one or two a year.
21  Q.   I would like to direct your attention to the stamp
22  on the lower -- I would like to direct your attention
23  to the stamp in the middle of the document.  Do you see
24  that stamp?
25  A.   Yes.

Trial

Mohamad E. Taha, et al. v. USA                    12/9/2019

1    Q.  The received stamp is the one I am looking at.
2    What is that stamp?
3    A.  This is the date that the paper document was
4    received in the Ogden, Utah service center.
5    Q.  And what is that date?
6    A.  November 29, 2013.
7    Q.  Is that an IRS marking?
8    A.  Yes.
9    Q.  Is that stamp made in the normal course of the
10   IRS's activities?
11   A.  Yes, it is.
12   Q.  So what does that stamp mean?
13   A.  That means that the IRS took possession of the
14   paper document on November 29, 2013.
15         MS. KANYER:  Your Honor, defendant offers
16   into evidence Defendant's Exhibit 12 as the IRS's filed
17   copy of the Amended Form 1120-S for 2004.
18         THE COURT:  Mr. Taha?
19         MR. TAHA:  No objection, Your Honor.
20         THE COURT:  Admitted.
21         (Defendant's Exhibit Number 12 was admitted
22      into evidence.)
23         MS. KANYER:  Your Honor, may I have a quick
24   moment?
25         THE COURT:  Yes.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial
Mohamad E. Taha, et al. v. USA                                        12/9/2019

1          MS. KANYER:  No further questions at this
2     time, Your Honor.
3          THE COURT:  Does that conclude Mr. Wolff's
4     testimony?
5          MS. KANYER:  Yes, Your Honor.
6          THE COURT:  Except for cross-examination?
7          MS. KANYER:  That's correct.
8          THE COURT:  All right.  Do you have another
9     witness?
10         MS. KANYER:  No, Your Honor.
11         THE COURT:  Before we turn to Mr. Taha on
12    cross-examination, what do we do with the rest of the
13    exhibits?
14         MS. KANYER:  Oh, Your Honor, thank you.  Many
15    of these exhibits are also listed on Plaintiffs'
16    Exhibit List, and so I didn't have plaintiff -- excuse
17    me, Mr. Taha go back through these and move them into
18    evidence.  I figured the Court did not want duplicates.
19         THE COURT:  All right.  Thank you.
20         Mr. Taha, are you ready for cross-examination
21    of Mr. Wolff, or we could do it tomorrow morning?  It's
22    up to you.
23         MR. TAHA:  I can do it now, Your Honor.
24         THE COURT:  All right.  Let's do it.
25         MR. TAHA:  It's only a couple of questions.

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1           THE COURT:  Yes.

2                     CROSS-EXAMINATION

3    BY MR. TAHA:

4    Q.  Good afternoon, Mr. Wolff.

5    A.  Good afternoon, sir.

6    Q.  My first question is about your experience or

7    knowledge of IRS Code 6511(d)-1.  Do you have that

8    experience in dealing with income tax returns based on

9    that code?

10   A.  I would have to consult the internal revenue code

11   to see exactly what you're talking about.

12          MS. KANYER:  Your Honor, we would object,

13   that this is outside the scope of the direct.  And it's

14   also moving into somewhat of a legal issue.

15          THE COURT:  Well, it is that.  But on the

16   other hand, the Court is inclined to allow the question

17   because this has got to be an issue that Mr. Wolff

18   occasionally sees.

19          But, Mr. Taha, you might list the title of

20   the code section for Mr. Wolff to refresh his memory.

21          MR. TAHA:  Yes, Your Honor.  May I?

22          THE COURT:  Yes.  You said 6511?

23          MR. TAHA:  Yes, Your Honor.

24          THE COURT:  Just a moment.  I'll see if I can

25   find it.

Trial

Mohamad E. Taha, et al. v. USA                          12/9/2019

1              MR. TAHA:  I have it here, Your Honor.

2              THE COURT:  All right.  Just a moment.  Let

3    me find it.

4              MR. TAHA:  Thank you.

5              THE COURT:  Why don't you go forward.  Let's

6    not stop progress, Mr. Taha.  Go ahead, read the title.

7              MR. TAHA:  This chapter is about Internal

8    Revenue Service Department of the Treasury,

9    Subchapter F procedure and administration, part 301,

10   procedure and administration.

11             And then the number 301.6511(d)-1.  And the

12   title is "Overpayment of Income Tax on Account of Bad

13   Debts, Worthless Securities, Et Cetera."  That's what

14   6511 is.

15             THE COURT:  Now, Mr. Wolff, if you can -- or

16   Ms. Kanyer.

17             MS. KANYER:  I just wanted to make clear that

18   Mr. Taha is referencing the regulation and not the 6511

19   code provision.

20             THE COURT:  Well, let's hope that the statute

21   and the regulation have the same number.  Just a

22   moment.  6511, what subsection?

23             MR. TAHA:  The number, exact number, Your

24   Honor, is 301.6511(d)-1.

25             THE COURT:  "Limitation or allowance on

Trial

Mohamad E. Taha, et al. v. USA                    12/9/2019

1   credit and refunds, filing of claim within prescribed
2   period."  Is that what you're talking about?
3              MR. TAHA:  No, the title, according to this
4   document, Your Honor, is "Overpayment of income tax on
5   account of bad debts, worthless securities, et cetera."
6              THE COURT:  And it's 6511?
7              MR. TAHA:  6511(d)-1.  The letter "d" is
8   between parentheses.
9              THE COURT:  Just a moment.
10             Oh, you're talking about "d."  I misheard
11  you.  I thought you were talking about "b," as in boy.
12  You're talking about "d" as in dog.  Now I have your
13  place.
14             You may ask your question of Mr. Wolff.
15             MR. TAHA:  Your Honor, would you like for me
16  to present it for you to see for yourself what it is?
17             THE COURT:  I certainly have the reference in
18  front of me, Mr. Taha, but you had a question pending
19  before Mr. Wolff.
20             MR. TAHA:  Yes.
21  BY MR. TAHA:
22   Q.  So the question of Mr. Wolff is, have you worked
23  on cases that in compliance or not in compliance, I
24  would say in compliance, based on debt that became
25  worthless, therefore, that debt is filed within the

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1    seven-year statute of limitations of IRS Code

2    6511(d)-1?  Have you worked on some cases like this?

