```
 1              IN THE UNITED STATES DISTRICT COURT

 2

 3   MOHAMAD E. TAHA, (Deceased),    )

 4   and SANAA M. YASSIN, his wife,  )

 5        Plaintiffs,                ) Case No. 17-1174C

 6             vs.                   )

 7   UNITED STATES OF AMERICA,       )

 8        Defendant.                 )

 9

10

11                    Courtroom 1201

12            Timberlake Federal Annex Building

13                 501 East Polk Street

14                   Tampa, Florida

15             Tuesday, December 10, 2019

16                     9:30 a.m.

17                  Trial - Volume 2

18

19

20         BEFORE THE HONORABLE CHARLES F. LETTOW

21

22

23

24

25   Reported by: Lori L. Bundy, RMR, CRR, FPR
```

218

Trial

Mohamad E. Taha, et al. v. USA                                    12/10/2019

```
 1    APPEARANCES:

 2

 3    ON BEHALF OF THE PLAINTIFFS:

 4            ALI M. TAHA, Pro Se

 5            247 Dove Trail

 6            Bradenton, FL  34212

 7            (941) 896-3571

 8

 9    ON BEHALF OF THE DEFENDANT:

10            ELIZABETH A. KANYER, ESQ.

11            DAVID PINCUS, ESQ.

12            U.S. Department of Justice, Tax Division

13            Ben Franklin Station

14            Post Office Box 26

15            Washington, D.C. 20044

16            (202) 514-9440

17            elizabeth.a.kanyer@usdoj.gov

18

19

20

21

22

23

24

25
```

219

Trial

Mohamad E. Taha, et al. v. USA                                    12/10/2019

```
 1                              INDEX
 2      WITNESS:                                        PAGE:
 3    DIEDRICH WOLFF
 4      CONTINUED CROSS-EXAMINATION                      220
 5      BY MR. TAHA:
 6      REDIRECT EXAMINATION                             252
 7      BY MS. KANYER:
 8      RECROSS EXAMINATION                              254
 9      BY MR. TAHA:
10
11                            *****
12
13
14                     ADMITTED EXHIBITS
15                                                     PAGE:
16    Defendant's Exhibit Number 32                     268
17    Defendant's Exhibit Number 33                     269
18    Plaintiffs' Exhibit Number J                      270
19    Plaintiffs' Exhibit Number K                      275
20
21                            *****
22
23
24
25
```

Trial

Mohamad E. Taha, et al. v. USA                                    12/10/2019

```
 1                    P R O C E E D I N G S
 2                 -    -    -    -    -    -
 3              (Proceedings called to order at 9:30 a.m.)
 4              THE COURT:  Good morning.
 5              MR. TAHA:  Good morning, Your Honor.
 6              MS. KANYER:  Good morning, Your Honor.
 7              THE COURT:  Any administrative matters before
 8    we actually begin with Mr. Wolff's cross-examination?
 9              MS. KANYER:  No, Your Honor.
10              MR. TAHA:  No.
11              THE COURT:  Mr. Wolff, would you please come
12    back to the witness stand and take your custom place.
13              THE WITNESS:  Continue or oath again?
14              THE COURT:  Once you're sworn, that works for
15    the trial.  That's perfectly fine, Mr. Wolff.
16              THE WITNESS:  Thank you.
17              THE COURT:  Mr. Taha, cross-examination.
18              MR. TAHA:  Thank you, Your Honor.
19              CONTINUED CROSS-EXAMINATION
20    BY MR. TAHA:
21     Q.  Good morning, Mr. Wolff.
22     A.  Good morning, Mr. Taha.
23     Q.  Good to see you again.  I would like to start with
24    where we left yesterday in regards to the IRS
25    Code 6511(d)-1 and it was overpayment, et cetera.  The
```

Trial

Mohamad E. Taha, et al. v. USA                              12/10/2019

```
 1    questions I'm about to ask are related to procedures on
 2    conduct of the IRS and processing refund claims.
 3              From what I understood yesterday that you
 4    have experience processing tax refund claims for
 5    taxpayers; is that correct?
 6    A.   I wouldn't call it processing.  I would examine a
 7    1040-X and close out the process.
 8    Q.   Once you examine those tax returns for tax refund
 9    and you -- once you examine them, do you make a
10    judgment of what the next step to do, whether somebody
11    else would approve the tax refund, or you would
12    continue examining it and process the claim, let's say,
13    in a favorable tax refund situation?
14    A.   It sounds like you're curious about the process.
15    When I receive a 1040-X, it has not been what's called
16    posted to the module or taxpayer's account.  The
17    taxpayer's module or account, it's synonymous.  It's
18    not been posted, so I have to evaluate it, audit it,
19    determine whether it's appropriate.
20              And when I'm finished, whatever the outcome
21    is, hopefully, and 90 percent of the time the taxpayers
22    agree, we agree, then the claim for refund will be
23    process, and the refund will be given, it's a matter of
24    several months afterwards.
25    Q.   Thank you.  You testified yesterday that you were
```

Trial

Mohamad E. Taha, et al. v. USA                    12/10/2019

1    aware of the IRS code for the seven-year statute for

2    business bad debt; is that correct?

3     A.   I'm aware of it, yes.

4     Q.   You are also aware or have knowledge of the IRS

5    Code Section 1362 for S corporations; is that correct?

6     A.   That's correct.

7     Q.   S corporations do not pay taxes on income

8    incurred; is that correct?

9     A.   That's correct.

10          MS. KANYER:  Your Honor, we do object to the

11    extent he's asking and answering legal questions.

12          THE COURT:  On the other hand, Mr. Wolff has

13    testified about his general experience as a tax

14    examiner, maybe I used the wrong title, and that

15    background is -- and he testified about the processing

16    of returns insofar as before it gets to him, so those

17    questions are allowable.

18          MS. KANYER:  Thank you, Your Honor.

19    BY MR. TAHA:

20     Q.   Section 1362 requirements -- this is just to give

21    you a little background of Section 1362 in situations

22    like this case.

23          S corporations do not -- I'm sorry,

24    Section 1362 requirements are to pass through

25    S corporations' income to its shareholders, so they pay

Trial
Mohamad E. Taha, et al. v. USA                           12/10/2019

1    taxes when they file their own income tax returns; is
2    that correct?
3     A.   That's correct.
4     Q.   In this action the S corporation, which is Atek
5    Construction, was forced into dissolution by bonding
6    insurance companies who bonded Atek's projects.  Atek
7    became unable to pay the shareholders because the
8    income incurred and distributed to the shareholders who
9    paid taxes on that income, Form 1040 was lost, that
10   income was lost.  It became --
11            THE COURT:  Go ahead, Mr. Taha.  You can
12   finish your question.
13   BY MR. TAHA:
14    Q.   It became that -- that income came because
15   business bad -- I'm sorry.  That income that was lost,
16   it became business bad debt according to the seven-year
17   statute of the IRS.  That's exactly what the statute
18   says, if the income becomes bad debt, then the taxpayer
19   is entitled to file income tax return to recover taxes
20   that they paid for that income that was lost?
21            THE COURT:  Ms. Kanyer?
22            MS. KANYER:  Your Honor, he's asking revenue
23   agent Wolff to assume facts that are ultimately the
24   Court's -- for the Court to decide.  He's trying to
25   have him agree with what Your Honor is supposed to be

Trial

1    deciding.

2          THE COURT:  Well, we don't exactly know,

3    we're about to find out.  But in any event, it's a

4    statement that, in effect, is a hypothetical statement,

5    so I'll allow the hypothetical to stand for the moment.

6          Mr. Taha, go ahead.

7          MS. KANYER:  Your Honor, but he's not a legal

8    expert, and so we object that he's being asked a

9    hypothetical question.

10         THE COURT:  He might be, but if that's a

11   problem, he can tell us.  On the other hand, he has

12   testified that he is qualified to address corporate tax

13   returns, individual tax returns, and Subchapter S tax

14   returns, so I'll allow the question to go forward.

15         MS. KANYER:  Thank you, Your Honor.

16   BY MR. TAHA:

17    Q.  The shareholder in this action filed Form 1040-X,

18   amended tax return, within the seven-year statute to

19   claim tax refund that he paid on the income that he did

20   not receive.  And this reference that I stated with

21   Form 1040-X, if you would like to refresh your memory,

22   I can refer you to the exhibit that you acknowledged

23   that the IRS received, and it's Exhibit Number 7.

24         MS. KANYER:  Your Honor, we would have the

25   same objection.  Again, he's asking him to assume that

Trial

Mohamad E. Taha, et al. v. USA                    12/10/2019

1    it was filed, and that is an issue for this Court to
2    decide.
3            THE COURT:  That objection is overruled.
4    BY MR. TAHA:
5     Q.  Do you see that Form 1040-X for 2003, Exhibit
6    Number 7?
7     A.  I have it in front of me, Exhibit Number 7,
8    Form 1040-X for 2002.
9     Q.  My apologies.
10           MR. TAHA:  Your Honor, can I refer him to my
11   exhibit instead of counsel's exhibit?
12           THE COURT:  Yes.
13           MR. TAHA:  Thank you.
14   BY MR. TAHA:
15    Q.  Do you have a white binder?
16    A.  No.
17           THE WITNESS:  Your Honor, this is all I have.
18           THE COURT:  It's probably right next to you,
19   Mr. Wolff.  It's a smaller binder.
20           THE WITNESS:  Yes, A through I?
21           THE COURT:  Yes.  You're going to have to get
22   some direction from either Mr. Taha or the Court to
23   find a particular exhibit.
24   BY MR. TAHA:
25    Q.  I refer you to Exhibit G.  The first 1040-X is for

Trial

Mohamad E. Taha, et al. v. USA                          12/10/2019

1    2002.  And two or three pages after, it's 1040-X for

2    2003 that Atek filed with the IRS.

