Ali M. Taha
247 Dove Trl
Bradenton, FL 34212
Telephone: 941-896-3471
Email: alim_taha@yahoo.com

Power of Attorney for *Pro Se* Plaintiffs
Mohamad E. Taha and Sanaa M. Yassin

### IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| MOHAMAD E TAHA (DECEASED), AND Sanaa M. Yassin, his wife<br><br>*Pro Se* Plaintiffs<br><br>vs.<br><br>UNITED STATES ON BEHALF OF THE INTERNAL REVENUE SERVICE<br><br>Defendants | **Case No.: 17-1174 T**<br>**Judge Charles F. Lettow**<br><br>**PLAINTIFFS' POST-TRIAL OPENING BRIEF** |

TO THE HONORABLE JUDGE CHARLES F. LETTOW, UNITED STATES COURT OF FEDERAL CLAIMS AND THE DEFENDANTS' OFFICE OF THE UNITED STATES ATTORNEYS OF RECORD:

Plaintiffs Mohamad Taha (deceased in 2007) and his wife Sanaa Yassin respectfully submit the following post-trial Opening Brief in response to the Honorable Court's Order filed December 11, 2019, Document No. 72.

### I.   TRIAL SYNOPSIS

Plaintiffs could not afford an attorney. They filed this action as *pro se*. They have been represented in this action by Ali Taha, a

Received - USCFC

JAN 17 2020

family member pursuant to (Rule 83.1(3), since their refund claim was filed with the IRS and the courts 12 years ago.

The Honorable Judge assigned Ali Taha to testify and be cross-examined in trial on behalf of Plaintiffs. Ali Taha, not a party of this action, testified willingly under oath, and presented Plaintiffs' refund claim filed under year 2004 amended tax return to recover taxes of $14,177 paid for years 2002 and 2003. The claim was justifiably and jurisdictionally filed. It was supported with preponderance of evidence for their shareholder's undistributed income from Atek Construction, S Corporation, that Plaintiffs never received. The undistributed income became bona fide business bad debt, worthless, when Atek was dissolved in year 2004 in a takeover by bonding insurance companies who bonded Atek Construction's projects.

**Plaintiffs respectfully request that the Honorable Judge tend closely, in person, to their 2004 tax refund claim which he affirmed repeatedly for consideration. He presided over this action in this trial. Plaintiffs respectfully request that the Honorable Judge act on it in favor of Plaintiffs.**

The IRS' multiple agents disallowed Plaintiffs' 2004 refund claim, multiple of times, for its alleged reason of receiving the claim late: 3 years from the return due date which was not applicable. In fact, Plaintiffs' refund claim was timely filed within the IRS' 7-year statute for business bad debt. After near nine years, another IRS agent finally acknowledged and admitted the

fact that the refund claim was filed correctly within the 7-year statute, but refused to process the claim. The IRS' refusal to process the claim led to filing this action.

Plaintiffs filed suit in 2017 to recover the taxes they paid on undistributed shareholder's income that became business bad debt in year 2004. The debt became worthless.

The government requested that the courts dismiss Plaintiffs' claim for lack of subject matter jurisdiction. The government alleged that the refund claim was filed untimely; was nonbusiness and should be treated as capital gain (loss) or dividend and therefore, not subject to refund as claimed within the 7-year statute. Two courts, first, the Federal Claims dismissed the claim; and second, Court of Appeals, remanded the refund claim. Both courts were dictated by the Government for its allegations. **I am confident that other courts would have ruled otherwise in Plaintiffs' favor**.

The Honorable Court called for this trial to be conducted in Tampa, Florida, as de novo, to resolve the refund claim filed for amended year 2004 to recover taxes paid for years 2002 and 2003.

Defendant and the courts' allegations have no weight or merit to consider. Plaintiffs rebutted these allegations[1] as meritless.

---

[1] Plaintiffs' representative, Ali Taha, may have misunderstood the Judge when he inquired about the time for his rebuttal to Defendant's allegations. At the conclusion of admitting Plaintiffs documents (trial, pg. 275), the Honorable Judge asked if I have anything else? I answered: "I was under the impression that plaintiffs were to present their rebuttal. The Honorable Judge responded: "That's now." The Honorable Judge moved immediately to scheduling the Trial Briefs. Then the trial ended immediately after scheduling the Briefs – no rebuttal was presented. No further evidence was presented. Rebuttal is presented in this Brief.

## II.   **INTRODUCTION**

It is hardly disputed that Plaintiffs' case for tax refund on the basis of bona fide business bad debt was and is considered unique as they have repeatedly asserted for the last 12 years.  That means Plaintiffs' case was not comparable to any of the hundreds of cases and regulations cited by Defendant and the Courts. All such cases were inapplicable, some of which were proven as such and will be proven again. The Honorable Judge acknowledged that uniqueness of the case at the trial of December 9-10, 2019:

> "This is just a fascinating case. I've never seen a case like this that is so complicated in all its legal aspects that is yet something that should be quite simple. You have to know a lot about Subchapter S, you have to know a lot about equity, and contributions to capital, you have to know a lot about survivorship or not, you have to know a little about community property. It's just fascinating. It's like a puzzle." (Trial, page 36).

Prior to the trial, and on behalf of Plaintiffs, I testified willingly in a deposition conducted by Defendant's Counsel on October 2, 2019 in Bradenton, Florida. I attended multiple of telephonic conferences conducted by the Honorable Court on April, 5, 2019, September 5, 2019, December 2, 2019 and December 6, 2019. I testified willingly in trial on December 9-10, 2019 in Tampa, Florida, even when I was not a party in this action, but a representative.

Plaintiffs filed a refund claim with the IRS center, Fresno, CA, for amended tax year 2004 to recover taxes paid for tax years 2002 and 2003, because they never received their distributed income

4

of $142,823 owed by Atek. Their undistributed income became business bad debt. Year 2004 was the year within which the bad debt became worthless. It was affirmed for consideration by the Honorable Court.

The IRS' center, Philadelphia, PA, (not Fresno, CA) disallowed the 2004 refund claim by alleging it received the claim late which was not true. It was filed within the IRS' 7-year statute.

I explained how the IRS finally, after near 10 years, realized and admitted that Plaintiffs' 2004 claim, was filed correctly within the 7-year statute for business bad debt and would be worthy of reconsideration if there had been actual bad debt. Even with the preponderance of evidence provided for the bad debt, the IRS ignored this evidence and refused to process the claim.

Consequently, Plaintiffs filed suit (Complaint) in 2017 to recover their taxes paid for tax years 2002 and 2003 and filed under amended year 2004 as a carryback.

The government requested that the Court dismiss Plaintiffs' complaint for lack of subject matter jurisdiction. The Court of Federal Claims obliged and dismissed the Complaint. No proof provided for their dismissal which was referenced to many inapplicable cases. They ignored Plaintiffs' evidence.

Plaintiffs appealed. The Court of Appeals for the Federal Circuit haphazardly fractured the claim that resulted in remanding it to the claims court to resolve. No proof provided for its remand. It only repeated the allegations that the government and the claims court alleged for their dismissal. It ignored Plaintiffs' evidence.

Plaintiffs representative emphasized that their California State taxes were refunded for both years 2002 and 2003, details of which are presented below with bank checks as evidence. He asserted that Atek's primary shareholder, Eyad Khalil, was refunded his taxes for 2002 and 2003 on the same basis of bad debt as claimed on his behalf by his attorney for the benefit of his bankruptcy creditors.

It is to be noted that Plaintiffs and I, as their representative, endured over two years of Defendant's and court's allegations that were of no merit. We endured the same from Defendant's Counsel during trial. Specifically, Counsel's allegations were harassing to the extreme. When these allegations twisted, altered, and concealed the true contents of the legal Rules and Codes, such as Sections 1366(d)(1)(B), 1367(a), 1367 (b)(2)(A), and 1.1366-1(a)(1), to name a few, then the allegations become, respectfully, "lies" and abuse of the law. (See REBUTTAL, Paragraph IV, Item No. 8).

