No. 17-1174 T
(Senior Judge Charles F. Lettow)

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ALI TAHA, on behalf of his deceased
brother and his brother's wife,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

## THE UNITED STATES' POST-TRIAL MEMORANDUM

RICHARD E. ZUCKERMAN
Principal Deputy Assistant Attorney General

DAVID I. PINCUS
ELIZABETH A. KANYER
Attorneys
Justice Department (Tax)
Court of Federal Claims Section
P.O. Box 26
Ben Franklin Post Office
Washington, D.C. 20044
(202) 514-0600
(202) 514-9440 (facsimile)
Elizabeth.A.Kanyer@usdoj.gov

RECEIVED FROM NIGHT BOX

FEB 1 0 2020

OFFICE OF THE CLERK
U.S. COURT OF FEDERAL CLAIMS

# TABLE OF CONTENTS

**Page(s)**

United States' Post-Trial Memorandum:

Introduction......................................................................................................1

Procedural History............................................................................................2

Statement of the Case.......................................................................................3

Statement of Facts.............................................................................................4

I.   Mr Taha was a shareholder of Atek.............................................................4

    A.   Atek earned income from its activities, which was taxed to the shareholders,
    but kept by Atek to keep the company in operation...........................................4

    B.   Mr. Taha received 10% of Atek's shares, but he did not participate in Atek's
    operations and was otherwise unemployed........................................................5

    C.   When Atek was unable to meet its financial obligations, the surety companies paid
    Atek's creditors, but not the shareholders of Atek.............................................6

    D.   The shareholder income was listed on a "Promissory Note," which was payable
    when Atek was financially capable of making a payment...................................7

II.  The IRS has no indication that Taypayers filed a 2003 refund claim...........................8

    A.   Plaintiff prepared Taxpayers' Forms 1040X and Forms 540X, requesting
    a refund for a bad debt..................................................................................8

    B.   Unlike the Taxpayers' refund claim for 2002 and 2004, the IRS's records do not
    indicate that the Taxpayers' refund claim for 2003 was received..........................9

    C.   The IRS has an established practice for handling refund claims..........................10

**Page(s)**

Argument ...................................................................................................................11

I.      Plaintiff has the burden to establish the Court's jurisdiction....................................12

      A.   Plaintiff failed to meet his burden to show that Taxpayers filed a refund
          claim for tax years 2003................................................................................14

          1.   Plaintiff did not show that a refund claim was physically delivered
              to the IRS or otherwise mailed by certified or register mail........................14

              i.   *Plaintiff cannot establish the 2003 refund claim was filed through
                  the common law mailbox rule*.......................................................16

              ii.  *Plaintiff cannot establish that Taxpayer meet the exclusive exceptions
                  to the physical-delivery rule under § 7502*......................................19

              2.   Plaintiff cannot show that Taxpayers filed a refund claim for tax year 2003
               through informal letters because no formal refund claim was filed..............22

              3.   Plaintiff cannot show that Taxpayers filed a refund claim for tax year
               2003 was filed using a refund claim for tax year 2004............................23

      B.   Plaintiff failed to meet his burden to show that Taxpayers timely filed a
          refund claim for tax year 2003.......................................................................24

              1.   Plaintiff did not meet his burden to show bona-fide debt..........................25

               i.   *The fact that the contribution is in a document labeled as a "Promissory
                  Note" should be given little – if any- weight*..................................27

               ii.  *The parties did not intend to create bona-fide debt*...........................28

               iii. *Atek's "Promissory Note" does not have a maturity date*....................30

               iv.  *Mr. Taha did not secure a right to enforce payment of principal
                  and interest*.................................................................................30

               2.   Plaintiff did not show that the purported debt was a *business* debt...............32

               3.   Plaintiff cannot show that Taxpayers are entitled to a refund through
                third-party refunds......................................................................................35

              4.   Plaintiff's attempt to claim a refund based on other adjustments to basis
                is also unavailing.........................................................................................36

**Page(s)**

5. Even if Plaintiff Did Meet His Burden, the Amount of the Refund
Cannot Exceed the Amount of the Overpayment for Tax Years 2003, that is,
$5,604......................................................................................................38

II.    Plaintiff cannot appear "on behalf of" decedent, Mr. Taha......................................39

Conclusion .........................................................................................................................40

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Adelsberger v. United States,*
   58 Fed. Cl. 616 (2003)......................................................................................39

*Adelson v. United States,*
   737 F.2d 1569 (Fed. Cir. 1984) ..............................................................26, 28

*Alexander Proudfoot Co. v. United States,*
   454 F.2d 1379 (Ct. Cl. 1972)..............................................................................23

*American Processing & Sales Co. v. United States,*
   371 F.2d 842 (Ct. Cl. 1967)..............................................................26, 28

*Anderson v. United States,*
   966 F.2d 487 (9th Cir. 1992) ..............................................................16, 21

*Arkansas Motor Coaches, Ltd. v. Commissioner,*
   198 F.2d 189 (8th Cir. 1952) ..............................................................................17

*Austin v. United States,*
   611 F.2d 117 (5th Cir. 1980) ..............................................................................35

*Baldwin v. United States,*
   921 F.3d 836 (9th Cir. 2019) (*petition for cert. filed*, Sep. 23, 2019) ....................*passim*

*Banks v. United States,*
   741 F.3d 1268 (Fed.Cir.2014) ..............................................................13, 14, 16

*Belser v. Commissioner,*
   174 F.2d 386 (4th Cir. 1949) ..............................................................................25

Page(s)

**Cases (continued):**

*Bernard v. United States,*
   59 Fed. Cl. 497 (2004), *aff'd*, 98 F. App'x. 860 (Fed. Cir. 2004) ....................................13

*Blue v. United States,*
   108 Fed. Cl. 61 (2012).......................................................................................................23

*Bordo Prod. Co. v. United States,*
   476 F.2d 1312 (Ct. Cl. 1973)...................................................................................28, 30, 31

*Cenex, Inc. v. United States,*
   156 F.3d 1377 (Fed. Cir. 1998) ................................................................................*passim*

*Chevron U.S.A. v. Natural Resources Defense Counsel, Inc.,*
   467 U.S. 837 (1984)............................................................................................................21

*Christianson v. Colt Indus. Operating Corp.,*
   486 U.S. 800 (1988)............................................................................................................13

*Commissioner v. Groetzinger,*
   480 U.S. 23 (1987)..............................................................................................................33

*Curry v. United States,*
   396 F.2d 630 (5th Cir. 1968) ..............................................................................................28

*Cuyuna Realty Co. v. United States,*
   382 F.2d 298 (Ct. Cl. 1967)................................................................................................26

*Davis v. Commissioner,*
   65 T.C. 1014 (1976)............................................................................................................35

*Davis v. United States,*
   43 Fed. Cl. 92 (1999), *aff'd without published opinion*, 2000 WL 194111
   (Fed. Cir. 2000).............................................................................................................15, 17

*Demes v. United States,*
   52 Fed. Cl. 365 (2002)........................................................................................................33

*Detroit Auto. Prods. Corp. v. Commissioner,*
   203 F.2d 785 (6th Cir. 1953) (per curiam) ........................................................................17

*Deutsch v. Commissioner,*
   599 F.2d 44 (2d Cir. 1979), *cert. denied,* 444 U.S. 1015 (1980)..........................15, 19, 20

Page(s)

**Cases (continued):**

*Estelle v. Gamble,*
  429 U.S. 97 (1976).................................................................................................13

*Fin Hay Realty Co. v. United States,*
  398 F.2d 694 (3rd Cir. 1968) ...............................................................................28

*Fischer v. United States,*
  441 F.Supp. 32 (E.D. Penn. 1977) .......................................................................31

*Gens v. United States,*
  673 F.2d 366 (Ct. Cl. 1982) .................................................................................39

*Greene–Thapedi v. United States,*
  549 F.3d 530 (7th Cir. 2008) ...............................................................................22

*Harris v. United States,*
  44 Fed Cl. 678 (1999), *aff'd*, 232 F.3d 912 (Fed. Cir. 2000) ............................15

*Imel v. Commissioner,*
  61 T.C. 318 (1973)...............................................................................................34

*INDOPCO, Inc. v. Commissioner,*
  503 U.S. 79 (1992)........................................................................................25, 37

*Ishler v. United States,*
  115 Fed. Cl. 530 (2014) .......................................................................................15

*Jones v. Liberty Glass Co.,*
  332 U.S. 524 (1947).......................................................................................38, 39

*Jones v. United States,*
  226 F.2d 24 (9th Cir. 1955) ...........................................................................16-19

*In re Lane,*
  742 F.2d 1311 (11th Cir. 1984) .....................................................................29, 30

*Lehman v. Nakshian,*
  453 U.S. 156 (1981).............................................................................................11

*Ljungberg v. United States,*
  No. 95-380, 1997 WL 222643 (W.D. N.Y. Feb. 4, 1997)...................................18

**Page(s)**

**Cases (continued):**

*Lockheed Martin Corp. v. United States,*
    210 F.3d 1366 (Fed. Cir. 2000) ..................................................................37

*Mallette Bros. Constr. Co. Inc. v. United States,*
    695 F.2d 145 (5th Cir. 1983) ....................................................................37

*Estate of Mann v. United States,*
    731 F.2d 267 (5th Cir. 1984) ....................................................................32

*Martinez v. United States,*
    101 Fed. Cl. 688 (2012) .....................................................................14, 16

*McBrady v. United States,*
    167 F.Supp.3d 1012 (D. Minn. 2015)........................................................21

*Mid-Continent Supply Co. v. Commissioner,*
    571 F.2d 1371 (5th Cir. 1978) ..................................................................35

*Miller v. United States,*
    784 F.2d 728 (6th Cir. 1986) (per curiam) ...............................15, 18, 19, 20

*Estate of Mixon v. United States,*
    464 F.2d 403 (5th Cir. 1972) ..............................................................27, 30

*National Cable & Telecommunications Ass'n v. Brand X Internet Service,*
    545 U.S. 967 (2005).................................................................................21

*Pennoni v. United States,*
    86 Fed. Cl. 351 (2009)........................................................................22, 23

*RadioShack Corp. v. United States,*
    566 F.3d 1358 (Fed. Cir. 2009) ................................................................12

*Roberts v. Commissioner,*
    62 T.C. 834 (1974)..................................................................................37

*Rockwell v. Commissioner,*
    512 F.2d 882 (9th Cir. 1975) ....................................................................13

**Page(s)**

**Cases (continued):**

*Rosano v. United Sates,*
   1999 WL 550313 (E.D.N.Y. June 24, 1999) ..................................................39

*Rosengarten v. United States,*
   181 F.Supp. 275 (Ct. Cl. 1960)...........................................................15, 18, 23

*Sara Lee Corp & Subsidiary. v. United States,*
   29 Fed. Cl. 330 (1993) ..........................................................................13

*Sensenig v. Commissioner,*
   T.C. Memo. 2017-1, 2017 WL 24785, *aff'd,* 720 F.App'x 139 (3d Cir.
   2018)..................................................................................................30

*Shaw v. United States,*
   T.C. Memo. 2013-170, *aff'd,* 623 F. App'x 467 (9th Cir. 2015)...............27, 28

*Slappey Drive Indust. Park v. United States,*
   561 F.2d 572 (5th Cir. 1977) ...................................................................29

*Sirbo Holdings, Inc. v. Commissioner,*
   509 F.2d 1220 (2d Cir. 1975) ..................................................................36

*Sollitt Const. Co., Inc. v. United States,*
   1 Cl. Ct. 333 (1983)...............................................................................35

*Sorrentio v. I.R.S,*
   383 F.3d 1187 (2004) .............................................................................17

*Taha v. United States,*
   137 Fed. Cl. 462 (2018).......................................................................2, 16