3    And what were the end result in your conclusion, if you

4    have been experience with cases like this?

5    A.   If I understand your question, I have worked on

6    bad debt cases where the question was, ultimately, is

7    it a business bad debt or a nonbusiness bad debt, but I

8    have not had occasion to work on a case where the

9    statute was seven years.

10   Q.   Thank you.  In the course of working on tax

11   returns, Forms 1040-X, if a return was allegedly not

12   received by the IRS, which was filed but allegedly

13   denied for any reason and then the IRS would be

14   reminded by sending the IRS letters by reminding them

15   of that allegedly not received income tax return, would

16   the IRS be responsible to respond to that letter that

17   inquired about why did the IRS neglect mentioning this

18   specific IRS for this year?

19             THE COURT:  Ms. Kanyer?

20             MS. KANYER:  Your Honor, I object that this

21   question is compound.  I'm not sure I understand

22   exactly what it's asking.

23             But revenue agent Wolff isn't a legal expert,

24   and he's not here to testify as to how IRS is treating

25   multiple letters that are coming in.  He was asked to

Trial
Mohamad E. Taha, et al. v. USA                    12/9/2019

```
 1    authenticate these documents.
 2             THE COURT:  Overruled.
 3    BY MR. TAHA:
 4    Q.  Do you understand the question, Mr. Wolff?  I'll
 5    give you an example.
 6    A.  I think I understand your question.
 7    Q.  Okay.
 8    A.  But if I were an employee of the taxpayer advocate
 9    office, I might have occasion to run into a situation
10    like that.  But as a revenue agent examining returns, I
11    can't answer with any degree of accuracy your question.
12    Q.  Let me put it in a different way, Mr. Wolff.  If
13    that came to your attention, two returns were sent
14    simultaneously and you only acknowledge one return but
15    you did not acknowledge the other return and you
16    responded receiving one of the two returns, now, since
17    I as a taxpayer -- I'm talking -- I'm a representative
18    of the taxpayers, if the taxpayers did not receive a
19    response from the IRS to that one income tax return,
20    1040-X, if they did not receive a response, that means
21    it neglected or ignored or lost or whatever the case
22    is, so what the taxpayer responds say, Mr. IRS, I asked
23    a question about this year that I did not receive a
24    response for, so this letter comes to your attention,
25    possibly, or any other agent, does that agent respond
```

Trial

1    to that letter saying, yes, we did not get it, or at

2    least you would inquire why the IRS did not respond to

3    that specific file according to the letter the taxpayer

4    reminded the IRS of?

5            MS. KANYER:  Your Honor, we would object.

6    This is argumentative, and plaintiff is also

7    testifying.

8            THE COURT:  It's more of a statement than it

9    is a question.  We're going to take our -- it is 5:30,

10   and we're going to take our evening recess and we'll

11   reconvene tomorrow morning.

12           And that'll give you a chance to reformulate

13   your questions, Mr. Taha.

14           MR. TAHA:  Okay.

15           THE COURT:  Okay?

16           MR. TAHA:  That's fine.

17           THE COURT:  Mr. Wolff, we'll see you in the

18   morning.

19           THE WITNESS:  Okay.  Yes, Your Honor.

20           MR. TAHA:  Your Honor?

21           THE COURT:  Yes.

22           MR. TAHA:  I found the letter that I sent to

23   the IRS with Form 1120-S, and -- sorry.  I found the

24   letter that I addressed the IRS with Form 1120-S for

25   2004.  And the date was --

Trial

Mohamad E. Taha, et al. v. USA                                    12/9/2019

1              THE COURT:  Well, do you have the letter with
2    you?
3              MR. TAHA:  Yes, Your Honor.
4              THE COURT:  All right.  We'll wait.  We'll
5    cover that tomorrow morning.  Don't let us forget.
6              MR. TAHA:  All right.  I have it right here.
7              THE COURT:  All right.  Thank you.
8              MR. TAHA:  Thank you.
9              THE COURT:  Ms. Kanyer, may we recess for the
10   evening?
11             MS. KANYER:  Yes, Your Honor.
12             THE COURT:  Mr. Wolff, do you mind?
13             THE WITNESS:  Not at all.
14             THE COURT:  All right.  We're in recess for
15   the evening.  Thank you.
16
17             (Proceedings concluded at 5:31 p.m. on
18        December 9, 2019, to be resumed at 9:30 a.m. on
19        December 10, 2019.)
20
21
22
23
24
25

216
Trial
Mohamad E. Taha, et al. v. USA                                    12/9/2019

1                          COURT CERTIFICATE

2     STATE OF FLORIDA          )

3     COUNTY OF HILLSBOROUGH  )

4

5          I, Lori L. Bundy, Registered Merit Reporter,

6     certify that I was authorized to and did

7     stenographically report the foregoing proceedings and

8     that the transcript is a true and complete record of my

9     stenographic notes.

10

11         DATED this December 17, 2019.

12

13

14                      s/Lori L. Bundy

15                      Lori L. Bundy,

16                      RMR, CRR, FPR

17

18

19

20

21

22

23

24

25