3    A.  I have it in front of me.

4    Q.  Thank you.

5           THE COURT:  Mr. Taha, the G set of exhibits

6    were not filed by Atek.  And I just wanted to correct

7    the record on your last question.

8           MR. TAHA:  This exhibit is not on the record,

9    you said?

10          THE COURT:  It is.  All I was doing was

11   trying to avoid confusion.  This was not filed on

12   behalf of Atek; this was filed on behalf of Ms.

13   Sanaa Yassin.

14          MR. TAHA:  That is correct, Your Honor, I

15   apologize if I said it was filed on behalf of Atek.

16          THE COURT:  Yes.

17          MR. TAHA:  I apologize, but you are correct.

18   Thank you, Your Honor.

19          THE COURT:  Thank you.

20   BY MR. TAHA:

21   Q.  So, Mr. Wolff, my question is, have you

22   experienced working on a case similar to this case?

23   A.  I've worked on cases where I had 1040-Xs and

24   there's flow-through adjustments.  Similar, yes, but I

25   would add that the returns were actually filed with the

Trial
Mohamad E. Taha, et al. v. USA                          12/10/2019

1   IRS.

2    Q.   Correct.  So you do have experience not

3   specifically for refunds claimed for on the basis of

4   bad business debt in accordance with Code 6511 within

5   the seven-year statute, that you have -- from what I

6   understand you have not experienced those cases before

7   or those returns in the past?

8    A.   If I understand your question, I have not dealt

9   with a seven-year statute with regard to business bad

10  debts.

11   Q.   Thank you.  I appreciate it.  This question here

12  is a general, but I thought based on your experience,

13  maybe you can answer it.

14        Do you believe that this case could be

15  considered simple and unique, one of its kind, because

16  no other cases can be compared to its basis for the

17  refund?  So if you have a general or standard case of

18  refund, whatever the basis is, other than the

19  seven-year statute for business bad debt, do you have

20  that kind of -- let me repeat the question.

21        THE COURT:  Mr. Taha, you might try to break

22  the question into different parts so Mr. Wolff has a

23  better chance to answer it.

24        MR. TAHA:  Thank you.

25  BY MR. TAHA:

Trial

Mohamad E. Taha, et al. v. USA                           12/10/2019

1    Q.  Do you believe that this case could be considered
2    simple and unique?  The reason I'm asking this
3    question, because of the comparison of other cases that
4    I would like to hear from you, that other cases that I
5    experience with were simple.  This case is simple and
6    unique because it could not be compared with the
7    standard cases for tax refund, if you know what I mean.
8    A.  Each case stands alone in its unique
9    characteristics.
10   Q.  That's fair.  Thank you.  Do you believe based on
11   your experience with any case filed for tax refund
12   should take ten years to resolve but never resolved?
13   A.  That's not unusual, if it goes all the way through
14   the court system.
15   Q.  It's not unusual, so that means it is usual?
16   A.  Correct, it can take many years to resolve tax
17   disputes.
18   Q.  Do you believe, based on your experience with tax
19   refund cases, filed for tax refund should be shuffled
20   between, for example, six IRS centers, six different
21   states, within 12 departments, 33 agents responded, and
22   numerous standard meritless correspondence is normal
23   procedure of the IRS to process the refund claim?
24   A.  Depending upon what region you reside in, it would
25   depend on what service center you actually dealt with.

Trial

1    For example, we send tax returns to the Austin, Texas

2    service center.  If you're in California, you send them

3    to Fresno.  So if you move around in the country, you

4    potentially could deal with different service centers

5    and different areas.

6            To me, it does not sound unusual.  A lot of

7    different functions within IRS are in different

8    locations throughout the country.

9    Q.  So it is unusual -- it's not unusual for an agent

10   to receive a tax refund claim, and that agent for some

11   reason did not respond, then the taxpayer would come

12   back to the IRS and request what the status is, and the

13   IRS agent or another agent and more agents up to, in

14   this case, 33 agents would get notified to process the

15   claim and they never process it; is that usual?

16   A.  Let me clarify something.  We have over

17   90,000 employees.  Very few of them are actual revenue

18   agents who examine tax returns.  Much more are customer

19   service representatives, other folks that handle other

20   tasks and are not actual federal agents.

21           So when you say "agents," if you're being

22   examined, you're generally examined by a revenue agent

23   or a tax compliance officer.  So when you say "agent,"

24   you're not correct when you say that.

25           If you were examined, I'm the only revenue

Trial

Mohamad E. Taha, et al. v. USA                              12/10/2019

1    agent you probably have contact with.  So there are a
2    lot of customer service representatives and other
3    individuals working in those various departments that
4    handle correspondence, and sometimes it's just a
5    computer-generated correspondence.
6       Q.   The reason I expressed "agent" because I have
7    gotten familiarized with that name, which is "agent,"
8    of the IRS.  At the same time I call them
9    representatives of the IRS.  So due to my limited
10   expression of the name of the IRS agent or
11   representative or examiner, in my definition, my
12   understanding, it's the same.  So I'm going to come
13   back to ask you the question.
14            When you receive a tax refund, claim, 1040-X,
15   wouldn't you or would you stay on that case until it
16   gets resolved even after ten years, or would it go to
17   several others where the income tax return gets lost or
18   gets unresponded to appropriately?  So what is your
19   input in that regard?
20      A.   Okay.  If I understand your question, I have a
21   mandate to look at the return to make a determination
22   as to whether the claim is appropriate.  I will do that
23   generally in under six months.  Occasionally it takes a
24   little longer to resolve a case.  But once I reach a
25   conclusion with the taxpayer, we either agree or we

Trial

Mohamad E. Taha, et al. v. USA                    12/10/2019

1   don't agree.

2           If we agree, we process the claim forward,

3   and it is resolved at that point.  If we do not agree,

4   the taxpayer generally has the option to appeal the

5   determination of examinations' conclusion, and I'm

6   examination.

7           So they would move on to the appeals division

8   and request another review of the case based on the

9   facts, all the facts that are developed.

10  Q.  Thank you.  And that other review that you just

11  mentioned, does it come back to you, or it goes to

12  another IRS representative or agent?

13  A.  It doesn't return to me.  It gets resolved by

14  appeals.

15  Q.  No, if it is not resolved?

16  A.  If it's not resolved?

17  Q.  Yes, and then it gets appealed and then maybe it

18  does not get responded to, and then appealed again.

19          So my question is, if it is not resolved and

20  it's still going on, does it come back to you to

21  resolve, one way or the other, even if you denied it

22  the very first time and you may reconsider based on the

23  appeal by the taxpayer?

24  A.  Right.  You used the proper terminology,

25  "reconsideration."  Occasionally there is a

Trial
Mohamad E. Taha, et al. v. USA                              12/10/2019

1    reconsideration.  Tax may be assessed by the IRS, which
2    means it was resolved and determined that it was owed.
3           And there is a process where a
4    reconsideration can occur where I would actually see
5    something come back and have to reconsider something.
6    So it's rare, but it is part of the process.
7    Q.  So in this situation, does it come back to you to
8    further evaluate or does it go to someone else within
9    the IRS organizations?
10   A.  Generally it would come back to me, but it doesn't
11   have to.  It could go to a different agent.
12   Q.  Thank you.  The reason I'm asking these questions
13   because of the different IRS representatives that got
14   involved in this action.  So, therefore, the case got
15   lost or got -- it got lost or it got trashed, excuse
16   that expression, or it got ignored so that --
17          MS. KANYER:  Your Honor, we object.  Mr. Taha
18   is testifying, and he's also -- we object also because
19   this is a de novo proceeding, and I believe he's
20   referencing facts relating to the tax year 2004, so we
21   would say it's also nonrelevant.
22          THE COURT:  Those objections generally are
23   not well taken.  On the other hand, Mr. Taha, you would
24   be better off to ask a relatively simple question, a
25   straightforward question.  The recitation introduces is

Trial

1    a compound set of facts, and that probably is difficult

2    for Mr. Wolff to address.

3              Ms. Kanyer, let me just comment that

4    Mr. Wolff is here as an IRS revenue agent to testify

5    about procedures in handling, and he has done so.  So

6    these questions are appropriate along those lines.

7              MS. KANYER:  Yes, Your Honor.

8              THE COURT:  Thank you.

9              MR. TAHA:  I'm coming to the end of my

10   questions.

11   BY MR. TAHA:

12    Q.  This next question is very important about the

13   conduct or -- more questions about the conduct and

14   procedures of the IRS.

15              So when the taxpayer files a claim for tax

16   refund, the taxpayer expects a response from the IRS;

17   is that correct?