The Honorable Judge will now have a first-hand knowledge of the jurisdictional events and facts of the case because he presided over them in trial.

For these reasons, as explained further below, Plaintiffs have met their burden of proof and jurisdiction and complied with all applicable codes and rules. There was and is no basis for any judgment in Defendant's favor, even with its Counsel's barrages of 23 harassing objections and multiple of meritless arguments in trial, in which I testified, that were all overruled or dismissed by

the Honorable Judge – all. Defendant's counsel presented no facts or proof in trial to Defendant's allegations, but mere copies of exhibits that Plaintiffs' presented for 12 years. Hypocritically, Defendant's Counsel objected to Plaintiffs' exhibits as "copies". She asserted that they were not "filed copies". The Honorable Court asked: "Why do we need the as-filed copy? Is it different in any way? But this is the return of the base company [Atek]." (Trial, pg. 45).

The only judgment is now lying at the jurisdiction of the Honorable Court in favor of Plaintiffs.

## III. <u>STATEMENT OF FACTS</u>

### <u>Plaintiffs' Opening Statement by Ali Taha (Trial, pg. 13-26)</u>

In my opening statement, I testified the truth and facts supported with hard evidence to Plaintiffs' refund claim as exhibited in trial (Exhibits A-I). Contrary to Plaintiffs' presentation, Defendant presented no truth or facts or evidence but mere repetitive allegations which amounted simply and respectfully to nothing but, for lack of appropriate expression, "lies", as proven below, especially under REBUTTAL, Paragraph IV.

During the trial, Defendant's Counsel harassed Plaintiffs' representative, Ali Taha. Counsel's actions were considered improper. For over two years, Counsel's tactics with meritless allegations continued in trial with 23 meritless objections and multiple of arguments and disagreements, all of which were overruled

and dismissed by the Honorable Court. That also disrupted the Court. The Honorable Judge noticed that. In some instances, the Honorable Judge exchanged not-so well taken arguments and objections from Counsel. It is imperative to expose Defendant and its Counsel for some excerpts of the exchange of arguments between the Honorable Judge and Defendant's Counsel in regards to Ali Taha's testimony and cross-examinations:

1. **Counsel:** "... we would object that this is not the filed copy [Form 1120S, tax year 2002]. We have the filed copy listed in our exhibits; the copy received by the IRS as Exhibit 9." (Trial, pg. 45).

2. **Court:** "Why do we need the as-filed copy? Is it different in any way? But this is the return of the base company." (Trial, pg. 45).

3. **Counsel:** "Correct. We would just like to use the filed copy since this case is about filing." (Trial, pg. 45).

4. **Court:** "I'm not sure I understand what you're driving at." (Trial, pg. 47)

5. **Counsel:** "No, no, no, I was just hoping it would be helpful for everyone." (Trial, pg. 47).

6. **Court** [in regards to transcript of deposition]: "You realize the Court is – I was about to use the word "persnickety" on the use of prior deposition testimony." (Trial, pg. 105).

7. **Counsel** [to Ali Taha]: "Okay. And your answer said –-" (Trial, pg. 109).

8. **Court:** "No. No answer. I haven't seen anything that amounts to a question that you've asked Mr. Taha today where he provided an inconsistent response." (Trial, pg. 108/109).

9. **Counsel:** "Okay. I will move on then." (Trial, pg. 109).

10. **Counsel:** "Your Honor, we object. Mr. Taha is testifying, and he's also –- we object also because this is a de novo proceeding, and I believe he's referencing facts relating to

the tax year 2004, so we would say it's also nonrelevant."
(Trial, pg. 232).

11. **Court:** "Those objections generally are not well taken... Ms.
Kanyer, let me just comment... So, these questions are
appropriate along those lines." (Trial, pg. 232, 233).

12. **Counsel:** "Can I just object that that question is compound, and
it also goes beyond the scope of the redirect." (Trial, pg.
255).

13. **Court:** "The general objection is overruled. Ms. Kanyer, if you
would stop doing that, we're talking about procedure... Ms.
Kanyer, we're talking about procedure. As long as these are
procedural questions, they're perfectly allowable in the
context." (Trial, pg. 255, 256).

What's ironic in this exchange of events, is Counsel's

assertion, among other things, that "... this case is about filing."

Does that mean this case is not about tax refund claim?

I testified the events that transpired with the several IRS'

centers and agents for 3,575 days; two government entities and three

courts for 925 days.

I asserted in trial that in year 2004, Atek experienced

financial difficulties because of delays by project owners in paying

its receivables. Atek's creditors and others complained and

requested the bonding companies, who bonded and secured Atek's

projects, to be paid.

The bonding companies immediately took over Atek's operation,

ordered project owners to withhold receivable payments due Atek,

hired other contractors to finish the projects; filed suits against

Atek and its primary shareholders; and obtained court judgments in

their favor. (Trial, P's Exh. D, E and F). That put Atek out of

business, and therefore, forced it into dissolution. The bonding companies essentially froze and possessed Atek's $2,795,983 dollars in receivables and other assets of $317,652 for total assets of $3,113,635. (P's Trial Exh. A, Form 1120S, Year 2004, Schedule L, pg. 4). As such, all shareholders of Atek lost their undistributed income, including plaintiff Taha's earned income of $142,823 that was lost and became bona fide business bad debt, i.e., worthless. This is undisputed proven fact: their money was possessed by the bonding companies.

As a result of the bonding companies' actions and taxpayers' loss of their undistributed income from Atek, they timely filed with the IRS center, Fresno, CA, their amended tax year 2004 to recover their taxes paid for years 2002 and 2003 on November 1, 2009. That would create a loss for 2004 that could be carried back to 2002 and 2003. Taxpayers' filing was as legally advised by a tax attorney who was a senior trial attorney for the IRS for six years prior to forming his tax law firm. In essence, 2004 was considered to be "fixed and determinable" within which shareholders' undistributed income was lost and became bad debt due to Atek's dissolution. The 2004 refund claim was filed within the IRS' 7-year statute for business bad debt, Code 6511(d)-1. The claim was supported with preponderance of evidence for the bona fide bad debt. It will be emphasized over and over again.

Taxpayers' claim complied with the IRS' 7-year statute, defined as follows:

**26 U.S.C. Code § 6511(d) SPECIAL RULES APPLICABLE TO INCOME TAXES**, states:

"**(1) SEVEN-YEAR PERIOD OF LIMITATION WITH RESPECT TO BAD DEBTS AND WORTHLESS SECURITIES**. If the claim for credit or refund relates to an overpayment of income tax on account of–

**(A)** The deductibility by the taxpayer, under section 166 or section 832(c) of a debt as a debt which became worthless, or, under section 165(g), of a loss from the worthlessness of a security, or,

**(B)** The effect that the deductibility of a debt or loss in subparagraph (A) has on the application to the taxpayer of carryover,

in lieu of the 3-year period of limitation prescribed in subsection (a), the period shall be 7 years from the date prescribed by law for filing the return for the year with respect to which the claim is made..."

I asserted in trial that six IRS' centers in CA, PA, TN, PA again, FL, and TX, and 33 agents, shuffled taxpayers claim from one State to another for near ten years. They disallowed the claim, before and after taxpayers' several appeals, for the alleged reason they received the claim late, i.e., 3 years from the return due date. That period was not applicable. The 7-year was. Some centers merely stalled and lied about the objective of taxpayers' refund claim, such as requesting 13 requests for 45 days to complete their research; "we have adjusted your account as you requested..." that was never requested; or "We received your inquiry requesting a reconsideration of prior audit results for the tax year(s) shown above [Dec. 31, 2004]"... when in fact taxpayers never requested any audit – mere IRS' lies.