*Taha v. United States,*
   757 F. App'x. 947 (Fed. Cir. 2018) ....................................................*passim*

*Tosello v. United States,*
   210 F.3d 1125 (9th Cir. 2000) ..................................................................12

*United States v. Clintwood Elkhorn Min. Co.,*
   553 U.S. 1 (2008)...................................................................................12

*United States v. Generes,*
   405 U.S. 93 (1972)............................................................................ 32-35

**Page(s)**

**Cases (continued):**

*United States v. Kales,*
    314 U.S. 186 (1941) ..........................................................................22, 23

*United States v. King,*
    395 U.S. 1 (1969) ...............................................................................11, 12

*United States v. Lombardo,*
    241 U.S. 73 (1916) ...................................................................................14

*United States v. Nordic Village, Inc.,*
    503 U.S. 30 (1992) ...................................................................................11

*United States v. Shaw,*
    309 U.S. 495 (1940) .................................................................................11

*United States v. Sherwood,*
    312 U.S. 584 (1947) .................................................................................12

*United States v. Testan,*
    424 U.S. 392 (1976) .................................................................................11

*Union Pacific R.R. v. United States,*
    182 Ct. Cl. 437 (1968) .............................................................................23

*Wagner v. United States,*
    387 F.2d 966 (Ct. Cl. 1967) ....................................................................35

*Whipple v. Commissioner,*
    373 U.S. 193 (1963) ............................................................................32, 33

*Estate of Wood v. Commissioner,*
    909 F.2d 1155 (8th Cir. 1990) ............................................................16, 21

Page(s)

**Statutes:**

    Internal Revenue Code of 1986 (26 U.S.C.):

        § 166 ...................................................................................................*passim*

        § 172 ...............................................................................................32, 37

        § 1211 ....................................................................................................32

        § 1212 ....................................................................................................32

        § 1366 ..........................................................................................3, 4, 6, 26

        § 1367 ...............................................................................................27, 36

        § 1377 ....................................................................................................27

        § 6511 .................................................................................................1, 12

        § 6532 ....................................................................................................12

        § 7422 .................................................................................................1, 12

        § 7502 ...................................................................................................*passim*

    28 U.S.C.:

        § 1346 ....................................................................................................12

        § 1491 ....................................................................................................12

    Act of Nov. 2, 1966, Pub. L. No. 89-713, § 5(a), 80 Stat. 1110-1111 ...........................18

    Cal. Fam. Code § 760 ...................................................................................39

    Cal. Fam. Code § 9820 .................................................................................39

**Page(s)**

**Miscellaneous:**

Rules of the Court of Federal Claims:

    Rule 17...................................................................................................................39

    Rule 83.1...............................................................................................................39

Treas. Reg. (26 C.F.R.):

    § 1.166-1.........................................................................................................3, 26

    § 1.166–5............................................................................................................33

    § 1.1366-1.......................................................................................................3, 27

    § 1.1366-2..........................................................................................................36

    § 301.6402-2...................................................................................................12, 37

    § 301.6402-3......................................................................................................23

    § 301.7502-1................................................................................................*passim*

TD 9543, 76 Fed. Reg. 52561 (Aug. 23, 2011), 2011 WL 3664239, 2011-40
    I.R.B. 470..........................................................................................................20

Rev. Rul. 95-70.............................................................................................................39

Saltzman & Book, IRS Practice and Procedure, ¶ 4.04(2) (June 2019) ...........................................3

x

Defendant, the United States, respectfully submits this Post-Trial Memorandum, pursuant to the Court's December 11, 2019 Scheduling Order and Paragraph 19 of Appendix A to the Rules of the United States Court of Federal Claims ("RCFC"). (Dkt. No. 72)

## INTRODUCTION

It is a basic tenet of Federal tax law that a taxpayer must both duly file and timely file a claim for refund before filing suit. §§ 7422; 6511. In this case, Ali Taha ("Plaintiff"), filed a suit on behalf of his deceased brother, Mohamad Taha ("Mr. Taha"), and his deceased brother's wife, Sanaa Yassin ("Mrs. Yassin"), to recover the Federal income tax payments for tax year 2003. [1] Contrary to this basic tenet, however, Mr. Taha and Mrs. Yassin (collectively, "Taxpayers") did not duly file or timely file their refund claim for tax year 2003.

Plaintiff cannot establish that Taxpayers duly filed their claim for refund for tax year 2003 because Plaintiff cannot establish that (1) the Taxpayers' refund claim for 2003 was physically delivered to the IRS or was mailed by certified or registered mail (or through evidence of proper mailing); (2) the letters mailed to the IRS are informal claims, and that their defects were perfected; or (3) the refund claim for *2004* is a refund claim for 2003.

Because Plaintiff did not show that the Taxpayers filed a refund claim for 2003, the Court does not need to reach the issue of whether the refund claim was timely. For the sake of argument, however, we go on to show that Plaintiff cannot establish that the 2003 refund was *timely* filed pursuant to the extended period of limitations for bad debt. Plaintiff argues that Taxpayers are entitled to a refund because Mr. Taha did not receive a distribution equal to his

---

[1] Although the suit is for the recovery of tax paid by Mr. Taha and Mrs. Yassin, we refer to Ali Taha as "Plaintiff" because he is appearing "on behalf of" his deceased brother, Mr. Taha, and Mrs. Yassin. Plaintiff may appear "on behalf of" Mrs. Yassin under the RCFC 83.1; however, he may not appear "on behalf of" Mr. Taha, who died in 2007, because Plaintiff has not establish he is the personal representative or executor of Mr. Taha's estate. *See infra* p. 39.

16248035.6

*pro rata* share of pass-through income from his S corporation, Atek Construction, Inc. ("Atek"),

thus allegedly, constituting a debt owed to Mr. Taha. Plaintiff, however, cannot meet his burden

because he cannot show that (1) Mr. Taha's *pro rata* share of pass-through income was debt;

(2) the purported debt was incurred in Mr. Taha's trade or business; or (3) the purported debt

became worthless in 2004. And, Plaintiff cannot otherwise meet his burden through evidence of

other taxpayers' refund claims or through unsubstantiated losses.

## PROCEDURAL HISTORY

This case is here before the Court after a remand from the Federal Circuit. Defendant

previously filed a motion to dismiss the complaint as to tax years 2002 through 2004. (Dkt. No.

12). This Court granted Defendant's motion as to each year, and Plaintiff appealed. *Taha v.

United States,* 137 Fed. Cl. 462 (2018); (Dkt No. 24). The Federal Circuit issued an opinion in

which it affirmed the Court's dismissal of the complaint as to tax years 2002 and 2004 but

vacated and remanded the Court's dismissal as to tax year 2003. *Taha v. United States*, 757 F.

App'x. 947, 952 (Fed. Cir. 2018). In doing so, the Federal Circuit pointed to three factual issues

to be resolved on remand: (1) whether the Taxpayers filed a refund claim for tax year 2003;

(2) whether, if the Taxpayers did file a refund claim for tax year 2003, that refund claim was

timely; and (3) whether the IRS disallowed the refund claim for tax year 2003. *Id. at* 952.

Trial was held on December 9-10, 2019, in Tampa, Florida, to resolve the issues raised in

this limited mandate by the Federal Circuit. At trial, the parties presented evidence as to issues

one and two ("duly filed" status and timeliness). Defendant does not contend that the IRS

disallowed the refund claim for tax year 2003.

## STATEMENT OF THE CASE

Atek, an S corporation, earned income from its business operations. The shareholders, such as Mr. Taha, paid tax on their *pro rata* share of Atek's income. *See* § 1366(a); *see also* Treas. Reg. § 1.1366-1(a)(1).[2] To keep the company in operation, Mr. Taha allowed Atek to retain his pass-through income. This amount was listed on a "Promissory Note," which was payable when Atek was financially capable of making a payment. Other than a distribution to pay the Taxpayers' taxes, Atek has made no other distributions or payment of interest to Mr. Taha. After Atek became unable to meet its financial obligations, Plaintiff testified that he prepared the Taxpayers' refund claim for tax year 2003 to recover the tax paid on Mr. Taha's undistributed pass-through income. Plaintiff believes that he may have been the one who mailed the claim to the IRS. Contrary to Plaintiff's assertion, however, the IRS has no record, and Plaintiff has produced no evidence, that the Taxpayers' refund claim was physically delivered to the IRS.[3] The IRS has an established practice of processing Forms 1040X, and, consistent with those practices, the IRS has determined that it does not have any indication that that process occurred for tax year 2003.[4]

---

[2] Unless otherwise indicated, all "§" or the word "Section" refers to the Internal Revenue Code of 1986, codified at Title 26 of the United States Code, as amended and in effect during the relevant period. All "Tr. I" citations refer to the transcript of record from December 9, 2019. All citations "Tr. II" refer to the transcript of record from December 10, 2019. All citations to "PX" and "DX" refer to Plaintiff's exhibits and Defendant's exhibits, respectively, which were admitted into evidence at trial.

[3] *See generally,* Saltzman & Book, IRS Practice and Procedure, ¶ 4.04(2) (June 2019) ("A tax return is generally considered filed when it is received by the Service, commonly referred to as the physical delivery rule.").

[4] As directed by the Federal Circuit's remand, the only year at issue is tax year 2003. However, because tax year 2003 relates to the application of a carryback, other tax years are addressed where relevant.

3

## STATEMENT OF FACTS

### I. **Mr. Taha was a shareholder of Atek.**

Atek was formed as a construction company in 1996. (Tr. I, 124:24-125:1.) Over the years, Atek was awarded multiple bids, employed dozens of individuals, hired subcontractors, and obtained bonding from surety companies. (*See* Tr. I, 125:9-126:4.) Atek acquired equipment, cars, and various tools. (Tr. I, 126:14-23.)

#### A. **Atek earned income from its activities, which was taxed to the shareholders, but kept by Atek to keep the company in operation.**

Atek earned income from its activities. (Tr. I, 126:24-127:2.) To report its income from its projects, Atek filed Forms 1120S, U.S. Income Tax Return for an S corporation, for tax years 2002 and 2003, reporting income of $850,102 and $778,164, respectively.[5] (DX 9, p. 1-2; DX 10, p. 1-2.) As an S corporation, Atek's income was considered to be passed through on a *pro rata* basis to its shareholders. § 1366; (*see also* Tr. I, 41:13-16).

Atek *kept* its shareholders' pass-through income to keep it in operation. (Tr. I, 128:20-23; 137:21-138:1; 146:5-7.) Atek would use the retained pass-through income to make bids and pay creditors. (Tr. I, 146:5-7, 149:25.) Atek maintained the shareholders' pass-through income in a subaccount of Atek's "shareholder equity account" called, "ret[ain]ed earnings." (DX 9, p. 4; DX

---

[5] Atek filed its 2004 Form 1120S in November 2007. (DX 11, p. 1). Plaintiff did not prepare this return; he retired from Atek shortly before October 2004. (Tr. I, 157:10-17). On this Form 1120S, Atek reported cost of goods sold of over $12 million, and a net loss of over $3.3 million. (DX 11.) Atek reported that Eyad Khalil, Plaintiff's nephew, was its sole shareholder, and did not report any cancellation of indebtedness income on account of any forgiven debt stemming from the shareholders' pass-through income. (Tr. I, 52:22-24; DX 11.) On Schedule L, Balance Sheet per Books, attached to the return, Atek reported a negative amount in "Retained earnings," and did not report any "Loans from shareholder" outstanding. (DX 11, p. 4.) Six years later, on November 29, 2013, Plaintiff filed an amended Form 1120S for tax year 2004. (DX 12). Plaintiff signed as President on November 15, 2013. (DX 12). Plaintiff amended the return to include Schedules K-1s for other shareholders. (Tr. I, 157:1-3). He did not make any other changes to the Form 1120S. (Tr. I, 157:4-5).