18    A.  Yes, it is either processed immediately or it goes

19   up the pipeline and gets reviewed and ultimately, in

20   small number of cases, it would get examined.

21    Q.  So ultimately, the taxpayer gets notified of the

22   status?

23    A.  Correct, there's a resolution.

24    Q.  Thank you.  When a taxpayer does not receive a

25   response from the IRS for whatever reason, the taxpayer

Trial
Mohamad E. Taha, et al. v. USA                               12/10/2019

1    reminds the IRS of the status of his tax refund claim,
2    the IRS has the responsibility to respond about the
3    status; is that correct?
4    A.   I can't speak to that, but all I can say is the
5    IRS will respond.   I mean, I am not in a position where
6    I'm responding to a lot of taxpayer requests.
7            What I'm responding to are tax returns given
8    to me, and I, in turn, can contact taxpayers and
9    representatives and deal with them directly.   So I'm
10   not involved with direct correspondence of what you're
11   talking about.
12   Q.   Partially.   But when you review or examine a case,
13   let's say you do not respond of the status to the
14   taxpayer and the taxpayer comes back to you and the IRS
15   and requests a status because the taxpayer did not
16   receive a response.   So what would your position be?
17   Would you respond to the second reminder of the
18   taxpayer about the status of his income tax return,
19   refund?
20   A.   In my position I am always 100 percent of the time
21   responding to the taxpayer.
22   Q.   Thank you.   When the taxpayer still does not
23   receive a response -- so this is the third time about
24   responding by the IRS, so this is the third one.   When
25   the IRS -- when the taxpayer does not receive a

Trial

Mohamad E. Taha, et al. v. USA                          12/10/2019

1    response from the IRS, the taxpayer reminds the IRS
2    again and again for the status of tax refund claim, but
3    he still does not receive a response, the IRS action is
4    considered irresponsible; do you believe that could be
5    correct or true?
6              THE WITNESS:  Your Honor, I'm not sure about
7    this question.  In my experience, I mean, there's -- we
8    are always in contact with the taxpayer.  I'm not in a
9    situation where I'm being contacted and ignoring the
10   taxpayer.
11             THE COURT:  That is responsive to the
12   question.  Thank you, Mr. Wolff.
13   BY MR. TAHA:
14    Q.  Finally, before I question -- or state my last
15   question, I understand that the IRS should or is
16   responsible to respond to every inquiry by the taxpayer
17   about their income tax refund claim.
18             So the question, again, the IRS should
19   respond to the taxpayer with the status every time the
20   taxpayer is ignored or forgotten or overlooked, so my
21   question, it's the responsibility of the IRS to respond
22   to every status request by the taxpayer?
23    A.  I would generally agree.
24    Q.  Thank you.
25    A.  But without any specific facts, I wouldn't be able

Trial

1    to comment on every situation.

2     Q.  I appreciate it.  These are really general

3    questions to the conduct of the IRS.  When and how and

4    not -- they should be responding under this situation,

5    this action, the IRS specifically did not respond to

6    this 1040-X that I referenced to you earlier.  They did

7    not respond to it.

8     A.  The 2003?

9     Q.  Correct.

10    A.  Correct.  There's no facts in front of me to make

11    a comment.  I mean, I can't comment on the 2003 return

12    that apparently wasn't filed.

13    Q.  I understand.  Thank you.  This Court doesn't have

14    to let you answer this question, but I'm going to spell

15    it out.

16         I'm asking some of these questions because of

17    the time period that it took whether to process or

18    disallow the claim.  So my last question in that regard

19    as such, based on what we have discussed, as agent or

20    representative of the IRS or any taxpayer get to

21    believe that the IRS is ignoring taxpayer request for

22    status of the claim to force him into giving up on his

23    claim.  Is all this irresponsible response or responses

24    by the IRS for any taxpayer's tax refund claim if the

25    IRS does not respond, my question is, is that

Trial

Mohamad E. Taha, et al. v. USA                              12/10/2019

1   considered to be ignoring the taxpayer's refund claim
2   such that they give up, forget it, we're not going to
3   pursue it?  Is that the attitude of the IRS?
4   A.   That is not the attitude of the IRS.  We are
5   extremely customer service focused since the RRA 1998
6   when our focus has been tilted much more to focusing on
7   the needs of the taxpayer and to resolving every issue
8   that the taxpayer may have.  So your presumption that
9   someone is ignoring correspondence, I reject that.
10  Q.   I appreciate that.  And from what I hear from you,
11  these are honest answers from an honest representative
12  or examiner of the IRS.  Others who got involved in
13  this claim, they did not prove as such.
14             MR. TAHA:  Thank you so much.
15             THE COURT:  Thank you, Mr. Taha.  The Court
16  has some questions.  May I ask them now?  I have waited
17  generally to ask them until direct and
18  cross-examination have been completed.  Mr. Taha, you
19  may be seated.
20             MR. TAHA:  Thank you.
21             THE COURT:  Now, you, Mr. Taha, and you,
22  Ms. Kanyer, may object to any question that you think
23  is inappropriate and I will consider the objection.
24             MS. KANYER:  Will I be given the opportunity
25  to do a redirect?

Trial

Mohamad E. Taha, et al. v. USA                          12/10/2019

1          THE COURT:  Yes.  The short answer is yes,
2    and so will Mr. Taha.  That's part of the purpose of my
3    waiting generally until after direct and
4    cross-examination has been completed.
5          Mr. Wolff, let's talk about the procedures
6    the IRS follows when paper returns come in.  What is
7    the procedure currently; that is, in 2019 when a paper
8    return is received by an IRS office?
9          THE WITNESS:  Well, it depends upon what kind
10   of return it is.  I mean, for example, the 1040-X, we
11   notice the difference between that return and a
12   standard return, and if a standard return is received
13   on a timely basis, it is not stamped.
14         THE COURT:  It is.
15         THE WITNESS:  It is not stamped received,
16   unless it is a late filed return.  That's important for
17   the running of the statute of limitations.
18         The 1040-Xs apparently are stamped received,
19   and it's because a determination has to be made about
20   the statute.  And there are two statutes, the statute
21   on the original return, and the one governing the
22   1040-X.  I'm not sure I covered your full question.
23         THE COURT:  Let's say an envelope arrives
24   with a standard return and it's timely.
25         THE WITNESS:  Yes.

Trial
Mohamad E. Taha, et al. v. USA                    12/10/2019

1          THE COURT:  What actually happens to that

2   return?

3          THE WITNESS:  Well, it's received in the

4   mailroom -- my understanding is that there are

5   different carriers.  Most of it is received by the

6   USPS, occasionally there's FedEx and what have you.

7          Each return is batched and received that day,

8   and it begins the process so they can at least

9   identify -- if the volume is very high, they can

10  identify that it was received if it's in whatever bin

11  that is for that day.

12         THE COURT:  So it's not actually stamped;

13  it's just basically put in a locator that reflects the

14  day in which it was received; is that correct?

15         THE WITNESS:  Yes, that's my understanding.

16         THE COURT:  Because you deal with millions of

17  returns at a time?

18         THE WITNESS:  That's correct.  That's

19  correct.  So it's the beginning of the pipeline

20  process.  And I cannot tell you for certain whether it,

21  on that first day, is actually stamped, but that is the

22  beginning of the process.

23         If it's not -- if it's a timely filed return,

24  they're not worrying about stamping; they're worrying

25  about entering it into the process, the submission

Trial

Mohamad E. Taha, et al. v. USA                    12/10/2019

1    processing process.

2           THE COURT:  Let's say a check and the

3    appropriate form -- I've forgotten the exact

4    designation of the form number, but it accompanies the

5    return, what happens to the check?

6           THE WITNESS:  That, I believe the -- it's

7    bifurcated, as you might say, between returns that do

8    have remittances or checks and those that do not.  And

9    at some point the check is separated and processed.

10          THE COURT:  Let us hypothetically say that a

11   return, an amended return or a return 1040-X is

12   received.  Is that different; and if so, how?

13          THE WITNESS:  Well, obviously it's a claim

14   for refund or abatement, which makes it different.  And

15   in my experience I've seen more stamps on those types

16   of return because more individuals will actually have

17   eyes on it, depending upon whether there are statute

18   issues, other issues.

19          At some point accounts -- we've seen an

20   account management stamp on a 1040-X where a customer

21   service representative may be reviewing that particular

22   1040-X.

23          Depending upon what is it a claim for may

24   distinguish the process, and it may -- depending upon

25   the kind of claim, a customer service representative

Trial

Mohamad E. Taha, et al. v. USA                    12/10/2019

1    may be able to make certain determinations at a

2    specific point or move it along into the process in

3    which it ultimately gets to a revenue agent for review

4    for actual audit, depending upon the complexity and the

5    kind of claim it is.  So there are lots of left and

6    right turns, depending upon what type of claim it is.

7          THE COURT:  Does the customer service

8    representative make a determination as to future

9    routing?

10          THE WITNESS:  I think so.  I think that's the

11    case.  I mean, it's either resolved or moved on to

12    someone else that has the capacity to make a

13    determination.

14          THE COURT:  Let's talk about physically what

15    happens when a mail return comes in today.  What

16    happens physically to the envelope or container in

17    which the return arrives?

18          THE WITNESS:  Right.  As I stated before, the

19    envelope is opened on three sides.