I presented and testified in trial that after 3,575 days of

messy and disoriented standard-written disallowances and meaningless letters by 6 IRS bureaucratic centers in 6 States, 33 agents, 12 departments, and 33 letters that were responded with 30 letters of appeals by taxpayers, **an IRS agent finally recognized and admitted on March 22, 2016, reference to the 2004 refund claim, that: "...The bad debts statute of 7 years is correct-and the claim would be worthy of reconsideration-if there had been actual bad debt."** **(Trial, P's Exh. I)**. This same agent sent a harassing letter on the same date as the latter, March 22, 2016, to taxpayers asserting that: "We adjusted your account as you requested [tax year 2004]." Taxpayers requested a tax refund and not "adjustment to their account" that never existed. It became obvious that the IRS intentionally ignored the preponderance of evidence for the bad debt that was first provided in part on January 21, 2008 (Trial, P's Exh. H). It was provided again in more detail on February 24, 2015 at the request of another IRS' agent for evidence. (Trial, P's Exh. C-F).

Taxpayers and I exhausted every administrative remedy available and demonstrated a good faith effort for near ten years to resolve all issues with the IRS before filing this action. They were left with no further options but to file suit.

Plaintiffs could not afford an attorney. They filed their complaint as *pro se* with my representation. They filed their Complaint for tax refund in this action on May 10, 2017 in the District Court of Florida. The District Court ordered on June 13, 2017 to transfer the complaint to Court of Federal Claims, due to

Plaintiffs' residency issues.

Plaintiffs transferred their Complaint to the Court of Federal Claims on September 15, 2017.

In response to Plaintiffs' Complaint, Defendant filed its motion to dismiss Plaintiffs' Complaint on January 30, 2018. Defendant followed with a motion for clarification on April 18, 2018, after their motion to dismiss was granted. Defendant alleged that the Court has no subject matter jurisdiction. No facts or proof or substance were presented by Defendant for its allegations. Due to the absence of tangible facts, Defendant only resorted to cite hundreds of referenced cases that were considered inapplicable, some of which were proven as such. Again, Plaintiffs' claim is unique and not comparable to other cases. This fact of uniqueness was acknowledged by the Honorable Judge during trial. Even Defendant's witness, Mr. Wolff, IRS' agent for 25 years, acknowledged that he has never worked on a tax refund case filed within the 7-year statute for bad debt. Respectfully, Defendant ignored intentionally to acknowledge the preponderance of evidence that Plaintiffs presented for the bona fide business bad debt. The business relationship between Atek Construction as business and its shareholders as owners of the business, cannot be disputed, which Defendant did.

Following Defendant's motion to dismiss, the Court issued its Opinion and Order on April 10, 2018 granting Defendant's motion to dismiss followed by its order granting Defendant's motion for

clarification on April 19, 2018. The Court also alleged that it lacked subject matter jurisdiction as dictated by Defendant with no proof. It is presumed that the Court relied heavily on Defendant's allegations and references to case laws. The Court also relied on referencing its allegations to several cases that were considered inapplicable. In fact, some of these cases were proven inapplicable. Respectfully, the Court also ignored Plaintiffs' preponderance of evidence for its jurisdiction, and theirs.

Plaintiffs requested the Court to reconsider its orders that granted Defendant's motion to dismiss and motion for clarification. They filed their Objection to the Court's orders on January 8, 2018 that included the preponderance of evidence for the bona fide bad debt. Plaintiffs respectfully noted that the Court's factual findings were "clearly erroneous". The Court's selection of law and its application of law to such findings regarding Plaintiffs' claim for tax refund element was "contrary to law." The Court provided no evidence for its lack of subject matter jurisdiction. Defendant cannot be trusted blindly for dictating lack of jurisdiction on the Court. Nor it can be trusted for mere references to case laws that were inapplicable.

In response to Plaintiffs' objection to the Court's order granting Defendant's motion to dismiss, the Court issued its order on May 1, 2018 by stating: "The clerk is directed to file the submission, but the court has no power to consider it. Jurisdiction has passed to the Court of Appeals for the Federal Circuit now that

plaintiff has taken an appeal."

Plaintiffs have taken an appeal reluctantly as the only option left at the time to pursue their claim. Plaintiffs' appeal was as directed by the Court's front office because the Court's Order was asserted as final and not subject to objection. No fairness was given to Plaintiffs, only to Defendant. The Court, in its decisions, unfortunately showed bias actions towards Defendant.

In response to Plaintiffs' appeal in the Federal Circuit, the Federal Circuit issued its Opinion and Order on December 14, 2018, by fracturing Plaintiffs' claim into annual pieces of inaccurate allegations and omission of facts: 2002, 2003, and 2004 inclusive of 2002 and 2003, thereby affirming-in-part, vacating-in-part, and remanding Plaintiffs' claim for tax refund for this Court to resolve. Prior to this Order, Plaintiffs-Appellants filed their Reply Brief with the preponderance of evidence on August 3, 2018 which was ignored by the Federal Circuit.

Plaintiffs-Appellants filed their petition for rehearing on January 3, 2019 for the Federal Circuit to reconsider its omission of their issues of facts, and ignoring the preponderance of evidence thereof, but denied with no reason: "The petition for panel rehearing is denied." That was followed by a formal mandate issued on February 4, 2019.

As of the date of trial on December 9-10, 2019, and this Opening Brief, 959 days and hundreds of thousands of dollars were consumed in courts, compounded by heavy volumes of motions and more

motions by Defendant and orders and more orders by the courts. They were responded by heavier volumes with counter motions and objections by Plaintiffs, to no avail.

**It became clear that the business bad debt became the major issue of this action plus other non-factual issues alleged by Defendant and the Courts. Reviewing 2003 claim only as alleged by Defendant cannot be acceptable. It was objected numerous times. Amended year 2004 to recover Plaintiffs' taxes paid for 2002 and 2003 is the heart of this action. It is sound, clear and jurisdictional for consideration by the Honorable Court. It is filed timely within the IRS' 7-year statute for bona fide business bad debt. It is determined and admitted as correctly filed by the IRS in its letter of March 22, 2016. It is asserted by the Honorable Court for consideration in multiple of telephonic conferences and trial.**

I concluded my opening statement with the fact that Plaintiffs' were refunded their California State taxes in the amount of $8,364.86 for 2002 and 2003 on the basis of bad debt. Here is a detail of the refund for years 2002 and 2003 as filed under California Form 540X, Amended Individual Income Tax Return, attached to Form 1040X, Amended U.S. Individual Income Tax Return (missed providing in trial because of distractions):

|  | 2002 | 2003 |
|---|---|---|
| Claim for tax refund | $2,833.00 | $1,793.00 |
| Tax refund including interest: |  |  |
|   Check # 05-975248+07-187878 & 23-455501 | $5,263.67 | $3,101.19 |
|   Total refund of 2002 and 2003 | $8,364.86 | |

Furthermore, Mr. Eyad Khalil has filed and was refunded his taxes of around $200,000 for 2002 and 2003 on the basis of bad debt, as he declared in his subpoena to produce documents in this action. His declaration is considered authentic. He confirmed the same to Ali Taha by e-mail on November 27, 2019.

**Defendant's Opening Statement (OS) - (Trial, pg. 26-37):**

Out of desperation, Defendant was determined in trial to quash Plaintiffs' refund claim with any means possible: harassments, burdens, oppression, vagueness, incapability of understanding simple accounting transactions; refund claim as untimely, nonbusiness; claim is dividend and capital gain/loss; no shareholder-Atek relationship; increased basis in stock; plaintiffs' lack of capacity; plaintiffs' lack of jurisdiction; dictating lack of jurisdiction on the courts; excessive meritless trial arguments and objections with responsive overruling... to say the least.

Plaintiffs selected to quote the following inaccurate allegations of the many that Defendant asserted in its opening statement along with the Court's responses, where applicable:

1.   **The Court** commented:

"Let me ask a question. Mr. Taha has indicated that the State of California provided a tax refund to the plaintiff Tahas. Is that correct?" (Trial, D's OS, pg. 32).