4

16248035.6

10, p. 4; Tr. I, 43:5-7, 49:1-5; 159:15-160:2.) For tax purposes, Atek did not report the shareholders' pass-through income on its Schedule L, Balance Sheet per Books, as "Loans from shareholder"; instead, Atek reported it as "Retained earnings." (*Id.*) (Tr. I, 156:12-15; *see also* DX 9, 10, 11, 12.)

### B. Mr. Taha received 10% of Atek's shares, but he did not participate in Atek's operations and was otherwise unemployed.

Although he previously worked in the United Arab Emirates, Mr. Taha was not engaged in any trades or businesses during 2002 and 2003. (DX 32, p. 9-10, 17.) He was unemployed.[6] (Tr. I, 131:4-6; *see also* DX 4, p. 2; DX 5, p. 1.)

In 2002, Mr. Taha received 10% of the shares of Atek from Plaintiff, his brother. (Tr. I, 56:19-20; 42:1-3; 122:9-14.) Mr. Taha did not exchange any money or services to receive these shares. (Tr. I, 123:19-24.) By 2002, Atek was owned by four relatives: 10% by Mr. Taha, 35% by Plaintiff, 5% by Plaintiff's other brother, and 50% by Mr. Khalil. (Tr. I, 124:6-23.)

Mr. Taha did not participate in any of Atek's operations after becoming a shareholder of Atek. (Tr. I, 131:21-23.) He did not hold any executive titles, and he did not receive any salary from Atek. (Tr. I, 131:24-132:5.) He did not evaluate projects, submit bids, obtain bonding, or work on any of the construction projects. (Tr. I, 132:7-133:5.) Mr. Taha did not review any of Atek's financial or tax documents, such as Forms 1120S, U.S. Individual Income Tax Return for an S corporation, financial statements, or balance sheets. (Tr. I, 133:7-12.) As Plaintiff readily admits, Mr. Taha's only role was as a shareholder. (DX 32, p. 9-10.)

As a shareholder of Atek, Atek's income was passed through to Mr. Taha on a *pro rata* basis. § 1366. As discussed *infra* p. 8-9, Taxpayers paid tax on this income. As with its other

---

[6] Mrs. Yassin did not work outside the home. (Tr. I, 133:23-134:3.)

5

shareholders, Atek maintained Mr. Taha's pass-through income in the "retained earnings" account. (Tr. I, 43:5-7, 49:1-5; 159:15-160:2.) Atek did, however, distribute $20,000 to Mr. Taha to cover Taxpayers' tax payments. (Tr. I, 140:14-19.)

### C. When Atek was unable to meet its financial obligations, the surety companies paid Atek's creditors, but not the shareholders of Atek.

Sometime in 2004, Atek became unable to meet its financial obligations. (Tr. I, 15:20-24.) When Atek's creditors had not been paid, they sought payment from the surety companies that bonded the projects. (*Id.*) The surety companies did not, however, pay the shareholders on any purported debt from the undistributed shareholder income. (Tr. I, 161:3-5.) In addition, in October of 2004, the surety companies sent letters to the project owners requesting that they cease any further payments to Atek (the "stop-payment letters"). (PX-D1–D4).

In November of 2004 and April of 2005, the surety companies filed complaints against Atek. (PX-E1, E2.) At some point, the surety companies took over Atek's bank accounts and documents. (Tr. I, 160:3-9.) In 2006, a court entered a judgment in favor of some of the surety companies against Atek. (DX 26.)

Mr. Taha was not aware of the surety companies' stop-payment letters, complaints, or final judgments. (Tr. I, 161:13-22.)

Although Mr. Taha did not receive any distributions from the surety company, Mr. Taha did seek a distribution from another shareholder's bankruptcy action in 2006. (PX-H2, p. 2.) He submitted the proof of claim in Mr. Khalil's bankruptcy proceeding for the undistributed "share of profit" because he was "hopeful" that he would get paid. (PX-H2, p. 6; Tr. I, 86:8-12, 89:7-9.) He did not recover on that proof of claim. (Tr. I, 86:11-12.)

6

### D. The shareholder income was listed on a "Promissory Note," which was payable when Atek was financially capable of making a payment.

After the shareholders had not received their *pro rata* distribution of Atek's income, Plaintiff drafted a "Promissory Note" for "loaned profit distributions" from its shareholders for tax years 2002 and 2003. (PX-C1, C2.) Each of these promissory notes represent each shareholders' undistributed income for the applicable year. (Tr. I, 134:4-9.) The "Promissory Note" for 2003 states, *inter alia,* that Atek agrees to pay Mr. Taha

> the sum of [$77,708.00] which represent[s] loaned profit distribution for the period ending 2003, at an appropriate request date to be paid at the interest rate of ten percent (10.00) per annum.

(PX-C2.) The "Promissory Note" was executed on March 15, 2004, by Plaintiff, as President. (*Id.*) The promissory notes for 2002 and 2003 are identical, except that, for 2002, the "loaned profit distribution" is $84,935 and the signature date is December 31, 2003. (*Compare* PX-C1 *with* C2.)

Mr. Taha did not have any role in drafting these documents. (Tr. I, 139:5-8.) He did not negotiate the language, the date of payment, or the interest rate of the note. (Tr. I, 139:8-24.) According to Plaintiff, the term "appropriate request date" means that a distribution would be paid only when Atek would be financially capable of making the distribution without causing financial difficulties for Atek. (Tr. I, 146:1-24.) This meant that "[c]reditors come first." (Tr. I, 146:11) This meant that Atek would pay its employees subcontractors as well as its materials and suppliers before making a distribution to its shareholders. (Tr. 146:17-24.)

Mr. Taha did not request any collateral or security in exchange for the "Promissory Note." (Tr. I, 148:11-15.) Mr. Taha did not demand that Atek secure the "Promissory Note" against its various assets, such as its equipment or automobiles. (*Id.*) Nor did he demand that Atek specifically set aside money to pay the purported debt. (Tr. I, 129:13-25.)

7

Although the "Promissory Note" calls for 10% interest, that interest would only be calculated if and when it was paid. (Tr. I, 147: 20-22.) In reality, Atek never paid any interest – indeed, it never made payment on the note at all. (Tr. I, 146:25-148:6; *cf.* Tr. I, 142:17-24.) To date, Mr. Taha has not taken any legal action to recover payment. (Tr. I, 163:2-5.)

## II. **The IRS has no indication that Taxpayers filed a 2003 refund claim.**

Plaintiff Taha prepared Taxpayers' Forms 1040, U.S. Individual Income Tax, for tax years 2002 and 2003. (*See* Tr. I, 61:21-62:7.) On those returns, Taxpayers reported Mr. Taha's *pro rata* share of Atek's ordinary income and interest income. (DX 4; PX-B2.) Taxpayers reported $85,010 and $77,813 for tax years 2002 and 2003, respectively, as their only source of income. (DX 4; PX-B2.) As a result of such reporting, they paid tax in the amount of $8,573 and $5,604 for taxable years 2002 and 2003, respectively.[7] (DX 1, 2, 4; PX-B2.)

### A. **Plaintiff prepared Taxpayers' Forms 1040X and Forms 540X, requesting a refund for bad debt.**

Plaintiff testified that he prepared Taxpayers' Forms 1040X, Amended U.S. Income Tax Return, and California Forms 540X, Amended Individual Income Tax Return, to request a refund of a bad debt loss. (Tr. I, 61:21-62:7; *see also* Tr. I, 77:23-24.) On Taxpayers' 2002 Form 1040X, they claimed a refund of $8,573. Mr. Taha testified that the Forms 1040X for tax year 2002 bears the signature of Mrs. Yassin on November 9, 2007. (PX G-1, G-2; Tr. I, 76:15.)

On their 2003 Form 1040X, Taxpayers claimed a refund of $5,604, based on an asserted loss: specifically, that "Income from Schedule K-1 as shown on Schedule E [was] not collected –

---

[7] On October 25, 2011, Mr. Taha and Mrs. Yassin filed Form 1040A for tax year 2004, indicating $0 income and $0 loss (DX 6; 8; DX 3, p. 2).

16248035.6

loss because Atek Construction ceased business." [8] (PX-G2, p. 2.) Taxpayers did not check the box indicating that "the change relates to a net operating loss carryback." (*Id.*) Mr. Taha testified that the Forms 1040X for tax year 2003 bears the signature of Mrs. Yassin on November 9, 2007. (Tr. I, 101:15-22; *see also* PX-G2.)

Plaintiff also prepared Form 540X for Taxpayers for tax years 2002 and 2003, which attach a copy of Form 1040X for the same year. [9] (*See* Tr. I, 61:21-62:7; Tr. I, 113:5-9.)

### B. Unlike the Taxpayers' refund claim for 2002 and 2004, the IRS's records do not indicate that the Taxpayers' refund claim for 2003 was received.

The IRS received the Taxpayers' refund claim for tax year 2002 (and 2004), but the IRS has no indication of receiving the Taxpayers' refund claim for tax year 2003. Twenty-one days after the date that Mrs. Yassin signed the 2002 Form 1040X (according to Plaintiff), the IRS physically received Taxpayers' 2002 Form 1040X on November 29, 2007. (DX 1, p. 2; DX 7, p. 1.) As the stamps on the 2002 Form 1040X indicate, the IRS received Taxpayers' 2002 Form 1040X in the mailroom on November 27, 2007. (DX 7, p. 1.) The IRS's Accounts Management group subsequently received and scanned the 2002 Form 1040X into the IRS's computer system.[10] (*Id.*) This claim for refund was ultimately disallowed by the IRS. (DX 1; PX-H1).[11]

---

[8] On the 2004 Form 1040X that Plaintiff prepared, Taxpayers claimed a refund of $14,177, and it purports to bear Mrs. Yassin's signature dated, November 1, 2009. (PX G-1, G-2).

[9] These Forms 540X for tax year 2002 and 2003 were not, however, offered into evidence. (Tr. I, 169:1-7). Nor were Plaintiff's or Mr. Khalil's refund claims or any checks. (Tr. I, 169:8-170:9)

[10] The IRS similarly processed the Taxpayers' refund claim for tax year 2004. (DX 3, p. 2; DX 8). As the stamps on the 2004 Form 1040X indicate, the IRS received the Taxpayers' refund claim for 2004 on April 1, 2011, over a *year* after Mrs. Yassin's signature date, November 1, 2009. (DX 3, p. 2; DX 8.) The IRS's Accounts Management group received and scanned the 2004 Form 1040X into the computer system, and it was ultimately disallowed. (DX 3, 8; PX-I1.)

(continued...)

As to tax year 2003, however, the IRS has no indication that it physically received the Taxpayers' refund claim for that year. (DX 2, p. 2.) The IRS's Form 4340, Certificate of Official Record, for Taxpayers does not list any refund claim filed for tax year 2003. (*Id.*) Plaintiff did not present any proof that the 2003 Form 1040X was sent by registered or certified mail. (Tr. I, 110:5-111:1; *see also* PX-A1–K.) The only evidence on the record as to where and how the Form 1040X for tax year 2003 was mailed is Plaintiff's personal testimony and "experience." (Tr. I, 78:24-79:5.) Plaintiff testified that, after preparing the Forms 1040X for tax years 2002 and 2003, the refund claims were "taken to the post office either by myself or my – whoever at the time, most likely myself, because [the Taxpayers] didn't have transportation, they didn't know where the post office is." (Tr. I, 78:14-17; *see also* Tr. I, 108:24-109:4, 101:9-11, 111:6-15.) Based on Plaintiff's experience, the Forms 1040X for tax years 2002 and 2003 were mailed in separate envelopes. (Tr. I, 78:23-79:3.)