20          THE COURT:  How does that occur?

21          THE WITNESS:  So it's laid flat.  If it's a

22    large envelope, there are three cuts in the envelope,

23    and it is laid flat and opened completely so the

24    contents is taken out of the envelope, and it's

25    completely -- inside is completely exposed.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Mohamad E. Taha, et al. v. USA                        12/10/2019

1           THE COURT:  What happens to the individual
2     pieces of, let's say paper that are in the inside of
3     the envelope?
4           THE WITNESS:  If it's one return and there's
5     all attachments, at some point early in the process it
6     goes through scanning, and there are individuals who
7     actually put it in the scanning machines that actually
8     have hands on it.
9           And after a return is scanned in, it's my
10    understanding that that then scanned computer document
11    becomes the original return.  And I believe, but I'm
12    not 100 percent sure, that the paper document is then
13    not stored, but is then destroyed.
14          THE COURT:  About how much time does it take
15    from the initial receipt to the time that the scanning
16    occurs?
17          THE WITNESS:  I think it's a matter of weeks,
18    a week, it may be -- I'm speculating, but I think it's
19    probably a matter of approximately a week.
20          THE COURT:  What happens physically to the
21    paper return in that interim period?
22          THE WITNESS:  I don't know how they store
23    them.  I know they batch them together.  I assume -- I
24    hate to assume -- it's done by date, but then it's done
25    by actual type of return.

Trial

Mohamad E. Taha, et al. v. USA                    12/10/2019

1          THE COURT:  Okay.  This case is a little
2     peculiar in the Court's experience, and that's why I'm
3     asking you all these questions.  But in any event, one
4     of the questions that the Court is obliged to answer is
5     what happens when a return supposedly is filed but the
6     IRS has no record of it?  Are you familiar with that
7     circumstance ever arising?
8          THE WITNESS:  Yes, Your Honor.
9          THE COURT:  In what context have you become
10    familiar with it?
11         THE WITNESS:  I had a taxpayer that submitted
12    a tax return, they showed me the certified mail
13    documents, and the return was never posted by the IRS.
14         So what we could -- we could only determine
15    that it appeared that the taxpayer had mailed, but
16    there was no identification on the return receipt sent
17    back to the taxpayer as to whether the service center
18    actually -- when it's a certified mail, they sign and
19    it gets returned by the post office back to the
20    taxpayer --
21         THE COURT:  Right.  You're talking about
22    certified mail and return receipt requested?
23         THE WITNESS:  Right.  The return receipt, it
24    didn't show any identification that the service center
25    actually received it.

Trial

1          THE COURT:  But was there a return receipt?
2          THE WITNESS:  The taxpayer received it back,
3     but it was not identified.
4          THE COURT:  In other words, the card was
5     there, but it was not identified by the recipient at
6     the IRS?
7          THE WITNESS:  Correct, which I --
8          THE COURT:  -- translating --
9          THE WITNESS:  Yes.  Now, in this case, it was
10    a very thick return, approximately 2 inches, so we
11    ultimately couldn't resolve and had to resubmit the
12    return.
13         THE COURT:  But that was an instance where it
14    was certified return receipt requested, so you had a
15    record one way or the other?
16         THE WITNESS:  Correct, there was a record.
17         THE COURT:  You don't get a certification
18    stamp unless the post office actually gets it and puts
19    it in the mail; right?  The post office has to give you
20    that little slip that has the stamp on it that when the
21    post office received it and put it in the mail.
22         THE WITNESS:  I believe so.  The recipient of
23    the certified mail then will acknowledge receipt.
24         THE COURT:  That's right, and then you get
25    the card back?

Trial

Mohamad E. Taha, et al. v. USA                    12/10/2019

1           THE WITNESS:  And you get a card back.  In
2    this case there was no acknowledgment of the receipt.
3    However, the card was returned back to the taxpayer.
4           THE COURT:  So that it was both the certified
5    mail stamp that it had been submitted, and then the
6    card coming back?
7           THE WITNESS:  Was returned, yes.
8           THE COURT:  The safe thing to do, obviously,
9    is to file all the returns certified return receipt
10   requested.  But what happens if there is a question
11   about a submission of a return and there's no
12   identifying paperwork; have you had that circumstance?
13          THE WITNESS:  I'm not sure what you mean by
14   that.
15          THE COURT:  Well, let's say a return is
16   actually mailed, but it was not mailed certified and
17   there was certainly no -- or registered --
18          THE WITNESS:  Right.
19          THE COURT:  -- so there's no post office
20   stamp indicating that something was actually put in the
21   flow of mail from the United States Postal Service.
22          THE WITNESS:  Yeah, there's no --
23          THE COURT:  There's no record?
24          THE WITNESS:  There's no record anywhere;
25   there's only conjecture, I guess.

Trial

Mohamad E. Taha, et al. v. USA                                    12/10/2019

1              THE COURT:  Okay.

2              THE WITNESS:  Presumption.

3              THE COURT:  All right.  Let's talk a little

4     bit, again, about what happens to documents that are

5     received by mail.  Are all of the documents in a packet

6     scanned, even though some of them may or may not be

7     relevant?

8              THE WITNESS:  I'm not 100 percent sure that I

9     can answer that question accurately.  Again, I'm a

10    revenue agent and I deal with a lot of tax returns and

11    stamp returns.

12             THE COURT:  I'm sure you do.

13             THE WITNESS:  And I wish I knew a lot more

14    about the submission processing process itself; it's

15    very interesting.  There are a lot of twists and turns

16    when you have millions of tax returns filed.

17             THE COURT:  As a revenue agent, it's the

18    Court's assumption that, given your testimony, that you

19    only deal with electronic records of returns; is that

20    correct?

21             THE WITNESS:  Well, it's both electronic and

22    paper.

23             THE COURT:  In what context would you ever

24    deal with a paper return if the paper return is

25    destroyed after it's scanned?

Trial

Mohamad E. Taha, et al. v. USA                12/10/2019

```
 1              THE WITNESS:  I would have a scanned copy of
 2      that return, which we would consider the original
 3      return.
 4              THE COURT:  So you could make a paper print,
 5      if you will?
 6              THE WITNESS:  Exactly.
 7              THE COURT:  And you might?
 8              THE WITNESS:  Yes.
 9              THE COURT:  Rather than just looking at a
10      screen all day?
11              THE WITNESS:  Right.  Now, that ends up with
12      me generally when I'm assigned a return.  I'm already
13      given either the scanned copy or an e-file electronic
14      printout copy of a return.
15              THE COURT:  All right.  How many returns
16      these days in 2019 are electronically filed as
17      contrasted to paper filed?
18              THE WITNESS:  My guess, and I have not looked
19      at the statistics, that we're approaching 50/50.
20              THE COURT:  50/50.
21              THE WITNESS:  I think there was a significant
22      push for electronic filing, obviously, but it's my best
23      guess at this point.
24              THE COURT:  Let's step back 12 years to 2007.
25      Can we talk a little bit about the procedure in 2007
```

Trial

Mohamad E. Taha, et al. v. USA                    12/10/2019

1   for receipt of returns?  Are you familiar with that
2   procedure?
3              THE WITNESS:  Modestly, Your Honor.
4              THE COURT:  All right.  Twelve years.  When a
5   paper return was received in 2007, what would happen to
6   it?
7              THE WITNESS:  Well, the envelope is received
8   in the mailroom of the service center, it is opened the
9   way I described before, and --
10             THE COURT:  I'm sorry to interrupt, but that
11  mode of opening didn't change during that time?
12             THE WITNESS:  I don't believe so.  I don't
13  believe so.
14             But anyway, it's received, it's opened, it's
15  batched.  And I believe in 2007 we're having a lot of
16  scanning of returns and to cut down on storage, which
17  used to take a significant amount of space when you
18  have millions of returns filed.
19             Returns are scanned, and then the original
20  paper document that would not be stored would be
21  destroyed.  I believe that's the case --
22             THE COURT:  It would not be destroyed, but
23  stored in --
24             THE WITNESS:  The paper return.
25             THE COURT:  Yes.

Trial

Mohamad E. Taha, et al. v. USA                    12/10/2019

1          THE WITNESS:  The paper return, if it goes
2     through the scanning process, it's my understanding
3     that, even in 2007, once it's scanned into the system,
4     the return then, the original return, is the computer
5     file, the computer picture of the return.
6          And this includes and will include on
7     occasion the actual copy of the envelope itself for
8     postmark dates and what have you.
9          THE COURT:  So that establishes at least the
10    date of the mailing, which is technically, if it's
11    mailed by the United States Postal Service, the date of
12    filing?
13         THE WITNESS:  That's my understanding, yes.
14         THE COURT:  Okay.  The locator number is
15    assigned when?  I have forgotten the exact terminology
16    for the locator number.
17         THE WITNESS:  DLN, document locator number.
18         THE COURT:  Yes.
19         THE WITNESS:  This is a number that is used
20    over the decades for identifying the location of the
21    return.  Even the electronic filed returns get a
22    document locator number, so it's a number that is
23    assigned to essentially everything, is my
24    understanding.  Even transactions on a module have a
25    document locator number.

1          So it's a unique number identifying each

2    particular form -- a return generally or in some -- I'm

3    not sure about correspondence, but the returns

4    themselves.