2.   **Defendant** responded:

"That is his testimony." (Trial, D's OS, pg. 32).

3.   **Defendant** alleged:

"Mohamad Taha should be dismissed because he is deceased...A

deceased person does not have legal existence, which is a prerequisite to have the capacity to sue or be sued... which renders the suit a nullity or otherwise extinguishes the claim unless it's inherited by some other party." (Trial, D's OS, pg. 33).

4.   **The** Court commented:

"Well, it depends. If there's an executor of the estate and the executor of the estate is a family member, that is a possible route for representation." (Trial, D's OS, pg. 33).

5.   **Defendant** responded:

"Understood... Ms. Yassin was a homemaker, she did not earn any income during the years at issue, and so she did not herself contribute to the overpayment... So, in order to be entitled to the refund, you have to actually be the one who makes the overpayment." (Trial, D's OS, pg. 35).

6.   **The Court** responded:

"Why would that make a difference?... But if the man and wife filed a joint return and held the asset jointly, why would not that suffice for the purpose?" (Trial, D's OS, pg. 35).

7.   **Defendant** responded:

"So that is a matter of state laws. The case law is pretty clear that the issue of who is entitled to the overpayment looks at the person who contributes it." (Trial, D's OS, pg. 35).

8.   **The Court** responded:

"Well, we'll find out."

"This is just such a fascinating case. I've never seen a case like this that is so complicated in all its legal aspects that is yet something that should be quite simple."

"You have to know a lot about Subchapter S, you have to know a lot about equity, and contributions to capital, you have to know a lot about survivorship or not, you have to know a little about community property. It's just fascinating. It's like a puzzle." (Trial, D's OS, pg. 36).

I am rebutting, as meritless, Defendant's above allegations and other allegations, some of which are the same, asserted in its

18

Memorandum of Contentions of Fact and Law under REBUTTAL, Paragraph IV, below.

**Plaintiffs' Testimony (Trial, pg. 37-100):**

Plaintiffs' testimony presented the following documents into evidence, including documents that evidenced Atek's loss of shareholders' distributed income due to Atek's takeover by the bonding companies and its dissolution. Some were objected by Defendant, but the Honorable Court admitted all into evidence.

**Exhibit A: (PX A(1)-PX A(3)):** Atek's Forms 1120S, Income Tax Return for an S Corporation, for tax years 2002, 2003, and amended 2004, that they filed with the IRS, respectively. (Trial, pg. 39-56).

Emphasis was made to the fact that Schedules K and K-1 of the form report only ordinary income (loss) from trade or business activities and interest. (Trial, pg. 40-56); no dividends or Forms 1099-DIV; no royalty income; no net short-term capital gain(loss); no net long-term capital gain(loss); no other portfolio income; no net section 1231 gain(loss); or no other income.

Emphasis was made to the fact that Schedules L of Forms 1120S, Balance Sheet Per Books, report Shareholders' Equity account comprising of, among other accounts, Retained Earnings account. Atek's financial statements summarize the following Shareholders' Equity, comprising of Shareholders' Retained Earnings that include their undistributed income (trial interruptions prevented showing this summary into evidence):

|                                        | 2002         | 2003        | 2004 |
|----------------------------------------|--------------|-------------|------|
| Earned income from contract revenue    | $13,495,564  | 8,474,362   | None |
| Cost of earned contract revenues       | (11,212,612) | (7,508,623) |      |
| Administrative expenses & others       | (340,689)    | (245,113)   |      |
| Net income                             | 1,942,263    | 720,626     |      |
| Retained earnings, prior year          | 1,533,959    | 3,130,145   |      |
| Distributions to shareholders          | (346,077)    | (635,919)   |      |
| Retained earnings, current year        | 3,130,145    | 3,214,852   | None |

**Exhibit B: (PX B(1)-PX B(3)):** Plaintiffs' Forms 1040, Individual Income Tax Returns, for tax years 2002, 2003, and 2004 that they filed with the IRS, respectively. Emphasis was made similar to that of Schedules K-1 of Forms 1120S' reported income as stated above, Exhibit A. (Trial, pg. 56-63).

**Exhibit C: (PX C(1)-PX C(3)):** Atek's promissory notes issued to shareholders for years 2002 and 2003. Atek promised to pay shareholders their undistributed income which represent loaned profit distribution at an appropriate request date to be paid at specified interest rate. (Trial, pg. 63-64).

Also, Atek's transactions by account showing profit distribution or earned income to Plaintiff Taha's for years 2002 and 2003 at a total of $162,543. It showed Atek's payments of $20,000 for 2002, leaving a balance of $142,543 that was possessed by the bonding companies, rendering it business bad debt. (Trial, pg. 64-66).

Furthermore, Tahas' financials showing Atek's profit distribution to Plaintiff Taha's at $162,543 less payments to him at $20,000, leaving a balance of $142,543 that was possessed by the bonding companies, rendering it business bad debt. (Trial, pg. 66-

68).

**Exhibit D: (PX D(1)-PX D(4)):** Bonding companies', Hartford and Developers, three letters dated October 13, 2004 and one letter October 19, 2004, respectively, ordering project owners to withhold payments of receivables due Atek. (Trial, pg. 68-73)

**Exhibit E: (PX E(1)-PX E(2)):** Bonding companies, Hartford and Developers, summons and complaints filed in two California Courts on November 15, 2004 and April 4, 2005 respectively, against Atek and its officers who signed the indemnity agreements. (Trial, pg. 73-76).

**Exhibit F: (PX F(1)):** Final Judgment on Plaintiff's [Hartford] First Cause of Action for Breach of Indemnity Agreement issued by a California Court on January 24, 2006 in favor of Hartford against Atek and its primary officers. (Trial, pg. 76-77)

**Exhibit: G (PX G(1)-PX G(3)):** Plaintiffs' Forms 1040X, Amended Individual Income Tax Returns, for tax years 2002 and 2003 and 2004, that they filed with the IRS, respectively. Emphasis was made to Defendant's allegation, due to ignorance or harassing, that Plaintiffs did not pay taxes on the $20,000 they received from Atek. Plaintiffs reported this payment on their 1040X for 2002. The taxable income, including the $20,000, showed zero. Therefore, Defendant's allegation is a "lie."

Emphasis was made for Forms 1040X, similar to Exhibits A and B, for the fact that shareholders income was purely ordinary income and interest. No other income of any sort. (Trial, pg. 77-83).

21

**Exhibit H: (PX H(1)-PX H(2); [PX H(3) & PX H-4) omitted-see below):**
As a background and not an issue of this action, IRS' disallowance
letter dated December 20, 2007 disallowing Plaintiffs' refund claim
for 2002 and ignoring 2003 for the wrong reason. Included also,
Plaintiffs' reminder letters to the IRS dated January 21, 2008,
September 24, 2009, and November 12, 2009 regarding the IRS'
disallowance of the 2002 claim and ignoring the 2003 for unknown
reason. Attached to letter of January 21, 2008 was Plaintiff Taha's
proof of claim for possible dividend in Eyad Khalil's bankruptcy as
ordered by the California bankruptcy court.
Exhibit H was admitted into evidence as exhibits PX H(1) and PX
H(2). Defendant omitted listing Plaintiffs' letters 9/24/09 and
11/12/09 in the Parties Exhibit List which would have been listed as
PX H(3), pdf 99 and PX H(4), pdf 100, as identified in Plaintiffs'
Exhibit List, prepared by Counsel. Counsel claimed she did not have,
to which Ali Taha testified. As such, the Honorable Judge admitted
only PX H(1) and PX H(2). Plaintiffs therefore, request that the
Honorable Judge admit all four documents PX H(1)-PX H(4) into
evidence. (Trial, pg. 84-93).