### C. The IRS has an established practice for handling refund claims.

The foregoing discussion provides background for further discussion of the facts driving the case at bar. The IRS receives millions of tax returns each year. (Tr. II, 31:12-16.) The IRS has an established practice of how it processes the tax documents it receives. When an envelope arrives in the IRS Service Center's mailroom, the IRS personnel cuts the envelope open along three sides and lays the envelope flat to ensure that no document is missed. (Tr. I, 185:20-186:1; Tr. II, 21:3-24:4.) If a Form 1040X is in one of the envelopes, the Form 1040X will receive a stamp, which indicates the date and location it was delivered. (Tr. I, 184: 13-18, 190:6-8; Tr. II,

---

(...continued)

[11] Plaintiff sent letters to the IRS asking it to reconsider its determination. (*See* PX-H2; Tr. I, 84:19-85:4.)

31:12-16.) This so-called "date stamp" indicates the date in which the IRS took possession of the Form 1040X. (Tr. I, 184: 15-18, 190:6-8.) After the IRS places a date stamp on the Form 1040X, the Form 1040X is sent through the IRS's Service Center's pipeline in batches and to Accounts Management where the image control team converts the paper Form 1040X into an image copy and stores the electronic version on the IRS's computer system. (Tr. I, 186: 5-17, 186:24-187:6.) After the Form 1040X is scanned into the computer system, the electronic Form 1040X is routed within other IRS components, such as the examination function, where a decision will be made as to the claim for refund. (*See* Tr. I, 178:5-14; Tr. II, 16:13-18.)

When two Forms 1040X are mailed in one envelope, the Forms 1040X are separated and both Forms 1040X receive a date stamp. (*See* Tr. I, 187:7-11.) The two Forms 1040X are separately converted into images, one per Form 1040X, and stored on the IRS's computer system. (Tr. I, 187:1-188:9.) If two returns are not separated when they are opened in the mailroom, they will be flagged by the computer system as two Forms 1040X when they are scanned into the computer system. (Tr. I, 188:2-8.) Of course, if a claim for refund is not received by the IRS, then this process will not occur.

## ARGUMENT

It is well settled that the United States, as the sovereign, is immune from suit, unless that immunity has been waived. *Lehman v. Nakshian*, 453 U.S. 156, 160 (1981); *United States v. Testan*, 424 U.S. 392, 399 (1976); *United States v. Shaw*, 309 U.S. 495, 500 (1940). It is also fundamental that where the sovereign has waived immunity, no suit can be maintained unless it is in exact compliance with the terms of the statute under which the sovereign has consented to be sued. *United States v. Nordic Village, Inc.*, 503 U.S. 30 (1992); *United States v. King*, 395

U.S. 1, 4 (1969); *United States v. Sherwood*, 312 U.S. 584, 590-91 (1947). The burden is on the plaintiff to demonstrate the United States has consented to suit. *Taha*, 757 F. App'x. at 950.

## I. **Plaintiff has the burden to establish the Court's jurisdiction.**

This Court's jurisdiction is dependent on Plaintiff's establishing certain prerequisites to maintaining suit. A suit for a refund of federal taxes can fall within this Court's Tucker Act jurisdiction. 28 U.S.C. § 1491(a)(1); *e.g.*, *RadioShack Corp. v. United States*, 566 F.3d 1358, 1360 (Fed. Cir. 2009); *see also* 28 U.S.C. § 1346(a)(1).

This jurisdiction, however, is dependent on taxpayers' satisfying certain prerequisites, two of which are at issue in this case. First, taxpayers must "duly file[]" an administrative claim for refund (or credit) with the IRS before commencing a refund suit. § 7422; *United States v. Clintwood Elkhorn Min. Co.*, 553 U.S. 1, 4-5 (2008). Second, taxpayers must *timely* file their refund claim with the IRS pursuant to the limitations period provided in the Code. *See* § 6511; *see also* Treas. Reg. § 301.6402-2(a)(1) ("[c]redits or refunds of overpayments may not be allowed or made after the expiration of the statutory period of limitation properly applicable unless, before the expiration of such period, a claim therefor has been filed by the taxpayer."). [12] These provisions constitute a limited waiver of the Government's sovereign immunity, and provide a mechanism whereby a taxpayer can seek judicial review of an IRS determination of a taxpayer's claim for refund. A limited waiver of the Government's sovereign immunity and the applicable statute of limitations "must be construed strictly in favor of the government." *Tosello v. United States*, 210 F.3d 1125, 1127 (9th Cir. 2000).

---

[12] A review of this Court's jurisdiction is not complete without including § 6532. Section 6532 provides that no suit may be within may be filed before the expiration of 6 months from filing a refund claim or after 2 years from the mailing date of the notice of claim disallowance. As Defendant is not contending that the IRS issued a notice of disallowance, § 6532 is not at issue.

16248035.6

A *pro se* plaintiff, like any other, must establish the court's jurisdiction to hear his or her claim. *Bernard v. United States*, 59 Fed. Cl. 497, 499 (2004), *aff'd*, 98 F. App'x. 860 (Fed. Cir. 2004) (per curiam); *see also Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Here, Plaintiff carries the burden of establishing, by a preponderance of the evidence, that the refund claim was both duly filed and timely filed. *Taha*, 757 F. App'x. at 950 (explaining that Plaintiff "must establish jurisdiction by a preponderance of the evidence"). Once jurisdiction is established, "[a] tax refund suit is a *de novo* proceeding, in which the plaintiff bears the burden of proof, including both the burden of going forward and the burden of persuasion." *Sara Lee Corp & Subsidiary. v. United States,* 29 Fed. Cl. 330, 334 (1993). Procedurally, this "requires the taxpayer to come forward with enough evidence to support a finding contrary to the Commissioner's determination." *Rockwell v. Commissioner*, 512 F.2d 882, 885 (9th Cir. 1975). "Plaintiff then must prove the exact dollar amount of the alleged overpayment to which it claims a refund." *Sara Lee,* 29 Fed. Cl. at 334.

In general, when deciding a case on remand like here, the court is bound by the mandate from the Federal Circuit and by its own prior findings in this case that are consistent with the Circuit's decision and mandate. In that connection, "[t]he law-of-the-case doctrine 'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *Banks v. United States*, 741 F.3d 1268, 1276 (Fed.Cir.2014) (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815–16 (1988)). Three exceptions can, if applicable, cause the law-of-the-case doctrine to be overcome. These exceptions appertain when: (1) subsequent evidence presented at trial was substantially different from the original evidence; (2) controlling authority has since made a contrary and

16248035.6

applicable decision of the law; or (3) the decision was clearly erroneous and would work a manifest injustice. *Id.*

As explained below, Plaintiff did not show that Taxpayers duly filed a claim for refund or timely filed a refund claim for tax year 2003.

### A. Plaintiff failed to meet his burden to show that Taxpayers filed a refund claim for tax year 2003.

The Federal Circuit, in issuing its opinion, remanded the case for this Court to resolve the factual issue of whether a refund claim for 2003 was filed. 757 F. App'x at 953. Plaintiff cannot show that Taxpayers duly filed the Taxpayers' refund claim for tax year 2003 because he cannot show that (1) the Taxpayers' refund claim for 2003 was physically delivered to the IRS or was otherwise mailed by certified or registered mail (or under the common law mailbox rule); (2) the letters mailed to the IRS are informal claims or, if they are, that they were perfected; or (3) the refund claim for *2004* is a formal or informal refund claim for 2003.

> 1. Plaintiff did not show that a refund claim was physically delivered to the IRS or otherwise mailed by certified or registered mail.

It is well established that a document is filed only if it is actually delivered to the IRS. § 7502; Treas. Reg. § 301.7502-1(e)(2); *Baldwin v. United States,* 921 F.3d 836, 839-843 (9th Cir. 2019) (*petition for cert. filed,* Sep. 23, 2019); *Martinez v. United States,* 101 Fed. Cl. 688, 692 (2012); *see also United States v. Lombardo*, 241 U.S. 73, 76-76 (1916) (holding that the word "file" as used in a federal statute "means to deliver to the office and not send through the United States mail," and that a paper is filed only "when it is delivered to the proper official and by him received"). This is known as the "physical-delivery rule."

Plaintiff has not shown that the Form 1040X for tax year 2003 meets the requirements of the physical-delivery rule: indeed, he presented no evidence that the refund claim for tax year

14

2003 was physically delivered to the IRS. Not only has plaintiff failed to meet his affirmative burden; he has also failed to rebut the evidence of the Form 4340 for tax year 2003, which contains no indication that a claim for refund was filed for that year. (DX 2). IRS official records, such as Forms 4340, are "presumed to be true, accurate, and correct." *Ishler v. United States,* 115 Fed. Cl. 530, 537-538 (2014); *Harris v. United States*, 44 Fed Cl. 678, 682 (1999), *aff'd*, 232 F.3d 912 (Fed. Cir. 2000). The presumption afforded to IRS official records is rebutted only when a plaintiff present reliable evidence to the contrary. *Davis v. United States,* 43 Fed. Cl. 92, 94 (1999), *aff'd without published opinion*, 2000 WL 194111 (Fed. Cir. 2000). "Such evidence 'must be strong enough to suggest that it is highly probable that the filing has taken place.'" *Id.* (quoting *Rosengarten v. United States,* 181 F. Supp. 275, 278 (Ct. Cl. 1960)). The Form 4340 is supported by the testimony of Revenue Agent Wolff, a Revenue Agent with 25 years of experience, regarding the IRS's process for handling Forms 1040X received by mail. Revenue Agent Wolff's testimony demonstrates that had Taxpayers' refund claim been received, the claim would have been date stamped and the IRS would have a copy of it. But, as the Form 4340 reflects, the IRS has no record of receiving the refund claim nor any copy of the refund claim.

Having no evidence of physical delivery, Plaintiff instead relies on his own self-serving testimony that they "filed" – i.e., mailed – a 2003 refund claim "simultaneously" with their 2002 refund claim. As explained *infra* p. 20, the circuits were split over what taxpayers may rely on to demonstrate physical delivery. Some courts held that the timely postmark and certified or registered mailing exceptions in § 7502 provide the exclusive exception to physical delivery. *Miller v. United States*, 784 F.2d 728, 730 (6th Cir. 1986) (per curiam); *Deutsch v. Commissioner*, 599 F.2d 44, 46 (2d Cir. 1979), *cert. denied,* 444 U.S. 1015 (1980). Others held

16248035.6

that the common law mailbox rule could *also* be used as evidence to create a presumption of delivery.[13] *Anderson v. United States,* 966 F.2d 487, 491 (9th Cir. 1992); *Estate of Wood v. Commissioner,* 909 F.2d 1155, 1160 (8th Cir. 1990).

In the Federal Circuit's opinion in this case, it cited the Ninth Circuit's decision in *Jones v. United States*, 226 F.2d 24, 27 (9th Cir. 1955). *Taha,* 757 F. App'x. at 952 n. 3. *Jones* applied the common law mailbox exception to physical delivery. *See Jones,* 226 F.2d at 27. But, after the Federal Circuit issued the opinion in *Taha,* the Ninth Circuit in *Baldwin,* reevaluated its prior ruling that taxpayers can show filing through the common law mailbox rule. 921 F.3d at 839-843. The Ninth Circuit held that recourse to the common law mailbox rule is no longer available. *Id.* Accordingly, because the Ninth Circuit has effectively overruled its holding in *Jones*, we submit that "the law of the case" should not apply.[14] *Banks,* 741 F.3d at 1276. And, this Court should find that *Jones* is not the law of the case. *Id.* Because the Federal Circuit directed this Court to find facts regarding the mailing of the 2003 refund claim, we, nevertheless, begin by addressing the common law mailbox rule before addressing § 7502.