5          THE COURT:  Does that document locator number

6    stay with the return as it moves through the IRS's

7    processing steps?  I say "processing steps," the

8    various steps?

9          THE WITNESS:  Right.  I believe it is an

10   unchanged number throughout the process.

11         THE COURT:  Okay.  Let me think a moment or

12   so because there might be a question I haven't asked

13   that I should.  I guess I will ask this question.  Let

14   me just think about how to frame the question

15   precisely.

16         If subsequent correspondence respecting an

17   amended return that asks for a refund is received and

18   it makes reference to a concurrent -- well, another

19   return, another amended return, would that raise any

20   flags in the examiner -- with the examiner?

21         THE WITNESS:  Could you state that one more

22   time for me to be clear?

23         THE COURT:  Yes.  Let's say an examiner is

24   assigned an amended return and the examiner has

25   correspondence basically back and forth with the

Trial

Mohamad E. Taha, et al. v. USA                          12/10/2019

1    taxpayer and there is a reference in correspondence to

2    another concurrent or at least amended return, would

3    that raise flags with the examiner?

4              THE WITNESS:  Yes, it would.

5              THE COURT:  And what would happen in your

6    experience?

7              THE WITNESS:  The examiner will generally

8    make a judgment.  We'll have to research what exactly

9    is a potential issue with another filed return that is

10   being identified by the taxpayer in this case, I guess,

11   and determine and resolve whatever the taxpayer's

12   questions are.

13             Because when we examine a return, we

14   essentially are at the disposal of the taxpayer if they

15   have any questions or any concerns about anything

16   regarding tax returns, filed, not filed, previous year,

17   subsequent year, questions of any kind.

18             Our focus is to answer and respond to

19   everything the taxpayer asks us completely and fully

20   and also deal with the examination part as well.  So we

21   are not narrowly focused and we do not ignore

22   questions; we engage in everything.

23             THE COURT:  This is the responsibility of the

24   agent, I take it, rather than the representative?

25             THE WITNESS:  Right, the agent.

Trial

Mohamad E. Taha, et al. v. USA                    12/10/2019

1           THE COURT:  Okay.  I think that's enough from
2      the Court's standpoint.
3           Ms. Kanyer, redirect?
4           MS. KANYER:  Thank you, Your Honor.
5                    REDIRECT EXAMINATION
6      BY MS. KANYER:
7      Q.  I believe you were previously discussing when you
8      are examining a return, once it's concluded, it gets
9      posted.  Do you recall that testimony?
10     A.  Yes, generally it's not a claim for refund if it
11     gets posted.  In other words, it just changes the
12     original numbers.  A 1040-X that comes in and gets
13     posted has been allowed, essentially.  So in order for
14     it to be a claim when it gets to me, it has to be a
15     document that has not been posted in the system.
16           The numbers have not been changed on the
17     taxpayer's module to reflect any adjustment from the
18     1040-X.  So it remains a claim for refund to me, as
19     long as it has not been processed through the system.
20           My function is to determine whether it is
21     appropriate under the law.  And then when I make my
22     determination, if we're all agreed, it will then get
23     processed and posted to the system.  And then a refund,
24     if that's the case, will be then issued by the computer
25     system.

Trial

Mohamad E. Taha, et al. v. USA                          12/10/2019

1    Q.  And I just want to be clear, that's separate, that
2    posting is different from a received stamp; correct?
3    A.  Absolutely, yes.
4    Q.  The received stamp --
5    A.  Posting, yes, is much later in the process.  If
6    your return gets posted, the original return is posted.
7    And if a 1040-X is posted, that means there is no flag,
8    shall we say, there is no -- the IRS has no basic
9    disagreement with what the taxpayer is trying to do.
10         If it comes to me, that means throughout --
11   something has flagged it as questionable and needing to
12   be reviewed or, in my case, audited, examined.
13   Q.  And I believe earlier you were testifying about
14   what happens when an envelope is received.  Do you
15   recall that testimony?
16   A.  Yes.
17   Q.  And you said that an envelope is received and then
18   it's opened and then it's scanned.  Do you recall that?
19   A.  Yes.
20   Q.  In between the envelope being opened and the scan,
21   there's a received stamp put on documents that are not
22   timely filed; correct?
23   A.  Correct, because it has to show up in the scan, in
24   the system, yes.
25         MS. KANYER:  May I have just one moment,

Trial

Mohamad E. Taha, et al. v. USA                    12/10/2019

1    Your Honor?

2            THE COURT:  Yes.

3            MS. KANYER:  No further questions, Your

4    Honor.  Thank you.

5            THE COURT:  I have a couple of other

6    questions.  Now, I'm going to wait until after Mr. Taha

7    asks his questions.

8            Mr. Taha, you may have recross-examination.

9                RECROSS EXAMINATION

10   BY MR. TAHA:

11   Q.  Mr. Wolff, when you get the return, you do

12   whatever procedures are necessary to put it on the

13   record in the system; is that correct?

14   A.  In a general way, yes.

15   Q.  Let's assume, for whatever reason it is, that you

16   did not record a tax return that the taxpayer sent to

17   the IRS, for whatever reason.  There may be no reason,

18   but it could happen.  Even if the IRS did not receive

19   it, it could happen.

20            Now, my question is, when the taxpayer did

21   not receive a response of action or status, the

22   taxpayer would notify the IRS of such.  Now, the IRS

23   did not respond to the taxpayer for -- I do not know

24   why, maybe you can explain why the IRS did not respond

25   to the taxpayer's inquiry of the status of the refund

Trial
Mohamad E. Taha, et al. v. USA                    12/10/2019

1    claim.  Could you, please?

2              MS. KANYER:  Can I just object that that

3    question is compound, and it also goes beyond the scope

4    of the redirect.

5              THE COURT:  The general objection is

6    overruled.

7              Ms. Kanyer, if you would stop doing that,

8    we're talking about procedures.  It is a compound

9    question, it is an improper question in that sense.

10             Mr. Taha, why don't you break it up in its

11   little compounded parts.

12             MR. TAHA:  Your Honor, I'm not a lawyer.

13             THE COURT:  Yes.

14             MR. TAHA:  So I understand that, I'm not a

15   lawyer, so my language and my terminology --

16             THE COURT:  You're doing very well, Mr. Taha.

17             MR. TAHA:  Comes out as in my mind.

18             THE COURT:  It's just that question has some

19   elements that require that he actually involve a set of

20   different questions in effect.  And if you just ask one

21   at a time, that would be perfectly acceptable.

22             MR. TAHA:  Well, my question, the way I

23   present it, Your Honor, to me it's simple, but maybe

24   it's not more than --

25             THE COURT:  All right.  Let's try again.

Trial

Mohamad E. Taha, et al. v. USA                          12/10/2019

1          MR. TAHA:  Try again.  Thank you.

2          THE COURT:  Ms. Kanyer, we're talking about

3     procedure.  As long as these are procedural questions,

4     they're perfectly allowable in the context.

5          MS. KANYER:  Yes, Your Honor.

6          THE COURT:  And Mr. Wolff is doing a great

7     job.  So let's let him do his job.

8          MR. TAHA:  Your Honor, this is really

9     important for the taxpayers Mohamad Taha and his wife,

10    Sanaa Yassin, to be able to know the procedure of the

11    IRS.

12         THE COURT:  Well, that's why we're here.

13         MR. TAHA:  So my question is not going to be

14    in five, six, seven words; it's going to be maybe more.

15    BY MR. TAHA:

16    Q.  So it's simply when the IRS received the tax

17    refund claim or not receive it and, therefore, the

18    taxpayer would not be able to know of what's happening

19    to the tax refund claim.  Could that happen?

20    A.  There are different ways to ask the IRS whether a

21    return has been processed.  One is by correspondence.

22    There's also by picking up the phone and calling IRS.

23    And there's also an IRS walk-in office in multiple

24    locations throughout the country where you could walk

25    in and inquire as to the processing of a tax return and

Trial
Mohamad E. Taha, et al. v. USA                    12/10/2019

1   you could get an answer immediately.

2   Q.   Thank you.  So the taxpayer in this situation did

3   not receive a response from the IRS and the taxpayer

4   requested a response of the status.  I did not get any

5   information or any response from the IRS.

6        So from what I understand, the IRS would

7   respond or should respond about the status of the

8   return for tax refund; is that correct?

9   A.   Generally, yes.  I mean, the IRS is going to

10  respond if you ask us a question, we're going to give

11  you an answer.

12  Q.   Thank you.  The second question is, the taxpayer,

13  based on his first inquiry of the status, he sends

14  another reminder to the IRS and he still does not get a

15  response.  Is that possible?

16  A.   It's speculation.  I mean, in my work with the

17  IRS, over 25 years, we're extremely customer focused.

18  There's millions of correspondences and the IRS does

19  its best to respond to everything humanly possible.

20  Q.   So going back to the first question, your answer

21  was, from what I understood, the very first question of

22  the taxpayers of the status, the IRS would respond.

23  That's what I understood from you; is that correct?

24  A.   My general answer is yes.  If you send it to the

25  wrong place or the wrong address, you know, I can't --

Trial

Mohamad E. Taha, et al. v. USA                    12/10/2019

1   generally I can only say yes.