**Exhibit I: (PX I(1)-PX I(2)):** IRS' letter dated March 22, 2016 by
Mr. Dianto, admitting that Plaintiffs' refund claim for amended tax
year 2004 was filed correctly, (PX I(1)), but refused to process the
claim for the reason that there was no evidence of bad debt which he
ignored as was ignored after by the government and the courts. Also,
included in this exhibit was Plaintiffs' response letter dated March

28, 2016 addressed to Mr. Dianto explaining the evidence for the bad debt which he ignored. In addition, Plaintiffs' response letter addressed Mr. Dianto's other letter dated March 22, 2016. Plaintiffs disputed Mr. Dianto's assertion that he adjusted their account, as they requested. There was never a request for account adjustment – a pure fallacy. (PX I(2)).

**Counsel** objected Plaintiffs for presenting the IRS' agent's Mr. Dianto's letter of March 22, 2016 in regards to his determination of Plaintiffs' 2004 refund claim as correctly filed within the 7-year statute for business bad debt. Counsel alleged this letter "is not relevant. It's a de novo proceeding and this relates to a tax year that's already been dismissed." (Trial, pg. 98).

**The Honorable Court** responded: "The Court will nevertheless admit them..." So PX-I1 and PX-I2 are admitted." (Trial, pg. 99).

**Plaintiffs'** disagreed with Counsel's objection to Mr. Dianto's **letter**. Mr. Dianto's letter was very relevant. He admitted that Plaintiffs' 2004 refund claim of $14,177 for taxes paid for 2002 and 2003 as filed within the 7-year statute was correct. That was discussed prior and during the telephonic conferences on April 5, 2019, September 5, 2019, and December 2, 2019. The honorable Court asserted that: (1) "You might have amended the 2003 claim in 2004, but that's part of the set of issues the Court must address post-trial, after presentation of evidence"; (2) "We're going to have to take this as a de novo, that is brand new, trial" in reference to the 2004 claim for refund. I asserted: "that the 2004 included both

23

years 2002 and 2003 for $14,177 with proof". The Honorable Judge

responded "All right. The Court will allow you that..." These

assertions were clear to his consideration of the 2004 claim.

In my testimony, I stated to the Honorable Judge: "The claim is

for 2002 and 2003 [combined and filed under 2004]. I asserted this

to you during more than one telephonic conference." The Honorable

Judge responded: "That's true." (Trial, pg. 99). I asked the

Honorable judge if there was a change in his ruling. He responded

"not necessarily." The Honorable Judge is respectfully requested to

stand firm with his assertions to the 2004 claim for taxes paid for

2002 and 2003 at $14,177, as conditional to the trial to which the

Honorable Judge agreed.

**I testified** in trial by directing the 2004 claim as the issue

for trial to the Honorable Judge.

**The Honorable Judge** responded: "Yes."

The Honorable Judge's responses are in line to his several

acknowledgements of considerations to the 2004 refund claim as

correctly filed and admitted by the IRS. "So PX-I1 and PX-I2 are

admitted" is clear evidence of his consideration to the claim. Any

other consideration by the Honorable Judge to Plaintiffs' 2004

refund claim will be **respectfully unfair and troubling**. (Trial, pg.

93-100).

**Exhibit J: (PX J):** Plaintiffs' letter dated November 15, 2013 to the

IRS confirming the signature date shown on Form 1120S, 2004 as

exhibited in Defendant's Exhibit 12 as the correct filed copy.

(Trial, pg. 269-272)

**Exhibit K: (PX K):** Plaintiffs' letter dated November 15, 2013 to the California Franchise Tax Board confirming the signature date shown on Defendant's 1120S, 2004, Exhibit 12, as the correct filed copy. This copy was attached to Plaintiffs' Form 100S, California S Corporation, Franchise or Income Tax return for 2004. It is to be noted that Counsel objected to Plaintiffs' letter to the California Franchise Tax Board. (Trial, pg. 272-275).

## Cross-examination of Mr. Taha (Trial, pg. 101-174)

It was obvious that Defendant's Counsel was determined to quash me with continued harassments. Counsel bounced me from one exhibit to another and back to the same exhibit multiple of times. Her intent, which I concluded as obvious, was to harass and confuse me, and cause me to stumble or err. That did not happen. Cross-examining me of whether the Defendant's exhibited documents for years filed, titles, taxpayers, signatures and dates, etc. were correct, was appalling. These documents were filed with the IRS by me on behalf of Atek and Plaintiffs. They were duplicate of what I filed and testified.

## Direct Examination - Revenue Agent Wolff (Trial, pg. 175-208)

Again, Defendant's Counsel consumed hours in questioning Mr. Wolff to authenticate or certify the same documents that she cross-examined me with, to which I filed and admitted. It was appalling for Counsel to have concentrated upon dates received by the IRS, receipt of stamped dates, management stamps, image control teams,

document locator numbers, opening envelopes, mailrooms, tracking,

indices about pipelines, to say the least. That was totally uncalled

for. It was meaningless and burdensome and of no merit to this

action because this action contained these documents as

"authenticated."

### Cross Examination - Revenue Agent Wolff (Trial, pg. 209-214, 220-237)

I questioned Mr. Wolff if he had experienced a case like this

case filed for tax refund claims based on the IRS 7-year statute for

business bad debt during his 25 years' experience with the IRS.

Mr. Wolff responded: "I have not dealt with a seven-year statute

with regard to business bad debts."

Mr. Wolff's response was a clear evidence in support of the

fact that this action is not comparable to any other. It is unique.

## IV.  REBUTTALS

### Defendant's Opening Statement (OS) in Trial and Memorandum of Contentions of Fact and Law (MOC):

Plaintiffs' facts rebutting Defendant's allegations are

presented below. Plaintiffs opted to select and rebut some of the

hundreds of allegations that were referenced with 60 cases that were

asserted by Defendant in its memorandum of contentions of fact and

law and in trial, some of which are respectfully considered pathetic

and ridiculous and insulting:

1.   **Defendant** alleged that:

"Atek was required to file 1120S, U.S. Income Tax Return for an S
Corporation to report its income, losses, and **dividends** of its S

corporation [to] shareholders." (D's MOC, pg. 4, ¶3).

   **Plaintiffs** respond that Defendant's allegation is wrong and respectfully, a "lie." Defendant twisted 1120S' reporting of income by fabricating and inserting the term **"dividends"** that Atek was to report. Atek filed its 1120S, U.S. Income Tax Return for an S Corporation that reported its Shareholder's share of Income, Credits, Deductions, etc to shareholders according to Schedule K-1. No word, **"dividends"**, in the title of the forms or in the income reported. The IRS asserts in its definition of the S Corporation that "The K-1 shows the amount of non-dividend distribution the shareholder receives..."

**2.   Defendant** alleged that:

"Plaintiffs or Ali Taha, however, have no evidence of these promissory notes." (D's MOC, pg. 8, ¶5).

   **Plaintiffs** respond that Ali Taha has evidence of the promissory notes, because he executed them to all the Shareholders, including Plaintiff Taha and himself. (P's Trial, Exh. C).

**3.   Defendant** alleged that:

"Plaintiff Taha did not have any role in drafting these purported promissory notes. He did not negotiate the language, the date of payment, or the interest rate. Plaintiff Taha did not request any collateral or security in exchange for the purported promissory notes. Nor did ne advance any funds to Atek in exchange for the promissory note. Plaintiff Taha did not take any legal action to receive payments. Interest was, likewise, never calculated." (D's MOC, pg. 9, ¶5; Trial, D's OS pg. 29).

   **Plaintiffs** respond that Atek was a family-owned company. Atek's two executives were the only authority to formulate the appropriate language for the promissory notes that suited all shareholders,

equally, for the undistributed monies owed by Atek as loans. As simple and legal as it was, the language was clear, the date of payment was set, and the interest rate was also set. The promissory notes were easy to understand and they represented the appropriate intent as a promise to pay. How could Plaintiff Taha or any shareholder of Atek, including myself, request collateral or security in exchange for the purported promissory notes against or from ourselves? That is respectfully ridiculous. How could Plaintiff Taha or any shareholder of Atek, including myself, take any legal action against ourselves? That is also ridiculous. How could the interest be calculated if there was no loan payment made or to be made? That was more ridiculous. That was harassing and insulting.