> ### i.  *Plaintiff cannot establish the 2003 refund claim was filed through the common law mailbox rule.*

In the Federal Circuit's opinion, it noted that "the mere fact that IRS records do not show receipt of the 2003 claim is not dispositive of this issue, meaning that [Plaintiff] may be able to show the claim was timely mailed." 757 F. App'x. at 952 n. 3. In doing so, the Court, as noted, cited *Jones v. United States*, 226 F.2d 24, 27 (9th Cir. 1955). *Id.* In *Jones*, the Ninth Circuit held

---

[13] The Federal Circuit "did not expressly adopt either rule…" *Martinez,* 101 Fed. Cl. at 693.

[14] Although *Baldwin* is not a "controlling" case in the Federal Circuit, it did demonstrate that the sole authority relied on by the Federal Circuit here (*Jones*), is not "good law." Any, in any event, the issue is jurisdictional.

16248035.6

that positive evidence of mailing created a strong presumption of delivery that may overcome negative evidence of nonreceipt. 226 F.2d at 27. As mentioned, this evidentiary presumption is known as the "common law mailbox rule." *Detroit Auto. Prods. Corp. v. Commissioner,* 203 F.2d 785 (6th Cir. 1953) (per curiam). For the reasons explained *infra* p. 19-22, after the enactment of § 7502 and Treasury regulation § 301.7502-1, the common law mailbox rule should not be used to establish filing.

The common law mailbox rule was created to avoid the seemingly harsh results of the physical-delivery rule. *Id.* Under this rule, if a taxpayer could show that a document was "properly addressed and deposited in the United States mail, with postage thereon duly prepaid," in time for the document to reach the IRS in the ordinary course of mail, the taxpayer was entitled to a rebuttable presumption that the document had been physically delivered to the IRS on time, even if the IRS had no record of receiving it. *Id.*; *see also Arkansas Motor Coaches, Ltd. v. Commissioner,* 198 F.2d 189, 191 (8th Cir. 1952). As courts have noted, where circumstantial evidence is considered, the courts have held taxpayers to "a strict standard of proof before invoking a presumption of receipt." *Sorrentio v. I.R.S,* 383 F.3d 1187, 1191 (2004). Uncorroborated testimony to show mailing is not enough to establish a presumption of proper mailing. *Davis*, 2000 WL 194111, *3 (Fed. Cir. 2000) (unpublished).

The only evidence that Plaintiff presented to show mailing was his uncorroborated testimony. Plaintiff testified that the refund claims were "taken to the post office *either by myself or my – whoever at the time, most likely myself*, because [Taxpayers] didn't have transportation, they didn't know where the post office is." (Tr. I, 78:11-18.) (emphasis added). Plaintiff testified that he *believes* that the 2003 refund claim was filed "simultaneously" with the federal tax refund for tax year 2002. He similarly believes that the 2003 Form 1040X and the 2002 Form 1040X

16248035.6

were mailed in separate envelopes. (Tr. I, 78:23-79:3.) But, Plaintiff's uncorroborated testimony that the claim was mailed is insufficient to prove filing of his refund claim.

In an analogous case, the Claims Court in *Rosengarten* distinguished the holding in *Jones*.[15] 181 F. Supp. 275, 278. There, the taxpayers' accountant prepared, and taxpayers signed, two refund claims for two years based on the same theory. *Id.* at 276. It was not shown whether the two refund claims were in one envelope or more than one envelope. *Id.* The IRS received one refund claim, but had no record of any claim for the other year. *Id.* The Court distinguished the holding in *Jones* because the taxpayers' accountant could not "definitively and explicitly" detail the handling of the refund claim. *Id.* at 277. The Court held that the taxpayers were not entitled to the presumption of delivery because the evidence was not "strong enough" that it was "highly probable" that the filing had taken place. *Id.* This was particularly true in light of the government's evidence concerning the step-by-step treatment of refund claims. *Id.*

As with the taxpayer in *Rosengarten,* Plaintiff cannot "definitively and explicitly" detail the handling of the refund claim. Similar to the taxpayer in *Rosengarten,* Plaintiff does not specifically recall how the 2003 Form 1040X was mailed. To that end, he does not specifically recall if he was the one who mailed it, or indeed, if it was mailed at all. Like *Rosengarten,* there is no evidence that the refund claims were mailed in one envelope. And the government, likewise, demonstrated the process of handling refund claims and the process even if Plaintiff did mail the 2002 and 2003 Forms 1040X in the same envelope.

---

[15] *Rosengarten,* like *Jones,* does not address § 7502. *Rosengarten,* 181 F. Supp. 275; *Jones,* 226 F.2d 24. Section 7502 was amended in 1966 to apply tax returns and tax payments. *See* Act of Nov. 2, 1966, Pub. L. No. 89-713, § 5(a), 80 Stat. 1110-1111. Courts, including the Sixth Circuit, have rejected the ruling in *Jones* on this account. *See e.g., Miller,* 784 F.2d at 731; *Ljungberg v. United States*, No. 95-380, 1997 WL 222643, at * 4-5 (W.D. N.Y. Feb. 4, 1997).

16248035.6

Other evidence in the record calls into doubt the alleged mailing. Plaintiff testified that the California Forms 540X were mailed "simultaneously" and include Taxpayers' 2003 Form 1040X.[16] As Forms 1040X were included with the Forms 540X, it is entirely plausible that the refund claim was mailed to the *State of California* and not the IRS. Other evidence in the record demonstrates significant delays between the purported signing and filing of refund claims as well as multiple signature dates for Plaintiff's retained copies of returns. (*Compare* DX 12 *with* PX-A3; *see also* DX 7-9.)

Because Plaintiff has nothing more than uncorroborated testimony, he did not establish that Taxpayers are entitled to a presumption of receipt under *Jones* or the common law mailbox rule.

> *ii. Plaintiff cannot establish that Taxpayers meet the exclusive exceptions to the physical-delivery rule under § 7502.*

Although Courts were in disagreement over what taxpayers may rely on to demonstrate physical delivery, that disagreement has been essentially resolved by Treasury regulation § 301.7502-1(e)(2)(i), as most recently explained by the Ninth Circuit. *Baldwin,* 921 F.3d at 839-42. (As noted, a petition for certiorari in *Baldwin* is pending.) In short, taxpayers may not rely on testimonial and circumstantial evidence to demonstrate physical delivery. *Id.*

Congress enacted § 7502, which establishes a carefully delineated pair of exceptions to the physical-delivery rule for tax documents in an effort to mitigate the potential inequities arising from the differences in mailing. *Miller*, 784 F.2d at 730. These exceptions establish easily administered rules, which produce uniform results for similarly situated taxpayers. *Deutsch*, 599 F.2d at 46. Section 7502(a)(2) provides that if a document is received by the IRS after the

---

[16] Once again, Plaintiff testified that there were California filings, but produced no documents to corroborate such filings.

16248035.6

applicable deadline, it will nonetheless be "deemed" to have been delivered on the date that the document is postmarked. This exception does not, however, speak to the means by which the fact of delivery can be proved. [17]  Section 7502(c) provides that for a document that is sent by *registered* U.S. mail, the taxpayer is provided with a limited evidentiary presumption that the document was delivered to the IRS. § 7502(c)(1)(A) and (B) (providing that the date of registration shall be" deemed" the date of postmark); § 7502(c)(2) and (f)(3); Treas. Reg. § 301.7502-1(c)(2)-(3) and (e)(2) (extending § 7502(c) to documents sent by certified mail and by designated private delivery services).

Following the enactment of § 7502, the circuits, as noted, were split over whether § 7502 foreclosed a taxpayer from relying on testimonial and circumstantial evidence to show physical delivery. As a result of the Circuit split, the Treasury Department amended its regulation to provide "certainty" that § 7502 sets forth "the only way to establish prima facie evidence of delivery of documents that have filing deadlines prescribed by the internal revenue laws, absent direct proof of actual delivery." TD 9543, 76 Fed. Reg. 52561 (Aug. 23, 2011), 2011 WL 3664239, 2011-40 I.R.B. 470. Treasury regulation § 301.7502-1(e)(2)(i) states:

> Other than direct proof of actual delivery, proof of proper use of registered or certified mail, and proof of proper use of duly designated [private delivery service] … are the *exclusive* means to establish prima facie evidence of delivery of a document to the agency, officer, or office with which the document is required to be filed. *No other evidence of a postmark or of mailing will be prima facie evidence of delivery or raise a presumption that the document was delivered.*

(emphasis added). The regulation applies to all documents mailed after September 21, 2004. Treas. Reg. § 301-7502-1(g)(4).

---

[17] If the document in question is *not* received by the IRS *at all*, there is no postmark and thus the § 7502(a) exception cannot apply. *Baldwin*, 921 F.3d at 840.

16248035.6

Recently, as noted, the Ninth Circuit reevaluated its holding in *Anderson*, which had held

that § 7502 merely supplements the common-law mailbox. *Baldwin,* 921 F.3d at 839-40.

Reviewing Treasury regulation § 301.7502-1(e), the Ninth Circuit explained that

> [t]he amended regulation interprets § 7502 as creating the exclusive exceptions to
> the physical-delivery rule… The regulation makes clear that, unless a taxpayer
> has direct proof that a document was actually delivered to the IRS, IRC § 7502
> provides that exclusive means to prove delivery. In other words, recourse to the
> common-law mailbox rule is no longer available.

*Id.* at 841; *see also McBrady v. United States,* 167 F.Supp.3d 1012, 1017 (D. Minn. 2015)

(doubt[ing] whether the Eight Circuit's decision in *Estate of Wood* remains good law" after

Treas. Reg. § 301.7502-1(e)(2) was promulgated). In doing so, the Court of Appeals applied the

two-step analysis of *Chevron U.S.A. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837

(1984). *Id.* at 842. The Court held that Treas. Reg. § 301.7502-1(e)(2) was a reasonable

interpretation of § 7502.[18] *Id.* at 843.

Thus, taxpayers may not rely on testimonial and circumstantial evidence to establish

physical delivery. Instead, taxpayers must demonstrate that a tax document was physically

delivered to the IRS. § 7502; Treas. Reg. § 301.7502-1(e)(2). Where there is a dispute over

whether a tax document was actually delivered to the IRS, the taxpayers must show that he or

she sent the tax documents by registered or certified mail or by duly designated private delivery

service. § 7502(c) and (f)(3); Treas. Reg. § 301.7502-1(c) and (e)(2). As a result, if a taxpayer

wants to ensure that a document will be deemed timely filed, that taxpayer should file it by

mailing it to correct address by registered mail or certified mail before the applicable deadline.

---

[18] The Court also reviewed the regulation under the *National Cable & Telecommunications Ass'n
v. Brand X Internet Service*, 545 U.S. 967 (2005) and held that the regulation should be given
*Chevron* deference because the Court in *Anderson* did not hold that its interpretation was "the
*only* reasonable interpretation." *Id.* at 843.

16248035.6

The current cost of certified mail services is $3.55, plus postage and other fees. U.S. Postal Serv., *Price List,* https://pe.usps.com/text/dmm300/Notice123.htm#_c191 (Feb. 10, 2020).

As Plaintiff has produced no evidence that the IRS physically received Taxpayers' refund claim for tax year 2003, Plaintiff must establish that Taxpayers come within the exception of § 7502(c) for claims mailed by registered or certified mail (or mailing by a duly designated private delivery service). Plaintiff has produced no such evidence. (Tr. I, 109:24-111:1; *see* PX-A1–K). Accordingly, Plaintiff did not show that Taxpayers' refund claim for 2003 was "duly filed" and the complaint should be dismissed.