2    Q.  Again, the taxpayer does not get a response, the

3   taxpayer gets worried.  If they don't get a response,

4   would that generally a procedure or non-procedure or

5   generally a nonresponse by the IRS as acceptable by the

6   IRS?

7    A.  I don't know.  I don't know what circumstances, I

8   can't answer that, but there are other options.

9   There's obviously the phone --

10              MR. TAHA:  Your Honor, can I address this

11   action --

12              THE COURT:  Mr. Taha, just a moment.

13              MR. TAHA:  -- by itself?  Maybe I'll make it

14   simpler.

15              THE COURT:  Yes.

16              MR. TAHA:  If I address it literally in

17   regards to this -- I'm asking a general question.

18   Maybe I should ask him specific.

19              THE COURT:  He might or might not be able to

20   answer a specific question because Mr. Wolff will

21   answer to the best of his knowledge of the personal --

22   personal knowledge of the facts.

23              MR. TAHA:  This specific question I'm talking

24   about is in regards to the procedure of the IRS.

25              THE COURT:  Yes, you may.

Trial
Mohamad E. Taha, et al. v. USA                           12/10/2019

1          MR. TAHA:  So maybe he will understand it
2     better.
3     BY MR. TAHA:
4      Q.  So, Mr. Wolff, taxpayers in this action filed a
5     tax refund claim under 1040-X for 2003, they did not
6     get a response of the action from the IRS.
7          Second --
8          MR. TAHA:  And I'll give him three questions
9     because they are simultaneous questions, they are
10    following each other.
11         THE COURT:  All right.
12    BY MR. TAHA:
13     Q.  The second question is, taxpayer did not receive a
14    response, so they write a letter to the IRS as a
15    reminder of the action.  They did not receive a
16    response, this is the second time.
17         The third time it happens again and the
18    taxpayer reminded the IRS of not receiving a response
19    from the IRS.
20         Is that procedural, not to respond three
21    times in a row by the IRS, or is it appropriate if it
22    is procedural, but is it appropriate not to respond?
23     A.  I can't specifically answer that question.  I
24    don't have enough facts to give you an accurate answer
25    to that.  But the IRS is going to respond to taxpayer's

Trial

Mohamad E. Taha, et al. v. USA                    12/10/2019

1    inquiries; that's what we do.  Taxpayers are not

2    ignored, so we respond if you ask a question.  And we

3    respond in different ways; in writing, over the phone

4    if you call, at the walk-in locations.

5     Q.  In this regard, Mr. Wolff, the IRS did not

6    respond.  Thank you.

7              THE COURT:  Mr. Taha, that's not a question.

8              MR. TAHA:  No, I'm just making a statement.

9              THE COURT:  You're making a statement.

10             MR. TAHA:  Yes.  Thank you, Mr. Wolff.

11             THE WITNESS:  Thank you.

12             THE COURT:  The question the Court has is,

13   whether to ask an additional question or so about

14   posting.

15             I take it posting is really the final step in

16   addressing a return, whether it's an original return or

17   an amended return; is that correct?

18             THE WITNESS:  The posting is the -- the --

19   that is the basic accounting for the tax return.  It's

20   put on your account or module, we call, where the

21   certain information from the return is posted to -- is

22   input into the system.  And from -- it's kind of hard

23   to describe; that's why I'm going a little slow.

24             But the actual posting of the return means

25   the return has been accepted and it's been placed on a

Trial

Mohamad E. Taha, et al. v. USA                    12/10/2019

1   module.  It can't be in the -- nothing can happen until
2   it's posted.  In other words, no refund can be
3   generated or a collection's request for payment can be
4   made until things are posted, until we have the numbers
5   in the system, so to speak.
6          THE COURT:  On reflection, perhaps we could
7   turn to Defendant's Exhibit 1.  That might help us out
8   a little bit.  This is a certificate of assessments,
9   payments and other specified matters, I take it, for a
10  particular taxpayer submission.
11         Is there an item on here that is actually
12  deemed or denominated as posting?
13         THE WITNESS:  Each -- well --
14         THE COURT:  Maybe it's each entry, I don't
15  know.
16         THE WITNESS:  We're looking at page 2;
17  correct?
18         THE COURT:  Yes.
19         THE WITNESS:  So when it -- it says there's a
20  date.  The first entry is 4/15/2003, and it indicates
21  return filed and tax assessed.  This can't happen until
22  it's posted on the system, so that 8,500 would be the
23  tax due from the taxpayer.
24         And the corresponding entry underneath shows
25  the corresponding payment with the return to offset

Trial

Mohamad E. Taha, et al. v. USA                    12/10/2019

1   that.  And that would generally mean, if there was just

2   this going on, that the account or module would have a

3   zero balance.  In other words, the taxpayer filed the

4   return indicating an assessment of and agreeing to an

5   assessment of 8,573, which was posted and offset by the

6   actual remittance included with the return.

7            And in this case the account would have a

8   balance of zero, meaning no tax at this point is due,

9   it's all paid up and paid in full.

10           THE COURT:  So if everything was essentially

11  completed at that point, there would be no other

12  entries on this certificate; is that correct?

13           THE WITNESS:  I don't believe so.  I'm not

14  specifically -- I don't specifically have a lot of

15  experience with this particular certificate.  It is a

16  little bit thinner than the usual taxpayer transcripts

17  which show all the activity within the account or

18  module.  It's a slightly different format.

19           THE COURT:  But you're, as an agent, allowed

20  to make entries on this type of module; is that

21  correct?

22           THE WITNESS:  Generally, no.  We can only see

23  what's on the account or module.  And what we determine

24  in the end would be posted to the module by others.  We

25  do not have the accounts management function.  It's not

Trial

Mohamad E. Taha, et al. v. USA                              12/10/2019

1    part of our function to go in and make changes to a

2    taxpayer's account.

3              We can only submit that into the process and

4    through approvals, then have it posted to the account.

5    So I can only -- when we're all done with something, we

6    have an additional assessment.  When I close the case

7    and it goes off to Memphis or North Carolina or

8    wherever it goes to, to ultimately process it, that's

9    where the posting of those items would occur.  So it's

10   far away from my ability to actually go in and make any

11   changes whatsoever.

12             THE COURT:  So whether, for example, a refund

13   is issued or a further assessment is made is something

14   that you might -- I hate to use the word "recommend,"

15   but decide to do, but it's not something that actually

16   shows up on this certificate until something else

17   happens?

18             THE WITNESS:  Yeah, I believe that's the

19   case.

20             THE COURT:  Okay.  Well, that helps.  If you

21   might recall, the Court asked the question about two

22   entries on this particular certificate being not in

23   chronological order, 12/31/2007, claim disallowed;

24   11/29/2007, amended return filed?

25             THE WITNESS:  Yeah, it's my experience that

Trial

1    sometimes these dates assigned aren't exactly
2    corresponding to a date when it really happens.  It's a
3    date within a certain period of time, a two-week period
4    of time occasionally, where entries are made, but the
5    date would be either the end or the beginning of that
6    period of time and wouldn't exactly correspond.
7             It wouldn't exactly make complete sense
8    because there is a delay in the actual dating, certain
9    transactions that hit the module.  So to me that's
10   not -- I would look at that and go, gee, how did that
11   happen, maybe look a little bit more, but then
12   understand that things are posted and it isn't
13   necessarily the exact date when that particular thing
14   happened.
15            There may be a different kind of batching
16   date, which put everything together at the end of a
17   particular period of time.  And this may be as much as
18   a month.  It's not unusual that as much as a month that
19   the date -- the actual occurrence was at the beginning
20   of the month and the actual posting was at the end of
21   the month, it would be assigned a particular date which
22   didn't necessarily correspond to the actual event,
23   shall we say.
24            THE COURT:  That's very helpful.  Thank you.
25   The Court has no further questions.

Trial

Mohamad E. Taha, et al. v. USA                              12/10/2019

```
 1                 MS. KANYER:  No questions, Your Honor.
 2                 THE COURT:  Mr. Taha?
 3                 MR. TAHA:  No questions, Your Honor.
 4                 THE COURT:  May have excuse Mr. Wolff as a
 5      witness?
 6                 MS. KANYER:  Yes, Your Honor.
 7                 THE COURT:  Mr. Wolff, you are excused.
 8      Thank you very much and thank you for your patience.
 9                 THE WITNESS:  Thank you, Your Honor.
10                 THE COURT:  Ms. Kanyer, where do we go from
11      here?
12                 MS. KANYER:  Your Honor, the United States
13      rests.
14                 THE COURT:  I'm sorry?
15                 MR. TAHA:  We have nothing further.
16                 THE COURT:  You have this other set of
17      exhibits.  What do we do with those?
18                 MS. KANYER:  Your Honor, most of these are
19      the same as what plaintiffs had admitted, and so we
20      didn't go and have Mr. Taha authenticate them.
21                 THE COURT:  Do you have the correspondence so
22      the Court can identify?
23                 MS. KANYER:  Sure.  It may just take me a
24      moment.
25                 THE COURT:  So let me just clarify with you,
```

Trial

1    we have -- let me just review the numbers that are

2    admitted specifically of the defendant's exhibits,

3    DX-1, DX-2, DX-3, DX-4, DX-6, DX-7, DX-8, DX-9, DX-10,

4    DX-11, DX-12, and DX-26.

5              Does that square with your reckoning?

6              MS. KANYER:  Yes, Your Honor.

7              THE COURT:  Mr. Taha?

8              MR. TAHA:  Your Honor, I didn't really keep a

9    record of what was admitted and what was not.  I just

10   made sketchy notes in here, but I would appreciate it

11   if I get some kind of remindment (phonetic) about what

12   was admitted and what was not.