**4.   Defendant** alleged that, Para. F:

"Atek's books and records do not reflect any outstanding shareholder debt... do not, however, reflect that there were outstanding loans from any shareholder by the end of 2003. Likewise, for tax year 2004, Atek reported that at year end, there were no loans outstanding to shareholder... This document [Transactions by Account] does not report any "loans" from Plaintiff Taha to Atek." (D's MOC, pg. 10, ¶ 1-2).

**Plaintiffs** respond that Defendant allegations are vague and meaningless. Defendant did not show any proof. Counsel could have consulted with a CPA experienced in construction and financials. The books show the outstanding loans for 2002 and 2003 for all shareholders as a lump sum in the Retained Earnings Account in the amount of $1,424,354 as evidenced by the promissory notes and Forms 1120S. (Trial, P's Exh. C, Form 1120S, Exh. A). This value was not split and transferred from Retained Earnings Account to Loans from

Shareholders Account.

**Plaintiffs** explain that the Transactions by Account document show four transactions of Plaintiff Taha's earned income for 2002 and 2003 at $162,643 and four transactions of Atek's payments at $20,000. Simply, the balance is what Atek owed Plaintiff Taha as loans at $142,823 and accounted for under Retained Earnings of Shareholders' Equity.

5. **Defendant** alleged in part of Para. **"CONCLUSION OF LAW" (60 referenced cases)**, pg. 13-40, that:

"Before commencing a refund suit, § 7422 requires a taxpayer to file a claim for refund or credit with the IRS... Indeed, the Court does not have jurisdiction over a refund suit where a taxpayer does not file a proper administrative claim. *United States v. Clintwood*... Section 6511(a) provides that a taxpayer must file a claim for refund within three years from the time the return was filed... § 6532(a) (providing that no suit may be filed before the expiration of 6 months from filing a refund claim or after 2 years from the mailing date of the notice of claim disallowance...) Plaintiffs bear the burden of establishing jurisdiction by a preponderance of evidence, *Langley v. United States*..." (D's MOC, Pg. 13, ¶3-4; pg. 14, ¶2).

**Plaintiffs** respond that Defendant ignored and continue to ignore their compliance, as prerequisite, since they filed their Complaint. They complied with:

§ **7422** – by filing their claim on November 9, 2007 and/or November 1, 2009 with the IRS; § **6402** – by filing their claim for tax refund on amended return Form 1040X; § **6511(d)-1** – by filing their claim for tax refund within the 7-year statute for business bad debt that became worthless; and § **6532** – by filing their complaint on May 17, 2017 within the 7-year statute for business bad debt which was more than the required 6 months from the date of filing their claim with

the IRS. Filing suit within 2 years from the mailing date of the notice of claim disallowance was never an option to consider, because the period was inapplicable for business bad debt. The 7-year was as ultimately acknowledged by the IRS.

**Plaintiffs** further respond that the Court does have jurisdiction over the refund claim, as repeatedly asserted. But the Court did not stand up for it. Defendant's reference to *United States v. Clintwood,* as referenced previously by the Court, is far from applicability to Plaintiffs Case. The case regards Clintwood Elkhorn Mining Company's suit for a refund of taxes in compliance with the IRS Code and jurisdiction. Clintwood Mining Co., a coal company, seeking a refund for a tax assessed in violation of the Export Claus..., which was allowed by the Court of Appeals, without allegedly filing timely administrative refund claim before bringing suit against the Government; whose case was granted by Court of Appeals but reversed by the Supreme Court. Not an iota of comparison: a case seeking a refund for tax assessed in violation of the Export Claus. No merit.

**Plaintiffs** bore the burden of establishing jurisdiction by providing preponderance of evidence: they filed their refund claim timely within the 7-year statute for business bad debt as exhibited in Trial, Exhibits A-I, and in previous motions and objections. They complied with the above rules and codes. Defendant provided with no proofs for its allegations that were deemed wrong and far from any fact. Defendant's cited divorce case, *Langley v. United States,* is

also inapplicable and not comparable to Plaintiffs' case in regards
to jurisdiction:

   **Ms. Langley,** Plaintiff, filed suit against the IRS. She sought
income tax refund for five years for "varying reasons", none for
business bad debt, four of which she filed individual income tax
return after finalization of her divorce from Mr. Langley. Ms.
Langley also brought a property-related claim in which she sought to
have the name of her husband removed from the title because of
divorce to the former marital home which was her home. The court of
federal claims concluded that it lacked jurisdiction over Ms.
Langley's claim because she had not filed timely administrative
claim with the IRS. Ms. Langley has not established jurisdiction for
any of her refund claims. Court of Appeals affirmed the Claims
Court's judgment in dismissing Ms. Langley's claim for lack of
jurisdiction. Ms. Langley's case as a reference is inapplicable to
Plaintiffs' case. It fails the comparison – no business bad debt or
promissory notes, or anything else in that regard. Plaintiffs' case
is not a divorce or property-related case.

**6.    Defendant** alleged that:

"In other words, the Code specifically requires the taxpayer to file
a claim for the year of overpayment and not the year of the loss."
(D's MOC, Pg. 21, ¶3).

   **Plaintiffs** respond that they did file a claim for the year of
overpayment, i.e., 2002 and 2003, within the 7-year statute, which
the IRS disallowed. They also filed a refund claim for the year of
the loss, 2004 inclusive of 2002 and 2003, which the IRS also

disallowed and then allowed but failed to process the claim.
Defendant cannot have the double standards of which period the claim
was to have been filed. Regardless, the claim was correctly filed
for either claim period. But the 2004 claim was in compliance with
the Code that required the claim to be filed within the year the bad
debt became worthless. Shareholder Eyad Khalil was refunded his
taxes as filed by his attorney for 2002 and 2003.

**7.**   **Defendant** alleged that:

"To account for the tax paid on the pass-through income,
shareholders receive a corresponding increase in their basis of
stock in the S corporation equal to the amount of flow-through
income they reported on their return and paid tax." (D's MOC, pg.
25, ¶4).

  **Plaintiffs** respond that Defendant's allegation is harassing,
burdensome, and oppressive and totally vague. Had there been
evidence, Defendant would have quickly presented it. Plaintiff Taha
had no increase in the basis of his stock. It's simply calculated:
(stock basis for 2002 = increase by distributed income ($85,010),
less decrease by the same undistributed income (loan, lost) = zero
stock basis.  The same logic applies for 2003. For 2004, with loss
of income of $387,378, basis in stock became below zero). This is
the math which is common sense in accordance with the IRS'
computation of the S Corporation Stock and Debt Basis – no vagueness
but facts. Nevertheless, shareholder Eyad Khalil was refunded his
taxes for 2002 and 2003, no questions asked or claims disallowed by
the IRS. Plaintiffs were refunded their California State taxes for
the same years.

**8.   Defendant** alleged that:

"Plaintiff Taha's basis in Atek was increased by $83,968 and $74,596 for tax years 2002 and 2003, respectively, in accordance with §1367(a). Atek was not required to make a distribution to Plaintiff Taha. Treas. Reg. § 1.1366-1(a)(1). However, when Atek made a distribution to Plaintiff Taha in the amount of $20,000 to "cover" the tax payments to the IRS, Plaintiff Taha did not pay tax on the distribution..." (D's MOC, pg. 26-27, ¶2).

   **Plaintiffs** respond that Defendant's allegation is of no merit. It is harassing, burdensome, oppressive. It is respectfully a "lie"; it concealed the fact of the Rule. It concealed the fact that there was no taxable income for the distribution of $20,000, as explained below.