> 2. <u>Plaintiff cannot show that Taxpayers filed a refund claim for tax year 2003</u>
>    <u>through informal letters because no formal refund claim was filed.</u>

In Plaintiff's post-trial brief, Plaintiff refers to so called "reminder letters." (Pl.'s Br. 41.) These documents are not "reminder letters" for Taxpayers' *2003 refund claim.* (*See* PX-H2). These letters ask the IRS to reconsider its disallowance of the Taxpayers' *2002 refund claim.* In any event, they are dated, January 21, 2008, September 24, 2009, and November 12, 2009. Because these letters fall outside the three-year period of limitations for filing a claim for refund for tax year 2003, they could not be considered informal refund claims. § 6511(a). An informal claim is valid if (1) it is submitted within the limitations period, (2) it has a written component, and (3) it adequately apprises the IRS that a refund is sought and for certain years. *Pennoni v. United States*, 86 Fed. Cl. 351, 362 (2009). In any event, Plaintiff did not demonstrate that the Taxpayers perfected the letters' informal defects – *i.e.,* filed a Form 1040X for tax year 2003. An informal claim is only valid if it is subsequently perfected by a proper formal claim for refund in accordance with the Treasury's regulations, in this case, a Form 1040X. *Greene–Thapedi v. United States,* 549 F.3d 530, 533 (7th Cir. 2008); *see also, United States v. Kales*, 314 U.S. 186,

16248035.6

194 (1941); *Pennoni*, 86 Fed. Cl. at 362; *Blue v. United States*, 108 Fed. Cl. 61, 68 (2012); Treas. Reg. § 301.6402-3(a)(2). And, here, no proper formal claim was filed.

### 3. Plaintiff cannot show that Taxpayers filed a refund claim for tax year 2003 was filed using a refund claim for tax year 2004.

Plaintiff makes much of the claim for refund for tax year *2004*.[19] To the extent Plaintiff is trying to use the 2004 claim to meet the burden to show that Taxpayers filed their *2003* refund claim, this contention similarly fails. A formal refund claim – *i.e.,* a Form 1040X – for tax year 2003 must be made on a *2003* Form 1040X. Treasury Regulation § 301.6402-3(a)(2) requires that "[i]n the case of an overpayment of income taxes for a *taxable year* of an individual for which a Form 1040 or 1040A has been filed, a claim for refund shall be made on Form 1040X." (emphasis added). The emphasized phrase provides that Taxpayers were required to file a formal refund claim on a Form 1040X for tax year 2003 and not 2004. As the Court of Claims explained in *Rosengarten,* "[w]e are aware of no case, however, where a court has held that a request for refund for a particular year constituted a claim for another year." 181 F. Supp. at 279. To hold otherwise would do nothing to "prevent surprise and … give adequate notice to the Service of the nature of the claim and the specific facts upon which it is predicated, thereby permitting an administrative investigation and determination." *Alexander Proudfoot Co. v. United States*, 454 F.2d 1379 (Ct. Cl. 1972) (quoting *Union Pacific R.R. v. United States*, 182 Ct. Cl. 437 (1968)).

In sum, Plaintiff cannot meet his burden to show that Taxpayers filed a formal refund claim for tax year 2003. Accordingly, the Court should dismiss Plaintiff's complaint on sovereign immunity grounds.

---

[19] Of course, a refund for tax year 2004 has been foreclosed by the Federal Circuit. *Taha,* 757 F. App'x. at 952 (holding that this Court correctly found that it lacked jurisdiction over the Taxpayers' 2004 claim).

16248035.6

### B.   Plaintiff failed to meet his burden to show that Taxpayers timely filed a refund claim for tax year 2003.

As described above, Plaintiff did not show that the Taxpayers' refund claim for tax year 2003 was physically delivered or otherwise mailed by certified or registered mail, and the Court does not need to reach this issue. *Taha,* 757 F. App'x at 952. But, even if it were to be assumed, for the sake of argument, that Plaintiff filed a refund claim for tax year 2003, Plaintiff did not establish that the refund claim was timely filed because it related to a bad debt loss.

Section 6511(a) requires a taxpayer to file a refund claim "within 3 years from the time the return was filed or 2 years from the time the tax was paid," whichever occurred later. It is undisputed that Taxpayers did not meet this deadline. *Taha,* 757 F. App'x at 954 n. 4.

Instead, Plaintiff alleges that Taxpayers filed their refund claim for tax year 2003 within the extended period of limitations provided in § 6511(d)(1) for a bad debt loss. (*See* Pl.'s Br. at 2). Section 6511(d)(1) provides for a seven-year period of limitations to file a claim for refund for bad debts. As related to carrybacks, § 6511(d)(1)(flush language) provides that

> [i]f the claim for ... refund relates to an overpayment on account of the effect that the deductibility of debt or loss has on the application to the taxpayer of a *carryback,* the period shall be either 7 years from the date prescribed by law for filing the return for the year of the net operating loss which results in such carryback or the period prescribed in paragraph (2) of this subsection [net operating losses or capital loss carrybacks], whichever expires later. (emphasis added)

In other words, if the overpayment for bad business debt results in a carryback, § 6511(d)(1) provides that the extended period of limitations is the later of (1) seven years from the time prescribed by law for filing the return containing the net operating loss related to the bad debt, or (2) three years from the time prescribed by law for filing the return containing the net operating loss.

24

Deductions for bad debts are governed by § 166. Section 166(a) allows a deduction for "any debt which becomes wholly worthless within the taxable year." Here, Plaintiff must prove (1) the existence of a valid debtor-creditor relationship, (2) the debt was business debt, and (3) the worthlessness of the debt and the year of worthlessness. Income tax deductions – such as deductions for bad debt that is business debt – are a matters of legislative grace, and the taxpayer bears the burden of proving that he has "clearly" satisfied all of the requirements for claiming the deduction. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992); *Belser v. Commissioner*, 174 F.2d 386, 389 (4th Cir. 1949) ("It is elementary that as to deductions for both losses and bad debts… the burden is squarely placed upon the taxpayer to bring himself clearly within the statutory provision authorizing the claimed deduction or exemption."). Because Plaintiff cannot demonstrate that the taxed but undistributed S corporation shareholder income is debt, that the purported debt is *business* debt, or that the purported debt became worthless in tax year 2004, Taxpayers are not entitled to the benefit of the an extended period of limitations for bad debts.

    1.   Plaintiff did not meet his burden to show bona-fide debt.

At its simplest, Plaintiff is attempting to convert Mr. Taha's *pro rata* share of Atek's income from capital to equity. But the existence of a "Promissory Note" does not convert his share into debt where (1) the purported debt is to be repaid at something as vague as an "appropriate request date;" (2) the interest on the purported debt is never calculated or paid; and (3) the lender does not require any assurance for repayment.

To qualify for bad debt deduction treatment under § 166, the taxpayer must establish, in the first instance, that the purported indebtedness constitutes a "bona fide debt." A "bona fide debt" is defined in the applicable regulations as "a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of

25

16248035.6

money." Treas. Reg. § 1.166-1(c); *Cenex, Inc. v. United States,* 156 F.3d 1377, 1381 (Fed. Cir.

1998). By definition, a contribution to capital is not bona fide debt for purposes of § 166. Treas.

Reg. § 1.166-1(c); *see Cenex,* 156 F.3d at 1381.

There are a myriad of cases that distinguish between debt and capital contributions. *See*

*Cenex,* 156 F.3d at 1381; *Adelson v. United States,* 737 F.2d 1569, 1571 (Fed. Cir. 1984). Courts

have developed a variety of factors to be used in distinguishing bona fide debt from capital

contributions. These factors include, for example,

> (1) the names given to the instruments evidencing the indebtedness; (2) the
> presence or absence of a fixed maturity date and schedule of payments; (3) the
> presence or absence of a fixed rate of interest and interest payments; (4) the
> source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the
> identity of interest between the creditor and the stockholder; (7) the security, if
> any, for the advances; (8) the corporation's ability to obtain financing from
> outside lending institutions; (9) the extent to which the advances were
> subordinated to the claims of outside creditors; (10) the extent to which the
> advances were used to acquire capital assets; and (11) the presence or absence of
> a sinking fund to provide repayments.

*Cenex*, 156 F.3d at 1381–82; *see also Adelson,* 737 F.2d at 1572; *Cuyuna Realty Co. v. United*

*States,* 382 F.2d 298 (Ct. Cl. 1967); *American Processing & Sales Co. v. United States*, 371 F.2d

842 (Ct. Cl. 1967). "The issue is essentially one of fact, and a balancing of the relevant factors

depends upon the unique circumstances of each case." *Adelson,* 737 F.2d at 1571-72.

The Court does not need to engage in the exercise of weighing the multitude of factors to

distinguish bona fide debt from capital contribution. Plaintiff does not dispute that the "debt" he

is describing is the *pro rata* shareholder income that was not distributed. During tax year 2003,

Atek, an S corporation, earned income, and that income was passed through and taxed by the

shareholders as provided by the Code. § 1366(a)(1) and (2) (providing that the S corporation's

income is "taken into account" by the shareholders); § 1377 (requiring the shareholder's to pay

tax on their *pro rata* share of the S corporation's income). The taxed but undistributed

26

16248035.6

shareholder income increased the basis of each of Atek's shareholders' share. § 1367(a)(1),(2), (b)(1) (providing that shareholder's basis shall be adjusted by the sum of the S corporation's items of income, loss, deduction, or credit). Although Taxpayers paid tax on this pass-through income, Atek was not required to distribute to Mr. Taha his *pro rata* share of its income. *See* Treas. Reg. § 1.1366-1(a)(1) ("An S corporation must report, and a shareholder is required to take into account in the shareholder's return, the shareholder's pro rata share, *whether or not distributed,* of the S corporation's items of income, loss, deduction, or credit") (emphasis added). Instead, Atek used Taha's undistributed shareholder income for its operations and to pay the creditors. Plaintiff, nevertheless, seeks to recast this additional equity interest in Atek thereby to necessitate an evaluation of the numerous factors described above. But it is clear that the "debt" here is in fact equity because (1) the purported debt is to be repaid at an "appropriate request date"; (2) the interest on the purported debt is ever calculated or paid; and (3) the lender does not require any assurance for payment.

> i.    *The fact that the contribution is in a document labeled as a "Promissory Note" should be given little – if any – weight.*

One consideration in the debt versus equity analysis is whether the formal indicia of debt are observed. *See Cenex*, 156 F.3d at 1381-82. This consideration looks at the labeling of the document. *See id*. Generally, if a corporation issues a debt instrument, such as a promissory note, that labeling supports the debt characterization. *Estate of Mixon v. United States*, 464 F.2d 403 (5th Cir. 1972). Here, Plaintiff has introduced as evidence a document is labeled, "Promissory Note." (PX-C1, C2). However, in circumstances such as these, the "Promissory Note" labeling should be given little, if any, weight. *Shaw v. United States,* T.C. Memo. 2013-170, * 13, *aff'd*, 623 F. App'x 467 (9th Cir. 2015). It is well recognized that family members and closely-held corporations are free to document a transaction in any manner that they choose. *Id.* Closely-held

27

corporations and their shareholders "ha[ve] the power to create whatever appearance would be of tax benefit to them despite the economic reality of the transaction." *Fin Hay Realty Co. v. United States*, 398 F.2d 694, 697 (3rd Cir. 1968). Therefore, the fact that the documents were labeled as a "Promissory Note" is of little probative value. In any event, the decisive factor is not what the instrument is called but what, in fact, they are, and that depends upon the real intentions of the parties. *See Am. Processing,* 371 F.2d at 855, 857 ( "Formal debt paraphernalia ... in closeknit family of corporate cousins ... alone [cannot] dictate a bona fide intention to create a debt without the accompaniment of other factors.").

ii.  *The parties did not intend to create bona-fide debt.*

"[T]he real differences [between a debt and a capital contribution] lie in the debt-creating intention of the parties, and the genuineness of repayment prospects in light of the economic realities." *Am. Processing,* 371 F.2d at 857; *see also Adelson,* 737 F.2d at 1571. Declarations of subjective intent are not controlling and cannot prevail over inferences drawn from objective acts. *Bordo Prod. Co. v. United States*, 476 F.2d 1312, 1324 (Ct. Cl. 1973)

An objective review of the circumstances surrounding the purported debt in this case indicates that the parties did not intend to create debt. In this case, $142,823 was at stake, but neither Atek or Mr. Taha calculated interest – let alone paid it. "A true lender is concerned with interest." *Curry v. United States*, 396 F.2d 630, 634 (5th Cir. 1968); *Cenex*, 156 F.3d at 1382. Although the "Promissory Note" provided for a 10% per annum interest rate, no interest amount was ever calculated or paid. (Tr. I, 147:5-22.) Instead, interest would only be calculated if a distribution was made, a nebulous event that would or would not occur based on Atek's financial success. (*Id.*; Tr. I, 146:1-4). As courts have stressed, "[w]hen a corporation contributor seeks no interest, it becomes *abundantly clear* that the compensation he seeks is that of equity interest: a

28

share or increase in the value of his shareholdings." *In re Lane*, 742 F.2d 1311, 1316 (11th Cir. 1984) (quoting *Slappey Drive Indus. Park v. United States*, 561 F.2d 572, 582 (5th Cir. 1977)) (emphasis added). Tellingly, Taxpayers did not include any unpaid interest in their purported 2003 claim for refund for a bad business debt deduction. (*See* PX-G2). Accordingly, this lack of interest calculations, payments, or accruals suggests that their contribution was equity, not debt.