13             THE COURT:  That's why I just did what I did.

14   I wanted to make sure the record was explicit.

15             MR. TAHA:  I didn't recognize some of the

16   numbers.  You were saying PX-A1 as a Number 1 or --

17             THE COURT:  All of plaintiffs' exhibits were

18   admitted.

19             MR. TAHA:  All the PX --

20             THE COURT:  I'm only dealing with the

21   defendant's exhibits.

22             MR. TAHA:  The PX numbers are admitted?

23             THE COURT:  All of them.

24             MR. TAHA:  All of them.  And the DX --

25             THE COURT:  That's the recitation I just

Trial

1   made.

2           MR. TAHA:  Okay.

3           THE COURT:  Do you want me to do it again?

4           MR. TAHA:  Yes, Your Honor, I appreciate it.

5           THE COURT:  We can just check them.  And I'm

6   just going to read the numbers rather than the DX

7   designation itself.  1, 2, 3, 4, 6, 7, 8, 9, 10, 11,

8   12, and 26.

9           MR. TAHA:  These are the ones that were

10  admitted?

11          THE COURT:  What?

12          MR. TAHA:  Are these the numbers --

13          THE COURT:  Yes, that were admitted.  That

14  were admitted.  The others were not.

15          MR. TAHA:  Were admitted?

16          THE COURT:  The numbers I just listed were

17  admitted by the Court's notation.

18          MR. TAHA:  Yes.

19          THE COURT:  Yes.

20          MR. TAHA:  And the other numbers?

21          THE COURT:  Were not admitted.

22          MR. TAHA:  Were not admitted?

23          THE COURT:  No, they're in the binders, but

24  they haven't been admitted.  Part of the problem the

25  Court is having is, some of the other items are more

Trial

1   complete copies.

2            MS. KANYER:  The only one that is a more

3   complete copy is the one that we had admitted.

4            THE COURT:  26?

5            MS. KANYER:  Yes.  And so the other ones --

6   and it may just take me a moment, I can go through and

7   identify the cross-reference, but they're just

8   duplicates.  I didn't think the Court wanted two sets

9   of the same thing.

10            THE COURT:  Well, not necessarily; that's why

11   I --

12            MS. KANYER:  And then the only ones in the

13   very back are the interrogatory response and the

14   discovery responses.

15            THE COURT:  So those are party responses, so

16   they're automatically admitted.

17            MS. KANYER:  Correct.

18            THE COURT:  All right.  That clarifies.

19            MS. KANYER:  Can I move to admit them then?

20            THE COURT:  Yes, that would be helpful.

21            MS. KANYER:  Well, we would move to admit

22   Defendant's Exhibit 32 and 33.

23            THE COURT:  That helps.  DX-32 is admitted,

24   DX-33 is admitted.

25            (Defendant's Exhibit Number 32 was admitted

Trial

Mohamad E. Taha, et al. v. USA                    12/10/2019

 1          into evidence.)

 2                (Defendant's Exhibit Number 33 was admitted

 3          into evidence.)

 4                MS. KANYER:  Your Honor, if I can take a

 5     moment, I can cross-reference these, if that would be

 6     helpful for the Court?

 7                THE COURT:  Well, it might, but do you think

 8     it's actually necessary?

 9                MS. KANYER:  I don't think it's necessary.

10                THE COURT:  Then we don't need to do it.  So

11     the defense rests?

12                MS. KANYER:  That's correct, Your Honor.

13                THE COURT:  Mr. Taha, you are entitled to a

14     rebuttal case, and my clerk has just given me a note

15     that you may want to present the letter that you said

16     accompanied the amended 2004 1120-S to confirm the

17     date.  Do you have the letter?

18                MR. TAHA:  Yes, Your Honor.  Thank you very

19     much because I was about to come out and state it.  Can

20     I present you with a copy of the letter?

21                THE COURT:  Do you have a copy?

22                MR. TAHA:  Yes.

23                THE COURT:  Do you have a copy for

24     Ms. Kanyer?

25                MR. TAHA:  Yes, I have three copies, Your

Trial

Mohamad E. Taha, et al. v. USA                          12/10/2019

1    Honor.

2            THE COURT:  Thank you.  You may present it.

3    May we identify this as PX-J?  And you say this is the

4    letter that accompanied the amended return for Atek; is

5    that correct?

6            MR. TAHA:  That's correct, Your Honor.

7            THE COURT:  It's admitted.

8            (Plaintiffs' Exhibit Number J was admitted

9        into evidence.)

10           THE COURT:  Go ahead.

11           MR. TAHA:  I just want to make sure --

12           THE COURT:  I'm sorry, let's hear from

13   Ms. Kanyer first.

14           MS. KANYER:  I was just hoping to ask for an

15   extra copy since I just wrote on mine to be able to

16   give to the court reporter.

17           COURT REPORTER:  I have one.

18           THE COURT:  I think we're barely good.  We're

19   okay.  Mr. Taha.

20           MR. TAHA:  I just want to emphasize, Your

21   Honor, and counsel's Exhibit Number 12 for 1120-S for

22   year 2004 as amended --

23           THE COURT:  Yes.

24           MR. TAHA:  -- that is the correct filed

25   1120-S.

Trial
Mohamad E. Taha, et al. v. USA                                    12/10/2019

1              THE COURT:  Thank you.

2              MR. TAHA:  With the correct date as

3     November 15, 2013.

4              THE COURT:  Thank you.

5              MR. TAHA:  And that matches exactly what this

6     letter says and it has the same date.

7              THE COURT:  So this -- you're saying that

8     your Exhibit J corresponds with the Defense Exhibit 12?

9              MR. TAHA:  My exhibit -- I'm sorry, exhibit

10    what?

11             THE COURT:  The letter you just handed us.

12             MR. TAHA:  This letter, Your Honor, again,

13    I'm sorry, dated November 15, 2013, coincides with the

14    same date as 1120-S for 2004 as amended.  It's the same

15    date with the same signature date.

16             THE COURT:  All right.  Thank you.

17             MR. TAHA:  And the 1120-S that I put in my

18    exhibit, Exhibit Number A, Exhibit A, with a date as

19    November 15, 2012, that is not correct.

20             THE COURT:  Thank you.

21             MR. TAHA:  So it was inadvertently pulled

22    with the wrong date.  And this is the accurate date as

23    counsel included in her list of exhibits.

24             THE COURT:  Thank you for the clarification.

25             MR. TAHA:  Thank you very much.  And one

Trial

Mohamad E. Taha, et al. v. USA                         12/10/2019

 1  more.

 2            THE COURT:  Yes.

 3            MR. TAHA:  The Franchise Tax Board of

 4  California received similar letter of submitting this

 5  amended income tax return, the same letter as the

 6  letter for the federal -- for the IRS.

 7            THE COURT:  Do you want to submit that as an

 8  exhibit?

 9            MR. TAHA:  I could, but I didn't make copies

10  of it, Your Honor.

11            THE COURT:  Yes, please.

12            MR. TAHA:  But I can show it to you.

13            THE COURT:  Well, you did make copies?

14            MR. TAHA:  I'm sorry, I did not.

15            THE COURT:  All right.  Before you show it to

16  me, would you show it to Ms. Kanyer?

17            MR. TAHA:  Sure.

18            MS. KANYER:  And, Your Honor, we would object

19  to this document.  It was never included on Plaintiffs'

20  Exhibit List, and this is the first time we're seeing

21  it.

22            THE COURT:  Do you have the ability,

23  nonetheless, to make a copy?

24            MS. KANYER:  No, not here.

25            THE COURT:  Not here?

Trial
Mohamad E. Taha, et al. v. USA                              12/10/2019

```
 1                MS. KANYER:  No, sorry.

 2                THE COURT:  Well, the U.S. Trustee is next

 3      door.

 4                MS. KANYER:  Okay.  We can see if we can

 5      knock on doors.

 6                THE COURT:  All right.  Why don't you take a

 7      look at that and -- because that's probably the first

 8      time you've seen it.

 9                MS. KANYER:  That's correct, Your Honor.

10                THE COURT:  Would you take a look, please?

11                We'll go off the record for a moment.  You

12      may confer with each other.

13                (A discussion was held off the record.)

14                THE COURT:  We have a copy machine next door,

15      actually, that is accessible to us, so we can make a

16      copy.

17                MS. KANYER:  Wonderful.

18                THE COURT:  We're obviously back on the

19      record.  I apologize to the reporter for not saying

20      that before I made the statement.

21                Ms. Kanyer, and Mr. Taha, have you conferred

22      about this particular document?

23                MS. KANYER:  We have not, Your Honor.

24                THE COURT:  Mr. Taha, what is the document

25      you wish to introduce?
```

Trial

Mohamad E. Taha, et al. v. USA                                    12/10/2019

1              MR. TAHA:  The reason was the different

2    exhibits that we already discussed with the signature

3    date of March 11 -- November 15, 2013, versus

4    November 15, 2012.

5              THE COURT:  Oh, that's not a problem.  We've

6    dealt with that.  I thought we were talking about the

7    California Franchise Tax Board letter that you handed

8    Ms. Kanyer for her to examine.

9              MR. TAHA:  The reason is, both letters were

10   sent to two different required entities to be filed to

11   be recipients of the tax return of the 1120-S, that's

12   the reason.