   The fact is that Plaintiff Taha's basis in Atek was not increased because of his loss of income for each of 2002 and 2003. It was explained mathematically above (Item 12). This loss is a debt owed by Atek that should be accounted for in computing or adjusting his basis in Atek, according to §1366(d)(1)(B), indebtedness of the S corporation; and §1367(b)(2)(A), Adjustments in Basis of Indebtedness. Defendant concealed this fact of the rules or does not understand them. It is simple math. What is distributed as income (§1367(a)(1)(A)) increases the basis, and that same undistributed income (indebted as loan) decreases the basis (§1367(b)(2)) resulting with zero basis – "no increase". Furthermore, Defendant failed to specify the loss incurred in 2004 at negative $387,234 that reduced Plaintiff Taha's basis in stock to negative value – "basis cannot be below zero".

   It is an embarrassment for Defendant to assert that "Atek was

not required to make a distribution to Plaintiff Taha. Treas. Reg. §
1.1366-1(a)(1)". It is respectfully a "lie" and/or a conceal to the
fact. Here is why. §1.1366-1 is titled "Shareholder's share of items
of an S corporation. Sub-paragraph (a) is titled "Determination of
shareholder's tax liability." Sub-sub paragraph (a)(1) is specific
to determination of shareholders' tax liability and reporting
shareholders' pro rata share. The Section has no mention of any
business "not required to make a distribution to shareholders."
Defendant failed to define who should Atek make distributions to?
Defendant's Counsel failed in understanding the Rules, or
intentionally twisted them, and therefore, her allegations are of no
merit and concealing.

**Plaintiffs** assert that there was no taxable income for the
distribution of $20,000 subject to taxes as reported on 1040X return
for 2002. (Trial, P's Exh. G). Plaintiffs' representative asserted
the same in his testimony in trial, page 77.

**9. Defendant** alleged that:

"Plaintiff Taha did not demand any security. The lack of security
indicates equity." (D's MOC, pg. 28, ¶3; Trial, D's OS, pg. 31).

**Plaintiffs** respond that Plaintiff Taha was not present in the
U.S. in 2004 when Atek was dissolved. He would not have demanded
security anyway. How could any one of us shareholders demand
security against ourselves or against our company? Defendant's
allegation is ridiculous.

**10. Defendant** alleged that:

"Plaintiff Taha did not have any role or responsibilities at Atek;
he did not hold any executive titles; he did not evaluate any of the
projects; submit any bids to the project owners, obtain any bonding
from the surety companies, or work on any of the construction
projects. Plaintiff Taha did not review any of Atek's Form 1120S,
financial statements, or balance sheets (D's Stipulation, Exh. 2;
Trial, D's OS, pg. 29).

**Plaintiffs** respond that Defendant's allegations are harassing,

burdensome, oppressive, and of no merit. So what? In fact, they are

insulting knowing that Plaintiff Taha was ill with cancer among

other things. I, as representative, and another shareholder, did not

do many of the functions alleged by Defendant.

**11. Defendant** alleged that:

"Indeed, where an unrelated lender would not have agreed to the
loan, this, too, suggests equity characterization. Plaintiff Taha
did not, however, conduct himself as an unrelated lender would.
Plaintiff Taha did not have any role in negotiating the promissory
notes. He did not review or suggest any of the language. Moreover,
he did nothing to discern Atek's creditworthiness. He did not
conduct any credit checks or otherwise observe the financial
situation of Atek. Plaintiff Taha never reviewed financial
statements, books and records, or returns. Indeed, he was not aware
that Atek was experiencing financial distress. This failure to
conduct himself as an unrelated lender would support equity
characterization." (D's MOC, pg. 31, ¶2, 3).

**Plaintiffs** respond that Defendant's allegations are vague,

harassing, burdensome, oppressive, and meritless. First, Plaintiff

Taha was never a "lender". Second, the promissory notes were legal,

simple and served the objective. All shareholders had the same

promissory notes. Third, Atek was creditworthy with over $2.5

million in assets for 2002, over $2.6 million for 2003, over $3.1

million for 2004. Nevertheless, I did not intend to burden Plaintiff

Taha with any role in Atek. He was my brother and he was grateful

for what I did for him as new immigrant. He knew what happened to

him, happened to me and other family shareholders in regards to our

loss of undistributed income.

**12. Defendant** alleged that:

"Plaintiff Taha made no serious efforts to obtain repayment of the
alleged mote. Plaintiff Taha did not pursue any collection actions.
He did not send a letter demanding payment; he did not contact an
attorney; and he did not file suit. A creditor with a genuine
expectation of repayment would not have been so cavalier when
$142,823 was at stake. (D's MOC, pg. 33, ¶2; Trial, D's OS, pg. 32).

   **Plaintiffs** respond briefly that Defendant is naïve and

insulting. First, Plaintiff Taha would not pursue any of Defendant's

allegations when there is no money to collect. Second, Atek was

dissolved and its assets and shareholders' monies owed were

possessed by the bonding companies. Defendant could have explained

how to sue ourselves, but did not. Its allegations are meritless.

**13. Defendant** alleged, MOC, para. B, pg. 33, that:

**"Plaintiff Taha cannot show that the undistributed shareholder
income was *business* bad debt."**

   **Plaintiffs** respond that they did show that the undistributed

shareholder income was business bad debt. They proved it in trial

with preponderance of evidence. They proved it before trial. The bad

debt occurred when the bonding companies took over Atek and forced

it into dissolution; possessed all its assets of over $3.3 million,

and shareholders' monies owed in Retained Earnings of over $1.8

million (Trial, Exh. A-I).

**14. Defendant** alleged that

"The analysis becomes more complicated in the situation where the

taxpayer occupies a dual role, i.e., as both employee of and an investor in the corporate borrower. (D's MOC, pg. 36, ¶2).

   **Plaintiff** respond that Defendant's allegation is harassing, burdensome, oppressive, and of no merit. Plaintiff Taha was not an employee of Atek or anybody else. He was not an investor, because he never invested any money. He had no money to invest. He was owed money by Atek that he lost as bad debt.

**15.  Defendant** alleged that:

"Plaintiff Taha's relationship to the purported debt falls squarely into nonbusiness debt... Thus, the purpose of the loan was to protect Atek. (D's MOC, pg. 36, ¶4).

   **Plaintiffs** respond that Plaintiff Taha's relationship to the debt was business debt as proven with preponderance of evidence in trial and before. Atek maintained the undistributed income as a loan. Plaintiff Taha did not give a loan to Atek to protect it. Atek maintained his and others' undistributed incomes as loans.

**16.  Defendant** alleged that:

"Plaintiff Taha did not conduct the lending activity as a prudent lender would; he did not perform credit checks, seek financial information, or require any collateral." (D's MOC, pg. 37, ¶2).

   **Plaintiffs** respond that Defendant's allegation is harassing, burdensome, and oppressive and of no merit. Plaintiff Taha was never a "lender". As a shareholder, he was owed money by Atek for undistributed income that became business bad debt. Performing credit checks and seeking financial information or requiring collateral, against himself as owner of family-owned Atek, is absurd and ridiculous.

**17.   Defendant** alleged that:

"Finally, ... Self-serving testimony is not enough to establish a business debt... Thus, Atek was in a trade or business is wholly irrelevant." (D's MOC, pg. 37, ¶3).

**Plaintiffs** respond that Defendant allegation is of no merit. What is so called "self-serving testimony" is a ridicule. Atek was established as construction business. The business bad debt was proven in trial with preponderance of evidence as proven before. Atek's trade or business is absolutely relevant. Atek's income was based on the IRS definition of S corporation: "trade or business activities income". (P's trial, Form 1120S, Exh. A). Defendant has proven none for its allegation.

**18.   Defendant** alleged that:

"However, Plaintiffs seek to convert Plaintiff Taha's undistributed pro rata share of Atek's income from capital into debt... In short, even assuming that the undistributed shareholder income is debt, the debt is nonbusiness debt because Plaintiff Taha held the debt as a shareholder and did not create the debt "in connection with" another trade or business nor was the debt "incurred" in Plaintiff Taha's trade or business.) (D's MOC, pg. 38, ¶).