Moreover, the "Promissory Note" lists *each* shareholder's *pro rata* amount of Atek's income. (PX-C1, C2). Again, this suggests that the "Promissory Notes" were equity, not debt: Where the amount of debt is proportional to a shareholders' share, that factor indicates a capital contribution. *Cenex*, 156 F.3d at 1382 ("The owners' pro rata shares are proportional to their ownership of stock, which suggests that the payments were contributions to capital.").

In addition, as a matter of bookkeeping, Atek maintained the taxed but undistributed shareholder income in an equity account. (Tr. I, 159:5-22). As Plaintiff himself observed, the taxed but undistributed shareholder income was "accounted for under retained earnings of *shareholders' equity*." (Pl.'s Br. p. 19, 29; Tr. I, 159:5-22) (emphasis added). At trial, Plaintiff emphasized that the Schedule L, "Balance per books," attached to Forms 1120S, reported the shareholders' equity account, which was the same as the retained earnings account. (Tr. I, 48:20-49:5, 159:15-160:2; Pl.'s Br. p. 19). As late as 2013, when Plaintiff filed an amended the 2004 Form 1120S, he did not list the amount as "Loans from shareholders" on Schedule L or otherwise report any cancellation of indebtedness income. (PX-A3). Thus, characterizing the "Promissory Note" as equity (not debt) is consistent with the corporate reporting.

Thus, Plaintiff did not intend to create a definite obligation repayable in any event. The fact that Mr. Taha received no payment or accrual of interest, let alone a calculation of interest, on an amount of over $100,000, coupled with the fact that the amount was *pro rata* and reported

29

16248035.6

internally as equity, objectively indicates that Mr. Taha intended the purported debt to be capital rather than debt.

    *iii.*  *Atek's "Promissory Note" does not have a maturity date.*

   Another consideration that is stressed in the debt versus equity analysis is the presence or absence of a fixed maturity date or payment schedule. *See Cenex*, 156 F.3d at 1381–82. Where there is no such fixed maturity date or payment schedule, the transaction looks like equity. *Bordo,* 476 F.2d at 1321-22; *Sensenig v. Commissioner*, T.C. Memo. 2017-1, at * 23, 2017 WL 24785, *aff'd,* 720 F. App'x 139 (3d Cir. 2018) ("The absence of an unconditional right to demand payment is practically conclusive that an advance is an equity investment rather than a loan."). Here, the "Promissory Note" provides that the purported loaned amount will be repaid at an "appropriate request date." This means that payment would occur based on the financial ability of the company. (Tr. I, 149:17-25.) In other words, "creditors always c[a]me first." (*Id.*) "[R]epayment [that is] in some way tied to the fortunes of the business, [is] indicative of an equity advance." *In re Lane,* 742 F.2d at 1316 (quoting *Mixon,* 464 F.2d at 404). This factor indicates Mr. Taha's contribution to capital is more properly recognized as equity than debt.

    *iv.*  *Mr. Taha did not secure a right to enforce payment of principal and interest.*

   In this case, Mr. Taha did not demand any security to protect himself against the possibility that his contribution would not be paid. (Tr. I, 148:11-15.) The "Promissory Note" made no provision for any security. (PX-C1, C2.) Not only was the purported debt unsecured, Mr. Taha did not require that Atek earmark any funds to ensure repayment. A failure to take steps to assure repayment in the event the business fails, including a failure to obtain security, is an indicator of equity. *Bordo*, 476 F.2d at 1324 ("The fact that a party has sought to protect its

creditor status by obtaining security enhances the possibility that its advances will be considered debt rather than equity.'").

Moreover, Mr. Taha allowed Atek to pay *all* creditors before making a distribution on the purported loan. (Tr. I, 146:8-24). He allowed Atek to use the undistributed amount to keep Atek in operation. (*Id.*). Allowing the purported debt to be subordinate to all other creditors suggests that this is a capital contribution. *Bordo*, 476 F.2d at 1322 ("subordination may negate 'an important characteristic of a debtor-creditor relationship: the right to share with general creditors in corporate assets upon dissolution or liquidation."). This fact practically assured that Mr. Taha would not be repaid in the event that business failed, and is indicative of equity.

Finally, Mr. Taha included no realistic safeguards to secure the purported debt. In addition to the subordination and lack of security, Mr. Taha did not conduct himself in the manner of an unrelated lender. *See Fischer v. United States*, 441 F. Supp. 32, 38 (E.D. Penn. 1977) ("The acid test of the economic reality of a purported debt is whether an unrelated outside party would have advanced funds under like circumstances"). Mr. Taha did not have any role in negotiating the terms of the "Promissory Note." (Tr. I, 139:8-11.) He did nothing to discern Atek's creditworthiness. Mr. Taha never reviewed financial statements, books and records, or returns. (Tr. 133:10-12.) Unlike Atek's creditors, he did not receive any payment from the surety companies along with Atek's creditors. (Tr. I, 161:3-5.) Thus, despite the nomenclature used in the document, the substance of Plaintiff Taha's undistributed pro rata share of Atek's income does not comport with the form.

In short, although two factors – the use of a "Promissory Note" and the provision for interest – may, superficially, suggest a debt, these factors should be afforded little weight. The

31

remaining evidence shows that Mr. Taha's undistributed pro rata share of Atek's income did not become debt by the mere use of a hollow document entitled, "Promissory Note."

2.   Plaintiff did not show that the purported debt was a *business* debt.

Even assuming, *arguendo*, that Mr. Taha's equity was converted into debt, Plaintiff did not show that this debt was *business* debt. Mr. Taha's was not engaged in any trades or businesses. His only relationship related to the purported debt was as a shareholder. This is plainly nonbusiness debt.

Section 166(a) allows a deduction for "any debt which becomes wholly worthless within the taxable year." For non-corporate taxpayers, however, the statute draws a distinction between business debts and nonbusiness debts. § 166(a), (d); *see Whipple v. Commissioner,* 373 U.S. 193, 202 (1963).

For *business* debt that has becomes worthless, an individual taxpayer may deduct the debt in full against ordinary income, and, to the extent the debt contributes to a net operating loss, the debt may be deducted against ordinary income in other years as a net operating loss carryback or a net operating loss carryover. *See* § 172; *see also United States v. Generes,* 405 U.S. 93, 95-96 (1972); *Estate of Mann v. United States*, 731 F.2d 267, 272 n.7 (5th Cir. 1984).

For *nonbusiness* bad debt, an individual must treat the loss as a short-term loss, which is subject to the limitations on deductibility imposed by §§ 1211 and 1212. *See Generes,* 405 U.S. at 96. Short-term capital losses are deductible only to the extent of the taxpayer's capital gain for the year, plus $3,000 of ordinary income. § 1211(b). Excess short term capital losses cannot be carried back as a net operation loss deduction. § 172(d)(4). "As a consequence, unless the taxpayer's loans are characterized as creating business debt, they may not be carried back to generate a refund for the taxes" paid in earlier years. *Estate of Mann,* 731 F.2d at 273 n 7.

32

Section 166(d)(2) defines a business debt as "a debt created or acquired (as the case may be) in connection with the trade or business of the taxpayer," or "a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business." To deduct a "business bad debt," an individual must show that he was engaged in a trade or business and that the debt was proximately related to it." Treas. Reg. § 1.166–5(b)(2). To be engaged in a trade or business, the taxpayer is required to participate in the activity with "continuity and regularity," and the "primary purpose for engaging in the activity must be income for profit." *Commissioner v. Groetzinger,* 480 U.S. 23, 35 (1987). Although the analysis is necessarily fact-specific, there are some straightforward basic rules.

It is well established that a shareholder interest is a nonbusiness interests for purposes of the bad debt deduction. *Whipple,* 373 U.S. at 202; *Generes,* 405 U.S. at 107-08; *Demes v. United States,* 52 Fed. Cl. 365 (2002). That is because managing one's investments, such as an interest in a company, no matter how extensive, is not a trade or business. *Whipple,* 373 U.S. at 200. As the Supreme Court said –

> Devoting one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged. Though such activities may produce income, profit or gain in the form of dividends or enhancement in the value of an investment, this return is distinctive to the process of investing and is generated by the successful operation of the corporation's business as distinguished from the trade or business of the taxpayer himself.

*Id.* at 202. Any rationale contrary to that conclusion would be inconsistent with the principle "that a corporation has a personality separate from its shareholders and that its business is not necessarily their business." *Generes,* 405 U.S. at 102. Thus, where a taxpayer's relationship to the debt is as a shareholder, that interest is a nonbusiness interest for purposes of the bad debt deduction. *Whipple,* 373 U.S. at 202; *Generes,* 405 U.S. at 107–08.

33

It is also well settled that being an employee may constitute a trade or business. *Generes,* 405 U.S. at 101. Likewise, in the exceptional situation in which the taxpayer's activities in making loans have been regarded as so extensive and continuous as to elevate that activity to the status as a separate business, a taxpayer may have the right to deduct the debt as a business loss. *Imel v. Commissioner,* 61 T.C. 318, 323 (1973). In situations such as these, courts must determine what the taxpayer's "dominant motivation" was in providing the debt. *See., e.g., Generes,* 405 U.S. at 100-06. The fact that a taxpayer is a shareholder does not preclude the Court from finding that the debt is business debt. But the "dominant" motivation requirement "prevents the mere presence of a business motivation, however small and however insignificant, from controlling the tax results." *Id.* at 104.

Mr. Taha's interest in the purported debt is plainly nonbusiness. Plaintiff did not establish that Mr. Taha was in any trade or business. Indeed, Plaintiff acknowledges that Mr. Taha was not in a trade or business. (DX 32, pp. 9-10.) His only role with respect to the purported debt was as a shareholder. The purported loan was meant to ensure that Atek could continue to operate and meet the needs of its creditors. (Tr. I, 146:1-4.)

Mr. Taha was not in the sort of dual-relationship status that the cases contemplate. Mr. Taha was not an employee of Atek; he did not receive a salary. (Tr. I, 132:2-6.) Thus, despite Atek being family-owned, Mr. Taha had no role in running Atek. He did not have any responsibility in the operations of Atek; he did not submit bids, obtain bonding, or work on the projects. (Tr. I, 132:10-133:6.) Mr. Taha did not have any responsibility for creating, managing, or reviewing the books and records for Atek. (Tr. I, 133:7-12.) He did not assist or review any of Atek's tax returns. (*Id.*) Thus, Mr. Taha's interest is nonbusiness.