13             THE COURT:  Thank you.

14             Ms. Kanyer, with that explanation, do you

15   maintain your objection?

16             MS. KANYER:  We do maintain our objection as

17   we have not received this document, but we are not --

18   we don't have a problem with it being admitted.

19             THE COURT:  All right.  Thank you.  Did you

20   give the document back to Mr. Taha?

21             MS. KANYER:  I just started marking the

22   exhibit.  I apologize.

23             THE COURT:  Let's not do that.  Let's take a

24   pause while the clerk makes a copy of the document, or

25   several copies of the document.  This will be PX-K.

Trial

Mohamad E. Taha, et al. v. USA                          12/10/2019

1              (A discussion was held off the record.)

2              THE COURT:  We're back on the record and we

3    thank the clerk for her adept help.

4              Mr. Taha, we now have before us what will be

5    identified as PX-K.  And could you provide an

6    explanation for why you would like this admitted?

7              MR. TAHA:  To conform with the letter

8    addressed to the IRS.

9              THE COURT:  Ms. Kanyer?

10             MS. KANYER:  If it is being admitted for that

11   purpose, we do not object.

12             THE COURT:  Admitted.

13             (Plaintiffs' Exhibit Number K was admitted

14        into evidence.)

15             MR. TAHA:  I'm sorry, Your Honor, is this

16   DX-34?

17             THE COURT:  No, this is PX-K.  I'll wait

18   until you finish your note, Mr. Taha.  Do you have

19   anything further?

20             MR. TAHA:  I was under the impression that

21   plaintiffs were to present their rebuttal.

22             THE COURT:  Yes.

23             MR. TAHA:  Is that next?

24             THE COURT:  That's now.

25             MR. TAHA:  That's now?

Trial

Mohamad E. Taha, et al. v. USA                    12/10/2019

1             THE COURT:  Yes.

2             MR. TAHA:  Okay.  Up to this point I have no

3    other comments to make.

4             THE COURT:  All right.  Thank you.  May we

5    talk about the one item on the pretrial or final

6    pretrial order that we still have remaining, and that

7    is whether the parties in this very unusual case would

8    like a post-trial briefing.

9             Would you, Ms. Kanyer?

10            MS. KANYER:  Your Honor, we would like

11   post-trial briefing.

12            THE COURT:  You would?  Okay.  May I go get a

13   device with a calendar so we can work that out?  Just

14   give me a moment.

15            MS. KANYER:  Yes, Your Honor.

16            (A break was taken.)

17            THE COURT:  Now, ordinarily, plaintiff would

18   go first in providing it, but do you want a different

19   procedure, Mr. Taha, or Ms. Kanyer?

20            MS. KANYER:  No, Your Honor.

21            THE COURT:  Mr. Taha, ordinarily what happens

22   in the post-trial briefing is, we get copies of the

23   transcript of trial, you have the exhibits in hand, so

24   that's not a problem, and you're allowed to file or

25   both parties are allowed to file, usually sequential,

Trial

Mohamad E. Taha, et al. v. USA                12/10/2019

1    not simultaneous, briefs on the facts and the law as to
2    what actually happened and what the results should be.
3    Sorry to put it in utterly simple-minded terms, but
4    that's it.
5              And ordinarily there's a page limit of
6    40 pages, but in this case the issues are much simpler,
7    they are and they aren't, they're actually very
8    complicated.
9              But in any event, so the question is, when
10   you would have access to the transcript and when you
11   would be able then to file a submission.  And we can
12   find out from the court reporter when the transcripts
13   might be available.
14             COURT REPORTER:  I have a five-day turnaround
15   for this.
16             THE COURT:  In other words, five-day really
17   means next Tuesday, probably, that the transcripts
18   would be available, which would be the 17th.
19             But sometime in January, Mr. Taha, could you
20   file your post-trial submission?
21             MR. TAHA:  Is that the briefing?
22             THE COURT:  Yes.
23             MR. TAHA:  January 17th?
24             THE COURT:  Yes.
25             MR. TAHA:  That would be appropriate, Your

Trial

1    Honor.

2              THE COURT:  Yes.  January 13th is a Monday.

3    Is that okay?

4              MR. TAHA:  That's fine.

5              THE COURT:  January 13th.

6              MS. KANYER:  Your Honor, I just have some

7    conflicts that I was hoping to raise.  I have a number

8    of depositions in January, so I was hoping we would

9    have a little bit of extra time, if that would be

10   available?

11             THE COURT:  Well, you ordinarily would file

12   in 30 days anyway, or less.  February 10th, a Monday?

13   Can you do that?

14             MS. KANYER:  Yes.

15             THE COURT:  And, Mr. Taha, you may file a

16   response.  Could you file a response by February 21st,

17   a Friday?

18             MR. TAHA:  So, Your Honor, what I understand

19   is that defendant would file its briefing on

20   February 10th?

21             THE COURT:  Yes.

22             MR. TAHA:  And I would file on behalf of

23   plaintiffs the briefing on February 21st?

24             THE COURT:  Yes.  Can you do that?

25             MR. TAHA:  That would be fine, Your Honor.

279

Trial

Mohamad E. Taha, et al. v. USA                              12/10/2019

1          THE COURT:  Do you actually want argument?
2   We could do it telephonically.  With the briefing I
3   think it would be satisfactory.  I don't know if we
4   actually need an argument afterward.
5          MS. KANYER:  I don't think we need an
6   argument.
7          THE COURT:  Mr. Taha?
8          MR. TAHA:  I'm not quite familiar with that
9   kind of procedure.
10         THE COURT:  Well, "usually" is not the word
11  for it.  Every once in a while we have a closing
12  argument where the parties make the additional points
13  that they have hopefully already covered in their
14  briefs but emphasize them.  And with the trial and with
15  the briefing, I don't necessarily see a need for it.
16         MR. TAHA:  It's your decision, Your Honor,
17  your decision.
18         THE COURT:  Well, I would say no.  I would
19  say once you file on the 21st, the case would be
20  submitted.
21         MR. TAHA:  So, Your Honor, is the closing
22  argument different from the briefing?
23         THE COURT:  No, shouldn't be.
24         MR. TAHA:  It's one and the same?
25         THE COURT:  Yes.

Trial
Mohamad E. Taha, et al. v. USA                                     12/10/2019

1              MR. TAHA:  Okay.  So these dates stay?
2              THE COURT:  Yes.
3              MR. TAHA:  Your Honor, in this regard, in
4    regard to the transcript, we briefly discussed it this
5    morning, and, again, I or plaintiffs cannot afford the
6    cost of a hard copy of the transcript.
7              THE COURT:  All right.  We will have to work
8    that out with the clerk's office when we go back to our
9    duty station, we will talk with the clerk about that.
10             MR. TAHA:  Okay.  That would be appreciated,
11   Your Honor.  I have mentioned it to counsel, and she
12   was gracious about thinking of providing me with a hard
13   copy.  It's almost impossible to review so many pages
14   on the computer.
15             THE COURT:  No, I understand.
16             MR. TAHA:  So I would appreciate it.
17             THE COURT:  I would have the same problem,
18   but we'll work this out.
19             MR. TAHA:  Incidentally, Your Honor, as you
20   probably know, plaintiffs' case is what you call forma
21   pauperis.
22             THE COURT:  It had been filed as a paid case
23   and it is a paid case, but I understand the
24   circumstances now.  We'll take that into account in
25   working with our clerk's office and counsel, so that

281

Trial

Mohamad E. Taha, et al. v. USA                                    12/10/2019

 1    the Court will not do that, but the clerk of court will
 2    do that.
 3                MR. TAHA:  Thank you, Your Honor.
 4                THE COURT:  No, you're welcome.  So I'll stay
 5    out of that completely, but the clerk will handle that.
 6                From the Court's standpoint, we have done
 7    everything we need to do.  May I close the record?
 8                MS. KANYER:  Yes, Your Honor.
 9                MR. TAHA:  Yes, Your Honor.
10                THE COURT:  The record is closed.  Thank you
11    very much.  We're at an end.
12
13                (Proceedings concluded at 11:12 a.m.)
14
15
16
17
18
19
20
21
22
23
24
25

```
 1                          COURT CERTIFICATE

 2    STATE OF FLORIDA          )

 3    COUNTY OF HILLSBOROUGH   )

 4

 5          I, Lori L. Bundy, Registered Merit Reporter,

 6    certify that I was authorized to and did

 7    stenographically report the foregoing proceedings and

 8    that the transcript is a true and complete record of my

 9    stenographic notes.

10

11          DATED this December 17, 2019.

12

13

14                          s/Lori L. Bundy

15                          Lori L. Bundy,

16                          RMR, CRR, FPR

17

18

19

20

21

22

23

24

25
```