**Plaintiffs** respond that Defendant's allegations are harassing, burdensome, oppressive, unreal, and of no merit. Plaintiff Taha's undistributed pro rata share of Atek's income is business bad debt. As proven in trial and before trial, there was no capital of any sort. (P's trial, Form 1120S, Exh. A). Atek's income was pure ordinary income. Why don't Defendant provide a proof of its allegation? The answer is there isn't any. Furthermore, Plaintiff Taha is not a creator to create debts. He did not hold any debts. The debt was forced on all shareholders by the bonding companies'

takeover of Atek. The debt was incurred in Plaintiff Taha's and all
shareholders' trade or business related to their family-owned Atek
Construction.

**19.  Defendant** alleged, D's MOC, para. C., pg. 38, that:

"Plaintiffs cannot show that the undistributed shareholder income
(the purported debt) became worthless in 2004... Debts are worthless
when there are reasonable grounds for abandoning all hope of
repayment in the future... But plaintiffs know nothing of the
complaint filed or actions of the bonding companies. Therefore, the
action of the bonding companies should not establish worthlessness."
(D's MOC, pg. 38, para. C, pg. 39, ¶1, 2).

**Plaintiffs** respond that the undistributed shareholder income
became a debt when it was lost in the bonding companies' takeover of
Atek in 2004; demanding project owners to withhold receivables due
to Atek in 2004; filing suit against Atek, et al, in 2004 and 2005;
and finally, as a result, obtaining court's judgments in their
favor. Atek's assets, office with all the records, all projects
under construction, and shareholders' monies owed were all possessed
by the bonding companies in 2004. These facts are genuine and strong
reasoning for the bad debt incurring in 2004, proved in trial and
before trial, but Defendant will continue denying it indefinitely
with no proof. Plaintiffs presented the proof. Plaintiffs knew
everything about the loss their undistributed income – Atek was
forced out of business. The bonding companies' actions definitely
established the worthlessness of the debt in 2004. They took over
Atek and forced into dissolution. (P's trial, Exh. A-I).

**20.  Defendant** alleged that:

"Even under plaintiffs' theory, however, at least some of the

projects were still viable and Atek continued to operate until 2005 because the bonding companies did not submit complaints for some of the projects. Moreover, the final judgments in some of these cases did not occur until 2006." (D's MOC, pg. 39, ¶2).

**Plaintiffs** respond that if Defendant's allegations are not facts, then they are respectfully "lies). Nobody should be afraid to express meritless allegations when they are "lies". There were no projects viable and Atek never continued to operate until 2005. First, Atek had financial difficulties in October 2004. The bonding companies, upon creditors' demand for payments, took over Atek by demanding project owners in four letters of October 2004 to withhold all receivables due Atek's. (P's trial, Exh. D). These four letters ended Atek's operation in October 2004 Second, consequent to the letters, at least one bonding company, Hartford, filed its complaint on November 15, 2004 for all its three projects. (P's trial, Exh. E). The second bonding company, Developers, waited for Hartford's lead, followed and filed its complaint on April 4, 2005 for all its three projects that were over 90% complete. (P's trial, Exh. E). Third, suits do never end or judged in a glimpse. Defendant should be experienced in this aspect. The California court issued its judgment in favor of Hartford on January 24, 2006 when the suit took its due process. (P's trial, Exh. F). In essence, the November 2004 law suit by Hartford and the April 2005 law suit by Developers compounded their takeover of Atek in October 2004, possessed all its assets in 2004, possessed all shareholders' monies owed in 2004, caused Atek to dissolve in 2004.

**21.   Defendant** alleged that:

"In conclusion, even assuming, *arguendo*, that plaintiffs filed a refund claim for tax year 2003, plaintiffs cannot show that the claim was timely. Plaintiffs cannot show that Plaintiff Taha's undistributed pro rata share of Atek's income is bona fide debt, is business bad debt, and became worthless in 2004. Accordingly, plaintiffs are not entitled to the extended period of limitation in § 6511(d)-1. (D's MOC, pg. 40; Trial, D's OS, pg. 26).

   **Plaintiffs** refuse to assume, *arguendo,* or otherwise. They

expressed and continue to express facts. They filed their refund

claim for tax year 2002 and 2003 simultaneously on the same date of

November 9, 2007. The IRS ignored the 2003 claim even after three

reminder letters were sent on January 21, 2008, September 24, 2009,

and November 12, 2009 in regards to 2002 and 2003. (P's trial, Exh.

H). In lieu of the 2002 and 2003 claim, disallowed by the IRS for no

jurisdictional reason, Plaintiffs filed a refund claim for tax year

2004, inclusive of both 2002 and 2003. Year 2004 was the year within

which Plaintiff Taha's undistributed pro rata share of Atek's

income, similar to all shareholders, became bona fide business bad

debt and worthless due to Atek's dissolution in 2004. Accordingly,

Plaintiffs are entitled to the 7-year statute of limitation §

6511(d)-1 without "extended period". Moreover, Plaintiffs refuse to

dwell on the 2003 refund claim because the Court of Appeals said so.

The Court of Appeals was wrong with its decisions to remand the

claim to this Court to resolve. It omitted most, if not all, the

facts Plaintiffs presented. Plaintiffs' requested for rehearing to

consider the facts that were omitted. That was ignored as well.

Plaintiffs' refund claim is comprehensive for both years 2002 and

2003, specifically as filed for year 2004. The Honorable Judge affirmed that the trial was to consider the claim in total. In fact, the trial was comprehensive in covering the total claim of $14,177. All documents presented covered this refund claim, never specifically for 2003 alone. The trial did not even dwell on 2003 claim alone.

### V.   CONCLUSION

In Trial, Plaintiffs were very clear in presenting their 2004 refund claim of $14,177 based on their loss of undistributed income that became bona fide business bad debt in year 2004 when Atek was dissolved. Year 2004 was the year within which the debt became worthless. It was filed within the IRS' 7-year statute which was admitted by the IRS.

Plaintiffs affirmed that their refund claim with California State Franchise Tax Board was refunded in the amount of $8,364.86 for 2002 and 2003 on the basis of bad debt. They affirmed that Atek's shareholder, Eyad Khalil, was refunded his 2002 and 2003 taxes of around $200,000 on the basis of bad debt.

As Plaintiffs' concluded in their opening statement: they pray for a fair, just, and jurisdictional ruling in their favor. They pray not be defeated based on obtuse technicality or mere allegations without facts or evidence. They pray for non-bias conclusion by the Honorable Court as a government entity.

Dated January 11, 2020.

Ali M. Taha, POA
for Plaintiffs

**PROOF OF SERVICE**

STATE OF FLORIDA, COUNTY OF MANATEE

I certify that I served the foregoing document described as .

**PLAINTIFFS' POST-TRIAL OPENING BRIEF**

on all interested parties in this action by placing the true copies
thereof enclosed in sealed envelopes mailed with postage thereon
fully prepaid to:

Elizabeth A. Kanyer, Esquire
U.S. Department of Justice
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Station
Washington, DC 20044

Executed on January 11, 2020

I declare under penalty of perjury under the laws of the United
States of America the foregoing is true and correct.

_____
Ali M. Taha

Mohamad Taha v US CFC Post Trial Open Brief.



RECEIVED

JAN 17 2020

OFFICE OF THE CLERK
U.S. COURT OF FEDERAL CLAIMS

U.S. COURT OF FEDERAL CLAIMS
NATIONAL COURTS BUILDING
CLERK'S OFFICE, ROOM 103
717 MADISON PLACE, NW
WASHINGTON, DC 20439



ALI TAHA
FOR M. TAHA S. YASSIN
247 DOLE TER
BRADENTON, FL 34212