34

Finally, it appears that Plaintiff contends that this is bad *business* debt based on *Atek's*

having a trade or business. (Pl.'s Br. pp. 38-39.) The dispositive factor, however, is whether the

*Mr. Taha* was in a trade or business because "a corporation has a personality separate from its

shareholders and its business is not necessarily their business." *Generes,* 405 U.S. at 102. Atek's

trade or business is irrelevant.

In short, even assuming that the undistributed shareholder income is debt, the debt is

nonbusiness debt because Mr. Taha held the debt as a shareholder and did not create the debt "in

connection with" another trade or business, nor was the debt "incurred" in Mr. Taha's trade or

business. Because Plaintiff cannot show that the debt is business debt, Taxpayers' refund claim

for tax year 2003 would not be timely even if it was filed.[20]

3. <u>Plaintiff cannot show that Taxpayers are entitled to a refund through third-party refunds.</u>

Plaintiff (Ali Taha) testified that (unlike Taxpayers) he and Mr. Khalil received refunds

stemming from losses from bad debts that are business debts. Plaintiff's argument should be

rejected for two reasons: First there is no general rule of law that permits a taxpayer to avoid

paying a tax that is otherwise rightfully due by showing that another taxpayer has escaped a

similar obligation. *See, e.g., Austin v. United States*, 611 F.2d 117, 119-120 (5th Cir. 1980); *Mid-Continent Supply Co. v. Commissioner,* 571 F.2d 1371, 1376 (5th Cir. 1978); *Wagner v. United States,* 387 F.2d 966, 972 (Ct. Cl. 1967); *Davis v. Commissioner,* 65 T.C. 1014, 1022 (1976). As

---

[20] Finally, even assuming, *arguendo*, that Mr. Taha's undistributed pro rata share of Atek Corporation's income is debt *and* that the debt is business debt, Plaintiff cannot show that it became worthless in 2004. § 166(a)(1). Plaintiff had a hope of recovery at least as late as 2006. *Sollitt Const. Co., Inc. v. United States,* 1 Cl. Ct. 333, 344 (1983). As late as 2006, Mr. Taha sought to use the bankruptcy process to obtain payment of the purported bad debts. (PX-H2). Plaintiff submitted proofs of claim with the "hope" that they would receive payments. (Tr. I, 86:8-12), Thus, as reflected by their own actions, Plaintiff could not have abandoned all hope of recovery in 2004, two years before they sought recovery in bankruptcy.

16248035.6

the Second Circuit has noted, "[w]hile even-handed treatment should be the Commissioner's

goal, … perfection in the administration of such vast responsibilities cannot be expected … The

making of an error in one case … gives other taxpayers *no* right to its perpetuation." *Sirbo*

*Holdings, Inc. v. Commissioner*, 509 F.2d 1220, 1222 (2d Cir. 1975) (emphasis added). Thus, the

purported fact that other shareholders received a refund on account of a bad debt that is business

bad debt – even if true – in no way binds the IRS to make a similar refund to the Taxpayers for

tax year 2003.

Second, Plaintiff did not present sufficient evidence to establish that either he or Mr.

Khalil received a refund for tax year 2003 on account of a bad debt that was business debt that

became worthless in tax year 2004. As should be clear at this point, both § 6511(d)(1) and § 166

require a fact-specific analysis based on the circumstances of each particular taxpayer. Plaintiff

did not present any evidence to support these facts for the other taxpayers who purportedly

received a refund.

4. <u>Plaintiff's attempt to claim a refund based on other adjustments to basis is also</u>
<u>unavailing.</u>

In an effort to claim some refund, Plaintiff apparently raises two alternative arguments,

the gist of both being that his basis is overstated in some way. Plaintiff appears to argue that Mr.

Taha's basis in his S corporation stock was decreased under § 1367(b)(2)(A). Section

1367(b)(2)(A) provides that "[i]f for any taxable year the amounts specified in subparagraphs

(B), (C), (D), and (E) of subsection (a)(2) [decreases in basis] exceed the amount which reduces

the shareholder's basis to zero, such excess shall be applied to reduce (but not below zero) the

shareholder's basis in any indebtedness of the S corporation to the shareholder." Contrary to

Plaintiff's assertions, this provision provides a mechanism for recovering basis; it does not define

a loss or deduction akin to § 166 on account of indebtedness. Treas. Reg. § 1.1366-2(a)(2) ("The

36

16248035.6

term basis of any indebtedness of the S corporation to the shareholder means the shareholder's

adjusted basis … in any bona fide indebtedness of the S corporation that runs directly to

shareholder. Whether indebtedness is bona fide indebtedness to a shareholder is determined

under general Federal tax principles and depends on all of the facts and circumstances.").

Nor can Plaintiff succeed in arguing that Mr. Taha's basis should, in fact, be zero because

Atek reported a $3.3 million loss on its Form 1120S for tax year 2004 due to excess cost of

goods sold over ordinary income.[21] (DX 12). Income tax deductions are a matters of legislative

grace, and the taxpayer bears the burden of proving that he has "clearly" satisfied all of the

requirements for claiming the deduction. *INDOPCO*, 503 U.S. at 84. Plaintiff did not present any

evidence related to the cost of goods sold. Indeed, Plaintiff did not assist in preparing the Form

1120S. (Tr. I, 157:4-20.) Instead, some six years after Plaintiff alleges the 2003 refund claim was

filed, he amended the Form 1120S to add Mr. Taha (and himself) as shareholders. He made no

other changes. It is well established that the statements and figures on the tax return merely

represent the taxpayer's claim and do not establish the truth or correctness of those statements

and figures. *Roberts v. Commissioner,* 62 T.C. 834, 839 (1974). Thus, Plaintiff's contention that

the basis should somehow be reduced should be rejected.

---

[21] As a preliminary matter, the substantial variance doctrine prevents Plaintiff from asserting that this purported loss in 2004 results in a carryback to 2003. *Lockheed Martin Corp. v. United States,* 210 F.3d 1366, 1371 (Fed. Cir. 2000); § 172; § 301.6402-2(b)(1)). On Taxpayers' purported 2003 Form 1040X, they claimed a refund for "not collected" income. In doing so, they did not mark the box indicating that they were seeking a refund on account of a net operating loss carryback or attach the schedule or form that shows the year in which the loss occurred. (*See* PX-G2, at 2, Part II). Nor did they make *any* mention of tax year 2004. It was not until six years after Plaintiff allegedly filed the 2003 claim that Mr. Taha was listed as a shareholder. Thus, had the IRS hazard a guess as to the nature of the Taxpayers' claim, which it is not required to do, it would not have been altered to this issue. *Mallette Bros. Constr. Co. Inc. v. United States,* 695 F.2d 145, 156 (5th Cir. 1983).

16248035.6

5. <u>Even if Plaintiff Did Meet His Burden, the Amount of the Refund Cannot Exceed the Amount of the Overpayment for Tax Year 2003, that is, $5,604.</u>

Finally, Plaintiff contends that Taxpayers are entitled to a refund of $14,177, which represents the amount Taxpayers paid for tax years 2003 *and 2002.*[22] The controlling provision of § 6511(d)(1) provides that

> In the case of a claim described in this paragraph the amount of the credit or refund may exceed the portion of the tax paid within the period prescribed in subsection (b)(2) or (c), whichever is applicable, to the extent of the amount of the *overpayment* attributable to the deductibility of items described in this paragraph.

(emphasis added). Under this language, in the case of a claim for refund based on bad debt, the amount of refund may exceed the amount paid under § 6511(b)(2) (the two-year refund limit). *Taha,* 757 F. App'x. at 953-954.

In other words, even if the Taxpayers could recover amounts that were paid within the extended period of limitation, and they cannot, that recovery is limited to amounts that were paid in the extended period of limitations. The language does not imply that taxpayers may recover amounts paid in other years. To read the statute that way would ignore the requirement that there is an "overpayment" attributable to the deductibility of the bad debt. § 6511(d)(1). Although the word "overpayment" is not defined in the Code, an "overpayment" has been read in its usual sense to mean "any payment in excess of that which is properly due." *Jones v. Liberty Glass Co.,* 332 U.S. 524, 531 (1947); *see also Saltzman & Book,* ¶ 11.02 "Overpayment" Defined, 1999 WL 1050962, *1 ("an overpayment is a payment in excess of what properly should have been assessed or collected as tax."). Taxpayers paid $5,604 for taxable year 2003. (DX-2). They did not pay $14,177 for tax year 2003. (*Id.*) $8,573 was paid for tax year *2002.* (DX-1.) Thus,

---

[22] They cannot receive a refund for tax year 2002 because tax year 2002 was dismissed by this Court for lack of subject matter jurisdiction. *Taha,* 757 F. App'x at 951-52.

16248035.6

because Taxpayers did not pay $8,573 for tax year 2003, they did not make payment in excess of that amount for tax year 2003 and the amount of the refund must be capped at $5,604.

## II.   **Plaintiff cannot appear "on behalf of" decedent, Mr. Taha.**

In the Court's December 19, 2019 Order, the Court revised the case's caption and substituted "Ali Taha, on behalf of his deceased and his brother's wife" for Taxpayers. (Dkt. No. 73). Because Plaintiff does not have standing to sue on behalf of decedent Mr. Taha, Plaintiff's suit should be dismissed as to Mr. Taha.

An individual that is not a personal representative or executor of a decedent's estate has no standing to act as a plaintiff in a tax refund suit where the taxpayer to whom the overpayment is attributable is deceased. *See* RCFC 17(a); Cal. Prob. Code § 9820; *Adelsberger v. United States,* 58 Fed. Cl. 616 (2003); *Rosano v. United Sates,* 1999 WL 550313 (E.D.N.Y. June 24, 1999). Here, as Plaintiff has not demonstrated that he has been appointed as the personal representative or executor of Mr. Taha's estate by a competent authority, he has no standing to sue on behalf of Mr. Taha.[23] Defendant, therefore, requests that the Court rule that Plaintiff is appearing only on behalf of Mrs. Yassin.

---

[23] Defendant does not object to Plaintiff's representation of Mrs. Yassin under RCFC 83.1(a)(3). In general, spouses filing joint returns have separate interest in any overpayment, the interest attributable to each depending on the amount he or she contributed to the overpayment. *Gens v. United States,* 673 F.2d 366, 367-68 (Ct. Cl. 1982). In community property states, such the State of California, each spouse is considered the recipient of one half of the aggregated income. Rev. Rul. 85-70; Cal. Fam. Code § 760 (West). Because the IRS authorizes a surviving spouse to file Form 1310, Statement of Person Claiming Refund Due a Deceased Taxpayer, to claim a deceased taxpayer's refund, Mrs. Yassin could file a Form 1310 and receive the other half of the refund. Field Service Advice 200144030. Accordingly, we do not object to Plaintiff's representation of Mrs. Yassin as to the full amount of the refund claim for tax year 2003.

16248035.6

## CONCLUSION

For the reason stated above, the United States respectfully submits that the evidence produced at trial did not establish that Taxpayers filed a refund claim for tax year 2003 or that the refund claim was timely filed and requests that the Court dismiss Plaintiff's complaint as to tax year 2003.

Respectfully submitted,

February 10, 2020

ELIZABETH A. KANYER
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20044
(202) 514-0600
(202) 514-9440 (facsimile)
elizabeth.a.kanyer@usdoj.gov

RICHARD E. ZUCKERMAN
Principal Deputy Assistant Attorney General
DAVID I. PINCUS
Chief, Court of Federal Claims Section

Of Counsel

40

16248035.6

CERTIFICATE OF SERVICE

I certify that service of the foregoing the United States' Post-Trial Memorandum has, this 10th day of February 2020, been made on Plaintiff by mailing a copy thereof, in a postage prepaid envelope, to the following address:

Ali M. Taha
247 Dove Trail
Bradenton, Florida 34212

_Katie M. Stevens_
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Station
Washington, D.C. 20044
(202) 307-6440

16248035.6